# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| LANGSTON PATTERSON, YILANAN ("ISSA") OUATTARA, CHAD MAURICE ("CJ") TAYLOR JR., QUINCY SKINNER JR., BRAYDEN SCHAGER, BERNARD ("BJ") HARRIS JR., JOHN ("JOHNNY") LUETZOW, HENRY STEWART, JAKOB RUSSELL, AND TIMO LEGOUT, on behalf of themselves and all others similar situated, | ) ) ) ) ) ) ) ) | Case No. |
| **Plaintiffs,** | ) ) | |
| **v.** | ) | |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | ) ) ) ) | |
| **Defendant.** | ) | |

Case No.

**JURY DEMAND**

## COMPLAINT – CLASS ACTION

Plaintiffs Langston Patterson, Yilanan ("Issa") Ouattara, Chad Maurice ("CJ") Taylor Jr., Quincy Skinner Jr., Brayden Schager, Bernard ("BJ") Harris Jr., John ("Johnny") Luetzow, Henry Stewart, Jakob Russell, and Timo Legout (together, "Plaintiffs"), on behalf of themselves and all persons similarly situated, by and through undersigned counsel, and complaining of Defendant National Collegiate Athletic Association ("NCAA"), allege as follows:

1

## INTRODUCTION

1. Plaintiffs bring this lawsuit on behalf of an Injunctive Relief Class and a Lost Opportunity Damages Class of Division I college athletes[1] challenging the NCAA's unreasonable restrictions that arbitrarily cut short college athletes' ability to compete.

2. For almost fifty years, the NCAA has enforced a rule providing Division I college athletes with a five-year window to exhaust their competition eligibility (the "Five-Year Rule").[2] However, within those five years, the NCAA limits college athletes to *competing* in only four seasons of intercollegiate competition (the "Four Seasons Rule")[3] and otherwise dictates that a college athlete may use the fifth year only to compete in team activities without, or with limited, participation in intercollegiate competition (the "Redshirt Rule").[4]

---

[1] The putative classes are defined below under "Class Allegations." *See infra* ¶¶ 118-125.

[2] NCAA Bylaw 12.6.1 Five-Year Rule. A student-athlete shall complete the student-athlete's seasons of competition within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution, with time spent on an official religious mission, in the armed services or with recognized foreign aid services of the U.S. government being excepted. For international students, service in the armed forces of the student's home country is considered equivalent to such service in the United States. *See* Ex. 1, *NCAA*, 2025-26 NCAA Division I Manual, Bylaw 12.6.1, at 46 (2025).

[3] NCAA Bylaw 12.6 Seasons of Competition: Five-Year Rule. A student-athlete shall not engage in more than four seasons of intercollegiate competition in any one sport (see Bylaws 12.02.3 and 14.3.3). An institution shall not permit a student-athlete to represent it in intercollegiate competition unless the student-athlete completes all seasons of competition in all sports within the time periods specified below. Ex. 1, *NCAA*, 2025-26 NCAA Division I Manual, Bylaw 12.6, at 46 (2025).

[4] The "Redshirt Rule" is not a discrete NCAA Bylaw but rather a term of art describing how a college athlete may preserve a season of competition by not competing (or minimally competition) under several interrelated provisions of the *NCAA Division I Manual*. A redshirt year may occur in multiple ways:

3. By operation of the Four Seasons Rule and the Redshirt Rule, Division I college athletes are denied the opportunity to fully use the five-year eligibility window that the NCAA itself prescribes. The Rules therefore have the unjustifiable effect of suppressing athletic careers, limiting college athletes' institutional mobility, and unlawfully restraining the market for college athletes' services. The NCAA's Rules force college athletes to the sidelines not because of injury, misconduct, or academic ineligibility, but because of an arbitrary, anticompetitive cap imposed by the governing body itself. Plaintiffs seek relief under federal law to strike down these unreasonable restraints and vindicate college athletes' rightful opportunity to compete throughout their eligibility window.

4. Plaintiffs do not challenge the concept of a defined eligibility period or the NCAA's Five-Year Rule itself. Rather, they challenge the NCAA's additional restrictions that arbitrarily limit college athletes' competitive opportunities. Specifically, the Four Seasons Rule, when combined with the so-called Redshirt Rule, functions not as a reasonable eligibility boundary but as an anticompetitive device. These overlapping Rules distort the market for Division I athletics by penalizing academically eligible high-performing college athletes who choose to compete

---

- *Institutional Redshirt (Non-Participation)*: A student-athlete withheld from competition for a season does not use a season of competition unless competition thresholds are crossed. *See* Ex. 1, *NCAA*, 2025-26 NCAA Division I Manual, Bylaw 12.6.1.7.1(a), at 48 (2025).

- *Sport-Specific Exceptions*: Certain sports, such as football, permit limited competition without triggering use of a season (e.g., competition in up to four games). Ex. 1, *NCAA*, 2025-26 NCAA Division I Manual, Bylaw 12.6.3.1.6, at 50 (2025).

- *Academic Redshirts*: First-year students admitted as "academic redshirts" must serve a year of residence before competing, preserving their seasons of competition. *See* Ex. 1, *NCAA*, 2025-26 NCAA Division I Manual, Bylaw 14.3.1.2, at 140 (2025).

3

instead of redshirting, thereby forcing them to forfeit a year of potential competition and market value without any legitimate procompetitive justification.

5. The NCAA's own conduct has already stripped away any credible justification for enforcing the Four Seasons and Redshirt Rules to artificially limit certain college athletes' ability to compete fully in the labor market for NCAA Division I athletics under the Five-Year Rule. For example, one historical justification for the Redshirt Rule was that it allowed athletes who transferred from one college to another to practice with their team while sitting out a year of competition as required by other NCAA Bylaws. But in 2023, the NCAA voluntarily removed the "one year sit out," making all athletes immediately eligible after transferring—thereby eliminating a major historical justification for the Redshirt Rule.

6. Additionally, when confronted with the extraordinary disruption of the COVID-19 pandemic, the NCAA voluntarily waived the Four Seasons Rule for college athletes who entered Division I programs between 2017 and 2020, thus allowing all college athletes to compete for five seasons in five (or six) years—a move that has, at best, a tangential connection to public health— thereby acknowledging that its rigid eligibility limits were neither indispensable nor tied to any genuine procompetitive justification. This waiver demonstrated that the enterprise could thrive without the restraints imposed by the Four Seasons and Redshirt Rules.[5] In other words, the NCAA's own actions reveal a clear and less restrictive alternative, undermining any claim that the

---

[5] The NCAA's operations were unaffected by extending college athletes' eligibility to five years under the COVID waiver, as its revenue of $1.5 billion in 2021 exceeded that of the pre-pandemic year. *See* Associated Press, *NCAA Earns $1.15 Billion in 2021 as Revenue Returns to Normal,* ESPN (Feb. 2, 2022), https://www.espn.com/college-sports/story/_/id/33201991/ncaa-earns-115-billion-2021-revenue-returns-normal (last visited Aug. 29, 2025).

overly restrictive Four Seasons and Redshirt Rules are necessary to achieve legitimate competitive objectives.

7. Instead, the NCAA denies Division I athletes who first enrolled in or after 2021 the ability to maximize their athletic competition within the Five-Year Rule for no legitimate reason. This inequity is compounded by the fact that the 2021 and later classes experienced severe disruptions to recruiting and college selection during the pandemic, further limiting their opportunities.[6] While their predecessors were granted both flexibility and extended careers, these Plaintiffs were left to navigate an artificially compressed window of all aspects of competition.

8. The consequences are particularly stark with respect to financial opportunities. College athletes who first enrolled in 2021 will receive none of the $20.5 million in annual payments that Division I universities are now permitted to pay out to college athletes, while those who first enrolled in 2022 will receive only one year of such payments. This selective denial of benefits, when juxtaposed with the windfalls provided to earlier academic year classes, underscores the arbitrary and anticompetitive nature of the Four Season and Redshirt Rules.

9. Moreover, certain harm to those who first enrolled in or after 2021 is irreversible. These college athletes will soon exhaust their five years of eligibility as it is now too late to obtain access to a fifth competitive season. These college athletes have suffered measurable economic and competitive injuries for which damages under existing antitrust law are warranted. By contrast, college athletes who first enrolled in or after 2022 remain within their five-year windows and could

---

[6] *See* Evan Bleier, *An NCAA Coach Describes the Difficulty of Recruiting Athletes During COVID-19*, InsideHook (Mar. 11, 2021), https://www.insidehook.com/sports/future-recruiting-college-athletes-wake-covid-19 (last visited Aug. 29, 2025); Michelle Brutlag Hosick*, DI Council Extends Recruiting Dead Period Through May 31*, NCAA (Feb. 17, 2021), https://www.ncaa.org/news/2021/2/17/di-council-extends-recruiting-dead-period-through-may-31 (last visited Aug. 29, 2025).

still benefit from an additional season. For them, injunctive relief is imperative: once the opportunity to compete is lost, it cannot be restored. Because collegiate careers are uniquely finite, the injury caused by the Four Seasons Rule and Redshirt Rule is not only ongoing but irreparable.

10. These anticompetitive restraints unreasonably limit the ability of NCAA Division I college athletes to compete and, in turn, restrict their opportunity to compete in the marketplace for name, image, and likeness ("NIL") compensation. By artificially curtailing athletic competition, the NCAA diminishes college athletes' economic opportunities and restrains competition in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs, therefore, seek damages as well as declaratory and injunctive relief to redress and prevent these ongoing violations. The NCAA grants athletes five years to practice and five years to graduate; they also deserve five years to play.

<u>**PROCEDURAL BACKGROUND**</u>

11. In *NCAA v. Alston*, 594 U.S. 69 (2021), the United States Supreme Court unanimously held that the lower court's enjoining of the NCAA's restraints on education related benefits was consistent with established antitrust principles. In reaching this conclusion, the Court rejected the NCAA's proposal for "a sort of judicially ordained immunity from the terms of the Sherman Act for its restraints of trade," in an attempt to resist a rule of reason analysis. *Id*. at 94-96. Under the rule of reason analysis, the Court endorsed the "demanding standard" applied by the lower court in reviewing the procompetitive rationale for the NCAA's restraints: whether it was "'patently and inexplicably stricter than necessary' to achieve the procompetitive benefits the league had demonstrated." *Id*. at 101 (internal citations omitted).

12. The *Alston* Court also recognized that "[w]hen it comes to college sports, there can be little doubt that the market realities have changed significantly since 1984." *Id*. at 93. Specifically, college athletics have transformed into a multibillion-dollar enterprise, paving the way for college

6

athletes to receive compensation for the use of their names, images, and likenesses ("NIL Compensation"). For example, between 1982 and 1984, CBS paid approximately $16 million per year for the broadcast rights to the NCAA's Division I Men's Basketball Tournament.[7] By 2016, those rights generated more than $1.1 billion annually.[8] The Supreme Court's decision in *Alston* paved the way for college athletes to begin earning NIL Compensation and affirmed that athletes are not mere participants in this system but essential contributors entitled to share in the immense economic value they help create.

