## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| LANGSTON PATTERSON, NICHOLAS ("NICK") LEVY, NATHANIAL VAKOS, KEVIN GALLIC, LANCE MASON, CHAD MAURICE ("CJ") TAYLOR JR., QUINCY SKINNER JR., BRAYDEN SCHAGER, BERNARD ("BJ") HARRIS JR., JOHN ("JOHNNY") LUETZOW, HENRY STEWART, JAKOB RUSSELL, JUSTINE PISSOTT, NDJAKALENGA ("JAK") MWENENTANDA, LAWSON LOVERING, ELLIE GEOFFROY, XCARET ("X") PINEDA, REESE RAGLAND, and TIMO LEGOUT, on behalf of themselves and all others similarly situated, | Case No. 3:25-cv-00994 |
| | Chief Judge William L. Campbell, Jr. |
| Plaintiffs, | Magistrate Judge Alistair Newbern |
| v. | JURY DEMAND |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | |
| Defendant. | |

## FIRST AMENDED COMPLAINT – CLASS ACTION

Plaintiffs Langston Patterson, Nicholas "Nick" Levy, Nathanial Vakos, Kevin Gallic, Lance Mason, Chad Maurice ("CJ") Taylor Jr., Quincy Skinner Jr., Brayden Schager, Bernard ("BJ") Harris Jr., John ("Johnny") Luetzow, Henry Stewart, Jakob Russell, Justine Pissott, Ndjakalenga ("Jak") Mwenentanda, Lawson Lovering, Ellie Geoffroy, Xcaret ("X") Pineda, Reese Ragland, and Timo Legout, (together, "Plaintiffs"), on behalf of themselves and all persons similarly situated, by and through undersigned counsel, and complaining of Defendant National Collegiate Athletic Association ("NCAA"), allege as follows for their First Amended Complaint:

1

**INTRODUCTION**

1. Plaintiffs bring this lawsuit on behalf of an Injunctive Relief Class and a Lost Opportunities Damages Class of Division I college athletes[1] challenging the NCAA's unreasonable restrictions that arbitrarily cut short college athletes' ability to compete.

2. For almost fifty years, the NCAA has enforced a rule providing Division I college athletes with a five-year window to exhaust their competition eligibility (the "Five-Year Rule").[2] However, within those five years, the NCAA limits college athletes to *competing* in only four seasons of intercollegiate competition (the "Four Seasons Rule")[3] and otherwise dictates that a college athlete may use the fifth year only to compete in team activities without, or with limited, participation in intercollegiate competition (the "Redshirt Rule").[4] NCAA Rules also punish any

---

[1] The putative classes are defined below under "Class Allegations." *See infra* ¶¶ 170-177.

[2] NCAA Bylaw 12.6.1 Five-Year Rule. A student-athlete shall complete the student-athlete's seasons of competition within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution, with time spent on an official religious mission, in the armed services or with recognized foreign aid services of the U.S. government being excepted. For international students, service in the armed forces of the student's home country is considered equivalent to such service in the United States. *See NCAA*, 2025-26 NCAA Division I Manual, Bylaw 12.6.1, at 46 (2025) https://ncaapublications.com/products/2025-2026-ncaa-division-i-manual.

[3] NCAA Bylaw 12.6 Seasons of Competition: Five-Year Rule. A student-athlete shall not engage in more than four seasons of intercollegiate competition in any one sport (see Bylaws 12.02.3 and 14.3.3). An institution shall not permit a student-athlete to represent it in intercollegiate competition unless the student-athlete completes all seasons of competition in all sports within the time periods specified below. *NCAA*, 2025-26 NCAA Division I Manual, Bylaw 12.6, at 46 (2025) https://ncaapublications.com/products/2025-2026-ncaa-division-i-manual.

[4] The "Redshirt Rule" is not a discrete NCAA Bylaw but rather a term of art describing how a college athlete may preserve a season of competition by not competing (or minimally competition) under several interrelated provisions of the *NCAA Division I Manual*. A redshirt year may occur in multiple ways including, *inter alia*:

member school found to be in violation of the foregoing rules, including forfeiture of wins, fines, and reductions in scholarships – up to and including the "death penalty" for repeat offenders, through which colleges are barred from participation in NCAA intercollegiate participation in the sport in which the violation occurred.[5]

3. By operation of the Four Seasons Rule and the Redshirt Rule, Division I college athletes are denied the opportunity to fully use the five-year eligibility window that the NCAA itself prescribes. The Rules therefore have the unjustifiable effect of suppressing athletic careers, limiting college athletes' institutional mobility, and unlawfully restraining the market for college athletes' services. The NCAA's Rules force college athletes to the sidelines not because of injury, misconduct, or academic ineligibility, but because of an arbitrary, anticompetitive cap imposed by the governing body itself. Plaintiffs seek relief under federal law to strike down these unreasonable restraints and vindicate college athletes' rightful opportunity to compete throughout their eligibility window.

---

- *Institutional Redshirt (Non-Participation)*: A student-athlete withheld from competition for a season does not use a season of competition unless competition thresholds are crossed. *See NCAA*, 2025-26 NCAA Division I Manual, Bylaw 12.6.1.7.1(a), at 48 (2025) https://ncaapublications.com/products/2025-2026-ncaa-division-i-manual.

- *Sport-Specific Exceptions*: Certain sports, such as football, permit limited competition without triggering use of a season (e.g., competition in up to four games). *NCAA*, 2025-26 NCAA Division I Manual, Bylaw 12.6.3.1.6, at 50 (2025) https://ncaapublications.com/products/2025-2026-ncaa-division-i-manual.

- *Academic Redshirts*: First-year students admitted as "academic redshirts" must serve a year of residence before competing, preserving their seasons of competition. *See NCAA*, 2025-26 NCAA Division I Manual, Bylaw 14.3.1.2, at 140 (2025) https://ncaapublications.com/products/2025-2026-ncaa-division-i-manual.

[5] *See generally*, 2025-26 NCAA Division I Manual, Bylaw 19. Infractions Program, at 307-31 (2025) https://ncaapublications.com/products/2025-2026-ncaa-division-i-manual.

4. Plaintiffs do not challenge the concept of a defined eligibility period or the NCAA's Five-Year Rule itself. Rather, they challenge the NCAA's additional restrictions that arbitrarily limit college athletes' competitive opportunities. Specifically, the Four Seasons Rule, when combined with the so-called Redshirt Rule, functions not as a reasonable eligibility boundary but as an anticompetitive device. These overlapping Rules distort the market for Division I athletics by penalizing academically eligible high-performing college athletes who choose to compete instead of redshirting, thereby forcing them to forfeit a year of potential competition and market value without any legitimate procompetitive justification.

5. The NCAA's own conduct has already stripped away any credible justification for enforcing the Four Seasons and Redshirt Rules to artificially limit certain college athletes' ability to compete fully in the labor market for NCAA Division I athletics under the Five-Year Rule. For example, one historical justification for the Redshirt Rule was that it allowed athletes who transferred from one college to another to practice with their team while sitting out a year of competition as required by other NCAA Bylaws. But in 2023, the NCAA voluntarily removed the "one year sit out," making all athletes immediately eligible after transferring—thereby eliminating a major historical justification for the Redshirt Rule.

6. Additionally, when confronted with the extraordinary disruption of the COVID-19 pandemic, the NCAA voluntarily waived the Four Seasons Rule for college athletes who entered Division I programs between 2017 and 2020, thus allowing all college athletes to compete for five seasons in five (or six) years—a move that has, at best, a tangential connection to public health— thereby acknowledging that its rigid eligibility limits were neither indispensable nor tied to any genuine procompetitive justification. This waiver demonstrated that the enterprise could thrive

without the restraints imposed by the Four Seasons and Redshirt Rules.[6] In other words, the NCAA's own actions reveal a clear and less restrictive alternative, undermining any claim that the overly restrictive Four Seasons and Redshirt Rules are necessary to achieve legitimate competitive objectives.

7. Instead, the NCAA denies Division I athletes who first enrolled in or after 2021 the ability to maximize their athletic competition within the Five-Year Rule for no legitimate reason. This inequity is compounded by the fact that the 2021 and later classes experienced severe disruptions to recruiting and college selection during the pandemic, further limiting their opportunities.[7] While their predecessors were granted both flexibility and extended careers, Plaintiffs were left to navigate an artificially compressed window of all aspects of competition.

8. The consequences are particularly stark with respect to financial opportunities. College athletes who first enrolled in 2021 will receive none of the $20.5 million in annual payments that Division I universities are now permitted to pay out to college athletes, while those who first enrolled in 2022 will receive only one year of such payments. This selective denial of benefits, when juxtaposed with the windfalls provided to earlier academic year classes, underscores the arbitrary and anticompetitive nature of the Four Season and Redshirt Rules.

---

[6] The NCAA's operations were unaffected by extending college athletes' eligibility to five years under the COVID waiver, as its revenue of $1.5 billion in 2021 exceeded that of the pre-pandemic year. *See* Associated Press, *NCAA Earns $1.15 Billion in 2021 as Revenue Returns to Normal,* ESPN (Feb. 2, 2022), https://www.espn.com/college-sports/story/_/id/33201991/ncaa-earns-115-billion-2021-revenue-returns-normal.

[7] *See* Evan Bleier, *An NCAA Coach Describes the Difficulty of Recruiting Athletes During COVID-19*, InsideHook (Mar. 11, 2021), https://www.insidehook.com/sports/future-recruiting-college-athletes-wake-covid-19; Michelle Brutlag Hosick*, DI Council Extends Recruiting Dead Period Through May 31*, NCAA (Feb. 17, 2021), https://www.ncaa.org/news/2021/2/17/di-council-extends-recruiting-dead-period-through-may-31.

9. The harm to athletes who first enrolled in or before 2021 is already complete and irreversible: their five-year eligibility clocks have expired, foreclosing any opportunity to regain a fifth season of competition. Those athletes have suffered concrete economic and competitive injuries for which damages under the antitrust laws are appropriate. By contrast, college athletes who first enrolled in or after 2022 remain within their five-year windows and could still benefit from an additional season. For them, injunctive relief is imperative: once the opportunity to compete is lost, it cannot be restored. Because collegiate careers are uniquely finite, the injury caused by the Four Seasons Rule and Redshirt Rule is not only ongoing but irreparable.

10. These anticompetitive restraints unreasonably limit the ability of NCAA Division I college athletes to compete and as a result, their participation in the market for name, image, and likeness ("NIL") compensation. By artificially curtailing athletic competition, the NCAA diminishes college athletes' economic opportunities and restrains competition in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs, therefore, seek damages as well as declaratory and injunctive relief to redress and prevent these ongoing violations. The NCAA grants athletes five years to practice and five years to graduate; they also deserve five years to play.

## PROCEDURAL BACKGROUND

11. In *NCAA v. Alston*, 594 U.S. 69 (2021), the United States Supreme Court unanimously held that the lower court's enjoining of the NCAA's restraints on education related benefits was consistent with established antitrust principles. In reaching this conclusion, the Court rejected the NCAA's proposal for "a sort of judicially ordained immunity from the terms of the Sherman Act for its restraints of trade," in an attempt to resist a rule of reason analysis. *Id.* at 94-96. Under the rule of reason analysis, the Court endorsed the "demanding standard" applied by the lower court in reviewing the procompetitive rationale for the NCAA's restraints: whether it was "'patently and

inexplicably stricter than necessary' to achieve the procompetitive benefits the league had demonstrated." *Id*. at 101 (internal citations omitted).

12. The *Alston* Court also recognized that "[w]hen it comes to college sports, there can be little doubt that the market realities have changed significantly since 1984." *Id*. at 93. Specifically, college athletics have transformed into a multibillion-dollar enterprise, paving the way for college athletes to receive compensation for the use of their names, images, and likenesses ("NIL Compensation"). For example, between 1982 and 1984, CBS paid approximately $16 million per year for the broadcast rights to the NCAA's Division I Men's Basketball Tournament.[8] By 2016, those rights generated more than $1.1 billion annually.[9] The Supreme Court's decision in *Alston* paved the way for college athletes to begin earning NIL Compensation and affirmed that athletes are not mere chess-pieces in this system but essential contributors entitled to share in the immense economic value they help create.

13. The market realities for college athletics have further evolved since the Supreme Court's decision in *Alston*. The NCAA has since lifted its blanket prohibition on NIL Compensation, effective July 1, 2021. The resulting NIL market has grown into a billion-dollar industry, valued at roughly $1.1 billion for football alone since 2024.[10]

---

[8] *NCAA Awards CBS Rights for $48 Million*, UPI (Mar. 5, 1981), https://www.upi.com/Archives/1981/03/05/NCAA-Awards-CBS-Rights-for-48-Million/8996352616400/.

[9] Andrew Chapados, *March Madness Money: How the NCAA Makes a Billion Dollars Every Year*, Blaze Media (Mar. 17, 2025), https://www.theblaze.com/fearless/march-madness-ncaa-money-tournament.

[10] *See The Annual Opendorse Report*, Opendorse, 4 (2024), https://biz.opendorse.com/wp-content/uploads/2024/07/NIL-AT-3-The-Annual-Opendorse-Report-1.pdf#gf_56.

14. The recent settlement in *House v. NCAA* underscores this ongoing evolution of the labor market for NCAA Division I college athletes, reflecting a recognition that their participation carries substantial economic value.[11] Starting in July 2025, Division I schools are authorized to make direct cash payments of up to $20.5 million annually per institution to their college athletes.[12]

15. Outside the NCAA Division I athletics framework, college athletes have no meaningful avenue to monetize their NIL.

16. In light of the evolution of the market for college athletics, the NCAA Eligibility Bylaws are commercial in nature.

17. Plaintiffs challenge two such Eligibility Bylaws: the NCAA's Four Seasons Rule and the Redshirt Rule. Together, these rules artificially restrict certain Division I college athletes who have demonstrated enough academic and athletic acumen to accumulate four seasons of athletic competition within a four-year window, while selectively granting others an additional fifth season of competition in college athletics. In doing so, the NCAA, without legitimate justification and/or by means arbitrarily stricter than necessary, punishes college athletes who are higher achieving earlier in their career, and rewards college athletes who, for example, do not earn enough playing time and choose to redshirt, and are able to maximize their eligibility and commercial opportunities for a fifth season in a way that college athletes who excel cannot.