13. The market realities for college athletics have further evolved since the Supreme Court's decision in *Alston*. The NCAA has since lifted its blanket prohibition on NIL Compensation effective July 1, 2021. The resulting NIL market has grown into a billion-dollar industry, valued at roughly $1.1 billion for football alone since 2024.[9]

14. The recent settlement in *House v. NCAA* underscores this ongoing evolution of the labor market for NCAA Division I college athletes, reflecting a recognition that their participation

---

[7] *NCAA Awards CBS Rights for $48 Million*, UPI (Mar. 5, 1981), https://www.upi.com/Archives/1981/03/05/NCAA-Awards-CBS-Rights-for-48-Million/8996352616400/ (last visited Aug. 29, 2025).

[8] *March Madness Money: How the NCAA Makes a Billion Dollars Every Year*, THE BLAZE (Mar. 17, 2025), https://www.theblaze.com/fearless/march-madness-ncaa-money-tournament (last visited Aug. 29, 2025).

[9] *See NIL at 3: The Annual Opendorse Report*, OPENDORSE, at 4 (2024), https://biz.opendorse.com/wp-content/uploads/2024/07/NIL-AT-3-The-Annual-Opendorse-Report-1.pdf#gf_56 (last visited Aug. 29, 2025).

carries substantial economic value.[10] Starting in July 2025, Division I schools are authorized to make direct cash payments of up to $20.5 million annually per institution to their college athletes.[11]

15. Outside the NCAA Division I athletics framework, college athletes have no meaningful avenue to monetize their NIL.

16. In light of the evolution of the market for college athletics, the NCAA Eligibility Bylaws are commercial in nature.

17. Plaintiffs challenge two such Eligibility Bylaws: the NCAA's Four Seasons Rule and the Redshirt Rule. Together, these rules artificially restrict certain Division I college athletes who have demonstrated enough academic and athletic acumen to accumulate four seasons of athletic competition within a four-year window, while selectively granting others an additional fifth season of competition in college athletics. In doing so, the NCAA, without legitimate justification and/or by means arbitrarily stricter than necessary, punishes college athletes who are higher achieving earlier in their career, and rewards college athletes who, for example, do not earn enough playing time and choose to redshirt, and are able to maximize their eligibility and commercial opportunities for a fifth season in a way that college athletes who excel cannot.

18. These restraints inflict direct harm on college athletes, distort labor markets, and diminish the quality of competition, directly undermining the NCAA's stated mission of supporting college athletes and violating the core principles of federal antitrust law.

---

[10] *In re Collegiate Athlete NIL Litigation* (commonly known as *House v. NCAA*), No. 20-cv-03919, slip op. (N.D. Cal. June 6, 2025) (last visited Aug. 29, 2025) (final approval of class-action settlement).

[11] Andrew Kean, *The Game-Changer: From 1 July Universities Can Now Pay Money Directly to Student-Athletes*, FIRSTPOINT USA (June 2025), https://www.firstpointusa.com/blog/2025/06/gamechanger-from-july-universities-can-pay-money-directly-to-studentathletes/ (last visited Aug. 21, 2025).

19. Plaintiffs, therefore, bring this action to halt the NCAA's unjustified and anticompetitive restrictions, to restore fair competition among universities, and to protect the economic opportunities of Division I college athletes. The NCAA's pandemic waiver proved that its Four Seasons eligibility limits are unnecessary to maintaining any plausible procompetitive justification. Having once admitted that these rules were not essential to preserving college sports, the NCAA cannot now fall back on them as a means to restrict college athletes' rights, suppress competition, and dictate who may or may not maximize their collegiate careers.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1337, and 15 U.S.C. § 4, as this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C.§§ 15(a) and 26.

21.     This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed classes are citizens of a state different from the Defendant, headquartered in Indianapolis, Indiana.

22.     This Court may exercise personal jurisdiction over Defendant because, *inter alia*, the NCAA: (a) currently transacts substantial business within the geographical boundaries of the Nashville Division of the Middle District of Tennessee; (b) conducts athletic competitions, ticket and merchandise sales, television agreements, and other revenue-generating activities in the District along with its member institutions; (c) has substantial contacts with the United States, including in this District; and (d) is engaged in an illegal anticompetitive scheme that is directed at and has the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. Moreover, several NCAA Division I

institutions are found within this District, *i.e.* Vanderbilt University, Belmont University, Tennessee State University, and Lipscomb University.

23.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391(b)(2) because the NCAA transacts business and is found within this District and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## THE PARTIES

### I.     Plaintiffs

24. Plaintiff Langston Patterson is a senior linebacker for Vanderbilt University football who resides in Nashville, Tennessee. Patterson, a standout from Christ Presbyterian Academy in Nashville, began his NCAA Division I career in 2022. He has since been a steady contributor to Vanderbilt's defense, continuing his progression from local high school star to Southeastern Conference ("SEC") competitor.

25. Plaintiff Issa Ouattara is a senior defensive lineman on the Vanderbilt University football team, residing in Nashville, Tennessee. A three-star international prospect from Cologne, Germany, Ouattara began his NCAA Division I career in the 2022-23 academic year. He has been a consistent defensive contributor, including logging 11 solo tackles and two sacks in the 2024 season.

26. Plaintiff CJ Taylor played NCAA Division I football at Vanderbilt University from 2021 through 2024. A highly regarded safety, Taylor was recognized for his leadership and performance, culminating in his appointment as team captain during his senior year.

27. Plaintiff Quincy Skinner Jr. played NCAA Division I football as a wide receiver at Vanderbilt University from 2021 through 2024. A productive four-year contributor, Skinner's

collegiate success led to his signing with the Atlanta Falcons as a rookie for the 2025-26 NFL season.

28. Plaintiff Brayden Schager played NCAA Division I football as a quarterback at the University of Hawaii from 2021 through 2024. He appeared in six games during his freshman season, preventing a redshirt year, and through his impressive performance earned the starting quarterback role, which he held for three consecutive seasons from 2022 to 2024.

29. Plaintiff BJ Harris Jr. played NCAA Division I football for four seasons, attending the University of Missouri for two years before transferring to Central Michigan University, competing from 2021 through 2024. Known for his strong on-field contributions and value to his team, Harris built a reputation as a reliable performer. He applied for a medical hardship waiver for his third season following an injury, but the NCAA denied his request and his appeal of the decision.

30. Plaintiff Johnny Luetzow is a catcher on the Santa Clara University baseball team who began his NCAA Division I career in 2022. An accomplished and recognized player, Luetzow has been a consistent contributor over three seasons, finishing third on the team in batting average (.281), fourth in on-base percentage (.387), and fifth in hits (41).

31. Plaintiff Henry Stewart is a pitcher on the Santa Clara University baseball team who began his NCAA Division I career in 2022. Known for his potential and skill on the mound, Stewart showed promise despite limited opportunities. Due to the presence of numerous "Covid seniors" (players granted an additional year of eligibility), he pitched only three innings in both his freshman and sophomore years, significantly limiting his two years of his college athletic experience.

32. Plaintiff Jakob Russell is a college baseball player from San Bernardino County, California. Known for his skill and contributions on the field, Russell began his NCAA Division I career at Long Beach State University, competing in the 2025 season. Prior to that, he attended the University of Redlands for three years where he competed in NCAA Division III baseball for three seasons.

33. Plaintiff Timo Legout is a student at the University of Texas and a member of its men's tennis program. Although he did not enroll until 2024, the NCAA imposed a three-season penalty based on the time between his high school graduation in Europe and his NCAA enrollment. As a result, Legout's only season of NCAA Division I competition was 2024-25. Despite the NCAA's penalty, he remains within his five-year eligibility window and would be eligible for an additional season of competition in the 2026-27 season.

## II.     Defendant

34. The National Collegiate Athletic Association is a self-described unincorporated, not-for-profit, educational organization founded in 1906, and maintains its principal place of business in Indianapolis, Indiana.

35. The NCAA is the governing body of college sports. The NCAA includes more than 1,100 member colleges and universities throughout the United States, including institutions in the Middle District of Tennessee.

36. Through the NCAA's Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports, including specifically, NCAA Bylaw 12.6 (the Four Seasons Rule) and the Redshirt Rule. The NCAA Constitution and Bylaws were adopted pursuant to a vote of the member institutions and various NCAA councils, and these rules can only be amended by a vote of the member institutions or NCAA councils.

37. As a practical matter, an academic institution that wishes to compete in any meaningful way in the highest and most popular level of collegiate athletics must maintain membership in the NCAA and abide by the Division I rules and regulations promulgated by the NCAA and its members. Failure to abide by these rules and regulations risks subjecting sports programs at the academic institution to punitive measures from the NCAA that include reduced athletic-scholarships, suspensions, prohibition on post-season eligibility, vacating previously earned wins, monetary fines, and the so-called "death penalty."[12]

38. The NCAA and its member institutions control the highest and most popular level of collegiate education and athletics. Therefore, any individual who wishes to provide athletic services in exchange for the payment of partial or full tuition for top tier education and wishes to derive the substantial benefits from competing at the highest level of collegiate athletics must attend an NCAA Division I member institution.

39. There are zero practical alternatives that can provide the unique combination of attributes offered by Division I NCAA athletic schools: (i) the ability to exchange athletic services for the payment of the partial or full cost of an education plus room and board, (ii) high quality academic educational services, (iii) top-of-the-line training facilities, (iv) high quality coaches that are best suited to launch players to professional careers, (v) national publicity through national championships and nationwide broadcasting contracts, (vi) opportunities to profit from NIL agreements, and (vii) competition at the highest level of collegiate athletics.

---

[12] The "death penalty" is the NCAA's most severe punishment and refers to the complete shutdown of a specific athletic program at a member institution for at least one year. This sanction is reserved for egregious and repeated rule violations, particularly where the institution has shown a pattern of noncompliance or a lack of institutional control.

### III. Co-Conspirators

40. Various other persons, firms, corporations, organizations, and business entities, both known and unknown, have participated as co-conspirators in the unlawful conduct alleged herein. These include NCAA member institutions and NCAA Division I athletic conferences. Representatives of member schools and conferences serve on NCAA committees that propose and adopt rule changes. By voting for and enforcing NCAA rules that unlawfully restrain trade, those institutions and conferences have knowingly agreed to impose and benefit from the anticompetitive restraints described herein.

## FACTUAL BACKGROUND

### I. An Overview of the NCAA

41. The NCAA is a member-led organization founded to "regulate the rules of college sport and protect young college athletes."[13] Article 1 of the NCAA Constitution states that the NCAA's basic purpose is to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body, and, by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports.

42. The NCAA claims it is "dedicated to the well-being and lifelong success of college athletes," and "united around one goal: creating opportunities for college athletes."[14] In practice, however, the NCAA has evolved into the central gatekeeper of a multibillion-dollar industry, where rules often serve to maximize institutional revenue rather than college athlete welfare.