---

[11] *In re Collegiate Athlete NIL Litigation* (commonly known as *House v. NCAA*), No. 20-cv-03919, 2025 WL 1675820, slip op. (N.D. Cal. June 6, 2025) (final approval of class-action settlement).

[12] Andrew Kean, *The Game-Changer: From 1 July Universities Can Now Pay Money Directly to Student-Athletes*, FirstPoint USA (June 2025), https://www.firstpointusa.com/blog/2025/06/gamechanger-from-july-universities-can-pay-money-directly-to-studentathletes/.

18. These restraints inflict direct harm on college athletes, distort labor markets, and diminish the quality of competition, directly undermining the NCAA's stated mission of supporting college athletes and violating the core principles of federal antitrust law.

19. Plaintiffs, therefore, bring this action to halt the NCAA's unjustified and anticompetitive restrictions, to restore fair competition among universities, and to protect the economic opportunities of *all* Division I college athletes. The NCAA's pandemic waiver proved that its Four Seasons eligibility limits are unnecessary to maintaining any plausible procompetitive justification. Having once admitted that these rules were not essential to preserving college sports, the NCAA cannot now fall back on them as a means to restrict college athletes' rights, suppress competition, and dictate who may or may not maximize their collegiate careers.

## JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1337, and 15 U.S.C. § 4, as this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C.§§ 15(a) and 26.

21. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed classes are citizens of a state different from the Defendant, headquartered in Indianapolis, Indiana.

22. This Court may exercise personal jurisdiction over Defendant because, *inter alia*, the NCAA: (a) currently transacts substantial business within the geographical boundaries of the Nashville Division of the Middle District of Tennessee; (b) conducts athletic competitions, ticket and merchandise sales, television agreements, and other revenue-generating activities in the District along with its member institutions; (c) has substantial contacts with the United States,

including in this District; and (d) is engaged in an illegal anticompetitive scheme that is directed at and has the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. Moreover, several NCAA Division I institutions are found within this District, *i.e.* Vanderbilt University, Belmont University, Tennessee State University, Middle Tennessee State University, Austin Peay University, Tennessee Tech University, and Lipscomb University.

23. Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391(b)(2) because the NCAA transacts business and is found within this District and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

## THE PARTIES

### I. Plaintiffs

24. Plaintiff Langston Patterson is a senior linebacker for Vanderbilt University football who resides in Nashville, Tennessee. Mr. Patterson, a standout from Christ Presbyterian Academy in Nashville, began his NCAA Division I career in 2022. He has since been a steady contributor to Vanderbilt's defense, continuing his progression from local high school star to Southeastern Conference ("SEC") competitor.

25. Plaintiff Nick Levy is a senior Long Snapper for the University of Wisconsin football team, who resides in Madison, Wisconsin. Mr. Levy began his NCAA Division I career in 2022 at the College of William & Mary. After an impressive freshman and sophomore season, Mr. Levy's performance earned him the opportunity to transfer to a Power Four school, Purdue University in 2024. After demonstrating his ability to compete in one of the most competitive conferences in

Division I, Mr. Levy transferred to the University of Wisconsin, where he was named to the Patrick Mannelly Award preseason watch list.

26. Plaintiff Nathanial Vakos is a senior Kicker for the University of Wisconsin football team, who resides in Madison, Wisconsin. Mr. Vakos began his NCAA Division I career in 2022 at Ohio University. After a standout freshman season, Mr. Vakos was honored as an All-American by College Football News and he transferred to the University of Wisconsin in 2023. Mr. Vakos played in every game during his sophomore and junior season where he converted 27 of 38 field goal attempts and all 65 of his extra point attempts.

27. Plaintiff Kevin Gallic is a senior Long Snapper for the University of Nebraska football team, who resides in Lincoln, Nebraska. Before Mr. Gallic transferred in 2025, he competed for three seasons at the University of New Hampshire. During his time at New Hampshire, Mr. Gallic played in 36 games as the Wildcats' Long Snapper and was honored in his junior season as a mid-season first-team FCS All-American by American sportswriter Phil Steele.

28. Plaintiff Lance Mason is a senior Tight End for the University of Wisconsin football team, who resides in Madison, Wisconsin. Mr. Mason began his NCAA Division I career in 2022 at Missouri State University, where he played three seasons. Mr. Mason quickly became a key player and has been recognized for his efforts, such as being honored as an All-American Third-Team selection by Stats Perform and FCS Football Central and as an honorable mention All-American by the Associated Press.

29. Plaintiff CJ Taylor played NCAA Division I football at Vanderbilt University from 2021 through 2024. A highly regarded safety, Mr. Taylor was recognized for his leadership and performance, culminating in his appointment as team captain during his senior year.

11

30. Plaintiff Quincy Skinner Jr. played NCAA Division I football as a wide receiver at Vanderbilt University from 2021 through 2024. A productive four-year contributor, Mr. Skinner's collegiate success led to his signing with the Atlanta Falcons as a rookie for the 2025-26 NFL season.

31. Plaintiff Brayden Schager played NCAA Division I football as a quarterback at the University of Hawaii from 2021 through 2024. Mr. Schager appeared in six games during his freshman season, preventing a redshirt year, and through his impressive performance earned the starting quarterback role, which he held for three consecutive seasons from 2022 to 2024.

32. Plaintiff BJ Harris Jr. played NCAA Division I football for four seasons, attending the University of Missouri for two years before transferring to Central Michigan University, competing from 2021 through 2024. Known for his strong on-field contributions and value to his team, Mr. Harris built a reputation as a reliable performer. Mr. Harris applied for a medical hardship waiver for his third season following an injury, but the NCAA denied his request and his appeal of the decision.

33. Plaintiff Johnny Luetzow is a catcher on the Santa Clara University baseball team who began his NCAA Division I career in 2022. An accomplished and recognized player, Mr. Luetzow has been a consistent contributor over the last three seasons, finishing third on the team in batting average (.281), fourth in on-base percentage (.387), and fifth in hits (41).

34. Plaintiff Henry Stewart is a pitcher on the Santa Clara University baseball team who began his NCAA Division I career in 2022. Known for his potential and skill on the mound, Mr. Stewart showed promise despite limited opportunities. Due to the presence of numerous "Covid seniors" (players granted an additional year of eligibility), he pitched only three innings in

his freshman season, which cost him an entire season of competition due to the fact that he could not take a redshirt after having thrown a single pitch.

35. Plaintiff Jakob Russell is a college baseball player from San Bernardino County, California. Known for his skill and contributions on the field, Mr. Russell began his NCAA Division I career at Long Beach State University, competing in the 2025 season. Prior to that, he attended the University of Redlands for three years where he competed in NCAA Division III baseball for three seasons.

36. Plaintiff Justine Pissott has played NCAA Division I women's basketball for the last three years, attending the University of Tennessee for one year before transferring to Vanderbilt University in 2025. Ms. Pissott finished her high school career as a McDonald's All-American and was one of the highest rated recruits in the class of 2022. Ms. Pissott is known for her shooting ability, particularly from three-point territory where she has consistently improved her three-point percentage during her Division I career.

37. Plaintiff Jak Mwenentanda has played NCAA Division I women's basketball for the last three years, attending the University of Texas before transferring to Vanderbilt University in 2025. Ms. Mwenentanda was a highly ranked high school recruit, and she immediately carved out a substantial role during her three seasons at Texas, appearing in more than 100 games and earning 18 starts during that period.

38. Plaintiff Lawson Lovering played NCAA Division I men's basketball for four seasons, attending the University of Colorado for two years from 2021 to 2023 before transferring to the University of Utah, where he competed from 2023 to 2025. At over seven feet tall, Mr. Lovering is known for his size and defensive prowess; he led the team in blocked shots during his sophomore season. He played a small role off the bench during his freshman season, which prevented a redshirt

13

year. He became a key piece during his years at Utah, starting 52 games during his two years in Salt Lake City.

39. Plaintiff Reese Ragland is a college athlete on full scholarship at Tulane University and a member of its women's cross country and track and field programs. Since joining Tulane, Ms. Ragland has competed in numerous collegiate meets, representing the university in both cross country and middle-distance track events. Ms. Ragland has recorded personal bests in the 800m, 1000m, 1500m, and mile, and has consistently contributed to Tulane's team performances through her reliability and steady progression each season.

40. Plaintiff Ellie Geoffroy is a senior defender for the Oklahoma State University women's soccer team and resides in Stillwater, Oklahoma. She began her NCAA Division I career in 2022 at the University of Oklahoma, where she appeared in 19 games (seven starts), totaling over 1,000 minutes and scoring her first career goal. As a junior, Ms. Geoffroy started all 22 games and anchored a defense that set a program record with nine consecutive shutouts.

41. Plaintiff X Pineda is a senior Midfielder for the Oklahoma State University women's soccer team, who resides in Stillwater, Oklahoma. Ms. Pineda has been a key player for the Cowgirls since her freshman season, starting in 17 of their 19 games and recording 2 goals and 2 assists. Ms. Pineda continues to impress each season she plays earning various awards, such as All-Big 12 Second Team honors and United Soccer Coaches All-Midwest Region First Team honors.

42. Plaintiff Timo Legout is a student at the University of Texas and a member of its men's tennis program. Although he did not enroll until 2024, the NCAA imposed a three-season penalty based on the time between his high school graduation in Europe and his NCAA enrollment. As a result, Mr. Legout's only season of NCAA Division I competition was 2024-2025. Despite the

14

NCAA's penalty, he remains within his five-year eligibility window and would be eligible for an additional season of competition in the 2026-2027 season.

## II.    Defendant

43. The National Collegiate Athletic Association is a self-described unincorporated, not-for-profit, educational organization founded in 1906, and maintains its principal place of business in Indianapolis, Indiana.

44. The NCAA is the governing body of college sports. The NCAA includes more than 1,100 member colleges and universities throughout the United States, including institutions in the Middle District of Tennessee.

45. Through the NCAA's Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports, including specifically, NCAA Bylaw 12.6 (the Four Seasons Rule) and the Redshirt Rule. The NCAA Constitution and Bylaws were adopted pursuant to a vote of the member institutions and various NCAA councils, and these rules can only be amended by a vote of the member institutions or NCAA councils.

46. As a practical matter, an academic institution that wishes to compete in any meaningful way in the highest and most popular level of collegiate athletics must maintain membership in the NCAA and abide by the Division I rules and regulations promulgated by the NCAA and its members. Failure to abide by these rules and regulations risks subjecting sports programs at the academic institution to punitive measures from the NCAA that include reduced athletic-

scholarships, suspensions, prohibition on post-season eligibility, vacating previously earned wins, monetary fines, and the so-called "death penalty."[13]

47. The NCAA and its member institutions control the highest and most popular level of collegiate education and athletics. Therefore, any individual who wishes to provide athletic services in exchange for the payment of partial or full tuition for top tier education and wishes to derive the substantial benefits from competing at the highest level of collegiate athletics must attend an NCAA Division I member institution.

48. There are zero practical alternatives that can provide the unique combination of attributes offered by Division I NCAA athletic schools: (i) the ability to exchange athletic services for the payment of the partial or full cost of an education plus room and board, (ii) high quality academic educational services, (iii) top-of-the-line training facilities, (iv) high quality coaches that are best suited to launch players to professional careers, (v) national publicity through national championships and nationwide broadcasting contracts, (vi) opportunities to profit from NIL agreements, and (vii) competition at the highest level of collegiate athletics.

### III. Co-Conspirators

49. Various other persons, firms, corporations, organizations, and business entities, both known and unknown, have participated as co-conspirators in the unlawful conduct alleged herein. These include NCAA member institutions and NCAA Division I athletic conferences.

---

[13] The "death penalty" is the NCAA's most severe punishment and refers to the complete shutdown of a specific athletic program at a member institution for at least one year. This sanction is reserved for egregious and repeated rule violations, particularly where the institution has shown a pattern of noncompliance or a lack of institutional control. *See Enforcement Process: Penalties*, NCAA, https://www.ncaa.org/sports/2013/11/27/enforcement-process-penalties.aspx (last visited Nov. 10, 2025).

16

Representatives of member schools and conferences serve on NCAA committees that propose and adopt rule changes. By voting for and enforcing NCAA rules that unlawfully restrain trade, those institutions and conferences have knowingly agreed to impose and benefit from the anticompetitive restraints described herein.

## FACTUAL BACKGROUND

### I. An Overview of the NCAA

50. The NCAA is a member-led organization founded to "regulate the rules of college sport and protect young college athletes."[14] Article 1 of the NCAA Constitution states that the NCAA's basic purpose is to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body, and, by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports.

51. The NCAA claims it is "dedicated to the well-being and lifelong success of college athletes," and "united around one goal: creating opportunities for college athletes."[15] In practice, however, the NCAA has evolved into the central gatekeeper of a multibillion-dollar industry, where rules often serve to maximize institutional revenue rather than college athlete welfare.

#### A. History and Purpose

52. In 1905, President Theodore Roosevelt called together athletic leaders from some of the top football universities of the time, prompting them to curb the violence in the sport. Thirteen universities assembled to tackle the issue of football safety, and they were ultimately able to reach agreement on a set of new rules. Shortly after this meeting, 62 colleges and universities became

---

[14] *History*, NCAA, https://www.ncaa.org/sports/2021/5/4/history (last visited Oct. 8, 2025).

[15] NCAA, Return of Organization Exempt from Income Tax (IRS Form 990) for Fiscal Year Ending Aug. 2018 (filed 2019).

charter members of the Intercollegiate Athletic Association of the United States ("IAAUS")—the precursor to the NCAA.[16]

53. The IAAUS became the official rules-making body as of March 31, 1906. By 1910, the IAAUS was renamed the National Collegiate Athletic Association ("NCAA"). The NCAA quickly expanded its reach, hosting its first national championship in track and field in 1921. Many others followed throughout the 1920s and 1930s, with the first NCAA basketball tournament being hosted in 1939.