---

[13] *History*, NCAA, https://www.ncaa.org/sports/2021/5/4/history (last visited Aug. 29, 2025).

[14] NCAA, Return of Organization Exempt from Income Tax (IRS Form 990) for Fiscal Year Ending Aug. 2018 (filed 2019).

### i.      History and Purpose

43. In 1905, President Theodore Roosevelt called together athletic leaders from some of the top football universities of the time, prompting them to curb the violence in the sport. Thirteen universities assembled to tackle the issue of football safety, and they were ultimately able to reach agreement on a set of new rules. Shortly after this meeting, 62 colleges and universities became charter members of the Intercollegiate Athletic Association of the United States—the precursor to the NCAA.[15]

44. The IAAUS became the official rules-making body as of March 31, 1906. By 1910, the IAAUS was renamed the National Collegiate Athletic Association ("NCAA"). The NCAA quickly expanded its reach, hosting its first national championship in track and field in 1921. Many others followed throughout the 1920s and 1930s with the first NCAA basketball tournament being hosted in 1939.

45. The NCAA rapidly grew into the giant organization recognized today due, in part, to its growing popularity and federal legislation prohibiting sex discrimination in sports. As bigger schools began to see returns from their participation in the sports cartel, they continued to invest in their sports programs; however, smaller schools were unable to keep pace. The result was a widening gap between haves and have-nots—a gap that persists to this day.

46. In 1973, the Association's membership was divided into Divisions I, II, and III, with each division having legislative powers and separate championships. Five years later, Division I members voted to create subdivision I-A and I-AA (renamed the Football Bowl Subdivision ("FBS") and the Football Championship Subdivision ("FCS") in 2007) in football.

---

[15] *History*, NCAA, https://www.ncaa.org/sports/2021/5/4/history (last visited Aug. 29, 2025).

47. Around the turn of the century, a "landmark restructuring of the NCAA governance,"[16] took place that "provided greater autonomy for the three divisions and placed institutional presidents in charge of each division and of the Association in general."[17]

48. Today, the NCAA generates billions in revenue, largely because of the business opportunities inherent in Division I football and basketball. FBS college football and Division I men's basketball are, combined, among the most lucrative sports products in the nation. During the 2022-2023 season alone, the NCAA reported roughly $1.3 billion in revenue, a number driven overwhelmingly by college athletes who are prohibited by application of the NCAA's rules and regulations from sharing equitably in that economic success.[18]

49. Meanwhile, college athletes devote extraordinary time and effort to their sports, often at the expense of academic opportunities, internships, and paid work, while the NCAA and member institutions reap billions of dollars in revenue from their efforts.

### ii. NCAA Governance Structure

50. The NCAA "is a voluntary, self-governing organization of four-year colleges, universities and conferences committed to the well-being and development of college athletes, to sound academic standards and the academic success of college athletes, and to diversity, equity and inclusion."[19]

---

[16] *Id.*

[17] *Id.*

[18] *NCAA Generates Nearly $1.3 Billion in Revenue for 2022-23*, ASSOCIATED PRESS, https://www.espn.com/college-sports/story/_/id/39439274/ncaa-generates-nearly-13-billion-revenue-2022-23 (last visited Aug. 29, 2025).

[19] NCAA Constitution at 1 (Dec. 14, 2021), https://ncaaorg.s3.amazonaws.com/governance/ncaa/constitution/NCAAGov_Constitution121421.pdf (last visited Aug. 29, 2025).

51. The NCAA asserts that member schools are ultimately responsible for determining which rules to adopt for their respective divisions, covering areas such as recruiting, compliance, academics, and championships. Nevertheless, employees at the NCAA national office play a significant role in "support[ing] the member committees that make rules and policies for college sports."[20]

52. Today, the NCAA and its members collaboratively establish rules governing numerous athletic competitions among member schools. Over 500,000 college athletes compete across NCAA's three divisions, representing approximately 1,100 member institutions. Roughly 350 schools compete at the Division I level, which is further divided into 32 conferences. While these conferences may adopt and enforce their own rules, such regulations must remain consistent with NCAA rules.

53. The NCAA Board of Governors, comprised of institution presidents, chancellors, ex-college athletes, and other chief executives, is the highest governing body and is responsible for enacting the rules governing participation in the NCAA.

54. The NCAA and its members abide by the NCAA manual, which is amended and promulgated annually and contains the NCAA's Constitution and Bylaws, which include nearly 500 pages of regulation governing all aspects of college sports. The NCAA's Constitution and Bylaws were adopted by a vote of the NCAA membership. These Bylaws are not merely technical guidance, but rather mechanisms by which the NCAA exerts control over college athletes' careers, compensation, and opportunities and the labor and consumer markets for college athletics.

---

[20] *Overview*, NCAA, https://www.ncaa.org/sports/2021/2/16/overview (last visited Aug. 29, 2025).

### iii.  The NCAA's History of Antitrust Violations

55. The NCAA has a history of violating federal antitrust law with numerous parties successfully challenging its restrictive rules. Time and again, the NCAA has argued that loosening its anticompetitive restraints would destroy amateurism and reduce consumer demand for college sports. Courts have rejected these arguments, and, in every instance that a court has rejected these arguments, demand for college athletics has only continued to grow.

56. In 1984, the U.S. Supreme Court in *NCAA v. Board of Regents* affirmed the lower court's finding that the NCAA violated the Sherman Act by limiting the number of televised football games and threatening penalties for schools that pursued competing broadcast agreements.[21]

57. Antitrust challenges have arisen in other contexts: in *White v. NCAA*,[22] a Central District of California court certified a class of individuals who received athletic-based grant-in-aid scholarships for claims that the NCAA and its member institutions entered into a horizontal agreement to adhere to a cap in their financial aid awards. And in *Law v. NCAA*,[23] the Tenth Circuit affirmed summary judgment and a permanent injunction striking down an NCAA rule limiting entry-level coaches' salaries. Each decision dismantled an artificial restraint and, contrary to NCAA predictions, demand for college sports increased.

---

[21] 468 U.S. 85, 119 (1984) (rejecting NCAA argument that restricting sale of broadcast rights was necessary "to preserve amateurism").

[22] No. CV 06-999-RGK, 2006 WL 8066803 (C.D. Cal. Oct. 19, 2006).

[23] 134 F.3d 1010, 1021 (10th Cir. 1998) (rejecting the NCAA's proposed procompetitive justifications for restricting assistant coach salaries).

18

58. The NCAA's restrictions on college athlete compensation have also been repeatedly struck down. In *O'Bannon v. NCAA*,[24] the court held that NCAA rules preventing college athletes from sharing in revenue generated from their name, image, and likeness violated Section 1 of the Sherman Act. Subsequent rulings, including the Ninth Circuit's decision in the *In re National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litigation*, and affirmed by the Supreme Court in *Alston*, confirmed that certain of the NCAA's compensation rules imposed substantial anticompetitive effects without legitimate procompetitive justification.[25]

59. The NCAA's historic entanglement with violating federal antitrust law further demonstrates that the NCAA operates as a cartel, artificially depressing the value of college athletes' services and violating antitrust law. Restrictions on compensation, eligibility, and benefits do not reflect market realities, but are instead deliberate attempts to control competition, suppress pay, and maximize profits for institutions at the expense of the college athletes themselves.

### iv. Bylaws and Enforcement

#### i. The Five Year Rule, the Four Seasons Rule, and the Eligibility Clock (Bylaw 12.6)

60. Under NCAA Bylaw 12.6, an NCAA Division I college athlete has five years of eligibility to play four seasons of intercollegiate competition in his or her chosen sport. The college athlete's window—known as an Eligibility Clock—starts to run from the date on which a college athlete registers as a full-time student at any collegiate institution.

---

[24] 802 F.3d 1049 (9th Cir. 2015).

[25] 958 F.3d 1239 (9th Cir. 2020), *aff'd sub nom.*, *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021).

61. Plaintiffs do not challenge the concept of a defined eligibility period or the Five-Year Rule itself. They accept that there are "outer bounds" to a college athletic career. What Plaintiffs challenge are the NCAA's additional, unnecessary restrictions that arbitrarily strip college athletes of seasons they should be able to compete within that window. The Four Seasons Rule, especially when coupled with the Redshirt Rule, functions not as a reasonable boundary, but as an anticompetitive device: it arbitrarily denies some college athletes full use of the period while selectively extending opportunities to others.

62. The NCAA claims its eligibility restrictions exist to "move student-athletes toward graduation in a timely manner."[26] Even if Eligibility Bylaws like the Four Seasons and Redshirt Rules loosely track academic pacing, they have no legitimate role in protecting competitive integrity—especially in the wake of the NCAA's rule change allowing players to transfer an unlimited number of times between schools without sitting out a season. Thus, while Plaintiffs do not challenge the NCAA's authority to define an overall eligibility window, the NCAA goes further—artificially capping the number of seasons of competition within that window and applying the Redshirt Rule inconsistently across sports and without any procompetitive rationale. These restrictions suppress competition and limit college athletes' economic opportunities.

### ii. The Redshirt Rule

63. The Redshirt Rule allows college athletes to extend their period of eligibility by sitting out competition for a season while remaining fully enrolled and practicing with their team. Under the NCAA's Eligibility Bylaws, a college athlete may compete in a limited number of activities

---

[26] *Guide for Four-Year Transfers 2024-25,* at 13, NCAA, http://fs.ncaa.org.s3.amazo-naws.com/Docs/eligibility_center/Transfer/FourYearGuide.pdf (last visited Aug. 29, 2025).

without it counting as a full season of eligibility, effectively "redshirting" that year. The rule is supposed to provide flexibility for athletes recovering from injury, adjusting academically, or developing athletically, while preserving the total number of seasons they may compete. In practice, it forces redshirt athletes to fulfill nearly all the benefits of obligations of their teammates: they train with the team, take classes, and participate in meetings, travel, and film study. Many even earn NIL compensation during a redshirt year, as their status as team members retains some marketable value.

64. Athletes who do not take a redshirt year at the start of their NCAA careers are typically those who are academically eligible, capable of and ready to compete immediately in their college athletics career and demonstrate that neither they nor their coaches believed a preparatory "primer" year was necessary. Their ability to participate fully without delaying eligibility highlights that the redshirt option primarily serves as a developmental tool. In practice, this distinction underscores the Redshirt Rule's uneven impact: it advantages some college athletes while unnecessarily restricting those ready to compete, limiting their playing opportunities and economic potential on the backend of their collegiate careers.

65. Historically, the Redshirt Rule granted Division I college athletes the ability to preserve a year of eligibility while adapting to the higher level of competition, provided—depending on the sport—they abstained from recognized competition during that season. At the same time, these athletes were permitted to practice with the team, participate in meetings and film sessions, and receive scholarships and other financial benefits tied to their athletic participation. In other words, the Redshirt Rule allowed (and universities often required) college athletes to engage fully in the day-to-day demands of Division I sports without consuming a season of eligibility.