54. The NCAA rapidly grew into the giant organization recognized today due, in part, to its growing popularity and federal legislation prohibiting sex discrimination in sports. As bigger schools began to see returns from their participation in the sports cartel, they continued to invest in their sports programs; however, smaller schools were unable to keep pace. The result was a widening gap between haves and have-nots—a gap that persists to this day.

55. In 1973, the Association's membership was divided into Divisions I, II, and III, with each division having legislative powers and separate championships. Five years later, Division I members voted to create subdivision I-A and I-AA (renamed the Football Bowl Subdivision ("FBS") and the Football Championship Subdivision ("FCS") in 2007) in football.

56. Around the turn of the century, a "landmark restructuring of the NCAA governance,"[17] took place that "provided greater autonomy for the three divisions and placed institutional presidents in charge of each division and of the Association in general."[18]

---

[16] *History*, NCAA, https://www.ncaa.org/sports/2021/5/4/history (last visited Oct. 8, 2025).

[17] *Id*.

[18] *Id*.

57. Today, the NCAA generates billions in revenue, largely because of the business opportunities arising from Division I FBS football and basketball. FBS college football and Division I men's basketball are, combined, among the most lucrative sports products in the nation. During the 2022-2023 season alone, the NCAA reported roughly $1.3 billion in revenue, a number driven overwhelmingly by college athletes who are prohibited by application of the NCAA's rules and regulations from sharing equitably in that economic success.[19]

58. Meanwhile, college athletes devote extraordinary time and effort to their sports, often at the expense of academic opportunities, internships, and paid work, while the NCAA and member institutions reap billions of dollars in revenue from their efforts.

### B. NCAA Governance Structure

59. The NCAA "is a voluntary, self-governing organization of four-year colleges, universities and conferences committed to the well-being and development of college athletes, to sound academic standards and the academic success of college athletes, and to diversity, equity and inclusion."[20]

60. The NCAA asserts that member schools are ultimately responsible for determining which rules to adopt for their respective divisions, covering areas such as recruiting, compliance, academics, and championships. Nevertheless, employees at the NCAA national office play a

---

[19] Associated Press, *NCAA Generates Nearly $1.3 Billion in Revenue for 2022-23*, ESPN (Feb. 1, 2024), https://www.espn.com/college-sports/story/_/id/39439274/ncaa-generates-nearly-13-billion-revenue-2022-23.

[20] *NCAA Constitution,* 1 (Dec. 14, 2021), https://ncaaorg.s3.amazonaws.com/governance/ncaa/constitution/NCAAGov_Constitution12142 1.pdf.

19

significant role in "support[ing] the member committees that make rules and policies for college sports."[21]

61. Today, the NCAA and its members collaboratively establish rules governing numerous athletic competitions among member schools. Over 500,000 college athletes compete across NCAA's three divisions, representing approximately 1,100 member institutions. Roughly 350 schools compete at the Division I level, which is further divided into 32 conferences. While these conferences may adopt and enforce their own rules, such regulations must remain consistent with NCAA rules.

62. The NCAA Board of Governors, comprised of institution presidents, chancellors, ex-college athletes, and other chief executives, is the highest governing body and is responsible for enacting the rules governing participation in the NCAA.

63. The NCAA and its members abide by the NCAA manual, which is amended and promulgated annually and contains the NCAA's Constitution and Bylaws, which include nearly 500 pages of regulation governing all aspects of college sports. The NCAA's Constitution and Bylaws are adopted by a vote of the NCAA membership. These Bylaws are not merely technical guidance, but rather mechanisms by which the NCAA exerts control over college athletes' careers, compensation, and opportunities, and the labor markets for college athletics.

### C. The NCAA's History of Antitrust Violations

64. The NCAA has a history of violating federal antitrust law with numerous parties successfully challenging its restrictive rules. Time and again, the NCAA has argued that loosening its anticompetitive restraints would destroy amateurism and reduce consumer demand for college

---

[21] *Overview*, NCAA, https://www.ncaa.org/sports/2021/2/16/overview (last visited Oct. 8, 2025).

sports. Time and again, courts have rejected these arguments, and, in every instance that a court has rejected these arguments, demand for college athletics has only continued to grow.

65. In 1984, the U.S. Supreme Court in *NCAA v. Board of Regents* affirmed the lower court's finding that the NCAA violated the Sherman Act by limiting the number of televised football games and threatening penalties for schools that pursued competing broadcast agreements. 468 U.S. 85, 119 (1984) (rejecting NCAA argument that restricting sale of broadcast rights was necessary "to preserve amateurism").

66. Antitrust challenges have arisen in other contexts: in *White v. NCAA*, a Central District of California court certified a class of individuals who received athletic-based grant-in-aid scholarships for claims that the NCAA and its member institutions entered into a horizontal agreement to adhere to a cap in their financial aid awards. No. CV 06-999-RGK, 2006 WL 8066803 (C.D. Cal. Oct. 19, 2006). And in *Law v. NCAA*, the Tenth Circuit affirmed summary judgment and a permanent injunction striking down an NCAA rule limiting entry-level coaches' salaries. 134 F.3d 1010, 1021 (10th Cir. 1998) (rejecting the NCAA's proposed procompetitive justifications for restricting assistant coach salaries). Each decision dismantled an artificial restraint and, contrary to NCAA predictions, demand for college sports increased.

67. The NCAA's restrictions on college athlete compensation have also been repeatedly struck down. In *O'Bannon v. NCAA*, the court held that NCAA rules preventing college athletes from sharing in revenue generated from their name, image, and likeness violated Section 1 of the Sherman Act. 802 F.3d 1049 (9th Cir. 2015). Subsequent rulings, including the Ninth Circuit's decision in the *In re National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litigation*, and affirmed by the Supreme Court in *Alston*, confirmed that certain of the NCAA's compensation rules imposed substantial anticompetitive effects without legitimate procompetitive

21

justification. 958 F.3d 1239 (9th Cir. 2020), *aff'd sub nom.*, *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021).

68. The NCAA's historic entanglement with violating federal antitrust law further demonstrates that the NCAA operates as a cartel, artificially depressing the value of college athletes' services and violating antitrust law. Restrictions on compensation, eligibility, and benefits do not reflect market realities, but are instead deliberate attempts to control competition, suppress pay, and maximize profits for institutions at the expense of the college athletes themselves.

### D.  Bylaws and Enforcement

#### 1.  The Five Year Rule, the Four Seasons Rule, and the Eligibility Clock (Bylaw 12.6)

69. Under NCAA Bylaw 12.6, an NCAA Division I college athlete has five years of eligibility to play four seasons of intercollegiate competition in his or her chosen sport. The college athlete's window—known as an Eligibility Clock—starts to run from the date on which a college athlete registers as a full-time student at any collegiate institution.

70. Plaintiffs do not challenge the concept of a defined eligibility period or the Five-Year Rule itself. They accept that there are "outer bounds" to a college athletic career. What Plaintiffs challenge are the NCAA's additional, unnecessary restrictions that arbitrarily strip college athletes of seasons they should be able to compete within that defined window. The Four Seasons Rule, especially when coupled with the Redshirt Rule, functions not as a reasonable boundary, but as an anticompetitive device: it arbitrarily denies some college athletes full use of the five-year period while selectively extending opportunities to others.

71. The NCAA claims its eligibility restrictions exist to "move student-athletes toward graduation in a timely manner."[22] Even if Eligibility Bylaws like the Four Seasons and Redshirt Rules loosely track academic pacing, they have no legitimate role in protecting competitive integrity—especially in the wake of the NCAA's rule change allowing players to transfer an unlimited number of times between schools without sitting out a season. Thus, while Plaintiffs do not challenge the NCAA's authority to define an overall eligibility window, the NCAA goes further—artificially capping the number of seasons of competition within that window and applying the Redshirt Rule inconsistently across sports and without any procompetitive rationale. These restrictions suppress competition and limit college athletes' economic opportunities.

### 2. The Redshirt Rule

72. The Redshirt Rule allows college athletes to extend their period of eligibility by sitting out competition for a season while remaining fully enrolled and practicing with their team. Under the NCAA's Eligibility Bylaws, a college athlete may compete in a limited number of activities without it counting as a full season of eligibility, effectively "redshirting" that year. The rule is supposed to provide flexibility for athletes recovering from injury, adjusting academically, or developing athletically, while preserving the total number of seasons they may compete. In practice, redshirt athletes continue to receive many of the benefits of full participation—they train with the team, take classes, and engage in meetings, travel, and film study. Many also earn NIL compensation during a redshirt year, as their ongoing team involvement retains marketable value.

73. Athletes who do not take a redshirt year at the start of their NCAA careers are typically those who are academically eligible, capable of and ready to compete immediately in their college

---

[22] *Guide for Four-Year Transfers 2024-25,* 13, NCAA, http://fs.ncaa.org.s3.amazo-naws.com/Docs/eligibility_center/Transfer/FourYearGuide.pdf (last visited Oct. 8, 2025).

athletics career, and demonstrate that neither they nor their coaches believed a preparatory "primer" year was necessary. Their ability to participate fully without delaying eligibility highlights that the redshirt option primarily serves as a developmental tool. In practice, this distinction underscores the Redshirt Rule's uneven, anticompetitive impact: it advantages some college athletes while unnecessarily restricting those ready to (and perhaps best able to) compete, limiting their playing opportunities and economic potential on the backend of their collegiate careers.

74. Historically, the Redshirt Rule granted Division I college athletes the ability to preserve a year of eligibility while adapting to the higher level of competition, provided—depending on the sport—they abstained from recognized competition during that season. At the same time, these athletes were permitted to practice with the team, participate in meetings and film sessions, and receive scholarships and other financial benefits tied to their athletic participation. In other words, the Redshirt Rule allowed (and universities often required) college athletes to engage fully in the day-to-day demands of Division I sports without consuming a season of eligibility.

75. By contrast, Plaintiffs and similarly situated college athletes who did not redshirt each lost a full season of athletic participation available to their redshirt counterparts. They are arbitrarily denied the opportunity to access the benefits of a fifth NCAA season—benefits their redshirt peers automatically receive. This limitation is particularly significant because a college athlete's final season—whether redshirted or not—often coincides with peak athletic development, maximum professional exposure, and highest earning potential.

76. The resulting disparity is stark: two college athletes may spend four years on campus and fully participate in their programs, yet one can preserve eligibility through redshirting and be automatically entitled to a fifth season while the other, by means of stepping on a court or field for

a single moment,[23] is arbitrarily denied that opportunity and limited to four seasons, unable to fully capitalize on their competitive window. This arbitrary distinction withholds the most valuable portion of a college athlete's career from some while granting it to others, creating an unequal playing field with significant economic and professional consequences. "Such [changed market] realities now include...seemingly prevalent participation by older, non-JUCO players on Division I football teams through pathways like...redshirting." *Pavia v. NCAA*, 154 F.4th 407, 421 (6th Cir. Oct. 1, 2025) (Hermandorfer, J., concurring) (citing Thapar, J., concurring; *Fourqurean*, 143 F.4th 859, 864 (7th Cir. 2025)).

77. The Redshirt Rule has been modified for football players, who may compete in up to four regular season games and, as of 2024, postseason contests without losing a year of eligibility.[24] No comparable flexibility exists for college athletes in other sports, such as basketball, where even a single moment of competitive play consumes an entire season of eligibility. This selective application underscores the Rule's arbitrary nature and lack of any procompetitive justification.

78. The economic consequences of these restrictions are significant. An additional season of competition now carries substantial financial benefits, including NIL earnings and payments through the recently established revenue-sharing model under the *House v. NCAA* settlement. Successful college athletes who are forced to expend eligibility without access to a fifth season are denied their most valuable years for compensation, exposure, and professional development.

---

[23] Or, for football, playing a snap in more than four regular season games.

[24] *See NCAA*, 2025-26 NCAA Division I Manual, Bylaw 12.6.3.1.6, at 50 (2025) https://ncaapublications.com/products/2025-2026-ncaa-division-i-manual.

25

79. With the advent of NIL earnings and revenue sharing, the Redshirt Rule functions as an unreasonable restraint of trade. It forecloses opportunities for some college athletes while selectively extending them to others.

80. So long as college athletes remain within the NCAA's five-year eligibility window, they should not be arbitrarily barred from competing in seasons for which they are physically, academically, and competitively prepared—and upon which their ability to finish a degree may depend. By inserting such a barrier, the NCAA restricts fair competition, depresses college athlete compensation, and entrenches its cartel power in violation of the Sherman Act. Athletes have five years to practice and five years to graduate. They should have five years to play.

### E. The Application of the Eligibility Restraints to Named Plaintiffs

81. The NCAA's application of the Four Seasons and Redshirt Rules to all named Plaintiffs, and those similarly situated, unreasonably restrains trade in the various labor markets for NCAA Division I college athletes in violation of Section 1 of the Sherman Act.

### 1. Application of Eligibility Restraints to Plaintiff Langston Patterson

82. Plaintiff Langston Patterson grew up in Nashville, Tennessee, and played high school football at Christ Presbyterian Academy, appearing in four consecutive state championship games. In his senior year, he was ranked the No. 12 inside linebacker nationally by ESPN and signed with Vanderbilt University in 2022.

83. The 2025 season marks Mr. Patterson's fourth year with the Commodores and only his second as a starting linebacker. Known for his leadership both on and off the field, 2025 is also his second year serving as team captain. Mr. Patterson has consistently excelled academically, earning a spot on the SEC Academic Honor Roll each of his first three seasons.

84. Mr. Patterson is expected to graduate in Spring 2026 with a bachelor's degree in Human and Organizational Development and a Business minor and hopes to pursue post-graduate coursework absent the challenged eligibility restrictions. Given his impressive tenure, he would be a valuable asset to his current team as a fifth-year player or a highly sought-after addition to the football program at another NCAA institution.

85. Because of the NCAA's Four Seasons and Redshirt Rules, Mr. Patterson's ability to compete and fully capitalize on NIL opportunities has been and continues to be restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

## 2. Application of Eligibility Restraints to Plaintiff Nicholas ("Nick") Levy

86. Plaintiff Nick Levy grew up in Ashburn, Virginia, and played football at Broad Run High School, where he earned first-team all-state honors at Linebacker. During his senior season, Mr. Levy led his team with 127 tackles, which was the second-best single-season total in school history.