66. By contrast, Plaintiffs and similarly situated college athletes that did not redshirt each lost a full season of athletic participation available to their redshirt counterparts. They are arbitrarily denied the opportunity to access the benefits of a fifth NCAA season—benefits their redshirt peers automatically receive. This limitation is particularly significant because a college athlete's final season—whether redshirted or not—often coincides with peak athletic development, maximum professional exposure, and highest earning potential.

67. The resulting disparity is stark: two college athletes may spend four years on campus and fully participate in their programs, yet one can preserve eligibility through redshirting and be automatically entitled to a fifth season while the other, by means of stepping on a court or field for a single moment,[27] is arbitrarily denied that opportunity and limited to four seasons, unable to fully capitalize on their competitive window. This arbitrary distinction withholds the most valuable portion of a college athlete's career from some while granting it to others, creating an unequal playing field with significant economic and professional consequences.

68. The Redshirt Rule has been modified for football players, who may compete in up to four regular season games and, as of 2024, postseason contests without losing a year of eligibility.[28] No comparable flexibility exists for college athletes in other sports, such as basketball, where even a single moment of competitive play consumes an entire season of eligibility. This selective application underscores the Rule's arbitrary nature and lack of any procompetitive justification.

69. The economic consequences of these restrictions are significant. An additional season of competition now carries substantial financial benefits, including NIL earnings and payments through the recently established revenue-sharing model under the *House v. NCAA* settlement.

---

[27] Or, for football, playing a snap in more than four regular season games.

[28] *See* Ex. 1, *NCAA*, 2025-26 NCAA Division I Manual, Bylaw 12.6.3.1.6, at 50 (2025).

Successful college athletes who are forced to expend eligibility without access to a fifth season are denied their most valuable years for compensation, exposure, and professional development.

70. With the advent of NIL earnings and revenue sharing, the Redshirt Rule functions as an unreasonable restraint of trade. It forecloses opportunities for some college athletes while selectively extending them to others.

71. So long as college athletes remain within the NCAA's five-year eligibility window, they should not be arbitrarily barred from competing in seasons for which they are physically, academically, and competitively prepared. By inserting such a barrier, the NCAA restricts fair competition, depresses college athlete compensation, and entrenches its cartel power in violation of the Sherman Act. Athletes have five years to practice and five years to graduate. They should have five years to play.

## II.     The Application of the Eligibility Restraints to Named Plaintiffs

72. The NCAA's application of the Four Seasons and Redshirt Rules to all named Plaintiffs, and those similarly situated, unreasonably restrains trade in the labor market for NCAA Division I college athletes in violation of Section 1 of the Sherman Act.

### i.     Application of Eligibility Restraints to Plaintiff Langston Patterson

73. Plaintiff Langston Patterson grew up in Nashville, Tennessee, and played high school football at Christ Presbyterian Academy, appearing in four consecutive state championship games. In his senior year, he was ranked the No. 12 inside linebacker nationally by ESPN and signed with Vanderbilt University in 2022.

74. The 2025 season marks Langston's fourth year with the Commodores and only his second as a starting linebacker. Known for his leadership both on and off the field, 2025 is also his

second year serving as team captain. Langston has consistently excelled academically, earning a spot on the SEC Academic Honor Roll each of his first three seasons.

75. Langston is expected to graduate in Spring 2026 and hopes to pursue a Master's degree absent the challenged eligibility restrictions. Given his impressive tenure, he would be a valuable asset to his current team as a fifth-year player or a highly sought-after addition to the football program at another NCAA institution.

76. Because of the NCAA's Four Seasons and Redshirt Rules, Langston's ability to compete and fully capitalize on NIL opportunities has been and continues to be restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### ii. Application of Eligibility Restraints to Plaintiff Yilanan ("Issa") Ouattara

77. Plaintiff Issa Ouattara grew up in Cologne, Germany and did not begin playing football until 2019. Standing six-foot-seven and weighing 311 pounds, Issa possesses the physical traits of a future NFL defensive lineman. Because he started football relatively late, he required time to adjust to the speed and complexity of NCAA Division I competition. Even so, he played in ten games as a freshman—thereby preventing him from obtaining an additional redshirt year—developing his skills and contributing to his team despite limited prior experience.

78. Issa has also excelled academically, earning SEC Academic Honor Roll recognition in 2022, 2023, and 2024. He is expected to graduate in Spring 2026 and hopes to pursue a Master's degree if granted an additional year of eligibility. With only a few years of football experience at any level, the additional athletic development afforded by another year of NCAA Division I competition could significantly advance Issa's NFL prospects.

79. The NCAA's Four Seasons and Redshirt Rules collectively restrain Issa's ability to compete and earn NIL income, in violation of Section 1 of the Sherman Act. These eligibility restrictions have directly limited his athletic opportunities and continue to cause ongoing competitive and economic harm.

### iii. Application of Eligibility Restraints to Plaintiff Chad Maurice ("CJ") Taylor Jr.

80. Plaintiff CJ Taylor Jr. hails from McMinnville, Tennessee and played NCAA Division I football at Vanderbilt University from 2021 through 2024. Throughout his collegiate career, he demonstrated exceptional athleticism and football IQ, culminating in his appointment as team captain during his senior year. CJ's dedication to the program was evident as he remained loyal to Vanderbilt, choosing to build something special at one unique program rather than transferring to another institution.

81. CJ's success in NCAA Division I football was not immediate. His freshman season was limited by injuries, including hand surgery, and the depth of Vanderbilt's roster. Nonetheless, he displayed natural instincts for the game. Instead of redshirting his first season, he found a way to contribute, excelling on special teams and developing under the guidance of coaches. His breakout came in his sophomore year including a pivotal play against Missouri in 2022 that highlighted his athleticism. Over the course of his 2021 through 2024 collegiate career, CJ established himself as a highly regarded safety and a leader on the team culminating in his appointment as team captain during his senior season.

82. During those four years, CJ played in 42 games, starting 29, and accumulated 181 total tackles, 17 tackles for loss, five interceptions, and four forced fumbles. In his senior season (2024-25), he played in all 13 games, starting 12, and finished fourth on the team with 64 tackles. His

performance earned him recognition as the Thorpe Award Player of the Week following a standout game against Auburn.

83. Academically, CJ pursued a degree in Medicine, Health, and Society maintaining strong academic performance while balancing the demands of Division I football. He has consistently demonstrated leadership, resilience, and dedication both on and off the field embodying the values of Vanderbilt University and serving as a role model to his teammates.

84. Because of the NCAA's Four Seasons and Redshirt Rules, CJ Taylor's ability to compete and fully capitalize on NIL opportunities has been restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### iv. Application of Eligibility Restraints to Plaintiff Quincy Skinner Jr.

85. Plaintiff Quincy Skinner Jr. played NCAA Division I football at Vanderbilt University from 2021 through 2024. Throughout his collegiate career, he demonstrated exceptional skill, athleticism, and consistency as a wide receiver culminating in a standout senior season and a reputation as a reliable team leader. Quincy's dedication to Vanderbilt reflected his commitment to developing within a single program rather than transferring elsewhere.

86. Quincy's collegiate career progressed steadily. As a freshman in 2021, he appeared in eight games, gaining valuable experience. His sophomore season (2022) saw him appear in nine games, recording 17 receptions for 238 yards and two touchdowns, including a pair of touchdown catches against South Carolina and four catches in consecutive games against Missouri and South Carolina. In 2023, Quincy continued to improve, finishing the season with 20 receptions for 204 yards and three touchdowns highlighted by touchdown receptions at Tennessee, South Carolina, and UNLV. He was named to the SEC Fall Academic Honor Roll.

26

87. Quincy capped his Vanderbilt career as a senior in 2024, playing in all 13 games and starting 12. He totaled 66 receptions for 809 yards and eight touchdowns, including a seven-yard touchdown in the Birmingham Bowl win over Georgia Tech, three catches for 72 yards and a score at LSU, and four catches for 72 yards with the season's first touchdown in the win over Virginia Tech. He finished the season with four consecutive games with multiple catches and established himself as a key offensive contributor. Following his collegiate career, Quincy signed to play in the NFL for the upcoming 2025-26 season.

88. Academically, Quincy pursued a degree in Communication Studies while balancing the rigorous demands of Division I football. He consistently demonstrated dedication, discipline, and leadership both on and off the field serving as a role model to teammates and embodying Vanderbilt's core values.

89. Because of the NCAA's Four Seasons and Redshirt Rules, Quincy Skinner Jr.'s ability to compete and fully capitalize on NIL opportunities has been restricted. These rules have directly limited his athletic participation, ability to compete, and leadership potential, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### v. Application of Eligibility Restraints to Plaintiff Brayden Schager

90. Plaintiff Brayden Schager competed in NCAA Division I football as a quarterback at the University of Hawaii from 2021 through 2024. He appeared in six games during his freshman season which precluded him from obtaining a redshirt year, and subsequently earned the starting quarterback role which he held for three consecutive seasons. Over the course of his career, Brayden demonstrated exceptional skill, leadership, and consistency, throwing for over 9,000 yards and 60 touchdowns and establishing himself as one of Hawaii's top quarterbacks.

91. A three-time Academic All-Mountain West honoree, Brayden graduated in the Spring of 2025 and was honored with the Jack Bonham Award (the University of Hawaii's highest honor),

rewarding "leadership on the court, in the pool and on the field, along with excellence in the classroom and service in the community." Brayden would have been highly sought after as a graduate transfer if he had an additional year of eligibility.

92. Despite his performance and potential, the NCAA's Four Seasons and Redshirt Rules restricted Brayden's ability to extend his collegiate career. Having lost a year of eligibility due to his ability to compete at the outset, he was denied the opportunity to compete for an additional season which would have allowed him to further refine his skills, gain additional game experience, and increase his visibility to professional scouts at his peak. These limitations curtailed both his athletic development and his opportunities to earn compensation through NIL arrangements.

93. Because of the NCAA's Four Seasons and Redshirt Rules, Brayden's ability to compete and fully capitalize on NIL opportunities has been restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### vi.  Application of Eligibility Restraints to Plaintiff Bernard ("BJ") Harris Jr.

94. Plaintiff BJ Harris Jr. played NCAA Division I football for four seasons, beginning his collegiate career at the University of Missouri before transferring to Central Michigan University. Over his four-year career, Harris appeared in 43 games and established himself as a consistent and productive contributor at running back. Across his career, he rushed for 562 yards and four touchdowns on 43 carries (averaging 4.0 yards per carry) and caught 13 passes for 102 yards. At Central Michigan, he rushed 110 times for 457 yards and three touchdowns, with a long of 71 yards, while catching 12 passes for 102 yards.