87. Mr. Levy began his Division I career at the College of William and Mary and he was incredibly successful. As a freshman, Mr. Levy started all 13 games at Long Snapper and was honored as an All-American by Stats Perform and Phil Steele Magazine. Mr. Levy flourished academically during his time at William & Mary, being named to CAA Commissioner's Academic Honor Roll and receiving the Provost Award for academic excellence.

88. His stellar athletic and academic performance earned him the opportunity to transfer to Purdue University for his junior season. At Purdue, Mr. Levy finally got the opportunity to demonstrate he was talented enough to succeed at the highest level of competition in Division I.

Mr. Levy appeared in all 12 games as the starting Long Snapper and he was credited with six tackles, including two against a highly ranked Notre Dame team. Mr. Levy transferred to Wisconsin for his senior season where he was named to the preseason watch list for the Patrick Mannelly Award.

89. Mr. Levy is expected to graduate with a bachelor's degree in Health Promotion and Health Equity in Spring of 2026 and hopes to pursue post-graduate coursework absent the challenged eligibility restrictions. Given his impressive athletic career, Mr. Levy would be a valuable asset to his current team as a fifth-year player or a highly sought-after addition to the football program at another NCAA institution.

90. Because of the NCAA's Four Seasons and Redshirt Rules, Mr. Levy's ability to compete and fully capitalize on NIL opportunities has been and continues to be restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 3.    Application of Eligibility Restraints to Plaintiff Nathanial Vakos

91. Plaintiff Nathanial Vakos is from Avon, Ohio, where he was a standout Kicker who played four years of varsity football at Avon High School. During his career he only missed one extra point attempt, and this came on his first ever attempt; Mr. Vakos went on to set a national record by making his next 260 extra point attempts. During his senior year, Mr. Vakos earned second-team all-state honors and was named Avon High School Athlete of the year.

92. Mr. Vakos began his Division I career at Ohio University in 2022 where he quickly found success. Mr. Vakos started in all 13 games his freshman year, making 19 of 23 field goals attempts and 48 of 49 extra point attempts. He transferred to the University of Wisconsin the

following year, where he continued to prove himself as a reliable Kicker. As a sophomore, Mr. Vakos started in all 13 games for the Badgers, converting 15 of 19 field goal attempts and all of his 34 extra point attempts. He was also named Big Ten Special Teams Player of the Week and honored as a Semifinalist for the Lou Groza Award. As a junior, Mr. Vakos became the Badgers' all-time leader in 50+ yard field goals. Mr. Vakos was named to the preseason watch list for the Lou Groza Award heading into his senior season.

93. Mr. Vakos is expected to graduate with a bachelor's degree in Consumer Behavior and Marketplace Studies in Spring of 2026 and hopes to pursue post-graduate coursework absent the challenged eligibility restrictions. Given his impressive athletic career, Mr. Vakos would be a valuable asset to his current team as a fifth-year player or a highly sought-after addition to the football program at another NCAA institution. Additionally, a fifth year would further support Mr. Vakos's development as he prepares for his goal of playing in the NFL.

94. Because of the NCAA's Four Seasons and Redshirt Rules, Mr. Vakos's ability to compete and fully capitalize on NIL opportunities has been and continues to be restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 4. Application of Eligibility Restraints to Plaintiff Kevin Gallic

95. Plaintiff Kevin Gallic is originally from Warren, New Jersey. Before beginning his NCAA Division I career, he played as a Long Snapper and Defensive Lineman at Lewistown High School in Maine where he established himself as a disciplined, hardworking, and dependable athlete.

29

96. Mr. Gallic began his NCAA Division I career at the University of New Hampshire, which competes in the FCS. His relentless work ethic and dedication quickly proved he was a valuable asset to the team, earning him playing time in all 13 games during his first season. He continued to build on that success throughout his remaining seasons at the University of New Hampshire consistently demonstrating reliability, leadership, and commitment to his craft both on and off the field.

97. Following his tenure at University of New Hampshire, Mr. Gallic transferred to the University of Nebraska where he has become an integral contributor to their football program. He currently serves as Nebraska's primary Long Snapper for punts and field goals/PATs and has appeared in every game this season showcasing his consistency and precision in a critical role. His performance and steady play have earned him recognition for his effort and dependability. Academically, his success has been acknowledged with his inclusion on the Nebraska Scholar-Athlete Honor Roll in Spring 2025, reflecting his commitment to excellence both athletically and academically.

98. Mr. Gallic is expected to graduate with a bachelor's degree in Child, Youth, and Family Studies in Spring 2026 and hopes to pursue post-graduate coursework absent the challenged eligibility restrictions. Given his impressive athletic career and proven leadership, Mr. Gallic would be a valuable asset to his current team as a fifth-year player or a highly sought-after addition to another NCAA football program. Additionally, a fifth year would further support Mr. Gallic's development as he prepares for his pursuit of being drafted into the NFL.

99. Because of the NCAA's Four Seasons and Redshirt Rules, Mr. Gallic's ability to compete and fully capitalize on NIL opportunities has been and continues to be restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and

economic opportunities causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

**5. Application of Eligibility Restraints to Plaintiff Lance Mason**

100. Plaintiff Lance Mason is from Rockwall, Texas, where he was a standout player on the Rockwall Heath High School football team. Mr. Mason was a three-year starter for Coach Mike Spradlin. After playing inside linebacker his sophomore year, Mr. Mason was given the opportunity to move to the offensive side of the ball to play Tight End. As a junior, Mr. Mason caught 27 passes for 450 yards and 3 touchdowns, which earned him all-district honors and an academic all-state selection. As a senior co-captain, Mr. Mason caught 39 passes for 603 yards and 7 touchdowns, which propelled his team to 11 wins, a district championship , and earned him first-team all-district honors.

101. Mr. Mason began his NCAA Division I career in 2022 at Missouri State University, where he played three seasons. Mr. Mason quickly became a key player for the Bears, starting in ten games as a freshman, and seven games as a sophomore. During his first two seasons, Mr. Mason was named to the Athletic Director's Honor Roll in every semester. Mr. Mason had a breakout season as a junior where he started in eight games and led the Missouri Valley Conference in yards per reception at 17.35, which ranked 28th nationally among all pass catchers and first among Tight Ends. He finished that season with 34 catches for 590 yards and six touchdowns. In his junior season, Mr. Mason was honored as an All-America Third-Team selection by Stats Perform and FCS Football Central, and he was named an honorable mention All-American by the Associated Press. Mr. Mason's stellar play earned him the opportunity to transfer to the University of Wisconsin, a Power Four school, where he could finally compete against the very best players in the country.

102. Mr. Mason has made consistent academic progress towards a bachelor's degree in Finance and hopes to pursue further graduate coursework absent the challenged eligibility restrictions. Given his impressive athletic career, Mr. Mason would be a valuable asset to his current team as a fifth-year player or a highly sought-after addition to the football program at another NCAA institution.

103. Because of the NCAA's Four Seasons and Redshirt Rules, Mr. Mason's ability to compete and fully capitalize on NIL opportunities has been and continues to be restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 6. Application of Eligibility Restraints to Plaintiff Chad Maurice ("CJ") Taylor Jr.

104. Plaintiff CJ Taylor Jr. hails from McMinnville, Tennessee and played NCAA Division I football at Vanderbilt University from 2021 through 2024. Throughout his collegiate career, Mr. Taylor demonstrated exceptional athleticism and football IQ, culminating in his appointment as team captain during his senior year. Mr. Taylor's dedication to the program was evident as he remained loyal to Vanderbilt, choosing to build something special at one unique program rather than transferring to another institution.

105. Mr. Taylor's success in NCAA Division I football was not immediate. His freshman season was limited by injuries, including hand surgery, and the depth of Vanderbilt's roster. Nonetheless, he displayed natural instincts for the game. Instead of redshirting his first season, he found a way to contribute, excelling on special teams and developing under the guidance of coaches. His breakout came in his sophomore year including a pivotal play against Missouri in 2022 that highlighted his athleticism. Over the course of his 2021 through 2024 collegiate career,

Mr. Taylor established himself as a highly regarded safety and a leader on the team culminating in his appointment as team captain during his senior season.

106. During those four years, Mr. Taylor played in 42 games, starting 29, and accumulated 181 total tackles, 17 tackles for loss, five interceptions, and four forced fumbles. In his senior season (2024-25), he played in all 13 games, starting 12, and finished fourth on the team with 64 tackles. His performance earned him recognition as the Thorpe Award Player of the Week following a standout game against Auburn.

107. Academically, Mr. Taylor pursued a degree in Medicine, Health, and Society maintaining strong academic performance while balancing the demands of Division I football. He has consistently demonstrated leadership, resilience, and dedication both on and off the field embodying the values of Vanderbilt University and serving as a role model to his teammates.

108. Because of the NCAA's Four Seasons and Redshirt Rules, Mr. Taylor's ability to compete and fully capitalize on NIL opportunities has been restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 7. Application of Eligibility Restraints to Plaintiff Quincy Skinner Jr.

109. Plaintiff Quincy Skinner Jr. played NCAA Division I football at Vanderbilt University from 2021 through 2024. Throughout his collegiate career, Mr. Skinner demonstrated exceptional skill, athleticism, and consistency as a wide receiver culminating in a standout senior season and a reputation as a reliable team leader. Mr. Skinner's dedication to Vanderbilt reflected his commitment to developing within a single program rather than transferring elsewhere.

33

110. Mr. Skinner's collegiate career progressed steadily. As a freshman in 2021, he appeared in eight games, gaining valuable experience. His sophomore season (2022) saw him appear in nine games, recording 17 receptions for 238 yards and two touchdowns, including a pair of touchdown catches against South Carolina and four catches in consecutive games against Missouri and South Carolina. In 2023, Mr. Skinner continued to improve, finishing the season with 20 receptions for 204 yards and three touchdowns highlighted by touchdown receptions at Tennessee, South Carolina, and UNLV. He was named to the SEC Fall Academic Honor Roll.

111. Mr. Skinner capped his Vanderbilt career as a senior in 2024, playing in all 13 games and starting 12. He totaled 66 receptions for 809 yards and eight touchdowns, including a seven-yard touchdown in the Birmingham Bowl win over Georgia Tech, three catches for 72 yards and a score at LSU, and four catches for 72 yards with the season's first touchdown in the win over Virginia Tech. He finished the season with four consecutive games with multiple catches and established himself as a key offensive contributor. Following his collegiate career, Mr. Skinner signed to play in the NFL for the Atlanta Falcons during the upcoming 2025-26 season, but he was cut before the first game.

112. Academically, Mr. Skinner pursued a degree in Communication Studies while balancing the rigorous demands of Division I football. He consistently demonstrated dedication, discipline, and leadership both on and off the field serving as a role model to teammates and embodying Vanderbilt's core values.

113. Because of the NCAA's Four Seasons and Redshirt Rules, Mr. Skinner's ability to compete and fully capitalize on NIL opportunities has been restricted. These rules have directly limited his athletic participation, ability to compete, and leadership potential, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 8. Application of Eligibility Restraints to Plaintiff Brayden Schager

114. Plaintiff Brayden Schager played NCAA Division I football as a quarterback at the University of Hawaii from 2021 through 2024. Mr. Schager appeared in six games during his freshman season which precluded him from obtaining a redshirt year, and subsequently earned the starting quarterback role which he held for three consecutive seasons. Over the course of his career, Mr. Schager demonstrated exceptional skill, leadership, and consistency, throwing for over 9,000 yards and 60 touchdowns and establishing himself as one of Hawaii's top quarterbacks.

115. A three-time Academic All-Mountain West honoree, Mr. Schager graduated in the Spring of 2025 and was honored with the Jack Bonham Award (the University of Hawaii's highest honor), rewarding "leadership on the court, in the pool and on the field, along with excellence in the classroom and service in the community." Mr. Schager would have been highly sought after as a graduate transfer if he had an additional year of eligibility. Following his collegiate career, Mr. Schager tried out for the Baltimore Ravens but was cut from the regular season roster.

116. Academically, Mr. Schager pursued an interdisciplinary degree in sports, business, and leadership while balancing the rigorous demands of Division I football. Had he maintained his redshirt, Mr. Schager planned to pursue his master's of Business Administration. Mr. Schager consistently demonstrated dedication, discipline, and leadership both on and off the field serving as a role model to teammates and embodying Vanderbilt's core values.

117. Despite his performance and potential, the NCAA's Four Seasons and Redshirt Rules restricted Mr. Schager's ability to extend his collegiate career. Having lost a year of eligibility due in part to having to fill in for an injured teammate and the coaching staffs' ignorance, he was denied the opportunity to compete for an additional season which would have allowed him to further refine his skills, gain additional game experience, and increase his visibility to professional scouts

at his peak. These limitations curtailed both his athletic development and his opportunities to earn compensation through NIL arrangements.

118. Because of the NCAA's Four Seasons and Redshirt Rules, Mr. Schager's ability to compete and fully capitalize on NIL opportunities has been restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 9. Application of Eligibility Restraints to Plaintiff Bernard ("BJ") Harris Jr.

119. Plaintiff BJ Harris Jr. played NCAA Division I football for four seasons, beginning his collegiate career at the University of Missouri before transferring to Central Michigan University. Over his four-year career, Mr. Harris appeared in 43 games and established himself as a consistent and productive contributor at running back. Across his career, he rushed for 562 yards and four touchdowns on 43 carries (averaging 4.0 yards per carry) and caught 13 passes for 102 yards. At Central Michigan, he rushed 110 times for 457 yards and three touchdowns, with a long of 71 yards, while catching 12 passes for 102 yards.

120. During his senior season in 2024, Mr. Harris played in all 12 games, earning one start, and was recognized with College Football Network All-MAC honorable mention honors. Mr. Harris was named MAC Offensive Player of the Week following a 151-yard rushing performance against Ball State. That season, he ranked second on the team in rushing yards (418), carries (91), rushing yards per game (34.8), and rushing touchdowns (three), while adding 11 receptions for 93 yards. Mr. Harris had several standout performances, including a 156 all-purpose yard game against Ball State, which included a career-long 71-yard run.