95. During his senior season in 2024, Harris played in all 12 games, earning one start, and was recognized with College Football Network All-MAC honorable mention honors. He was

named MAC Offensive Player of the Week following a 151-yard rushing performance against Ball State. That season, he ranked second on the team in rushing yards (418), carries (91), rushing yards per game (34.8), and rushing touchdowns (three), while adding 11 receptions for 93 yards. Harris had several standout performances, including a 156 all-purpose yard game against Ball State, which included a career-long 71-yard run.

96. Academically and personally, Harris excelled while balancing the demands of Division I athletics, majoring in Information Systems and demonstrating leadership on and off the field. An additional year of eligibility at the NCAA Division I level would have allowed Harris to continue his academic pursuits, develop his athletic skills, expand professional prospects, and increase his NIL opportunities to at least a five-figure package.

97. Because of the NCAA's Four Seasons and Redshirt Rules, BJ's ability to compete and fully capitalize on NIL opportunities has been restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### vii. Application of Eligibility Restraints to Plaintiff John ("Johnny") Luetzow

98. Plaintiff Johnny Luetzow is a catcher on the Santa Clara University baseball team who began his NCAA Division I career in 2023. Over three seasons, he has emerged as a consistent performer both athletically and academically earning recognition as one of the program's most dependable players.

99. Johnny has appeared in 87 games with 72 starts, including 60 behind the plate, and has maintained a career batting average of .279 with a .381 on-base percentage. He has recorded 69 hits, nine doubles, two home runs, 34 RBIs, and 33 runs scored while posting a career fielding percentage of .986 and throwing out 18 base runners. In 2025, he was named to the Buster Posey

Award Midseason Watch List recognizing the nation's top collegiate catchers and finished third on the team in batting average and fourth in on-base percentage.

100. Academically, Johnny has consistently excelled, earning "Gold" honors on the West Coast Conference Commissioner's Honor Roll in each of his three seasons. He was named to the WCC All-Academic first team in 2025 after receiving honorable mention honors in 2024 and was also recognized as Academic All-District by the College Sports Communicators.

101. An additional year of eligibility would allow Johnny to continue developing his skills, enhance his professional baseball prospects, and expand his NIL opportunities while providing veteran leadership to his team.

102. Because of the NCAA's Four Seasons and Redshirt Rules, Johnny Luetzow's ability to compete and fully capitalize on NIL opportunities has been restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### viii.    Application of Eligibility Restraints to Plaintiff Henry Stewart

103. Plaintiff Henry Stewart is a pitcher for the Santa Clara University baseball team who began his NCAA Division I career in the 2022-23 season. Over his three seasons to date, he has established himself as a reliable and highly efficient bullpen arm, complementing his strong academic performance with on-field effectiveness.

104. In his first two seasons, Henry's opportunities were sharply curtailed by the presence of Covid seniors and extended rosters resulting from the NCAA's pandemic waiver. With limited innings available, he appeared in only a handful of games and was unable to fully develop through regular competition. Despite those restrictions, he persisted and in 2025 emerged as a key contributor, making 17 appearances—tied for third-most on the team—including 15 relief outings

30

and two starts. He posted a 3-0 record with a 2.28 ERA, held opponents to a .214 average, and struck out 23 batters in 27⅔ innings. He began the year with a 15⅔-inning scoreless streak, did not yield a run in 11 appearances, and struck out multiple batters in seven games.

105. Academically, Henry has excelled consistently, earning WCC Commissioner's Honor Roll "Silver" honors in each of his three seasons. In 2025, he was named Academic All-District by the College Sports Communicators and earned WCC All-Academic Honorable Mention.

106. Continued eligibility would afford Henry the vital opportunity to further refine his pitching craft, strengthen his leadership presence in the dugout, and increase his visibility for potential professional pursuits and Name, Image, and Likeness (NIL) ventures.

107. Because of the NCAA's Four Seasons and Redshirt Rules, Henry's ability to compete and fully capitalize on NIL opportunities is restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### ix. Application of Eligibility Restraints to Plaintiff Jakob Russell

108. Plaintiff Jakob Russell is a left-handed pitcher for the Long Beach State University baseball team who began his NCAA Division I career in 2025 after transferring from the University of Redlands. Over his four collegiate seasons, including three at the NCAA Division III level, he has demonstrated both athletic versatility and academic dedication.

109. During his three seasons at Redlands (2022-2024), Jakob appeared in 49 games, including two starts, compiling a 9-3 record with six saves. He struck out 143 batters over 114.2 innings—showcasing impressive strikeout rates—while walking 44. He complemented his on-field contributions by making the Dean's List on two occasions. In the summer of 2024, he competed in elite summer leagues where he combined for three saves, a 2.45 ERA in the CCL, and strong strikeout numbers that further elevated his profile.

110. In the 2025 season at Long Beach State, Jakob pitched 12.1 innings across 16 relief appearances, striking out 17 and walking only four, ending with a 6.57 ERA. Notably, he earned the win in a key victory against LMU, delivering 1.1 innings and striking out two in his sole appearance as the pitcher of record. These contributions underscore his ability to step into high-pressure situations and perform effectively at the Division I level.

111. Academically, Jakob maintains solid standing as a Consumer Affairs major. His consistent academic performance, combined with his athletic persistence, reflects a well-rounded college athlete poised for further opportunities.

112. Additional eligibility would offer Jakob meaningful benefits: the chance to continue refining his pitching arsenal at the NCAA Division I level, enhance his prospects for both professional baseball and significant NIL opportunities, and possibly secure graduate funding such as tuition, room, and board scholarships to pursue postgraduate studies. This extra year would also have allowed him to build deeper rapport with teammates and coaching staff, strengthening his leadership contributions.

113. Because of the NCAA's Four Seasons and Redshirt Rules, Jakob's ability to compete and fully capitalize on NIL opportunities is restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### x. Application of Eligibility Restraints to Plaintiff Timo Legout

114. Plaintiff Timo Legout is a student at the University of Texas and a member of its men's tennis program. Although he did not enroll until 2024, the NCAA imposed a three-season penalty on him based on the time between his high school graduation in Europe and his enrollment at Texas. As a result, Timo's only season of NCAA Division I competition was the 2024-25 season.

115. Despite this limitation, Timo made an immediate impact on the Texas program. He contributed consistently in both singles and doubles play, demonstrating strong competitive instincts, technical skill, and leadership on the court. Coaches and teammates alike recognized his value as a versatile and reliable competitor, and he played a key role in the team's success throughout the season.

116. Timo remains within his Five-Year Eligibility Window and would be eligible for an additional season of competition. Restoring this opportunity would allow him to continue developing as a college athlete, further his athletic goals, and fully realize the benefits of his commitment to the Texas men's tennis program.

117. Because of the NCAA's Four Seasons and Redshirt Rules, Timo Legout's ability to compete and fully capitalize on NIL opportunities is restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

## CLASS ALLEGATIONS

118. Plaintiffs Langston Patterson, Issa Ouattara, Johnny Luetzow, Henry Stewart, and Timo Legout bring this action under Federal Rule of Civil Procedure 23(b)(2), on their own behalf and on behalf of the following Class:

The "Injunctive Relief Class"—

All NCAA Division I college athletes who first enrolled in college in the fall of 2022 or beyond who (i) have not taken a redshirt year, and (ii) will have at least one of their five years of eligibility available for the 2026-27 academic year.

This Class excludes NCAA officers, directors, and employees. This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

33

119. Plaintiffs CJ Taylor Jr., Quincy Skinner Jr., Brayden Schager, BJ Harris Jr., and Jakob Russell bring this action under Federal Rule of Civil Procedure 23(b)(3), on their own behalf and on behalf of the following Class:

The "Lost Opportunities Damages Class"—

All NCAA Division I college athletes who first enrolled in college no earlier than the fall of 2020 and no later than the spring of 2022, who (i) did not take a redshirt year, and (ii) whose four-seasons of eligibility was extinguished by application of NCAA Bylaw 12.6 at the conclusion of the 2023-2024 season (for Spring sports) or 2024-2025 season (for all sports).

This Class excludes NCAA officers, directors, and employees. This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

120. Henceforth, the Injunctive Relief Class and the Lost Opportunities Damages Class will be referred to collectively as the "Classes."

121. **<u>Numerosity.</u>** The Classes are so numerous that joinder of all members is impracticable. While the exact number of members in each of the classes is unknown to Plaintiffs at this time and can only be discerned through discovery, Plaintiffs are informed and believe that there are thousands of members in each of the Classes.

122. **<u>Commonality.</u>** Numerous common questions of law and fact exist as to all members of the Classes. Furthermore, these common questions predominate over any questions affecting solely individual members of the Classes. The questions of law and fact common to the Classes include but are not limited to:

   a. Whether the Defendants engaged in a contract, combination, or conspiracy to unreasonably restrain trade by limiting the compensation available to members of the Classes for lost athletic scholarships, lost revenue sharing, loss of use of their names, images, and/or likenesses;

   b. Whether such conduct caused members of the Classes to receive less compensation than they would have received for lost athletic scholarships, lost revenue sharing, loss of use of their names, images, and/or likenesses in a truly competitive market;

c. The duration of the contract, combination, or conspiracy alleged herein;

d. Whether Defendants violated Section 1 of the Sherman Act;

e. Whether the conduct of the NCAA and its co-conspirators caused injury to Plaintiffs and Class members;

f. Whether the Injunctive Relief Class is entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief;

g. Whether the Members of the Lost Opportunities Damages Class are entitled to monetary relief, and if so, the manner in which damages (including treble damages authorized by the Sherman Act) should be determined.

123. **Typicality.** Plaintiffs' claims are typical of the claims of other members of the Classes. Plaintiffs and other members of the Classes sustained damages arising out of the NCAA's common course of anticompetitive conduct in violation of law as described herein. Additionally, Plaintiffs' claims are typical of the Class because the challenged eligibility restraints directly and proximately caused injuries to both named Plaintiffs and the members of the Classes.

124. **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class action litigation, including antitrust class action litigation. Additionally, Plaintiffs are adequate representatives of the Classes and will protect the claims and interests of the Classes. Plaintiffs do not have interests that conflict with those of the Classes and Plaintiffs will vigorously prosecute the claims set forth herein.

125. **Superiority.** A class action is superior to other methods for the fair and efficient resolution of this controversy. The class action device presents fewer management difficulties, and provides the benefit of a single adjudication, economy of scale, and comprehensive supervision by a single court. The damages suffered by named Plaintiffs and each member of the Classes are relatively small as compared to the expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent class certification, it would not be feasible for named

Plaintiffs and members of the Classes to redress the wrongs done to them. It would be grossly inefficient for the judicial system to preside over large numbers of individual cases. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the judicial system. Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

## **RELEVANT MARKETS**

126. The Four Seasons and Redshirt Rules operate in a single, nationwide labor market for the services of NCAA Division I college athletes. In that market, every NCAA Division I institution competes—through athletic scholarships, room-and-board benefits, and, beginning in July 2025, up to $20.5 million in direct payments authorized by the *House* settlement—to secure the athletic services of prospective and current college athletes. The named Plaintiffs, and all similarly situated class members, are the sellers of those services; the NCAA member schools are the buyers. The challenged Four Seasons and Redshirt Rules directly suppress output in this market by barring otherwise-eligible athletes from offering their services for a fifth season of competition.