121. Academically and personally, Mr. Harris excelled while balancing the demands of Division I athletics, majoring in Information Systems and demonstrating leadership on and off the field. An additional year of eligibility at the NCAA Division I level would have allowed Mr. Harris to continue his academic pursuits, develop his athletic skills, expand professional prospects, and increase his NIL opportunities to at least a five-figure package.

122. Because of the NCAA's Four Seasons and Redshirt Rules, Mr. Harris's ability to compete and fully capitalize on NIL opportunities has been restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 10. Application of Eligibility Restraints to Plaintiff John ("Johnny") Luetzow

123. Plaintiff Johnny Luetzow is a catcher on the Santa Clara University baseball team who began his NCAA Division I career in 2023. Over three seasons, he has emerged as a consistent performer both athletically and academically earning recognition as one of the program's most dependable players.

124. Mr. Luetzow has appeared in 87 games with 72 starts, including 60 behind the plate, and has maintained a career batting average of .279 with a .381 on-base percentage. He has recorded 69 hits, nine doubles, two home runs, 34 RBIs, and 33 runs scored while posting a career fielding percentage of .986 and throwing out 18 base runners. In 2025, he was named to the Buster Posey Award Midseason Watch List recognizing the nation's top collegiate catchers and finished third on the team in batting average and fourth in on-base percentage.

125. Academically, Mr. Luetzow is pursuing a bachelor's degree in Finance, while balancing the rigorous demands of Division I baseball. Mr. Luetzow has consistently excelled in

37

the classroom, earning "Gold" honors on the West Coast Conference Commissioner's Honor Roll in each of his three seasons. He was named to the WCC All-Academic first team in 2025 after receiving honorable mention honors in 2024 and was also recognized as Academic All-District by the College Sports Communicators.

126. An additional year of eligibility would allow Mr. Luetzow to continue developing his skills, pursue post-graduate coursework, enhance his professional baseball prospects, and expand his NIL opportunities while providing veteran leadership to his team.

127. Because of the NCAA's Four Seasons and Redshirt Rules, Mr. Luetzow's ability to compete and fully capitalize on NIL opportunities has been restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

**11.      Application of Eligibility Restraints to Plaintiff Henry Stewart**

128. Plaintiff Henry Stewart is a pitcher for the Santa Clara University baseball team who began his NCAA Division I career in the 2022-23 season. Over his three seasons to date, he has established himself as a reliable and highly efficient bullpen arm, complementing his strong academic performance with on-field effectiveness.

129. In his first two seasons, Mr. Stewart's opportunities were sharply curtailed by the presence of Covid seniors and extended rosters resulting from the NCAA's pandemic waiver. With limited innings available, he appeared in only a handful of games and was unable to fully develop through regular competition. Despite those restrictions, he persisted and in 2025 emerged as a key contributor, making 17 appearances—tied for third-most on the team—including 15 relief outings and two starts. He posted a 3-0 record with a 2.28 ERA, held opponents to a .214 average, and

38

struck out 23 batters in 27⅔ innings. He began the year with a 15⅔-inning scoreless streak, did not

yield a run in 11 appearances, and struck out multiple batters in seven games.

130. Academically, Mr. Stewart has excelled consistently, earning WCC Commissioner's

Honor Roll "Silver" honors in each of his three seasons. In 2025, he was named Academic All-

District by the College Sports Communicators and earned WCC All-Academic Honorable

Mention.

131. Continued eligibility would afford Mr. Stewart the vital opportunity to pursue post-

graduate coursework, further refine his pitching craft, strengthen his leadership presence in the

dugout, and increase his visibility for potential professional pursuits and Name, Image, and

Likeness (NIL) ventures.

132. Because of the NCAA's Four Seasons and Redshirt Rules, Mr. Stewart's ability to

compete and fully capitalize on NIL opportunities is restricted. These rules have directly limited

his athletic participation, ability to compete, leadership potential, and economic opportunities

causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 12.  Application of Eligibility Restraints to Plaintiff Jakob Russell

133. Plaintiff Jakob Russell is a left-handed pitcher for the Long Beach State University

baseball team who began his NCAA Division I career in 2025 after transferring from the University

of Redlands. Over his four collegiate seasons, including three at the NCAA Division III level, Mr.

Russell has demonstrated both athletic versatility and academic dedication.

134. During his three seasons at Redlands (2022-2024), Mr. Russell appeared in 49 games,

including two starts, compiling a 9-3 record with six saves. Mr. Russell struck out 143 batters over

114.2 innings—showcasing impressive strikeout rates—while walking 44. Mr. Russell

complemented his on-field contributions by making the Dean's List on two occasions. In the

39

summer of 2024, he competed in elite summer leagues where he combined for three saves, a 2.45 ERA in the CCL, and strong strikeout numbers that further elevated his profile.

135. In the 2025 season at Long Beach State, Mr. Russell pitched 12.1 innings across 16 relief appearances, striking out 17 and walking only four, ending with a 6.57 ERA. Notably, Mr. Russell earned the win in a key victory against LMU, delivering 1.1 innings and striking out two in his sole appearance as the pitcher of record. These contributions underscore his ability to step into high-pressure situations and perform effectively at the Division I level.

136. Academically, Mr. Russell maintains solid standing as a Consumer Affairs major. His consistent academic performance, combined with his athletic persistence, reflects a well-rounded college athlete poised for further opportunities.

137. Additional eligibility would offer Mr. Russell meaningful benefits: the chance to continue refining his pitching arsenal at the NCAA Division I level, enhance his prospects for both professional baseball and significant NIL opportunities, and possibly secure graduate funding such as tuition, room, and board scholarships to pursue postgraduate studies. This extra year would also have allowed him to build deeper rapport with teammates and coaching staff, strengthening his leadership contributions.

138. Because of the NCAA's Four Seasons and Redshirt Rules, Mr. Russell's ability to compete and fully capitalize on NIL opportunities is restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 13. Application of Eligibility Restraints to Plaintiff Justine Pissott

139. Plaintiff Justine Pissott is a senior guard for the Vanderbilt University women's basketball team. Ms. Pissott joined Vanderbilt after a successful true freshman season at Tennessee.

Over her time in NCAA Division I women's basketball, Ms. Pissott has demonstrated skill, resilience, and a commitment to elevating her team's performance.

140. Ms. Pissott stands 6'4" and was highly regarded coming out of high school as a McDonald's All-American. In her Vanderbilt tenure, she has played in 23 games (2024-25 season) averaging 3.6 points per game and making 19 three-pointers, including a 38.8% rate from beyond the arc. Earlier, in her first season at Vanderbilt (2023-24), she appeared in 33 games and made 28 starts, contributing 6.8 points per game and ranking second on the team with 52 made 3-pointers.

141. Academically, Ms. Pissott is majoring in Human and Organizational Development, demonstrating dedication to both her studies and her athletic career. She transferred to Vanderbilt after initially committing elsewhere, ultimately choosing Vanderbilt to make her mark and help restore its women's basketball program.

142. Ms. Pissott is expected to graduate in Spring of 2026 and hopes to pursue post-graduate coursework absent the challenged eligibility restrictions. An additional year of eligibility would allow Ms. Pissott to continue refining her game, expand her role, increase her NIL opportunities, and build greater continuity and leadership for her team.

143. Because of the NCAA's Four Seasons and Redshirt Rules, Ms. Pissott's ability to compete fully and capitalize on NIL opportunities has been restricted. These rules have directly limited her athletic participation, ability to compete, leadership potential, and economic opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 14.    Application of Eligibility Restraints to Plaintiff Ndjakalenga ("Jak") Mwenentanda

144. Plaintiff Ndjakalenga ("Jak") Mwenentanda is a guard on the Vanderbilt University women's basketball team who began her NCAA Division I career at the University of Texas in

2022. Over her collegiate career, Ms. Mwenentanda has emerged as a versatile and impactful player consistently demonstrating skill, adaptability, and leadership on the court.

145. Ms. Mwenentanda has appeared in over 100 games with 18 starts contributing points, rebounds, and defensive plays in every season. She has earned recognition for her athletic performance, including participation in the 2022 Jordan Brand Classic and being a 2022 McDonald's All-American Nominee, highlighting her status as a top high school recruit and a significant contributor at the collegiate level. Notably, she recorded a career-high 19 points against Illinois in the NCAA Tournament showcasing her scoring ability under postseason pressure.

146. Academically, Ms. Mwenentanda has maintained strong performance throughout her collegiate career. She is pursuing a degree in Psychology while balancing the demanding schedule of a Division I athlete and earning recognition on the SEC Academic Honor Roll. Ms. Mwenentanda exemplifies dedication both on and off the court, demonstrating her ability to excel as both a scholar and an athlete.

147. An additional year of eligibility would allow Ms. Mwenentanda to continue developing her game, expand her NIL opportunities, and provide veteran leadership to her team. With another season, Ms. Mwenentanda could further refine her skills, increase her visibility to professional scouts, and continue serving as a role model within the Vanderbilt program and the broader women's college basketball community.

148. Because of the NCAA's Four Seasons and Redshirt Rules, Ms. Mwenentanda's ability to compete fully and capitalize on NIL opportunities has been restricted. These rules have directly limited her athletic participation, ability to compete, leadership potential, and economic opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 15. Application of Eligibility Restraints to Plaintiff Lawson Lovering

149. Plaintiff Lawson Lovering played NCAA Division I basketball for four seasons, beginning his collegiate career at the University of Colorado before transferring to the University of Utah. Throughout his career Mr. Lovering worked tirelessly and demonstrated consistent development in his skill, athleticism, and leadership abilities, earning him the job of starting Center and the NIL opportunities to match. Mr. Lovering is known as a kind, hardworking, and humble teammate, who has mentored younger players to help them acclimate to the struggles of being a Division I basketball player.

150. Over his four-year career, Mr. Lovering appeared in 113 games and started in 86 of them, establishing himself as a strong rebounder and defensive anchor. Across his career, Mr. Lovering contributed more than 600 points (averaging 5.7 per game), 486 rebounds, 176 assists, 81 blocks, and 53 steals. Mr. Lovering played NCAA Division I basketball for four seasons, beginning his collegiate career at the University of Colorado before transferring to the University of Utah.

151. Mr. Lovering graduated from the University of Utah with his Bachelor of Arts in Communications, demonstrating that his skills extend far beyond the court. Academically, Mr. Lovering thrived while balancing the demands of Division I athletics, being recognized as Student Athlete of the Month and named to the Honor Roll. An additional year of eligibility would have allowed Mr. Lovering to continue his academic pursuits, further develop his athletic abilities, expand his professional prospects, and capitalize from an NIL valuation in excess of seven figures.

152. Because of the NCAA's Four Seasons and Redshirt Rules, Mr. Lovering's ability to compete and fully capitalize on NIL opportunities has been restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic

43

opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

**16.    Application of Eligibility Restraints to Plaintiff Reese Ragland**

153. Plaintiff Reese Ragland is a member of the Tulane University women's cross country and track and field teams. Since joining the Green Wave in 2022, Ms. Ragland has competed in a range of middle-distance and long-distance events establishing herself as a consistent and dependable performer in both indoor and outdoor competition. Ms. Ragland steady progression has made her a key contributor to Tulane's success and a respected leader within the program.

154. Before arriving at Tulane, Ms. Ragland was an accomplished runner at the high school level where she was recognized among the top distance athletes in her region. Ms. Ragland earned multiple all-state honors, set school records in both cross country and track events, and consistently qualified for state championship meets. Ms. Ragland's early achievements reflected the same determination, endurance, and leadership that have characterized her collegiate career.

155. At Tulane, Ms. Ragland has balanced her athletic commitments with academic excellence. As a double Political Science and Gender Studies major, she has demonstrated a strong commitment to her studies and plans to attend law school. Ms. Ragland's academic and athletic discipline have made her a role model for her teammates and an asset to the university community.

156. Ms. Ragland seeks to continue her studies in a field related to her undergraduate degree to advance her professional development and prepare for her eventual pursuit of law school. An additional year of eligibility would allow Ms. Ragland to continue competing at a high level, further develop her athletic potential, and expand her NIL and leadership opportunities as she prepares for her future professional endeavors.

44

157. Because of the NCAA's Four Seasons and Redshirt Rules, Ms. Ragland's ability to compete and fully capitalize on NIL opportunities has been and continues to be restricted. These rules have directly limited her athletic participation, leadership potential, and economic opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 17. Application of Eligibility Restraints to Plaintiff Ellie Geoffroy

158. Plaintiff Ellie Geoffroy is from Andover, Kansas, where she was a standout three sport athlete at Andover Central High School, who lettered in Soccer, Tennis, and Track and Field. Ms. Geoffroy also served a team captain for her club soccer team, Oklahoma Energy FC.

159. Ms. Geoffroy began her NCAA Division I career in 2022 at the University of Oklahoma. Before transferring, Ms. Geoffroy played in 19 games--starting in seven of them--for the Sooners, totaling over 1000 minutes of playing time and scoring her first career goal. Ms. Geoffroy received a bigger opportunity during her sophomore year at Oklahoma State, where she started in 16 of her 17 games played. Ms. Geoffroy started in all 22 games for the Cowgirls as a junior, anchoring a defense that set a program record with nine consecutive shutouts and that led the Big 12 and ranked fourth nationally with 15 shutouts.

160. Ms. Geoffroy is expected to graduate in Spring of 2026 and hopes to pursue post-graduate coursework absent the challenged eligibility restrictions. Given her impressive athletic career, Ms. Geoffroy would be a valuable asset to her current team as a fifth-year player or a highly sought-after addition to the women's soccer program at another NCAA institution.

161. Because of the NCAA's Four Seasons and Redshirt Rules, Ms. Geoffroy's ability to compete and fully capitalize on NIL opportunities has been and continues to be restricted. These rules have directly limited her athletic participation, ability to compete, leadership potential, and

economic opportunities causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 18. Application of Eligibility Restraints to Plaintiff Xcaret ("X") Pineda

162. Plaintiff Xcaret Pineda is from Bolingbrook, Illinois, where she was a standout Midfielder for Plainfield East High School and Eclipse Select Soccer Club. As a senior, Ms. Pineda earned all-conference and all-sectional honors representing her high school and helped lead her club team to a national championship in the Elite Club National League.