127. The Four Seasons and Redshirt Rules also restrain trade in a separate consumer market: the market for Division I collegiate-athletic competitions purchased by spectators, broadcasters, and streaming services. Consumers in this market—ticket buyers, media partners, advertisers, and the general viewing public—derive value from watching the most skilled college athletes compete at the highest collegiate level. By prematurely sidelining qualified athletes during what would otherwise be their peak competitive seasons, the Four Seasons and Redshirt Rules reduce the quality, variety, and continuity of the on-field and on-court product, thereby harming consumers.

128. The relevant geographic market is the United States. The NCAA and its member institutions are located across the country, and they engage in on-field competition and competition in a nationwide labor market for collegiate college athletes. The restraints at issue affect a national market as member institutions recruit and compete for talent across state lines. Accordingly, the relevant labor market extends throughout the United States.

129. There are no alternatives to the NIL Compensation opportunities, *House* Settlement revenue sharing opportunities, or other benefits college football players receive from competing in NCAA Division I athletics.[29] The opportunity to showcase athletic skills at the highest level of amateur athletic competition while pursuing a degree from a Division I institution makes competition in this market unique. Within this market, the NCAA and its member institutions maintain exclusive market power, with the sole ability to dictate the rules and regulations for competition in Division I athletics. The transactions in which the NCAA and its member institutions engage in this market with college athletes are commercial in nature, as they significantly affect the future earning potential of college athletes and yield significant financial revenue for the member institutions from the sizable consumer interest in college athletics. As a practical matter, NIL opportunities are only available to college athletes competing at NCAA Division I institutions as more than 99% of NIL dollars are paid to those college athletes.[30] And even if Division II or Division III programs provide some marginal substitute opportunities, those

---

[29] The NIL market is booming—projected to reach $1.67 billion in 2024-25 (a 43.1 percent year-over-year increase), with women's-sports earnings expected to rise 15 percent and collectives out-spending commercial deals at roughly a four to one ratio—demonstrating the uniqueness and magnitude of these opportunities. *See NIL at 3: The Annual Opendorse Report*, OPENDORSE, at 4 (2024), https://biz.opendorse.com/wp-content/uploads/2024/07/NIL-AT-3-The-Annual-Opendorse-Report-1.pdf#gf_56 (last visited Aug. 29, 2025).

[30] *See id.*

levels are also governed by the NCAA's cartel and subject to the same eligibility rules that restrain Division I athletes.

130. Although the NCAA is a non-profit organization, the transactions that member institutions make with college athletes yield significant financial revenue for the member institutions and have significant effects on the future earning potential of those college athletes. Namely, these transactions include partial or full scholarships in exchange for the college athlete's services. The college athletes, in return, receive the means to develop, refine, and showcase their skills—essential inputs to their future earning potential. NCAA athletic events in which these college athletes compete are marketed to consumers who view both in-person and via broadcasts of these sporting events, yielding significant revenue to the NCAA's member institutions and conferences. Accordingly, and as numerous courts have recognized, the exchange between member institutions and college athletes is commercial in nature and squarely within the scope of the Sherman Act.

## ANTITRUST ALLEGATIONS

### I.     The Commercial Nature of the Four Seasons and Redshirt Rules

131. This Court's finding in *Pavia* is fully applicable here: "[R]estrictions on who is eligible to play and therefore negotiate NIL agreements [are] commercial in nature."[31] The Four Seasons and Redshirt Rules function as artificial caps on competition and therefore constitute commercial restraints subject to scrutiny under the Sherman Act in the post-*Alston* era.

132. When the NCAA lifted its compensation restrictions and allowed college athletes to profit from their name, image, and likeness, many existing eligibility rules circumscribing the

---

[31] *Pavia v. NCAA*, 760 F. Supp. 3d 527, 537 (M.D. Tenn. 2024).

population of college athletes who may compete in Division I athletics necessarily became commercial in nature.[32] The Four Seasons and Redshirt Rules restrict "who is eligible to play and therefore to negotiate NIL agreements[.]"[33] Because eligibility to compete in NCAA Division I athletics is an essential condition of gaining access to the NIL market, the NCAA transformed its artificial restriction on a college athlete's ability to maximize his or her window of eligibility into an unreasonable market restraint. Accordingly, the Four Seasons and Redshirt Rules fall within the ambit of the Sherman Act.[34]

133. The NCAA may contend that the Four Seasons and Redshirt Rules are tied to academics, competitive balance, or amateurism. In reality, these rules function as restraints in the relevant markets.[35] They arbitrarily limit the ability of college athletes who forego a redshirt year to obtain the full competitive and commercial benefits that are available within their five-year eligibility window, thereby artificially restricting both who may earn NIL and other compensation and the period of time during which they may earn it. In addition, by curtailing athletes' participation opportunities, these rules also deprive them of meaningful educational benefits—such as additional years of scholarship support, academic progress, and professional development opportunities.

134. The NCAA itself generates billions of dollars from the competitions these college athletes make possible, and its exceptions—such as transfer waivers and medical redshirts—

---

[32] *See id.*

[33] *Id.*

[34] The NCAA conceded that this Court's interpretation of *Bassett v. NCAA*, 528 F.3d 426 (6th Cir. 2008), in the *Pavia* order—concluding that the NCAA's eligibility rules are commercial in nature—remains controlling precedent at this time. *See Bellamy v. NCAA*, No. 3:25-cv-00750, Transcript of Proceedings, at 7-8 (M.D. Tenn. July 16, 2025).

[35] *See supra* ¶¶126-130.

demonstrate that the restrictions are not essential to educational goals. Moreover, the Redshirt Rule allows some college athletes to receive most of the benefits of competition—including practice, financial aid, academic progress, NIL opportunities, and (going forward) access to the compensation funds provided by the NCAA member institutions themselves—without losing a season of eligibility.

135. Plaintiffs, by contrast, are denied the opportunity of a fifth competitive season, at the point of their greatest collegiate earning potential, for no justifiable reason. The Four Seasons and Redshirt Rules therefore operate as commercial restraints subject to antitrust review.

## II.     Anticompetitive Effects

### a.      Effects on Labor Market for Division I College Athletics

136. The Four Seasons and Redshirt Rules operate as coordinated restrictions among NCAA member institutions, functioning as horizontal agreements that reduce quality, decrease output, and limit competition for the labor of Division I college athletes.

137. By capping competition at four seasons within a five-year window, the Four Seasons and Redshirt Rules limit the number of college athletes who could otherwise contribute to and benefit from an additional season of play. The effect is to suppress economic opportunities, reduce bargaining power, and arbitrarily limit college athletes' personal and professional development. Absent the horizontal agreements to implement these restrictions, universities would compete for this talent, as they already do for redshirting fifth-year college athletes, increasing competition in the relevant labor market and compensation opportunities for college athletes, while also allowing them to pursue graduate education. The growing market for transfer and graduate-transfer college athletes since *Alston* illustrates the natural demand for retaining skilled players when eligibility is not artificially capped.

40

138. The Four Seasons and Redshirt Rules also undermine the quality of competition in the NCAA labor market. College athletes who do not redshirt are denied a full year of benefits—including team access, scholarships, training, academic support, and, in some cases, NIL income—that redshirt athletes leverage to enhance their academic options, athletic performance, and market value. The cumulative advantages of five seasons, available only through redshirting, allow athletes to reach peak performance in their final year, maximizing both competitive impact and economic potential. Those who do not redshirt lack the opportunity to earn additional degrees, refine their skills and elevate their quality in a fifth season—Plaintiffs are forced to expend eligibility at the front end of their careers, effectively removing what could be their highest-quality season from the labor market. Further, the NCAA applies these restrictions unevenly across sports. Division I football players may now compete in up to nine games, including postseason competition, and still claim a redshirt season. No comparable flexibility exists in other Division I sports. A basketball player, for example, forfeits their fifth year of eligibility by playing a single second of an intercollegiate game in the recognized competitive season. This inconsistent application highlights that the restrictions are not tethered to educational goals or competitive balance, but rather operate as restraints on labor supply in most college sports.

139. Plaintiffs' experiences illustrate these harms. Henry Stewart, who had limited participation in his first two NCAA Division I seasons, is deprived of the opportunity to fully develop and showcase his skills, diminishing the overall quality of his play. Quincy Skinner, a wide receiver who played in his first four years, is being denied the opportunity to extend his career into a fifth season ultimately limiting his contribution to competition in the market at his peak. Johnny Luetzow, a top catcher at Santa Clara, cannot continue building on his record of performance reducing both his competitive quality and professional prospects. Each example

41

reflects the economic and developmental opportunities foreclosed by the Four Seasons and Redshirt Rules.

### i. The NCAA's Deprivation of Plaintiffs' Benefitting from the *House* Settlement

140. In June 2025, the NCAA reached a settlement with a putative class of current and former NCAA college athletes, through which the NCAA would begin compensating players for the NCAA's use of their NIL between 2016 and 2024. Under the settlement, the NCAA and its "Power Four" member conferences (ACC, Big Ten, Pac-12, and SEC) have agreed to share up to 22% of the average athletic department revenue among Power Four conference schools with their college athletes, up to an agreed maximum of $20.5 million per school.[36]

141. While *House* Settlement creates a new commercial stream for college athletes, the NCAA's enforcement of the Four Seasons Rule and the Redshirt Rule would deprive Plaintiffs and class members of its full benefit during their windows of eligibility.

142. Moreover, while the *House* Settlement establishes a potential framework for future college athlete compensation, the model has not been uniformly adopted across the NCAA's member institutions.[37] For example, the settlement does not mandate that schools pay the full $20.5

---

[36] *See* Stipulation and Settlement Agreement (ECF 450-3), *In re College Athlete NIL Litigation*, 4:20-cv-03919-CW (N.D. Cal. July 26, 2024).

[37] MarketWatch, *WNBA Players Only Get 9.3% of League Revenue. Here's How Much NBA, NFL, and NHL Players Get*, MarketWatch (Oct. 15, 2024), https://www.marketwatch.com/story/wnba-players-only-get-9-3-of-league-revenue-heres-how-much-nba-nfl-and-nhl-players-get-0abef80c (last visited Sept. 1, 2025).

million, and many institutions may opt out entirely.[38] Additionally, all Ivy League schools have declined participation in the *House* Settlement.[39]

143. While Plaintiffs commend the *House* plaintiffs for their efforts, they neither represented—nor represent—the Class members in this case for compensation beyond the 2024 season.