163. Ms. Pineda began her Division I career at Oklahoma State University, and she immediately carved out a significant role in the team's midfield, starting in 17 of their 19 games and recording 2 goals and 2 assists. Ms. Pineda showed significant improvement in her second season. As a sophomore, Ms. Pineda started in all 20 games and was third on the team among field players in minutes played with 1,518. She also contributed six goals and five assists for 17 points, which ranked among the top three on the team, and earned her Second Team All-Big 12 honors. Her stellar performance carried over throughout her junior season. Ms. Pineda started in all 22 games and accounting for 16 points (6 goals and 4 assists) and a team-high 24 shots, earning her All-Big 12 First Team and United Soccer Coaches All-Midwest Region First Team honors.

164. Ms. Pineda is expected to graduate in Spring of 2026 and hopes to pursue post-graduate coursework absent the challenged eligibility restrictions. Given her impressive athletic career, Ms. Pineda would be a valuable asset to her current team as a fifth-year player or a highly sought-after addition to the women's soccer program at another NCAA institution.

165. Because of the NCAA's Four Seasons and Redshirt Rules, Ms. Pineda's ability to compete and fully capitalize on NIL opportunities has been and continues to be restricted. These rules have directly limited her athletic participation, ability to compete, leadership potential, and

economic opportunities causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 19. Application of Eligibility Restraints to Plaintiff Timo Legout

166. Plaintiff Timo Legout is a student at the University of Texas and a member of its men's tennis program. Although he did not enroll until 2024, the NCAA imposed a three-season penalty on him based on the time between his high school graduation in Europe and his enrollment at Texas. As a result, Mr. Legout's only season of NCAA Division I competition was the 2024-25 season.

167. Despite this limitation, Mr. Legout made an immediate impact on the Texas program. He contributed consistently in both singles and doubles play, demonstrating strong competitive instincts, technical skill, and leadership on the court. Coaches and teammates alike recognized his value as a versatile and reliable competitor, and he played a key role in the team's success throughout the season.

168. Mr. Legout remains within his Five-Year Eligibility Window and would be eligible for an additional season of competition. Restoring this opportunity would allow him to continue developing as a college athlete, further his athletic goals, and fully realize the benefits of his commitment to the Texas men's tennis program.

169. Because of the NCAA's Four Seasons and Redshirt Rules, Mr. Legout's ability to compete and fully capitalize on NIL opportunities is restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

## CLASS ALLEGATIONS

170. Plaintiffs Langston Patterson, Nathanial Vakos, Nick Levy, Kevin Gallic, Lance Mason, Justine Pissott, Jak Mwenentanda, Johnny Luetzow, Henry Stewart, Ellie Geoffroy, X Pineda, Reese Ragland, and Timo Legout bring this action under Federal Rule of Civil Procedure 23(b)(2), on their own behalf and on behalf of the following Class:

> The "Injunctive Relief Class"—

> All NCAA Division I college athletes who first enrolled in college in the fall of 2022 or beyond who (i) have not taken a redshirt year; (ii) have received or will receive at least 50% of "full grant-in-aid," which is defined by NCAA Bylaw 15.02.5; and (iii) will have at least one of their five years of eligibility available for the 2026-27 academic year.

> This Class excludes NCAA officers, directors, and employees. This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

171. Plaintiffs CJ Taylor Jr., Quincy Skinner Jr., Brayden Schager, BJ Harris Jr., Lawson Lovering, and Jakob Russell bring this action under Federal Rule of Civil Procedure 23(b)(3), on their own behalf and on behalf of the following Class:

> The "Lost Opportunities Damages Class"—

> All NCAA Division I college athletes who first enrolled in college no earlier than the fall of 2020 and no later than the spring of 2022, who (i) did not take a redshirt year; (ii) received at least a 50% of "full grant-in aid," which is defined by NCAA Bylaw 15.02.5; and (iii) whose four-seasons of eligibility was extinguished by application of NCAA Bylaw 12.6 at the conclusion of the 2023-2024 season (for spring sports) or 2024-2025 season (for all sports).

> This Class excludes NCAA officers, directors, and employees. This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

172. Henceforth, the Injunctive Relief Class and the Lost Opportunities Damages Class will be referred to collectively as the "Classes."

173. **Numerosity.** The Classes are so numerous that joinder of all members is impracticable. While the exact number of members in each of the classes is unknown to Plaintiffs

at this time and can only be discerned through discovery, Plaintiffs are informed and believe that there are thousands of members in each of the Classes.

174. **Commonality.** Numerous common questions of law and fact exist as to all members of the Classes. Furthermore, these common questions predominate over any questions affecting solely individual members of the Classes. The questions of law and fact common to the Classes include but are not limited to:

a. Whether the Defendants engaged in a contract, combination, or conspiracy to unreasonably restrain trade by limiting the compensation available to members of the Classes for lost athletic scholarships, lost revenue sharing, loss of use of their names, images, and/or likenesses;

b. Whether such conduct caused members of the Classes to receive less compensation than they would have received for lost athletic scholarships, lost revenue sharing, loss of use of their names, images, and/or likenesses in a truly competitive market;

c. The duration of the contract, combination, or conspiracy alleged herein;

d. Whether Defendants violated Section 1 of the Sherman Act;

e. Whether the conduct of the NCAA and its co-conspirators caused injury to Plaintiffs and Class members;

f. Whether the Injunctive Relief Class is entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief;

g. Whether the Members of the Lost Opportunities Damages Class are entitled to monetary relief, and if so, the manner in which damages (including treble damages authorized by the Sherman Act) should be determined.

175. **Typicality.** Plaintiffs' claims are typical of the claims of other members of the Classes. Plaintiffs and other members of the Classes sustained damages arising out of the NCAA's common course of anticompetitive conduct in violation of law as described herein. Additionally, Plaintiffs' claims are typical of the Class because the challenged eligibility restraints directly and proximately caused injuries to both named Plaintiffs and the members of the Classes.

49

176. **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class action litigation, including antitrust class action litigation. Additionally, Plaintiffs are adequate representatives of the Classes and will protect the claims and interests of the Classes. Plaintiffs do not have interests that conflict with those of the Classes and Plaintiffs will vigorously prosecute the claims set forth herein.

177. **Superiority.** A class action is superior to other methods for the fair and efficient resolution of this controversy. The class action device presents fewer management difficulties, and provides the benefit of a single adjudication, economy of scale, and comprehensive supervision by a single court. The damages suffered by named Plaintiffs and each member of the Classes are relatively small as compared to the expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent class certification, it would not be feasible for named Plaintiffs and members of the Classes to redress the wrongs done to them. It would be grossly inefficient for the judicial system to preside over large numbers of individual cases. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the judicial system. Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

## RELEVANT MARKETS

178. The Four Seasons and Redshirt Rules are effective as to all NCAA Division I college athletes, but operate in multiple distinguishable nationwide labor markets for the respective services of NCAA Division I college athletes. Specifically, the Rules operate in (1) the market for Division I FBS football players, (2) the market for Division I men's basketball players, (3) the

market for Division I women's basketball players, and (4) the markets for athletes in the remaining Division I sports for both men and women (the fourth collectively, the "Tuition Revenue Sports").

179. These markets share many similarities: in each, NCAA Division I institutions compete—through athletic scholarships, room-and-board benefits, and, beginning in July 2025, up to $20.5 million in direct payments authorized by the *House* settlement—to secure the athletic services of current and prospective college athletes. The named Plaintiffs, and all similarly situated class members, are or were the sellers of those services; the NCAA member schools are the buyers. The challenged Four Seasons and Redshirt Rules directly suppress output in these markets by barring otherwise-eligible athletes from offering their services for a fifth season of competition.

180. For each sport and gender market, the relevant geographic market is the United States. The NCAA and its member institutions are located across the country, and they engage in on-field competition and competition in nationwide labor markets for collegiate college athletes. The restraints at issue affect national markets as member institutions recruit and compete for talent across state lines. Accordingly, the relevant labor market extends throughout the United States.

181. There are no alternatives to the NIL Compensation opportunities, *House* Settlement revenue sharing opportunities, or other benefits college athletes receive from competing in NCAA Division I athletics.[25] The opportunity to showcase athletic skills at the highest level of amateur athletic competition while pursuing a degree from a Division I institution makes competition in

---

[25] The NIL market is booming—projected to reach $1.67 billion in 2024-25 (a 43.1 percent year-over-year increase), with women's-sports earnings expected to rise 15 percent and collectives outspending commercial deals at roughly a four to one ratio—demonstrating the uniqueness and magnitude of these opportunities. *See The Annual Opendorse Report*, Opendorse, 4 (2024), https://biz.opendorse.com/wp-content/uploads/2024/07/NIL-AT-3-The-Annual-Opendorse-Report-1.pdf#gf_56.

these markets unique. Within these markets, the NCAA and its member institutions maintain exclusive market power, with the sole ability to dictate the rules and regulations for competition in Division I athletics. The transactions in which the NCAA and its member institutions engage in these markets with college athletes are commercial in nature, as they significantly affect the future earning potential of college athletes and yield significant financial revenue for the member institutions from the sizable consumer interest in college athletics. By prematurely sidelining qualified athletes during what would otherwise be their peak competitive seasons, the Four Seasons and Redshirt Rules reduce the quality, variety, and continuity of the on-field and on-court product.

182. As a practical matter, NIL opportunities are only available to college athletes competing at NCAA Division I institutions as more than 99% of NIL dollars are paid to those college athletes.[26] And even if Division II or Division III programs provide some marginal substitute opportunities, those levels are also governed by the NCAA's cartel and subject to the same eligibility rules that restrain Division I athletes.

183. Although the NCAA is a non-profit organization, the transactions that member institutions make with college athletes yield significant financial revenue for the member institutions and have significant effects on the future earning potential of those college athletes. These transactions include, among other benefits, partial or full scholarships in exchange for the college athlete's services. The college athletes, in return, receive the means to develop, refine, and showcase their skills—essential inputs to their future earning potential. NCAA athletic events in which these college athletes compete are marketed to consumers who view both in-person and via

---

[26] *See id.*

broadcasts of these sporting events, yielding significant revenue to the NCAA's member institutions and conferences. Accordingly, and as numerous courts have recognized, the exchange between member institutions and college athletes is commercial in nature and squarely within the scope of the Sherman Act.

## ANTITRUST ALLEGATIONS

### I.        The Commercial Nature of the Four Seasons and Redshirt Rules

184. This Court's finding in *Pavia* is fully applicable here: "[R]estrictions on who is eligible to play and therefore to negotiate NIL agreements [are] commercial in nature."  *Pavia v. Nat'l Collegiate Athletic Ass'n*, 760 F. Supp. 3d 527, 537 (M.D. Tenn. 2024). The Four Seasons and Redshirt Rules function as artificial caps on competition and therefore constitute commercial restraints subject to scrutiny under the Sherman Act in the post-*Alston* era.

185. When the NCAA lifted its compensation restrictions and allowed college athletes to profit from their name, image, and likeness, many existing eligibility rules circumscribing the population of college athletes who may compete in Division I athletics necessarily became commercial in nature. *See id.* The Four Seasons and Redshirt Rules restrict "who is eligible to play and therefore to negotiate NIL agreements[.]" *Id.* Because eligibility to compete in NCAA Division I athletics is an essential condition of gaining access to the NIL market, the NCAA transformed its artificial restriction on a college athlete's ability to maximize his or her window of eligibility into an unreasonable market restraint. Accordingly, the Four Seasons and Redshirt Rules fall within the ambit of the Sherman Act. (The NCAA conceded that this Court's interpretation of *Bassett v. NCAA*, 528 F.3d 426 (6th Cir. 2008), in the *Pavia* order—concluding that the NCAA's eligibility rules are commercial in nature—remains controlling precedent at this time. *See Bellamy v. Nat'l*

53

*Collegiate Athletic Ass'n*, No. 3:25-cv-00750, Oral Arg. Tr. at 7-8, ECF No. 32 (M.D. Tenn. July 16, 2025).)

186. The NCAA may contend that the Four Seasons and Redshirt Rules are tied to academics, competitive balance, or amateurism. In reality, these rules function as restraints in the relevant markets.[27] They arbitrarily limit the ability of college athletes who forego a redshirt year to obtain the full competitive and commercial benefits that are available within their five-year eligibility window, thereby artificially restricting both who may earn NIL and other compensation and the period of time during which they may earn it. In addition, by curtailing athletes' participation opportunities, these rules also deprive them of meaningful educational benefits—such as additional years of scholarship support, academic progress, and professional development opportunities.

187. The NCAA itself generates billions of dollars from the competitions these college athletes make possible, and its exceptions—such as transfer waivers and medical redshirts—demonstrate that the restrictions are not essential to educational goals. Moreover, the Redshirt Rule allows some college athletes to receive most of the benefits of competition—including practice, financial aid, academic progress, NIL opportunities, and (going forward) access to the compensation funds provided by the NCAA member institutions themselves—without losing a season of eligibility.

188. Plaintiffs, by contrast, are denied the opportunity of a fifth competitive season, at the point of their greatest collegiate earning potential, for no procompetitive reason. The Four Seasons and Redshirt Rules therefore operate as commercial restraints subject to antitrust review.

---

[27] *See supra* ¶¶178-183.

## II. Anticompetitive Effects

### A. Effects on Labor Markets for Division I College Athletics

189. The Four Seasons and Redshirt Rules operate as coordinated restrictions among NCAA member institutions, functioning as horizontal agreements that reduce quality, decrease output, and limit competition for the labor of Division I college athletes in numerous markets.