144. Absent the $20.5 million cap, many schools would likely pay substantially more for NIL rights. In 2024, the University of Texas generated $331.9 million in athletic revenue; Ohio State, $292.3 million; and Alabama, $234.8 million.[40] The $20.5 million cap represents only 6%, 7%, and 8.7% of these schools' revenues, respectively. Even lower-revenue programs in the new Power Four, such as Mississippi State ($127 million), Kansas State ($104 million), and North Carolina State ($133 million), could allocate more but for the settlement-imposed ceiling.[41] Therefore, without the NCAA's eligibility restraints and the $20.5 million cap, many NCAA Division I programs would spend significantly more to attract and compensate college athletes, including for college athletes' fifth year of competition.

---

[38] Gerard T. Leone, Jr., Austin Maloney & Brigid Harrington, *Important Considerations for Universities Awaiting House Settlement Approval*, Nat'l L. Rev. (May 21, 2025), https://natlawreview.com/article/important-considerations-universities-awaiting-house-settlement-approval (last visited Sept. 1, 2025).

[39] ESPN, *Ivy League Won't Join NCAA Antitrust Settlement*, (Jan. 24, 2025), https://www.espn.com/college-sports/story/_/id/43550303/ivy-league-join-28-billion-ncaa-antitrust-settlement (last visited Sept. 1, 2025).

[40] Knight-Newhouse College Athletics Database, *Football Bowl Subdivision (FBS)*, Knight Commission, https://knightnewhousedata.org/fbs (last visited Sept. 1, 2025).

[41] *Id.*

### ii. The Four Seasons and Redshirt Rules Arbitrarily Bar College Athletes from Obtaining Scholarships and Other Education-Related Benefits

145. The Four Seasons and Redshirt Rules arbitrarily bar college athletes who do not take a redshirt year from receiving a fifth year of scholarships and other education-related benefits, despite remaining within the NCAA's defined five-year eligibility window. Redshirt athletes automatically preserve these benefits for an additional season merely by abstaining from competition early in their careers, yet similarly situated athletes, who demonstrate readiness to compete at the outset, are denied the same entitlement. These foreclosed benefits include not only tuition, room and board, and academic support but also access to high-level training facilities, coaching, medical care, and performance development programs. By depriving Plaintiffs of an additional year of such resources, the NCAA imposes an artificial barrier to maximizing athletic performance and career opportunities—benefits that, in a competitive market, would be available to all qualified athletes.

### iii. The Four Seasons and Redshirt Rules Arbitrarily Bar College Athletes from Obtaining Additional Non-University NIL Payments

146. Separate and apart from the direct payments that universities may now provide under the *House* Settlement, college athletes continue to have the ability to secure additional compensation for their individual NIL rights from third parties. While the university payments are designed to compensate college athletes for the institutions' collective use of NIL, college athletes are also free to enter into private market arrangements with school-affiliated collectives, national corporations, and local merchants for the commercial use of their personal NIL.

147. The NCAA's eligibility rules, however, arbitrarily restrict access to this market. By capping some college athletes at four seasons of competition the NCAA forecloses their ability to generate NIL income tied to competition in a fifth year while at the same time permitting other

college athletes to compete and profit from NIL for five seasons. This arbitrary distinction is not driven by market forces or competitive necessity. To the contrary, third-party collectives, sponsors, and brands remain motivated to pay college athletes so long as they can compete on the field or court. The NCAA's restriction therefore functions as a horizontal restraint that artificially suppresses NIL opportunities for one subset of college athletes while allowing others similarly situated to benefit.

148. By excluding college athletes from a fifth competitive season, the NCAA suppresses compensation, reduces bargaining power, and distorts market incentives. Combined with the NCAA's undisputed market power, recognized by the Supreme Court in *Alston*, the Four Seasons and Redshirt Rules operate as unlawful restraints of trade under Section 1 of the Sherman Act.

### b. Effects on Consumer Market for Division I Athletics

149. The NCAA's Four Seasons and Redshirt Rules diminish the nationwide consumer market for Division I athletics by sidelining skilled college athletes during their peak years. When college athletes such as Langston Patterson, BJ Harris, Jakob Russell, and Timo Legout are prevented from competing due to arbitrary eligibility restrictions, the quality of competition declines. Teams lose continuity, elite performers are prematurely excluded, and fans are denied the opportunity to watch familiar, high-caliber college athletes. These restraints reduce the entertainment value of games for ticket holders, television viewers, and other consumers of NCAA athletics.

150. The impact is illustrated by the named Plaintiffs. Issa Ouattara, still developing after only a few years of organized football, is barred from continuing to improve and contribute to a stronger competitive product. Brayden Schager, a proven quarterback, is excluded at his peak. CJ Taylor, a recognized leader, cannot extend his performance for Vanderbilt fans. Each example reflects a lost opportunity for fans to engage with familiar, talented players.

151. These restrictions also sever the emotional connections that consumers build with college athletes across multiple seasons. Fans follow players' development and invest in their success; when experienced college athletes are prematurely removed, those connections end abruptly. The result is diminished ticket sales, lower broadcast viewership, and reduced fan engagement. Universities, conferences, and broadcasters all lose revenue that would otherwise be generated by retaining skilled college athletes who heighten competition and sustain consumer interest.

152. By arbitrarily restricting college athletes' ability to compete within the existing five-year window, the Four Seasons and Redshirt Rules degrade the quality and market value of Division I athletics. Fans are deprived of seeing the most experienced college athletes at their peak, while institutions are prevented from fielding the most competitive teams. The result is a less dynamic, less recognizable, and less valuable product for all consumers of NCAA sports.

### III. No Procompetitive Justification for the Four Seasons and Redshirt Rules

153. The NCAA's position is that the Four Seasons and Redshirt Rules are essential to the preservation of college athletics, typically justifying these limits by referencing (1) the alignment of academics and athletics; (2) preserving the NCAA's amateurism model; and (3) maintaining competitive balance among college athletes, the NCAA, and member institutions. Yet, real-world experience shows that none of these justifications stand up to scrutiny.

### a. Alignment of Academics and Athletics

154. The NCAA claims its eligibility standards foster the academic development of college athletes as they "are designed to move student-athletes toward graduation in a timely manner."[42]

---

[42] *See Guide for Four-Year Transfers 2024-25*, NCAA, at 13 (2024), http://fs.ncaa.org.s3.amazo-naws.com/Docs/eligibility_center/Transfer/FourYearGuide.pdf (last visited Aug. 29, 2025).

The NCAA suggests that limiting eligibility to four years encourages students to prioritize their studies and avoid unnecessary delays in completing their degrees. However, this rationale oversimplifies the realities faced by college athletes and ignores the diverse academic ambitions and personal circumstances that can affect a student's educational journey.

155. College athletes who face circumstances beyond their control often experience disruptions in both their academic and athletic progress. For example, earlier cohorts benefited from an additional year to develop and compete as a result of Covid. Unforeseen events can also interrupt a college athlete's progress, making it difficult to complete both their academic and athletic goals within the rigid four-season timeframe. Allowing these college athletes an additional season of NCAA eligibility would not undermine or be responsible for any delays in their academic careers; it would simply offer a fair opportunity to recover lost athletic development without penalizing them for disruptions they could not control.

156. Many college athletes do, in fact, complete their degrees in a timely manner, with a significant number graduating in good academic standing within four years. However, the restrictive Four Seasons and Redshirt Rules disincentivize more ambitious academic pursuits, such as dual degrees, combined undergraduate and graduate programs, or graduate-level study in general—academic paths that often require more than the four seasons of eligibility NCAA rules allow. As a result, the current rule can force college athletes to choose between maximizing their educational opportunities and continuing their athletic careers, undermining the very academic development the NCAA claims to promote.

157. Additionally, the NCAA's own reporting underscores the inconsistency. It measures graduation success over a six-year period, while its eligibility rules impose a five-year window

while limiting participation in competition to four years.[43] Further, the NCAA's recent rule allowing players to transfer to a new school each and every year shows a dramatic disconnect between the NCAA's purported goal of encouraging graduation within four years and the reality of current competitive market for college athletes.[44] For example, prior to the NCAA's rule change allowing unlimited transfers without having to sit out, less than 1% of highly recruited football players transferred more than once. In contrast, more than 20% of the top 600 recruits in the 2021 high school graduating class transferred multiple times. This disconnect shows that the four-season competition cap is not grounded in genuine academic standards and does not serve a procompetitive purpose.

### b. Promoting Amateurism

158. Additionally, the Four Seasons and Redshirt Rules do not advance the NCAA's claimed interest in preserving consumer demand through its "amateurism model," which purports to distinguish college athletic events from professional sporting events. The NCAA has never articulated a clear, consistent, or enforceable definition of amateurism, and its application of the concept has shifted over time to suit its own interests. The Four Seasons and Redshirt Rules are not tied to any substantive aspect of amateurism: they do not address whether college athletes are compensated, whether they maintain academic standing, or whether they compete for the love of the game rather than financial gain. Instead, they simply impose an arbitrary time limit on competition, regardless of a college athlete's actual status or conduct. In fact, the NCAA's own

---

[43] *Division I Graduation Rates Database,* NCAA (Dec. 12, 2017), https://www.ncaa.org/sports/2017/12/12/division-i-graduation-rates-database (last visited Aug. 29, 2025).

[44] *See* David Ubben, *How often do college football players actually transfer? Here's what the data tells us*, N.Y. TIMES (Aug. 1, 2025), https://www.nytimes.com/athletic/6527935/2025/08/01/college-football-transfer-portal-numbers/ (last visited Aug. 29, 2025).

rules and enforcement history show that eligibility limits like the Four Seasons and Redshirt Rules are not essential to maintaining the distinction between college and professional sports, nor do they have any real impact on the public's perception of amateurism.

159. The NCAA's position that college athletes lose a year of amateur status solely by competing in games against another school while they are attending school, practicing with their team, and within their five-year window is unfounded. The NCAA itself permits numerous exceptions under which college athletes may compete beyond normal eligibility without undermining its asserted amateurism model. For example, students are allowed to attend a preparatory school prior to their undergraduate university without triggering the Four Seasons Rule, and professional college athletes may attend NCAA member institutions to compete in other sports without penalty. These longstanding exceptions make clear that the Four Seasons and Redshirt Rules are not about protecting amateurism, but rather serve as an unnecessary and anticompetitive restriction on college athletes' opportunities. Any argument by the NCAA to the contrary is not only inconsistent with its own policies and the lived experience of college athletes, but also fails to justify the exclusionary and restrictive nature of the rule.

### c. Maintaining Competitive Balance

160. Finally, the NCAA's claimed procompetitive justification of preserving competitive balance among college athletes, the NCAA, and its member institutions is undermined by the organization's own precedents. The COVID-era eligibility exception, which allowed certain college athletes to compete for five seasons, provides a clear example that competitive integrity was not only preserved, but enhanced when eligibility was extended. College athletes continued to perform at a high level while benefiting from NIL opportunities; the NCAA sustained its

49

popularity and commercial appeal; and member institutions actively recruited and showcased top-tier talent generating significant financial returns.