190. By capping competition at four seasons within a five-year window, the Four Seasons and Redshirt Rules limit the number and/or quality of college athletes who could otherwise contribute to and benefit from an additional season of play. The effect is to suppress economic opportunities, reduce bargaining power, and arbitrarily limit college athletes' personal and professional development. Absent the horizontal agreements to implement these restrictions, universities would compete for this talent, as they already do for redshirting fifth-year college athletes, increasing competition in the relevant labor market and compensation opportunities for college athletes, while also allowing them to pursue graduate education. The growing markets for transfer and graduate-transfer college athletes since *Alston* illustrates the natural demand for retaining skilled players when eligibility is not artificially capped.

191. The Four Seasons and Redshirt Rules also undermine the quality of competition in the NCAA labor markets. College athletes who do not redshirt are denied a full year of benefits— including team access, scholarships, training, academic support, and, in some cases, NIL income— that redshirt athletes leverage to enhance their academic options, athletic performance, and market value. The cumulative advantages of five seasons, available only through redshirting, allow athletes to reach peak performance in their final year, maximizing both competitive impact and economic potential. Those who do not redshirt lack the opportunity to earn additional degrees, refine their skills and elevate their quality in a fifth season—Plaintiffs are forced to expend

eligibility at the front end of their careers, effectively removing what could be their highest-quality season from the labor market. Further, the NCAA applies these restrictions unevenly across sports. Division I football players may now compete in up to nine games, including postseason competition, and still claim a redshirt season. No comparable flexibility exists in other Division I sports. A basketball player, for example, forfeits their fifth year of eligibility by playing a single second of an intercollegiate game in the recognized competitive season. This inconsistent application highlights that the restrictions are not tethered to educational goals or competitive balance, but rather operate as restraints on labor supply in most college sports.

192. Plaintiffs' experiences illustrate these harms. Henry Stewart, who had limited participation in his first two NCAA Division I seasons, is deprived of the opportunity to fully develop and showcase his skills, diminishing the overall quality of his play. Quincy Skinner, a wide receiver who played in his first four years, is being denied the opportunity to extend his career into a fifth season ultimately limiting his contribution to competition in the market at his peak. Johnny Luetzow, a top catcher at Santa Clara, cannot continue building on his record of performance reducing both his competitive quality and professional prospects. Each example reflects the economic and developmental opportunities foreclosed by the Four Seasons and Redshirt Rules.

### 1. The NCAA's Exclusion of Plaintiffs From the Benefits of the *House* Settlement

193. In June 2025, the NCAA reached a settlement with a putative class of current and former NCAA college athletes, through which the NCAA would begin compensating players for the NCAA's use of their NIL between 2016 and 2024. Under the settlement, the NCAA and its "Power Four" member conferences (ACC, Big Ten, Pac-12, and SEC) have agreed to share up to

22% of the average athletic department revenue among Power Four conference schools with their college athletes, up to an agreed maximum of $20.5 million per school.[28]

194. While the *House* Settlement creates a new commercial stream for college athletes, the NCAA's enforcement of the Four Seasons Rule and the Redshirt Rule would deprive Plaintiffs and class members of its full benefit during their windows of eligibility.

195. Moreover, while the *House* Settlement establishes a potential framework for future college athlete compensation, the model has not been uniformly adopted across the NCAA's member institutions.[29] For example, the settlement does not mandate that schools pay the full $20.5 million, and many institutions may opt out entirely.[30] Additionally, all Ivy League schools have declined participation in the *House* Settlement.[31]

196. While Plaintiffs commend the *House* plaintiffs for their efforts, they neither represented—nor represent—the class members in this case for compensation beyond the 2024 season.

---

[28] *See* Stipulation and Settlement Agreement (ECF 450-3), *In re College Athlete NIL Litigation*, 4:20-cv-03919-CW (N.D. Cal. July 26, 2024).

[29] Weston Blasi, *WNBA Players Only Get 9.3% of League Revenue. Here's How Much NBA, NFL, and NHL Players Get*, MarketWatch (Oct. 22, 2024), https://www.marketwatch.com/story/wnba-players-only-get-9-3-of-league-revenue-heres-how-much-nba-nfl-and-nhl-players-get-0abef80c.

[30] Gerard T. Leone, Jr., Austin Maloney & Brigid Harrington, *Important Considerations for Universities Awaiting House Settlement Approval*, Nat'l L. Rev. (May 21, 2025), https://natlawreview.com/article/important-considerations-universities-awaiting-house-settlement-approval.

[31] Associated Press, *Ivy League Won't Join NCAA Antitrust Settlement*, ESPN (Jan. 24, 2025), https://www.espn.com/college-sports/story/_/id/43550303/ivy-league-join-28-billion-ncaa-antitrust-settlement.

197. Absent the $20.5 million cap, many schools would likely pay substantially more for NIL rights. In 2024, the University of Texas generated $331.9 million in athletic revenue; Ohio State, $292.3 million; and Alabama, $234.8 million.[32] The $20.5 million cap represents only 6%, 7%, and 8.7% of these schools' revenues, respectively. Even lower-revenue programs in the new Power Four, such as Mississippi State ($127 million), Kansas State ($104 million), and North Carolina State ($133 million), could allocate more but for the settlement-imposed ceiling.[33] Therefore, without the NCAA's eligibility restraints and the $20.5 million cap, many NCAA Division I programs would spend significantly more to attract and compensate college athletes, including for college athletes' fifth year of competition.

### 2. The Four Seasons and Redshirt Rules Arbitrarily Bar College Athletes from Obtaining Scholarships and Other Education-Related Benefits

198. The Four Seasons and Redshirt Rules arbitrarily bar college athletes who do not take a redshirt year from receiving a fifth year of scholarships and other education-related benefits, despite remaining within the NCAA's defined five-year eligibility window. Redshirt athletes automatically preserve these benefits for an additional season merely by abstaining from competition early in their careers, yet similarly situated athletes, who demonstrate readiness to compete at the outset, are denied the same entitlement. These foreclosed benefits include not only tuition, room and board, and academic support but also access to high-level training facilities, coaching, medical care, and performance development programs. By depriving Plaintiffs of an additional year of such resources, the NCAA imposes an artificial barrier to maximizing athletic

---

[32] *Football Bowl Subdivision (FBS)*, Knight Commission on Intercollegiate Athletics, https://knightnewhousedata.org/fbs (last visited Nov. 7, 2025).

[33] *Id.*

performance and career opportunities—benefits that, in a competitive market, would be available to all qualified athletes.

> ### 3. The Four Seasons and Redshirt Rules Arbitrarily Bar College Athletes from Obtaining Additional Non-University NIL Payments

199. Separate and apart from the direct payments that universities may now provide under the *House* Settlement, college athletes continue to have the ability to secure additional compensation for their individual NIL rights from third parties. While the university payments are designed to compensate college athletes for the institutions' collective use of NIL, college athletes are also free to enter into private market arrangements with school-affiliated collectives, national corporations, and local merchants for the commercial use of their personal NIL.

200. The NCAA's eligibility rules, however, arbitrarily abuse its market power in the relevant markets to restrict access to outside NIL opportunities. By capping some college athletes at four seasons of competition the NCAA forecloses their ability to generate NIL income tied to competition in a fifth year while at the same time permitting other college athletes to compete and profit from NIL for five seasons. This arbitrary distinction is not driven by market forces or competitive necessity. To the contrary, third-party collectives, sponsors, and brands remain motivated to pay college athletes so long as they can compete on the field or court. The NCAA's restriction therefore functions as a horizontal restraint that artificially suppresses overall athlete compensation for their services (such as through NIL opportunities) for one subset of college athletes while allowing others similarly situated to benefit.

201. By excluding college athletes from a fifth competitive season, the NCAA suppresses compensation, reduces bargaining power, and distorts market incentives. Combined with the

NCAA's undisputed market power, recognized by the Supreme Court in *Alston*, the Four Seasons and Redshirt Rules operate as unlawful restraints of trade under Section 1 of the Sherman Act.

### III. No Procompetitive Justification for the Four Seasons and Redshirt Rules

202. The NCAA's position is that the Four Seasons and Redshirt Rules are essential to the preservation of college athletics, typically justifying these limits by referencing (1) the alignment of academics and athletics; (2) preserving the NCAA's amateurism model; and (3) maintaining competitive balance among college athletes, the NCAA, and member institutions. Yet, real-world experience shows that none of these justifications stand up to scrutiny.

### A. Alignment of Academics and Athletics

203. The NCAA claims its eligibility standards foster the academic development of college athletes as they "are designed to move student-athletes toward graduation in a timely manner."[34] The NCAA suggests that limiting eligibility to four years encourages students to prioritize their studies and avoid unnecessary delays in completing their degrees. However, this rationale oversimplifies the realities faced by college athletes and ignores the diverse academic ambitions and personal circumstances that can affect a student's educational journey.

204. College athletes who face circumstances beyond their control often experience disruptions in both their academic and athletic progress. For example, earlier cohorts benefited from an additional year to develop and compete as a result of Covid. Unforeseen events can also interrupt a college athlete's progress, making it difficult to complete both their academic and athletic goals within the rigid four-season timeframe. Allowing these college athletes an additional season of NCAA eligibility would not undermine or be responsible for any delays in their academic

---

[34] *See Guide for Four-Year Transfers 2024-25*, NCAA, 13, http://fs.ncaa.org.s3.amazo-naws.com/Docs/eligibility_center/Transfer/FourYearGuide.pdf (last visited Oct. 8, 2025).

careers; it would simply offer a fair opportunity to recover lost athletic development without penalizing them for disruptions they could not control.

205. Many college athletes do, in fact, complete their degrees in a timely manner, with a significant number graduating in good academic standing within four years. However, the restrictive Four Seasons and Redshirt Rules disincentivize more ambitious academic pursuits, such as dual degrees, combined undergraduate and graduate programs, or graduate-level study in general—academic paths that often require more than the four seasons of eligibility NCAA rules allow. As a result, the current rule can force college athletes to choose between maximizing their educational opportunities and continuing their athletic careers, undermining the very academic development the NCAA claims to promote.

206. Additionally, the NCAA's own reporting underscores the inconsistency. It measures graduation success over a six-year period, while its eligibility rules impose a five-year window while limiting participation in competition to four years.[35] Further, the NCAA's recent rule allowing players to transfer to a new school each and every year shows a dramatic disconnect between the NCAA's purported goal of encouraging graduation within four years and the reality of current competitive market for college athletes.[36] For example, prior to the NCAA's rule change allowing unlimited transfers without having to sit out, less than 1% of highly recruited football players transferred more than once. In contrast, more than 20% of the top 600 recruits in the 2021

---

[35] *Division I Graduation Rates Database,* NCAA (Nov. 2024), https://www.ncaa.org/sports/2017/12/12/division-i-graduation-rates-database.

[36] *See* David Ubben, *How Often Do College Football Players Actually Transfer? Here's What the Data Tells Us*, The Athletic (Aug. 1, 2025), https://www.nytimes.com/athletic/6527935/2025/08/01/college-football-transfer-portal-numbers/.

high school graduating class transferred multiple times. Finally, the NCAA allows athletes to compete in four seasons in one sport and then a fifth season in a different sport (and even trumpets that opportunity), again showing a disconnect application of NCAA rules and any supposed desire to force students to graduate in four years.[37] This disconnect shows that the four-season competition cap is not grounded in genuine academic standards and does not serve a procompetitive purpose.

### B. Promoting Amateurism

207. Additionally, the Four Seasons and Redshirt Rules do not advance the NCAA's claimed interest in preserving consumer demand through its "amateurism model," which purports to distinguish college athletic events from professional sporting events. The NCAA has never articulated a clear, consistent, or enforceable definition of amateurism, and its application of the concept has shifted over time to suit its own interests. The Four Seasons and Redshirt Rules are not tied to any substantive aspect of amateurism: they do not address whether college athletes are compensated, whether they maintain academic standing, or whether they compete for the love of the game rather than financial gain. Instead, they simply impose an arbitrary time limit on competition, regardless of a college athlete's actual status or conduct. In fact, the NCAA's own rules and enforcement history show that eligibility limits like the Four Seasons and Redshirt Rules

---

[37] *See Former Lacrosse Standout Sammy White Joins Northwestern Women's Basketball,* NU Sports (June 20, 2025), https://nusports.com/news/2025/6/20/womens-basketball-former-lacrosse-standout-sammy-white-joins-northwestern-womens-basketball (four-year women's lacrosse player plays basketball in fifth year); *How Pat Spencer, College Lacrosse Record Holder, Made the Golden State Warriors,* NCAA.com (May 1, 2025), https://www.ncaa.com/news/lacrosse-men/article/2025-05-01/how-pat-spencer-college-lacrosse-record-holder-made-golden-state-warriors (four-year men's lacrosse player plays basketball in fifth year, followed by NBA).

are not essential to maintaining the distinction between college and professional sports, nor do they have any real impact on the public's perception of amateurism. Recent NCAA eligibility decisions further confirm that "amateurism" is not coherently or consistently defined. This year, the NCAA allowed former G League Ignite player Thierry Darlan to be ruled eligible to compete in Division I men's basketball, notwithstanding his prior professional employment.[38] And in 2024, the NCAA ended its categorical ban on Canadian Hockey League players, opening Division I hockey to athletes long labeled "professional."[39] These shifts—embracing athletes with prior professional experience—underscore that the NCAA's amateurism rationale cannot justify capping competition at four seasons within a five-year window.

208. The NCAA's position that college athletes lose a year of amateur status solely by competing in games against another school while they are attending school, practicing with their team, and within their five-year window is unfounded. The NCAA itself permits numerous exceptions under which college athletes may compete beyond normal eligibility without undermining its asserted amateurism model. For example, students are allowed to attend a preparatory school prior to their undergraduate university without triggering the Four Seasons Rule, and professional college athletes may attend NCAA member institutions to compete in other sports without penalty. These longstanding exceptions make clear that the Four Seasons and Redshirt Rules are not about protecting amateurism, but rather serve as an unnecessary and

---

[38] Lindsay Schnell, *Former G League Player Thierry Darlan Ruled Eligible by the NCAA to Play at Santa Clara*, N.Y. Times (The Athletic) (Sept. 23, 2025), https://www.nytimes.com/athletic/6655724/2025/09/23/g-league-player-eligible-santa-clara-thierry-darlan/.