161. The NCAA argues that allowing players to compete throughout their entire five-year window takes opportunities away from graduating high school seniors, but the NCAA's Covid-based extension of eligibility had the exact same impact without ruining college sports. This is the perfect time for the NCAA to permanently change its rules to allow all Division I college athletes to compete for five seasons because it essentially would essentially codify the NCAA's Covid season of competition waiver, negating any disparate impact on high school students in comparison to students who graduated at any time in the previous five years since Covid—with the notable exception of the Lost Opportunities Damages Class, whose members graduated at the end of Covid but did not receive an additional season of competition waiver.

162. Moreover, since 2018, Division I football players have been permitted to compete in up to four games in a season without losing a year of eligibility, effectively allowing them to gain meaningful game experience while preserving a redshirt year.[45] With the expansion of the postseason, some players have now competed in as many as nine games in a single season—including four regular season games, a conference championship, and multiple College Football Playoff games—without exhausting a season of eligibility.[46]

---

[45] Michelle Brutlag Hosick, *DI Football to Offer More Participation Opportunities*, NCAA (June 13, 2018), https://www.ncaa.org/news/2018/6/13/di-football-to-offer-more-participation-opportunities (last visited Aug. 29, 2025).

[46] Shehan Jeyarajah, *NCAA Rules Postseason Contests No Longer Count Against Four-Game Max for Redshirt Eligibility*, CBS SPORTS (Aug. 27, 2024), https://www.cbssports.com/college-football/news/ncaa-rules-postseason-contests-no-longer-count-against-four-game-max-for-redshirt-eligibility/ (last visited Aug. 29, 2025).

163. This approach has not diminished competitive equity; to the contrary, college football's popularity, commercial appeal, and overall level of play have only increased. These outcomes underscore that allowing college athletes additional opportunities to compete can enhance, rather than undermine, the health and integrity of collegiate athletics. The NCAA cannot demonstrate that stricter limitations are necessary, nor has it shown that relaxing these restrictions would harm competitive balance, reduce consumer demand, or adversely affect the labor markets in which college athletes participate.

164. The anticipated impact of the NCAA's exception following *Pavia* is likely to confirm the same principle: making eligibility to compete in intercollegiate play coextensive with the window of eligibility does not harm competitive balance. For instance, since the Court's ruling, Diego Pavia has starred in a Netflix documentary ("Any Given Saturday") and Vanderbilt sold out its season opening game for the first time since 2019; this was a particularly notable feat because its opponent was not an SEC stalwart bringing thousands of opposing fans to Nashville, but small FCS school Charleston Southern. Eligibility extensions allow college athletes, institutions, and the NCAA to continue thriving within a dynamic and competitive market.

## IV.    Any Potential Procompetitive Justifications for the Four Seasons Rule and Red Shirt Rule Could be Accomplished by Less Restrictive Alternatives

165. Even if the NCAA's asserted goals of promoting the alignment of academics and athletics, preserving amateurism, and maintaining competitive balance were valid procompetitive justifications—which they are not—each could be achieved through significantly less restrictive means.

166. Indeed, the NCAA already employs less restrictive measures to advance these objectives. For example, NCAA Bylaw 14.4.1 requires college athletes to maintain satisfactory progress toward their degrees to remain eligible for competition. Other Bylaws establish minimum

credit hour and grade point average requirements for athletic eligibility. These provisions addressing academic progress, GPA, and in-season transfers effectively further the NCAA's stated academic and amateurism objectives without imposing the unnecessary and harmful restrictions embodied in the Four Seasons Rule and the Redshirt Rule.

167. Modifications to the Four Seasons Rule could similarly preserve any legitimate procompetitive objectives asserted by the NCAA while mitigating harm to NCAA Division I college athletes. For instance, as recognized by the United States District Court for the District of Wisconsin, the NCAA could allow up to five seasons of competition within the five-year eligibility window.[47] This approach mirrors the result of the existing Redshirt practices for certain college athletes without prohibiting intercollegiate competition, and reflects a proven, less restrictive method of balancing academics, amateurism, and competition. By adopting such measures, the NCAA could accomplish its stated goals without arbitrarily excluding college athletes at the height of their athletic and commercial potential.

---

[47] The NCAA is currently considering a proposal to allow all college athletes five years to complete five seasons of competition. *See Fourqurean v. NCAA*, 771 F.Supp.3d 1043, 1055 (W.D. Wis. Feb. 6, 2025) (granting preliminary injunction to football player whose father passed away during his freshman season noting that "recent news reports suggest that Defendant is considering allowing five seasons of competition") citing Ross Dellenger, *College Sports Leaders Mulling '5-in-5' Rule to Eliminate Redshirts, Waivers and Other Exemptions*, YAHOO! SPORTS (Jan. 16, 2025), https://sports.yahoo.com/collegesports-leaders-mulling-5-in-5-rule-to-eliminate-redshirts-waivers-and-other-exemptions-211750014.html.

As recent as July 2025, the NCAA endorsed this concept when the Division II Management Council formally recommended that Division II colleges and universities permit college athletes to compete in each year of their five-year eligibility window. Unfortunately, Division I has yet to follow suit. *See* Corbin McGuire, *Division II Management Council Supports Proposal for 5 Seasons of Competition*, NCAA (July 23, 2025), https://www.ncaa.org/news/2025/7/23/media-center-division-ii-management-council-supports-proposal-for-5-seasons-of-competition.

52

## COUNT 1: VIOLATION OF SECTION 1 OF THE SHERMAN ACT
## ILLEGAL AGREEMENT TO RESTRAIN TRADE

168. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as if fully restated herein.

169. Defendant NCAA, acting through its officers, directors, employees, agents, and representatives, together with its member institutions, has entered into and enforced an unlawful agreement to restrain and suppress competition in the relevant markets by adopting and maintaining the Four Seasons Rule and the Redshirt Rules. These rules operate as an illegal agreement to restrain trade, unreasonably restricting the ability of Division I college athletes who did not take or receive a redshirt year to compete in the market for an additional fifth year. By denying college athletes this opportunity, the rules restrict exposure necessary to earn NIL compensation, impair professional advancement, and unlawfully restrain trade.

170. The relevant labor market for purposes of antitrust analysis is the market for the services of NCAA Division I college athletes. The relevant consumer market is the market for the consumption of NCAA Division I athletics. Transactions between NCAA member institutions and college athletes in these markets that are impacted by the Four Seasons and Redshirt Rules are commercial in nature and fall squarely within the scope of the Sherman Act.

171. The unlawful horizontal agreement unreasonably restrains competition for college athlete services. By preventing college athletes from competing in every season during their five-year eligibility window, the rules deny college athletes NIL compensation opportunities, reduce their visibility to professional scouts, and diminish their present and future earning potential.

172. Absent these restrictions, schools would compete more vigorously for college athletes, including for graduate transfers. The artificial cap imposed by the Four Seasons and

Redshirt Rules directly suppresses that competition, inflicting antitrust injury on named Plaintiffs and similarly situated college athletes.

173. The Four Seasons and Redshirt Rules, which limit college athletes to only four seasons of competition within a five-year window (while arbitrarily permitting exceptions), provide little, if any, procompetitive benefit. Any such benefits are far outweighed by the harm to college athletes and to competition. Moreover, a plainly less restrictive alternative exists that would advance the NCAA's stated objectives without suppressing trade: allowing all college athletes five full seasons of competition within their five-year eligibility window.

174. Defendant's conduct is ongoing and continues to inflict direct harm on named Plaintiffs and other college athletes by restricting their ability to secure NIL compensation, preventing them from receiving direct payments available under the *House* Settlement, and limiting their ability to showcase their skills for professional opportunities. Unless enjoined, this unlawful restraint will continue to injure named Plaintiffs, other college athletes, and consumers of NCAA Division I sports.

175. Defendant NCAA and its member institutions' anticompetitive conduct is intentionally directed at the United States market and has had, and continues to have, a substantial and foreseeable effect on interstate commerce.

176. Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, named Plaintiffs seek a permanent injunction prohibiting Defendant from continuing to violate Section 1 of the Sherman Act by enforcing the competition restrictions contained in NCAA Bylaw 12.6.

177. Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, named Plaintiffs further request that the Court declare that members of the Injunctive Class are entitled to compete in every season of competition occurring within their five-year eligibility window.

178. Plaintiffs belonging to the Damages Class seek monetary damages to compensate them for the loss of their final year of eligibility and related economic opportunities.

179. Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, named Plaintiffs are entitled to recover their reasonable attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, named Plaintiffs, individually and on behalf the Classes, respectfully request that the Court enter judgment in their favor and grant them relief as follows:

1. Order a trial by jury on all claims and issues so triable;

2. Certify the proposed Classes as set forth herein, appoint Plaintiffs as Class Representatives, and designated undersigned counsel as Class Counsel;

3. Adjudge and decree that Defendant's enforcement of the Four Seasons Rule constitutes an unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

4. Adjudge and decree that Defendant's enforcement of the Redshirt Rule constitutes an unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

5. Enter a permanent injunction, in a form that the Court deems just and proper, pursuant to 15 U.S.C. § 26, enjoining Defendant from continuing to violate Section 1 of the Sherman Act by enforcing NCAA Bylaw 12.6 as to all current and future NCAA Division I college athletes;

6. Award all members of the Lost Opportunities Damages Class damages according to the proof at trial;

7. Order all damages awarded to the members of the Lost Opportunities Damages Class to be trebled pursuant to 15 U.S.C. § 15;

8. Award Plaintiffs their costs, including reasonable attorneys' fees under 15 U.S.C. § 15; and

9. Order any other relief that this Court deems just and proper.

DATED: September 2, 2025

Respectfully submitted,

*/s/ Ryan Downton*
Ryan Downton
Texas Bar No. 24036500 (*pro hac vice* to be filed)
**THE TEXAS TRIAL GROUP**
875 Carr 693, Ste. 103
Dorado, PR 00646*
(512) 680-7947
Ryan@TheTexasTrialGroup.com
*Ryan Downton is licensed in Texas, not Puerto Rico

*/s/ Salvador Hernandez*
Salvador Hernandez (# 020121)
Milton S. McGee III (# 024150)
**RILEY & JACOBSON, PLC**
1906 West End Ave.
Nashville, TN 37205
P: (615) 320-3700
F: (615) 320-3737
shernandez@rjfirm.com
tmcgee@rjfirm.com

*/s/ JoAnna B. Adkisson*
JoAnna B. Adkisson (#041016)
Christopher P. Wilson (*pro hac vice* to be filed)
Erik T. Koons (*pro hac vice* to be filed)
Bridget Moore (*pro hac vice* to be filed)
Michael A. Munoz (*pro hac vice* to be filed)
**BAKER BOTTS L.L.P.**
700 K Street NW
Washington, DC 20001
(202) 639-7700
joanna.adkisson@bakerbotts.com
christopher.wilson@bakerbotts.com
erik.koons@bakerbotts.com
bridget.moore@bakerbotts.com
michael.munoz@bakerbotts.com

*Counsel for Plaintiffs and the Proposed
Classes*

56