[39] Greg Wyshynski, *NCAA Makes Canadian Hockey League Players Eligible for Div. I*, ESPN (Nov. 7, 2024), https://www.espn.com/college-sports/story/_/id/42254200/ncaa-makes-canadian-hockey-league-players-eligible-div-i.

anticompetitive restriction on college athletes' opportunities. Any argument by the NCAA to the contrary is not only inconsistent with its own policies and the lived experience of college athletes, but also fails to justify the exclusionary and restrictive nature of the rule.

### C. Maintaining Competitive Balance

209. Finally, the NCAA's claimed procompetitive justification of preserving competitive balance among college athletes, the NCAA, and its member institutions is undermined by the organization's own precedents. The COVID-era eligibility exception, which allowed certain college athletes to compete for five seasons, provides a clear example that competitive integrity was not only preserved, but enhanced when eligibility was extended. College athletes continued to perform at a high level while benefiting from NIL opportunities; the NCAA sustained its popularity and commercial appeal; and member institutions actively recruited and showcased top-tier talent generating significant financial returns.

210. The NCAA argues that allowing players to compete throughout their entire five-year window takes opportunities away from graduating high school seniors, but the NCAA's Covid-based extension of eligibility had the exact same impact without ruining college sports. This is the perfect time for the NCAA to permanently change its rules to allow all Division I college athletes to compete for five seasons because it essentially would essentially codify the NCAA's Covid season of competition waiver, negating any disparate impact on high school students in comparison to students who graduated at any time in the previous five years since Covid—with the notable exception of the Lost Opportunities Damages Class, whose members graduated at the end of Covid but did not receive an additional season of competition waiver.

211. Moreover, since 2018, Division I football players have been permitted to compete in up to four games in a season without losing a year of eligibility, effectively allowing them to gain

64

meaningful game experience while preserving a redshirt year.[40] With the expansion of the postseason, some players have now competed in as many as nine games in a single season—including four regular season games, a conference championship, and multiple College Football Playoff games—without exhausting a season of eligibility.[41]

212. This approach has not diminished competitive equity; to the contrary, college football's popularity, commercial appeal, and overall level of play have only increased. These outcomes underscore that allowing college athletes additional opportunities to compete can enhance, rather than undermine, the health and integrity of collegiate athletics. The NCAA cannot demonstrate that stricter limitations are necessary, nor has it shown that relaxing these restrictions would harm competitive balance, reduce consumer demand, or adversely affect the labor markets in which college athletes participate.

213. The anticipated impact of the NCAA's exception following *Pavia* is likely to confirm the same principle: making eligibility to compete in intercollegiate play coextensive with the window of eligibility does not harm competitive balance. For instance, since the Court's ruling, Diego Pavia has starred in a Netflix documentary ("Any Given Saturday"), Vanderbilt sold out its season opening game for the first time since 2019—a particularly notable feat because its opponent was not an SEC stalwart bringing thousands of opposing fans to Nashville, but small FCS school Charleston Southern, and four Vanderbilt games through the first ten weeks have finished in the

---

[40] Michelle Brutlag Hosick, *DI Football to Offer More Participation Opportunities*, NCAA (June 13, 2018), https://www.ncaa.org/news/2018/6/13/di-football-to-offer-more-participation-opportunities.

[41] Shehan Jeyarajah, *NCAA Rules Postseason Contests No Longer Count Against Four-Game Max for Redshirt Eligibility*, CBS Sports (Aug. 27, 2024), https://www.cbssports.com/college-football/news/ncaa-rules-postseason-contests-no-longer-count-against-four-game-max-for-redshirt-eligibility/.

top five most viewed games according to Nielsen measurements.[42] Eligibility extensions allow college athletes, institutions, and the NCAA to continue thriving within dynamic and competitive markets.

### IV. Any Potential Procompetitive Justifications for the Four Seasons Rule and Red Shirt Rule Could be Accomplished by Less Restrictive Alternatives

214. Even if the NCAA's asserted goals of promoting the alignment of academics and athletics, preserving amateurism, and maintaining competitive balance were valid procompetitive justifications—which they are not—each could be achieved through significantly less restrictive means.

215. Indeed, the NCAA already employs less restrictive measures to advance these objectives. For example, NCAA Bylaw 14.4.1 requires college athletes to maintain satisfactory progress toward their degrees to remain eligible for competition. Other Bylaws establish minimum credit hour and grade point average requirements for athletic eligibility. These provisions addressing academic progress, GPA, and in-season transfers effectively further the NCAA's stated academic and amateurism objectives without imposing the unnecessary and harmful restrictions embodied in the Four Seasons Rule and the Redshirt Rule.

216. Modifications to the Four Seasons Rule could similarly preserve any legitimate procompetitive objectives asserted by the NCAA while mitigating harm to NCAA Division I college athletes. For instance, as recognized by the United States District Court for the District of Wisconsin, the NCAA could allow up to five seasons of competition within the five-year eligibility

---

[42] Jon Lewis, *College Football TV Ratings — 2025*, Sports Media Watch (Nov. 10, 2025), https://www.sportsmediawatch.com/college-football-tv-ratings/.

window.[43] This approach mirrors the result of the existing Redshirt practices for certain college athletes without prohibiting intercollegiate competition, and reflects a proven, less restrictive method of balancing academics, amateurism, and competition. By adopting such measures, the NCAA could accomplish its stated goals without arbitrarily excluding college athletes at the height of their athletic and commercial potential.

## V.  Enforcement of the Challenged Rules Represents a Group Boycott

217. The Four Seasons Rule and Redshirt Rule also effectuate a horizontal agreement among the NCAA and its member institutions to boycott college athletes who have competed in Division I intercollegiate athletics for four years without taking a redshirt season. This boycott is enforced through the threat of severe penalties imposed on a member college or university that fields a college athlete who has completed four years of intercollegiate competition, even if that athlete is still within the five-year window of eligibility.

218. For example, a member school found to be in violation of the Four Seasons Rule can face forfeiture of wins, fines, and reductions in scholarships, among other potential punishments

---

[43] The NCAA is currently considering a proposal to allow all college athletes five years to complete five seasons of competition. *See Fourqurean v. NCAA*, 771 F. Supp. 3d 1043, 1055 (W.D. Wis. Feb. 6, 2025) (granting preliminary injunction to football player whose father passed away during his freshman season noting that "recent news reports suggest that Defendant is considering allowing five seasons of competition") citing Ross Dellenger, *College Sports Leaders Mulling '5-in-5' Rule to Eliminate Redshirts, Waivers and Other Exemptions*, Yahoo! Sports (Jan. 16, 2025), https://sports.yahoo.com/collegesports-leaders-mulling-5-in-5-rule-to-eliminate-redshirts-waivers-and-other-exemptions-211750014.html.

As recent as July 2025, the NCAA endorsed this concept when the Division II Management Council formally recommended that Division II colleges and universities permit college athletes to compete in each year of their five-year eligibility window. Unfortunately, Division I has yet to follow suit. *See* Corbin McGuire, *Division II Management Council Supports Proposal for 5 Seasons of Competition*, NCAA (July 23, 2025), https://www.ncaa.org/news/2025/7/23/media-center-division-ii-management-council-supports-proposal-for-5-seasons-of-competition.

– up to and including the "death penalty" for repeat offenders, through which colleges are barred from participation in NCAA intercollegiate participation in the sport in which the violation occurred.

219. Moreover, any member school that knowingly competes against a school that is in violation of eligibility rules such as the Four Seasons Rule can similarly be subject to severe penalties. Such enforcement mechanisms illustrate the nature of the boycott against college athletes such as Plaintiffs, as orchestrated by the NCAA and carried out by its member schools.

220. Absent NCAA bylaws prohibiting NCAA Division I schools from retaining players for a fifth season of competition (within each athlete's five-year eligibility window), many athletes (including the named-plaintiffs in this lawsuit) would have an opportunity to compete—and earn money in—a fifth season of competition.

## COUNT 1: VIOLATION OF SECTION 1 OF THE SHERMAN ACT ILLEGAL AGREEMENT TO RESTRAIN TRADE

221. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as if fully restated herein.

222. Defendant NCAA, acting through its officers, directors, employees, agents, and representatives, together with its member institutions, has entered into and enforced an unlawful agreement to restrain and suppress competition in the relevant markets by adopting and maintaining the Four Seasons Rule and the Redshirt Rules. These rules operate as an illegal agreement to restrain trade, unreasonably restricting the ability of Division I college athletes who did not take or receive a redshirt year to compete in the market for an additional fifth year. By denying college athletes this opportunity, the rules restrict exposure necessary to earn NIL compensation, impair professional advancement, and unlawfully restrain trade.

223. The relevant labor markets for purposes of antitrust analysis are the markets for the services of NCAA Division I college athletes nationwide, in each sport and gender combination, as discussed above. Transactions between NCAA member institutions and college athletes in these markets that are impacted by the Four Seasons and Redshirt Rules are commercial in nature and fall squarely within the scope of the Sherman Act.

224. The unlawful horizontal agreement unreasonably restrains competition for college athlete services. By preventing college athletes from competing in every season during their five-year eligibility window, the rules deny college athletes NIL compensation opportunities, reduce their visibility to professional scouts, and diminish their present and future earning potential.

225. Absent these restrictions, schools would compete more vigorously for college athletes, including for graduate transfers. The artificial cap imposed by the Four Seasons and Redshirt Rules directly suppresses that competition, inflicting antitrust injury on named Plaintiffs and similarly situated college athletes.

226. The Four Seasons and Redshirt Rules, which limit college athletes to only four seasons of competition within a five-year window (while arbitrarily permitting exceptions), provide little, if any, procompetitive benefit. Any such benefits are far outweighed by the harm to college athletes and to competition. Moreover, a plainly less restrictive alternative exists that would advance the NCAA's stated objectives without suppressing trade: allowing all college athletes five full seasons of competition within their five-year eligibility window.

227. Defendant's conduct is ongoing and continues to inflict direct harm on named Plaintiffs and other college athletes by restricting their ability to secure NIL compensation, preventing them from receiving direct payments available under the *House* Settlement, and limiting their ability to showcase their skills for professional opportunities. Unless enjoined, this

unlawful restraint will continue to injure named Plaintiffs, other college athletes, and consumers of NCAA Division I sports.

228. Defendant NCAA and its member institutions' anticompetitive conduct is intentionally directed at the United States market and has had, and continues to have, a substantial and foreseeable effect on interstate commerce.

229. Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, named Plaintiffs seek a permanent injunction prohibiting Defendant from continuing to violate Section 1 of the Sherman Act by enforcing the competition restrictions contained in NCAA Bylaw 12.6.

230. Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, named Plaintiffs further request that the Court declare that members of the Injunctive Class are entitled to compete in every season of competition occurring within their five-year eligibility window.

231. Plaintiffs belonging to the Damages Class seek monetary damages to compensate them for the loss of their final year of eligibility and related economic opportunities.

232. Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, named Plaintiffs are entitled to recover their reasonable attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, named Plaintiffs, individually and on behalf the Classes, respectfully request that the Court enter judgment in their favor and grant them relief as follows:

1.      Order a trial by jury on all claims and issues so triable;

2.      Certify the proposed Classes as set forth herein, appoint Plaintiffs as Class Representatives, and designated undersigned counsel as Class Counsel;

3.      Adjudge and decree that Defendant's enforcement of the Four Seasons Rule constitutes an unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

4.      Adjudge and decree that Defendant's enforcement of the Redshirt Rule constitutes an unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

5.      Enter a permanent injunction, in a form that the Court deems just and proper, pursuant to 15 U.S.C. § 26, enjoining Defendant from continuing to violate Section 1 of the Sherman Act by enforcing NCAA Bylaw 12.6 as to all current and future NCAA Division I college athletes;

6.      Award all members of the Lost Opportunities Damages Class damages according to the proof at trial;

7.      Order all damages awarded to the members of the Lost Opportunities Damages Class to be trebled pursuant to 15 U.S.C. § 15;

8.      Award Plaintiffs their costs, including reasonable attorneys' fees under 15 U.S.C. § 15; and

9.      Order any other relief that this Court deems just and proper.

DATED: November 10, 2025                    Respectfully submitted,

*/s/ Ryan Downton*
Ryan Downton (*Admitted pending oath*)
Texas Bar No. 24036500
**THE TEXAS TRIAL GROUP**
875 Carr 693, Ste. 103
Dorado, PR 00646*
(512) 680-7947
Ryan@TheTexasTrialGroup.com
*Ryan Downton is licensed in Texas, not Puerto Rico

*/s/ Salvador M. Hernandez*
Salvador M. Hernandez (# 020121)
Milton S. McGee III (# 024150)
**RILEY & JACOBSON, PLC**
1906 West End Ave.
Nashville, TN 37205
P: (615) 320-3700
F: (615) 320-3737
shernandez@rjfirm.com
tmcgee@rjfirm.com

*/s/ JoAnna B. Adkisson*
JoAnna B. Adkisson (#041016)
Christopher P. Wilson (*pro hac vice*)
Erik T. Koons (*pro hac vice*)
Bridget Moore (*pro hac vice*)
Michael A. Munoz (*pro hac vice*)
**BAKER BOTTS L.L.P.**
700 K Street NW
Washington, DC 20001
(202) 639-7700
joanna.adkisson@bakerbotts.com
christopher.wilson@bakerbotts.com
erik.koons@bakerbotts.com
bridget.moore@bakerbotts.com
michael.munoz@bakerbotts.com

*Counsel for Plaintiffs and the Proposed Classes*

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that I caused to be served, a true and correct copy of the foregoing upon the following persons via-email in addition to filing on the ECF system on the 10th day of November 2025:

Taylor J. Askew
**Holland & Knight**
511 Union Street, Suite 2700
Nashville, TN 37219
Tel: (615) 850-8113
Fax: (615) 244-6804
taylor.askew@hklaw.com

Rakesh Kilaru
Max Warren
**Wilkinson Stekloff LLP**
2001 M Street NW
10th Floor
Washington, DC 20036
Tel: (202) 847-4046
Fax: (202) 847-4005
rkilaru@wilkinsonstekloff.com

*/s/ JoAnna B. Adkisson*
JoAnna B. Adkisson

73