# Attachment C

**In the Matter Of:**

*LANGSTON PATTERSON vs*

*NATIONAL COLLEGIATE ATHLETIC ASSOCIATION*

---

*LANGSTON PATTERSON*

*December 12, 2025*

---



1

```
 1          IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                  NASHVILLE DIVISION

 3  LANGSTON PATTERSON,        )
    NICHOLAS ("NICK") LEVY,    )
 4  NATHANIAL VAKOS, KEVIN     )
    GALLIC, LANCE MASON, CHAD  )
 5  MAURICE ("CJ") TAYLOR JR.,)
    QUINCY SKINNER JR.,        )
 6  BRAYDEN SCHAGER, BERNARD   )
    ("BJ") HARRIS JR., JOHN    )
 7  ("JOHNNY") LUETZOW, HENRY  )
    STEWART, JAKOB RUSSELL,    )
 8  JUSTINE PISSOTT,           )
    NDJAKALENGA ("JAK")        )
 9  MWENENTANDA, LAWSON        )
    LOVERING, ELLIE GEOFFROY,  )
10  XARLET ("X") PINEDA, REESE)
    RAGLAND, AND ALL OTHERS    )
11  SIMILARLY SITUATED,        )
                               )
12       PLAINTIFFS            )
                               )
13  vs.                        )   CASE NO. 3:25-cv-00994
                               )
14  NATIONAL COLLEGIATE        )
    ATHLETIC ASSOCIATION,      )
15                             )
         DEFENDANT             )
16

17

18            ORAL VIDEOTAPED DEPOSITION

19               LANGSTON PATTERSON

20               DECEMBER 12, 2025

21

22

23

24

25
```

1

2      ORAL VIDEOTAPED DEPOSITION OF LANGSTON PATTERSON,

3  via Zoom, produced as a witness at the instance of the

4  Defendant and duly sworn, was taken in the above-styled

5  and numbered cause on the 12th day of December, 2025,

6  from 12:35 p.m. to 3:06 p.m. EST, before Melinda Barre,

7  Certified Shorthand Reporter in and for the State of

8  Texas, reported by computerized stenotype machine, all

9  parties appearing remotely via web videoconference,

10 pursuant to the rules of procedure and the provisions

11 stated on the record or attached hereto.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
1                    APPEARANCES
        (ALL APPEARED VIA ZOOM VIDEO CONFERENCE)
2


3

4  FOR PLAINTIFFS:

5       Mr. Salvador M. Hernandez
        RILEY & JACOBSON, PLC
6       1906 West End Avenue
        Nashville, Tennessee 37205
7
        Telephone: 715.320.3700
8       E-mail: shernandez@rjfirm.com

9                      -and-

10      Ms. JoAnna B. Adkisson
        BAKER BOTTS LLP
11      700 K Street, N.W.
        Washington, D.C. 20001
12
        Telephone: 202.639.7700
13      E-mail: joanna.adkisson@bakerbotts.com

14                     -and-

15      Mr. Ryan Downton
        THE TEXAS TRIAL GROUP
16      6607 Canon Wren Drive
        Austin, Texas 78746
17
        Telephone: 512.680.7947
18      E-mail: ryan@thetexastrialgroup.com

19

20

21

22

23

24

25
```

4

```
 1                    APPEARANCES

 2

 3 FOR DEFENDANT:

 4     Mr. Taylor J. Askew
       HOLLAND & KNIGHT
 5     511 Union Street, Suite 2700
       Nashville, Tennessee 37219
 6
       Telephone: 615.244.6380
 7     E-mail: taylor.askew@hklaw.com

 8                   -and-

 9     Mr. Max Warren
       WILKINSON STEKLOFF LLP
10     2001 M Street, N.W.
       Washington, D.C. 20036
11
       Telephone: 202.847.4000
12     E-mail: mwarren@wilkinsonstekloff.com

13

14 ALSO PRESENT:  Adrian Beltran, Videographer

15

16

17

18

19

20

21

22

23

24

25
```

5

1

2                           INDEX

3                                           PAGE

4 Examination by Mr. Askew .........................7
  Signature Page  .................................64
5 Court Reporter's Certificate ....................66

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

6

```
 1        THE VIDEOGRAPHER:  We are now

 2   on the record.  My name is Adrian

 3   Beltran.  I am the remote

 4   videographer with Lexitas.  Today's

 5   date is December 12, 2025, and the

 6   time is 1:35 p.m. Eastern Time.

 7             This deposition is being

 8   held remotely in the matter of

 9   Langston Patterson, et al versus

10   National Collegiate Athletic

11   Association.  The deponent is

12   Langston Patterson.

13             And now would counsel and

14   all present please introduce

15   themselves after which the court

16   reporter, Melinda Barre, will swear

17   in or affirm the witness.

18        MR. ASKEW:  Taylor Askew of the

19   law firm Holland & Knight in

20   Nashville, Tennessee on behalf of

21   the NCAA with my colleague Max

22   Warren out of Washington, D.C., the

23   law firm of Wilkinson Stekloff.

24        MR. HERNANDEZ:  My name is Sal

25   Hernandez with Riley & Jacobson for
```

```
 1           Mr. Patterson.  With me is JoAnna
 2           Adkisson with Baker Botts, also
 3           representing Mr. Patterson.
 4                LANGSTON PATTERSON,
 5  having been first duly sworn, testified as follows:
 6                EXAMINATION
 7  QUESTIONS BY MR. ASKEW:
 8      Q.   Good afternoon, Mr. Patterson.  My
 9  name is Taylor Askew.  I represent the NCAA.
10  I appreciate your time here today.
11                Have you ever given a
12  deposition before?
13      A.   I have not.
14      Q.   So there are a couple ground rules
15  that you and I may or may not follow, but we
16  ought to endeavor to try to do so.
17                The most important one is
18  that we try not to talk over each other
19  because Melinda here is writing everything
20  down, and she needs to be able to know
21  who's saying what and when.  So if you
22  could let me finish my question before you
23  start to answer, I'd appreciate it; and I
24  will try not to talk over you while you're
25  answering.
```

1          Second rule, also important,

2 you're not being held here captive or

3 anything like that.  So if you need to

4 take a break, take a phone call, you know,

5 have a text message from somebody and you

6 want to take five or ten or however long

7 you'd like, you just let me know; and I'll

8 make sure that you get that break.

9          Third is you may hear your

10 attorney, Mr. Hernandez, object to some of

11 my questions.  If he does so, you still

12 answer it following the objection unless

13 he instructs you not to answer.

14          It will sound kind of odd

15 talking over each other or the lawyers

16 putting things down on the record; but

17 unless you are told not to answer a

18 question, you should answer it.

19          Does that all make sense?

20     A.   Good.

21     Q.   Fourth rule, if you could give

22 verbal answers, that would be helpful.  The

23 court reporter can't write down head shakes or

24 head nods or anything like that.

25          So while I can see you and

1 you can see me and our body language would

2 indicate answers sometimes, we still have

3 to verbalize those for purposes of the

4 record.  Does that make sense?

5     A.   Yes.

6     Q.   And then, finally, if I ask a

7 question that is confusing to you or you don't

8 understand it -- and I promise I will do so --

9 you ask me to rephrase it or say you

10 understand it; and I'll try to ask it a

11 different way.

12           So if you don't understand a

13 question, tell me you don't understand it.

14 And if you answer a question, I'm going to

15 assume that you did understand it.  Does

16 that make sense?

17     A.   Yes.

18     Q.   Are we ready to rock and roll?

19     A.   Ready.

20     Q.   All right.  Are you located in

21 Nashville, Tennessee?

22     A.   Yes.

23     Q.   Is that where you physically are

24 right now?

25     A.   Yeah.

10

```
 1      Q.    Do you have football practice later

 2 today?

 3      A.    I had it this morning.

 4      Q.    Do you-all know what bowl game

 5 you're going to yet?

 6      A.    Yes.

 7      Q.    What bowl game?

 8      A.    It's called the ReliaQuest Bowl in

 9 Tampa.

10      Q.    Do you know who your opponent is?

11      A.    Yes.

12      Q.    Who is your opponent?

13      A.    Iowa.

14      Q.    If you could -- you play football,

15 correct?

16      A.    Yes.

17      Q.    If you could, walk me through your

18 football-playing history starting with high

19 school and where you played and then through

20 today, if you could.

21      A.    In high school I played for Christ

22 Presbyterian Academy in Tennessee.  It's kind

23 of close to Brentwood.  You know, freshman

24 year, played, played on JV; sophomore year,

25 started; junior year, started; senior year, I
```

1   started, played a good amount.

2              Came to Vanderbilt, played

3   my freshman year, played my sophomore

4   year, started my junior year, and started

5   my senior year.

6        Q.   So you'd agree with me that you have

7   participated in four seasons of college

8   football with Vanderbilt, correct?

9        A.   Yes.

10       Q.   You've played in each of those four

11   years that you've been at Vanderbilt since you

12   enrolled, correct?

13       A.   Yes.

14       Q.   How much playing time did you get

15   your freshman year?

16       A.   Special teams.

17       Q.   Which special teams?

18       A.   Kickoff return, kickoff, punt

19   return, and a little bit of punt.

20       Q.   What position do you play?

21       A.   Linebacker.

22       Q.   Inside, outside, star, jack,

23   anything like that?

24       A.   Inside.

25       Q.   And I'm very familiar with CPA.  I

1  played football at Webb in Knoxville.  Every

2  time we played y'all, y'all blasted us.  So

3  congratulations.

4                   How did -- let me start that

5  over.

6                   You're the named plaintiff

7  in this lawsuit.  Do you understand that?

8       A.    Yes.

9       Q.    How did you decide that you were

10  going to file this lawsuit?

11      A.    Because of opportunities that

12  presented itself.

13      Q.    Can you describe that a little bit

14  more for me?

15      A.    Yes.  Basically arguing the five in

16  five years due to not being able to take a

17  redshirt.  Filing the lawsuit after I found

18  out that I would not be eligible for a

19  redshirt this year would mean I'd have another

20  year of extra eligibility.

21      Q.    You cut up a little bit.  I want to

22  make sure the court reporter is able to hear

23  you.

24                   MR. ASKEW:  Did everybody hear

25           that?

13

```
 1            THE REPORTER:  I got it.
 2  BY MR. ASKEW:
 3      Q.   When you say that you learned that
 4  you were not going to be able to take a
 5  redshirt, what do you mean by that?
 6      A.   You have four games into the year to
 7  decide if you are going to take a redshirt.
 8  And then once you play one single snap in the
 9  fifth, you are not able to.  So senior year
10  when I played in my fifth game, one snap, my
11  redshirt was burned.
12      Q.   Were you considering not playing in
13  more than four games your senior year?
14      A.   No.  But with injury and people
15  coming in, you never know what happens.
16      Q.   What do you mean by that?  Were you
17  injured?
18      A.   Football is a dangerous game, and
19  you could get hurt anytime.
20      Q.   Are you saying that you were
21  consciously thinking about whether or not to
22  play in that fifth game?
23      A.   No.
24      Q.   When did you first start thinking
25  about filing this lawsuit?
```

1    A.    In the summer.

2    Q.    Last summer?

3    A.    Last summer.

4    Q.    Summer of 2025?

5    A.    Yes.

6    Q.    Before this season had started?

7    A.    Yes.

8    Q.    What made you begin considering a

9  potential lawsuit against the NCAA?

10    A.    Due to just how my career basically

11  had been shorted at the time and I'd be one of

12  the first four and out players in college

13  football.

14    Q.    When you say "one of the first four

15  and out players in college football," what do

16  you mean by that?

17    A.    Four and out means four years and

18  then you're done.  And due to COVID and

19  redshirts and medical redshirts that the NCAA

20  has given out, I only know of one other player

21  on Vanderbilt that has only played four years

22  in my time here.

23    Q.    That's because of the COVID year

24  that the NCAA granted a waiver if certain

25  athletes met certain conditions?

```
1       A.    COVID and redshirts.
2       Q.    Did you play your freshman year in
3  any capacity other than special teams?
4       A.    I did.
5       Q.    Can you describe that playing time
6  for me.
7       A.    Game No. 1 in Hawaii I got a couple
8  snaps, one drive.  I'm not exactly sure how
9  many, but it was less than a drive.  And I'm
10 pretty sure that's it.  Maybe one other play
11 or two plays appearance.
12      Q.    Did you want to take a redshirt your
13 freshman year, or did you want to play?
14      A.    I wanted to redshirt.
15      Q.    Why didn't you redshirt?
16      A.    I talked to my linebackers coach
17 about redshirting; and he said that I'm
18 beneficial on special teams, so I'd need to
19 talk to the special teams coordinator.
20            And when I talked to special
21 teams coordinator at the time, he said,
22 You cannot redshirt.  We need you on
23 special teams.
24      Q.    What year were you -- when you got
25 to Vanderbilt, what year was it?
```

16

1      A.    2022.

2      Q.    So going back to last summer, summer

3 of 2025, did you have any conversations with

4 anyone about a potential lawsuit about the

5 NCAA?

6      A.    Yes.

7      Q.    Who did you speak with?

8      A.    Ryan.

9      Q.    Here's an important part of this

10 deposition.  I assume when you say "Ryan," you

11 mean Ryan Downton?

12      A.    Yes, sir.

13      Q.    One of the lawyers in this case?

14      A.    Yeah, yeah.

15      Q.    If I ask you any question where

16 something in your mind says, Oh, I had this

17 conversation with a lawyer that represented

18 me, or, My lawyer told me this, don't tell me

19 that.  Okay?

20      A.    (Witness nods head affirmatively.)

21      Q.    I'm not entitled to know it.  I

22 don't want to know it, and I don't want you to

23 get in a bind on attorney/client issues.  Does

24 that make sense?

25      A.    Yes.

17

```
 1    Q.   I do get to ask questions, however,
 2 around things that may involve your lawyers,
 3 though.  So it's a line that I want you to be
 4 aware of.  So when I ask these next questions,
 5 don't tell me anything that your lawyer told
 6 you.  Okay?
 7              How did you find out about
 8 Ryan Downton?
 9    A.   Through a former player.
10    Q.   Who was that player?
11    A.   Diego.
12    Q.   Is that Diego Pavia?
13    A.   Diego Pavia.
14    Q.   Why do you call Diego a former
15 player?
16    A.   Because after this year he's done.
17    Q.   Is he going to play in the bowl
18 game?
19    A.   Yes.
20    Q.   So he's still an active player?
21    A.   Yes.
22    Q.   Are you aware that Mr. Pavia is
23 still a party to a lawsuit pending in
24 Tennessee concerning whether or not players in
25 his situation should be granted an additional
```

18

1 year of competition?

2      A.   No.

3      Q.   Has Mr. Pavia told you that he is

4 not trying to play college football next year?

5      A.   No.

6      Q.   Do you know whether Mr. Pavia

7 intends to attempt to play football for

8 Vanderbilt or another NCAA member institution

9 next year?

10      A.   No.

11      Q.   When you say, as you said a moment

12 ago, "because after this year he's done," how

13 do you know he's done?

14      A.   Assumptions.  If he wins the

15 Heisman, I assume he's going to the NFL.

16      Q.   Do you think Mr. Pavia is good

17 enough to go to the NFL?

18      A.   Yes.

19      Q.   Jumping back to the conversation you

20 had with Diego about Mr. Downton, what did he

21 tell you?

22      A.   I asked who Ryan was; and he said,

23 "He's the lawyer that represented me in my

24 case."

25      Q.   Did you have any other questions

19

```
 1  about his lawsuit or Mr. Downton or anything
 2  like that?
 3      A.   No.
 4      Q.   Did Mr. Pavia give you Mr. Downton's
 5  contact information?
 6      A.   No.
 7      Q.   How did you get in contact with
 8  Mr. Downton?
 9      A.   I was reached out to.
10      Q.   When were you reached out to?
11      A.   I'm not sure.
12      Q.   Can you ballpark it?
13      A.   I would say early summer.
14      Q.   Before fall camp began?
15      A.   Yes.
16      Q.   Before the 4th of July?
17      A.   I'm not sure.
18      Q.   But it was after school had stopped
19  in the spring?
20      A.   I'm actually not sure.  I'm trying
21  to ballpark.
22      Q.   Do you remember if you were
23  attending classes when you first spoke with
24  Mr. Downton?
25      A.   No.  I am not sure.
```

```
1       Q.   Do you recall what date you filed
2  this lawsuit on?
3       A.   September.
4       Q.   Have you spoken with any other
5  players that are plaintiffs in this lawsuit?
6       A.   Yes.
7       Q.   Who?
8       A.   I don't know their names.
9       Q.   Where did you speak with them?
10      A.   On Zoom.
11      Q.   Was a lawyer present during that
12 Zoom call?
13      A.   Yes.
14      Q.   Have you spoken with any of the
15 other plaintiffs in this lawsuit outside of
16 the presence of a lawyer?
17      A.   I'm not sure if one of them is still
18 in the case.
19      Q.   Who's the player you're thinking
20 about?
21      A.   ███████████████████
22      Q.   What did y'all talk about?
23      A.   Just like the case in general.
24      Q.   Do you recall any specifics about
25 that conversation?
```

```
 1       A.    Nothing really, no.
 2       Q.    Do you recall signing a declaration
 3  in this case that was submitted as part of
 4  this lawsuit?
 5       A.    Yes.
 6       Q.    Did you type that up yourself?
 7       A.    No.
 8       Q.    Did you review it before you signed
 9  it?
10       A.    Yes.
11       Q.    Do you still think it's accurate?
12       A.    Yes.
13       Q.    So I'll cut to the chase on some of
14  this stuff.  In your declaration you say you
15  were not able to -- or did not receive any NIL
16  compensation for the first couple of years
17  that you attended Vanderbilt.  Is that
18  correct?
19       A.    Yes.
20       Q.    Your junior year, which would have
21  been 2024, I believe, you received your first
22  NIL payment.  Is that correct?
23       A.    Yes.
24       Q.    Do you recall how much money that
25  you received?
```

22

```
 1       A.   ███████.
 2       Q.   And in your declaration it says --
 3  at paragraph 12 I'll represent to you it says,
 4  "During the 2024 season I received
 5  approximately $██████ in NIL compensation
 6  from sponsorships and endorsements."  Is that
 7  correct?
 8       A.   Yes.
 9       Q.   What were the sponsorships and
10  endorsements?
11       A.   It was part of Anchor Impact.
12       Q.   Who endorsed you?
13       A.   The Collective.
14       Q.   Did you have to do anything to
15  receive that money?
16       A.   Instagram posts.
17       Q.   What did you have to post?
18       A.   Things like shouting out the Anchor
19  Impact.
20       Q.   Can you describe that a little bit
21  more for me so I understand?
22       A.   Yeah.  It was basically like
23  promotion, like, photos and stuff.
24       Q.   Do you recall any specific posts?
25       A.   I mean, like, Hey, check out the
```

23

1  Anchor Impact Collective.  Like we need like

2  extra donors and extra people to help the

3  Collective.

4      Q.   More like a fundraising post, it

5  sounds like?

6      A.   Yes.

7      Q.   Did you have to make any public

8  appearances or anything like that?

9      A.   No.

10     Q.   About how many of those Instagram

11  posts did you make?

12     A.   I'm not sure.

13     Q.   More than five?

14     A.   Yes.

15     Q.   More than ten?

16     A.   I'm not sure.

17     Q.   Do you know how the Anchor

18  Collective calculated your NIL compensation,

19  how they reached that $█████ number?

20     A.   Market value.

21     Q.   What makes you say "market value"?

22  How do you know that?

23     A.   Teams reached out to my high school

24  coach and said what I was worth.

25     Q.   Why did they reach out to your high

24

1 school coach, if you know?

2     A.   Because I have no agent.  Since I

3 wasn't in the transfer portal, they cannot

4 contact me.

5     Q.   Do you know -- did you say teams

6 contacted your high school coach?

7     A.   (Witness nods head affirmatively.)

8     Q.   Do you know what teams contacted

9 your high school coach?

10     A.   There was a few, but Texas was the

11 one like for sure.

12     Q.   Did your high school coach tell you

13 what those conversations were about and what

14 was said during them?

15     A.   Yes.

16     Q.   Can you tell me what he told you,

17 your coach?

18     A.   That they would pay me $▮▮▮▮ to

19 go to ▮▮▮▮.

20     Q.   When you received that information

21 from your coach, do you recall what time of

22 year it was?

23     A.   Winter.

24     Q.   The winter following your sophomore

25 season?

25

```
 1      A.    Yes.
 2      Q.    Did you have a reaction to that
 3 information?
 4      A.    Not really.
 5      Q.    Didn't have any feelings whatsoever
 6 about somebody saying they'd give you ████████
 7 ████████████████?
 8      A.    Thought it was cool.
 9      Q.    It would be cool.  Never had anybody
10 do that for me.
11           What did you do with that
12 information? ████████████████████
13 ███████████████████████████████████
14 ██████████████████████████████████
15 ████████████████████████████████████
16 █████████████████?
17      A.   ██████████████████.
18      Q.   ████████████████████
19 █████?
20      A.   ████████████████████
21 ██████.
22      Q.    Safe to say, though, you ultimately
23 didn't go to ██████ or anywhere else; you
24 stayed at Vanderbilt, right?
25      A.    Yes.
```

1     Q.   Did you take the information that

2  you had learned from your high school coach to

3  anyone associated with Vanderbilt?

4     A.   Not directly.

5     Q.   Did you do so indirectly?

6     A.   Not me.

7     Q.   Who did?

8     A.   I don't exactly know who.

9     Q.   Did Vanderbilt reach out to you and

10  say, We've heard you're getting interest from

11  other schools, or anything like that?

12     A.   Something like that.

13     Q.   When you say "something like that,"

14  what are you thinking of?

15     A.   It was two years ago and it was a

16  pretty long negotiation, but they were aware

17  that I was of interest of other schools.

18     Q.   You said it's a pretty long

19  negotiation, or it was a pretty long

20  negotiation.  Can you describe that

21  negotiation process to me?

22     A.   Yes.

23     Q.   Would you do so.

24     A.   So our season ended versus ██ my

25  sophomore year.  And basically we had a whole

27

```
1  month of really doing nothing until you
2  kind -- the transfer win -- when the transfer
3  portal window closed.
4            So that whole kind of month
5  I wasn't involved as much as just people
6  in my corner were, and we had to come to
7  an agreement about how much I was worth.
8       Q.   How did you -- what was the back and
9  forth on value?  If you have to come to an
10 agreement on something, there must have been a
11 disagreement at some point.
12      A.   They came out and said I was worth ████
13 ███████████████████████.  And I don't like
14 exactly know who; but the people that were
15 vouching for me were saying that other teams
16 have reached out and said, He's worth a lot
17 more than that.
18      Q.   And you don't know who those people
19 vouching for you were?
20      A.   I know who they were.  I don't know
21 who, like, was the one that had the impact on
22 them.
23      Q.   When you say "who was the one that
24 had the impact on them," that's a lot of
25 pronouns.  Can you kind of extrapolate that
```

1  out for me a little bit.

2       A.   Like who went to Vanderbilt and said

3  that and Vanderbilt was like, We have to do

4  something about this.

5       Q.   Because they were afraid you were

6  going to leave?

7       A.   Yes.

8       Q.   Do you know -- well, let me back up.

9            Is the ███████ from ███████

10 the only firm number you've received from

11 a school other than Vanderbilt?

12           MR. HERNANDEZ:  Object to form.

13           THE WITNESS:  What did you say,

14      Sal?  Sorry.

15           MR. HERNANDEZ:  I objected to

16      the form of the question.

17      A.   As far as I know, that was the only

18 firm number communicated to me.

19 BY MR. ASKEW:

20      Q.   How did Vanderbilt ultimately come

21 to the ███████ if the only number offered was

22 ███████?

23      A.   I don't know.

24      Q.   How did you ultimately decide to

25 accept ███████ less than what had been

29

```
 1   offered from ████?
 2        A.    Because of who I am to this school.
 3        Q.    What do you mean by that?
 4        A.    I love Vanderbilt and the people
 5   that surround this program, and I accepted a
 6   pay cut so I could come back and be a starter
 7   and be a captain.
 8        Q.    It's not all about the money for
 9   you, right?
10        A.    Yes.
11        Q.    You made a commitment to the school
12   and the team, and you wanted to stick around?
13        A.    Yes.
14        Q.    That's very laudable, and that's
15   something that you should be proud of.
16              At the time did you think
17   $█████ was your market value, or did you
18   think you had accepted a pay cut?
19        A.    Accepted a pay cut.
20        Q.    What were you basing that thought
21   on?
22        A.    The other offer.
23        Q.    Any other information?
24        A.    Just how many teams were interested
25   in me.
```

```
 1      Q.    Did you know if those other teams
 2 were willing to pay ███████?
 3      A.    No.
 4      Q.    Did you know if those teams were
 5 willing to pay ███████?
 6      A.    No.
 7      Q.    Did you have a sense or
 8 understanding of how the Vanderbilt
 9 collective -- what's it called, the Anchor
10 Collective?
11      A.    Anchor Impact.
12      Q.    Did you have a sense of how Anchor
13 Impact budgeted the funds that were available
14 to it?
15              MR. HERNANDEZ:  Object to the
16          form of the question.
17 BY MR. ASKEW:
18      Q.    You can answer.
19      A.    No.
20      Q.    When you were posting on Instagram
21 following agreeing to this ████████
22 compensation number, you said that you were
23 trying to generate interest in the Vanderbilt
24 collective?
25      A.    I assume that's the goal.
```

```
 1      Q.   That was to increase the amount of
 2 money that the Vanderbilt collective had at
 3 its disposal to use for NIL payments to
 4 athletes like yourself?
 5      A.   As far as I'm aware.
 6      Q.   Do you know how much money was
 7 available or how much money the Vanderbilt
 8 collective had to use to pay players NIL in
 9 2024?
10      A.   No.
11      Q.   ███████████████████████████████
12 ████████████████████████████████████████
13 ████████████████████████████████████████
14 ███████?
15      A.   Can you ask that again?
16      Q.   Yeah.  ████████████████████████
17 ████████████████████████████████████████
18 ████████████████████?
19      A.   ████████████████
20      Q.   ██████████████████████████████
21      A.   ████████████████████████████████
22 █████████
23      Q.   █████████████████████████████████████
24 ██████████████
25      A.   █████████████
```

```
 1      Q.   Do you know if people on the team
 2 who did receive NIL money in 2024 received
 3 more than you from the Vanderbilt collective?
 4      A.   No.
 5      Q.   Do you know if anybody on the team
 6 during the 2024 season received less than you
 7 from the Vanderbilt collective?
 8      A.   No.
 9      Q.   All you know is what you were paid,
10 right?
11      A.   Yes.
12      Q.   And you know that others did receive
13 payments, but those amounts you have no idea?
14      A.   Yes.
15      Q.   This past season have you received
16 any NIL compensation?
17      A.   Yes.
18      Q.   Do you know how much you've
19 received?
20      A.   ██████.
21      Q.   Say that again.  I'm sorry.  I got a
22 text message.  That was rude.
23      A.   ██████.
24      Q.   In your declaration it says you
25 anticipate roughly $█████ this year.  Is
```

1    that correct?

2        A.    Yes.

3        Q.    Why is there an anticipated amount

4    that you haven't received yet?

5        A.    I get paid the 15th of every month.

6        Q.    How much do you receive per month?

7        A.    Depends.

8        Q.    Are those payments guaranteed?

9        A.    No.

10       Q.    What are they dependent on?

11       A.    If I'm on the team.

12       Q.    Who paid you this year?

13       A.    Vanderbilt.

14       Q.    The university?

15       A.    As far as I'm aware.

16       Q.    What makes you say the university

17   this year?

18       A.    It's not the Anchor Impact

19   Collective anymore, and we switched our

20   contract to dealing more with the university.

21       Q.    Do you know why that switch

22   happened?

23       A.    No.

24       Q.    The contract that you signed -- you

25   signed a contract, I believe you just said.

1  Is that right?

2       A.    Yes.

3       Q.    Who drafted that contract?

4       A.    I'm not sure.

5       Q.    Did you get to edit or revise it or

6  redline or anything like that?

7       A.    No.

8       Q.    Do you know whether other members of

9  Vanderbilt's team have signed contracts like

10 the one you signed?

11      A.    Yes.

12      Q.    How do you know that?

13      A.    I was told.

14      Q.    By who?

15      A.    People on the team.

16      Q.    What were those conversations about?

17 Describe to me a conversation that you've had

18 with a player on Vanderbilt's team around the

19 NIL contracts.

20      A.    Did you get the contract?  Have you

21 signed the contract?

22      Q.    Nothing more specific than that?

23      A.    No.

24      Q.    You've said that you don't know how

25 much your teammates received during the 2024

1 football season, if they received anything.

2 Same questions for 2025. Do

3 you know how much money any of your

4 teammates received this past year?

5 A. No.

6 Q. ████████████████████████████

7 ████████████████████████████?

8 A. ████████████

9 Q. ████████████████████████████████

10 ███████████████████?

11 A. ████████

12 Q. ███████████████████?

13 A. ████████████████████████

14 ████████████████████████

15 Q. Is that just kind of word of mouth,

16 or is it specifically tied to an individual

17 player?

18 A. Word of mouth.

19 Q. Are you the best linebacker on the

20 team, in your opinion?

21 A. Yes.

22 Q. Are any of the other linebackers on

23 Vanderbilt's team receiving NIL compensation?

24 A. Yes.

25 Q. How many of them, if you know?

```
 1      A.    I do not know.

 2      Q.    How many linebackers are on the

 3 team, if you know?

 4      A.    Nine or ten.

 5      Q.    What kind of a defense does

 6 Vanderbilt run?

 7      A.    A 4-3.

 8      Q.    Does that mean there's three

 9 starting linebackers?

10      A.    Yes.

11      Q.    Who are your starting linebackers?

12      A.    Me,                     ,

13              .

14      Q.    Do you know what class year your

15 other two starting linebackers are?

16      A.    2023.

17      Q.    Are they younger than you?

18      A.    Yes.

19      Q.    Do you have any linebackers on your

20 team this year that are the same class year as

21 you?

22      A.    Yes.

23      Q.    How many?

24      A.    Two.

25      Q.    Do they play inside or outside
```

1  linebacker?

2       A.    Inside.

3       Q.    So there are three 2022 graduates on

4  Vanderbilt -- high school grads on

5  Vanderbilt's roster that play middle

6  linebacker?

7       A.    Yes.

8       Q.    Only one of you starts, correct?

9       A.    Yes.

10      Q.    Do the two gentlemen -- what are

11 their names?

12      A.    Nick Rinaldi and Bryce Cowan.

13      Q.    Do Mr. Rinaldi and Mr. Cowan receive

14 NIL compensation?

15      A.    I believe so.

16      Q.    Do you know how much?

17      A.    No.

18      Q.    Is it less than you?

19      A.    I don't know.

20      Q.    Would it surprise you if it were

21 less than you?

22      A.    No.

23      Q.    Is that because they're not

24 starters?

25      A.    Not exactly.

38

```
 1      Q.    Well, what is it exactly then?
 2      A.    I start at inside linebacker and
 3 play base-down snaps and Nick starts on some
 4 of the third-down packages and is mainly used
 5 for pass rush and Bryce is kind of unique.
 6      Q.    How is he unique?
 7      A.    6-4, long, fast.
 8      Q.    So he's a pass-down linebacker?
 9      A.    They both are.
10      Q.    Does that mean they play less than
11 you?
12      A.    Depends.
13      Q.    Depends on what?
14      A.    How the game goes.
15      Q.    What percentage of snaps would you
16 say you take on average in a given game?
17      A.    I don't know.
18      Q.    If there's nine or ten offensive
19 series by your opponent, how many of those
20 series would you expect to be on the field?
21      A.    Six or seven.
22      Q.    Going back to the other middle
23 linebackers' NIL compensation packages, you
24 just don't know one way or the other what
25 those individuals are receiving from
```

1  Vanderbilt, correct?

2      A.    Yes.

3      Q.    Let's talk about outside

4  linebackers.  Are there any outside

5  linebackers that are older than the two

6  starting outside linebackers for Vanderbilt?

7      A.    We have one starter outside

8  linebacker.

9      Q.    The other two -- I'm sorry.  That

10 was unclear.

11              So you run a 4-3, so there's

12 three starting linebackers?

13     A.    Yes.

14     Q.    The other two starting linebackers

15 are a year younger than you, correct?

16     A.    Yes.

17     Q.    Are the players that they start in

18 front of, are any of those players older than

19 them?

20     A.    Yes.

21     Q.    How many?

22     A.    One.

23     Q.    Does Vanderbilt start any true

24 freshmen on offense, defense, or special

25 teams?

```
1       A.    Yes.

2       Q.    Who?

3       A.    Austin Howard.

4       Q.    What position does Mr. Howard play?

5       A.    Special teams.

6       Q.    And he starts?

7       A.    Yes.

8       Q.    What position is he starting at?

9       A.    I don't know.

10      Q.    Is he a kicker?

11      A.    No.

12      Q.    Is he a snapper?

13      A.    Nope.

14      Q.    I guess I'm confused.  How is he a

15 starter if you don't know what position he

16 plays?

17      A.    He plays on kickoff, and there's 10

18 positions on -- 11 positions on kickoff, and

19 I'm not sure which one he starts at.

20      Q.    Got it.  So he's a starter on an

21 individual play package?

22      A.    Special teams.

23      Q.    Does Vanderbilt start any redshirt

24 freshmen anywhere on the team?

25      A.    I don't believe so unless it's on
```

41

1 special teams.

2      Q.    Same question for sophomores.

3      A.    Yes.

4      Q.    Who's a sophomore on Vanderbilt's

5 team that starts?

6      A.    C.J. Heard.

7      Q.    Hurt, H-u-r-t?

8      A.    H-e-a-r-d.

9      Q.    Heard.  Got it.  What position does

10 Mr. Heard play?

11      A.    Safety.

12      Q.    Free safety or strong safety?

13      A.    We call it whip [phonetic], which is

14 weak-side safety.

15      Q.    How many weak-side safeties are on

16 Vanderbilt's roster?

17      A.    That's not exactly how we do it.

18      Q.    How do you do it?

19      A.    There's safeties -- and I'd probably

20 say nine or ten -- and they can play both

21 positions.

22      Q.    Are any of the nine or ten safeties

23 on Vanderbilt's roster older than Mr. Heard?

24      A.    Yes.

25      Q.    How many?

```
 1        A.    I don't know.

 2        Q.    More than one?

 3        A.    Yes.

 4        Q.    More than two?

 5        A.    I'm not sure.

 6        Q.    That's okay.  It's not a memory

 7 test.  I'm just trying to get a sense of the

 8 age group of the position.

 9              Mr. Heard is a sophomore and

10 he's starting over players that are older

11 than him, correct?

12        A.    Yes.

13        Q.    How many players on Vanderbilt's

14 roster are your class year?

15        A.    I'm not sure.

16        Q.    Do you know how many seniors are on

17 the team?

18        A.    No.

19        Q.    Did you have a senior night down the

20 road for the last game, last home game of the

21 season?

22        A.    Yes.

23        Q.    Did you walk or were you recognized

24 on senior night?

25        A.    Yes.
```

```
 1      Q.   Do you recall how many other players
 2 were with you on the field that night?
 3      A.   No.
 4      Q.   Was it more than five?
 5      A.   Yes.
 6      Q.   More than ten?
 7      A.   Yes.
 8      Q.   More than 15?
 9      A.   Yes.
10      Q.   More than 20?
11      A.   Yes.
12      Q.   More than 25?
13      A.   I'm not exactly sure.
14      Q.   So it's probably somewhere over 20
15 but under 25 thereabout?
16      A.   I would guess over.
17      Q.   Over 25?
18      A.   But I'm not sure.
19      Q.   That's okay.  How many of that pool
20 of players, how many of those players are
21 starters?  And I mean on the 11-man offensive
22 or defensive side of the team, separate teams
23 aside.
24      A.   Around 14.
25      Q.   Do you know how many -- well, let me
```

```
 1  rephrase that.
 2              Sounds like there's going to
 3  be a lot of turnover on Vanderbilt's
 4  starting lineup next year.
 5              MR. HERNANDEZ:  Object to form.
 6      A.   Yes.
 7  BY MR. ASKEW:
 8      Q.   Do you believe that Vanderbilt has
 9  the ability to replace those players with
10  players currently on its roster?
11              MR. HERNANDEZ:  Object to form.
12      A.   I don't know.
13  BY MR. ASKEW:
14      Q.   You don't have an opinion on that?
15      A.   Not really.
16      Q.   Why do you think you're entitled to
17  an additional season of competition?
18      A.   Based on the four-year rule and the
19  redshirt rule, which limit my ability.
20      Q.   Can you describe that a little bit
21  more for me.
22      A.   Yeah.  I am not -- I have not been
23  given the opportunity within my five-year
24  window to play my five years, only four years.
25      Q.   You've not been given the
```

1 opportunity to play five years. Is that what

2 you're saying?

3     A. Yes.

4     Q. Is anybody given the opportunity to

5 play five years, as far as you know?

6     A. Technically, yes.

7     Q. What do you mean "technically"?

8     A. Almost everyone on the team -- on

9 Vanderbilt that I've been on the team of has

10 had the opportunity to play five years with

11 Vanderbilt.

12     Q. But one of those five years was

13 either the COVID season, which was a shortened

14 season, correct?

15     A. Yes.

16     Q. Or they took a redshirt, correct?

17     A. One, the COVID year wasn't

18 shortened; two, they took a redshirt medical

19 or a regular redshirt, yes.

20     Q. I thought there were only ten games

21 during the COVID year. Isn't that right?

22     A. I don't know.

23     Q. How many players on Vanderbilt's

24 team this year played in only four games to

25 preserve their redshirt?

1    A.   I don't know.

2    Q.   Do you know if anybody did that?

3    A.   Yes.

4    Q.   Who?

5    A.   I don't know.

6    Q.   Well, how do you know it happened
7 then?

8    A.   Because in games they hold players
9 out a game so they don't reach their four --
10 they don't overpass their four-game maximum.

11    Q.   When you say they hold them out,
12 does that mean they don't dress them for the
13 game?

14    A.   No.

15    Q.   What do you mean then?

16    A.   They won't let them play.

17    Q.   Have you had any discussions with
18 anyone about how much NIL compensation you
19 might earn if you're given the chance to play
20 again for Vanderbilt next season?

21    A.   Can you explain that more?

22    Q.   Yeah.  You want to play in the
23 2026/2027 Vanderbilt football season, correct?

24    A.   Yes.

25    Q.   Have you talked to anybody about how

```
1   much you might get paid if you play next
2   season?
3        A.    Yes.
4        Q.    Who have you talked to?
5        A.
6        Q.
7        A.
8
9        Q.
10       A.
11
12       Q.
13       A.
14       Q.
15
16       A.
17       Q.
18
19
20       A.
21       Q.
22       A.
23       Q.
24       A.
25       Q.
```

```
1      A.    Not that I'm aware.
2      Q.    Do you agree that the market value
3  for a starting inside linebacker is $████████?
4      A.    As of today.
5      Q.    Are you basing that off of
6  ████████████████████████████████████
7  ████████?
8      A.  ████████
9      Q.    What are you basing that on?
10     A. ████████████████████████
11 █████████████████████████████
12 ████████████████████████████
13 ██████
14     Q.    Describe that, if you could, in a
15 little bit more detail.
16     A.  █████████████████████
17 ███████████████████████████
18 ███████████████████████████
19 ██████████████████████████████
20 █████████████████████████████
21 ██████████.    And social media speculation
22 says that if you start in the SEC as a
23 linebacker, the evaluation would be $████████.
24     Q.    Do you know how these individuals
25 that are relaying this information have come
```

49

1    to those conclusions?

2        A.    No.

3        Q.    What are you going to do if you

4    don't get another year of eligibility to play

5    for Vanderbilt next season?

6        A.    Train for the NFL.

7        Q.    Would you enter the draft?

8        A.    Yes.

9        Q.    Do you think you'd get drafted?

10       A.    No.

11       Q.    Why not?

12       A.    I don't know what they are exactly

13   looking for.

14       Q.    Have you asked anybody about that?

15       A.    No.

16       Q.    You haven't considered whether or

17   not you'd be a good prospect for the NFL?

18       A.    I've put a little bit of thought

19   into it.

20       Q.    When you say you've put a little bit

21   of thought into it, what does that mean?

22       A.    I have thought about, you know, if I

23   get drafted, when I get drafted, if I would

24   sign with somebody and where I'd train, things

25   like that.

50

1    Q.   Do you expect to have a shot at the
2 NFL this year if you're not granted an -- do
3 you think you have a chance of making the
4 roster for the next NFL season if you're not
5 granted another year to compete at Vanderbilt?
6    A.   Yes.
7    Q.   What are you basing that thought on?
8    A.   My career.
9    Q.   Have you seen other players with
10 similar careers to yours at the college level
11 earn a roster spot on an NFL team?
12    A.   Yes.
13    Q.   When you say you're basing it on
14 your career, can you describe your career to
15 me.
16    A.   I played my sophomore year, had good
17 stats.  I played my junior year, played well,
18 dealt with an injury and then came back my
19 senior year and had really good film and put
20 up good numbers.
21    Q.   Have any NFL scouts contacted you or
22 Vanderbilt about you?
23    A.   I don't know.
24    Q.   You talked a little bit earlier
25 about what a starting inside linebacker might

51

```
 1  be worth in NIL payments and what an elite
 2  linebacker might be worth in NIL payments.
 3            How many -- it's not your
 4  testimony that every linebacker on a
 5  Division I football roster is worth
 6  _____ or more, right?
 7            MR. HERNANDEZ:  Object to the
 8        form of the question.
 9      A.   No.
10  BY MR. ASKEW:
11      Q.   And it's not your testimony that
12  every player or every linebacker that's your
13  age, your class year is as good as you,
14  correct?
15      A.   Yes.
16      Q.   And there are some players across
17  the FBS that are your age and play your
18  position that do not start, correct?
19      A.   Yes.
20      Q.   And it's a fair assumption that they
21  don't receive or haven't received the amounts
22  of money that you've received from the
23  Vanderbilt collective in 2024 and from
24  Vanderbilt in 2025, right?
25            MR. HERNANDEZ:  Objection to
```

52

```
1           form.
2       A.    I don't know.
3  BY MR. ASKEW:
4       Q.    Would it be fair to assume that?
5       A.    Yes.
6       Q.    The amounts of money that you're
7  paid are in part tied to your performance on
8  the field, are they not?
9       A.    Yes.
10      Q.    If you weren't a good football
11 player, Vanderbilt wouldn't be paying you so
12 much, right?
13      A.    I don't know.
14      Q.    When you think of -- let me start
15 that over.
16             The market values that
17 you've been told about for lead
18 linebackers and starting linebackers, that
19 has nothing to do with how old the player
20 is, right?
21      A.    No.
22      Q.    We've been going about an hour.  I'm
23 going to try to wrap this up quickly when we
24 get back from the break.  If we could go off
25 the record, I'm going to try to organize the
```

53

```
 1  rest of my questions so I can get you to your
 2  weekend.  Okay?
 3      A.   Yep.
 4      Q.   All right.  Check back in here in
 5  about 15 minutes.
 6               MR. HERNANDEZ:  Sounds good.
 7               MR. ASKEW:  All right.  Thanks,
 8          Sal.
 9               THE VIDEOGRAPHER:  The time is
10          2:34 p.m., and we're going off the
11          record.
12               (Recess taken)
13               THE VIDEOGRAPHER:  The time is
14          2:55 p.m., and we're back on the
15          record.
16  BY MR. ASKEW:
17      Q.   Mr. Patterson, back after a short
18  break.  I don't think I've got too much here.
19  So hopefully we'll be done in relatively short
20  order.
21               About a week ago you
22  submitted a second declaration in this
23  case.  Do you recall that?
24      A.   Yes.
25      Q.   In that declaration you talk about a
```

54

```
 1  conversation ███████████████████████████
 2  about your request for a statement in support
 3  of your lawsuit.  Do you recall that?
 4      A.   Yes.
 5      Q.   Do you remember when that
 6  conversation took place?
 7      A.   No.
 8      Q.   Could you wager a guess?
 9      A.   Yeah.  Like probably like, I would
10  assume, three weeks ago, two weeks ago maybe.
11  I'm not exactly sure, but that's a ballpark.
12      Q.   Paragraph 6 of your declaration says
13  that "Prior to the filing of plaintiff's
14  motion for preliminary injunction, I
15  approached ████████████████████ to request
16  a statement that could be submitted in support
17  of the motion which would confirm that I would
18  be offered a roster spot if I am eligible to
19  participate in the 2026 season."
20              Is that statement accurate?
21      A.   Yes.
22      Q.   If I represent to you that
23  plaintiff's motion for preliminary injunction
24  was filed on November 10th of this year, would
25  you have any reason to dispute that?
```

55

```
 1        A.    Can you ask that again?

 2        Q.    Yeah.  You filed your motion for

 3   preliminary injunction on November 10th.  Do

 4   you agree with that?

 5        A.    Yes.

 6        Q.    The next paragraph of your

 7   declaration says something along the lines of

 8   ███████████  weren't able to provide the

 9   statement that you asked for.

10              Can you describe for me the

11   conversation ████████████████████

12   ██████  surrounding your request for a

13   supporting statement from Vanderbilt that

14   you had a roster spot?

15        A.    Yes.  I asked ████████████ for his

16   signature, ████████████████████████████████

17   ████████████████████████████████████████

18   if he could sign off saying that he wants me

19   back; and he said yes.  Yeah.

20        Q.    Then what happened?

21        A.    Then he went to our ██████████████

22   ████████████, and asked if he could do it; and

23   ████  said yes.

24              And then later that day,

25   because ██████  had to talk to the Vanderbilt
```

1 legal team, and they said no, you cannot.

2 And they had a meeting that said that no

3 coach could sign off on any player doing a

4 lawsuit against the NCAA.

5      Q.   All of that happened on the same

6 day?

7      A.   I am not sure.

8      Q.   But all of it happened before you

9 filed your motion for preliminary injunction?

10      A.   I believe so.

11      Q.   Paragraph 8 of your declaration that

12 you filed on December 3rd of this year says,

13 "I am aware that the NCAA has communicated

14 with its member institutions about not

15 encouraging or supporting college athletes'

16 eligibility-related lawsuits."

17              It's the first sentence.  Is

18 that a true statement?

19      A.   As far as I'm aware.

20      Q.   How are you aware that the NCAA has

21 communicated with its member institutions

22 about not encouraging or supporting college

23 athletes' eligibility-related lawsuits?

24      A.   That has been how it's been told to

25 me.

57

```
1        Q.    Who's told you that?
2        A.    People of the [REDACTED]
3        Q.    When did they tell you that?
4        A.    I'm not sure.
5        Q.    What did they say?
6        A.    They were talking about how due to
7   Vanderbilt and the NCAA being like together,
8   that Vanderbilt does not want to in any way
9   get involved in any sort of lawsuit.
10       Q.    What do you mean by Vanderbilt and
11  the NCAA being together?
12       A.    Like Vanderbilt is a part of the
13  NCAA.
14       Q.    Who are you talking to when you're
15  having these conversations?
16       A.    People in the [REDACTED]
17       Q.    Do you know their names?
18       A.    Yes.
19       Q.    What are their names?
20       A.    [REDACTED] and [REDACTED]
21       Q.    When [REDACTED] unable to
22  provide the statement that you requested, did
23  you ask them why?
24       A.    Yes.
25       Q.    What did they say in response to
```

58

1  that question?

2      A.    Because Vanderbilt -- the Vanderbilt

3  legal side would not allow them to.

4      Q.    Did they elaborate on that further?

5      A.    No.

6      Q.    Did they say that they didn't want

7  to get in trouble with the NCAA individually?

8      A.    No.

9      Q.    Did the NCAA -- or did any

10 apprehension or fear of retaliation from the

11 NCAA come up in any of those conversations?

12     A.    I don't remember.

13     Q.    The second sentence of paragraph 8

14 says, "I believe that this guidance" --

15 meaning the NCAA's communications.  "I believe

16 that this guidance influenced the decision by

17 ████████████████████ not to provide public

18 statements indicating that I would have a

19 roster spot on the team for the 2026 season if

20 I am eligible to participate for a fifth

21 season."

22          Do you recall signing a

23 declaration that said something like that?

24     A.    Yes.  That was a little long.  Can

25 you please repeat it again or show it?

59

```
 1      Q.    Yeah.   I'll show it to you.   I'm not
 2 trying to hide the ball.
 3      A.    No, I know.
 4      Q.    Can you see my screen?
 5      A.    Yes.
 6      Q.    Just for purposes of completion,
 7 this is an exhibit page.   Feel free to tell me
 8 you want to read this whole document before I
 9 ask you another question, or if you just want
10 me to scroll through it so you can see it's
11 the whole thing.
12      A.    I'm good.
13      Q.    Does that all jive with your memory
14 of what that declaration looked like?
15      A.    Yes.
16      Q.    Do you believe that I'm showing you
17 an accurate copy of the declaration that you
18 filed in this lawsuit on December 3, 2025?
19      A.    Yes.
20      Q.    So I'm asking you about this
21 sentence right here.   It says, "I believe that
22 this guidance influenced the decision by ████
23 ████████████████████████ not to provide public
24 statements indicating that I would have a
25 roster spot on the team for the 2026 season if
```

60

```
 1  I am eligible to participate for a fifth
 2  season."
 3          Did I read that accurately?
 4      A.   Yes.
 5      Q.   Why do you believe that the NCAA's
 6  guidance influenced ███████████ decision not
 7  to provide a supporting statement to you?
 8      A.   During my conversations it sounded
 9  like Vanderbilt legal does not want to get
10  involved in any way due to its association
11  with the NCAA and communicated that to me,
12  that that is the reason why they could not
13  sign off on the document.
14      Q.   Is there a specific statement you're
15  thinking of from any of the people you spoke
16  with that makes you think that?
17      A.   No.
18      Q.   Do you have any idea about when the
19  communications from the NCAA that you're
20  referring to in this paragraph 8 were
21  communicated?
22      A.   No.
23      Q.   Do you know if those communications
24  took place after you filed your motion for
25  preliminary injunction?
```

```
 1   A.    No.
 2              MR. ASKEW:  I don't think I
 3         have any further questions for this
 4         witness, Sal.  I'll pass him to you.
 5              MR. HERNANDEZ:  All right.  I
 6         don't have any questions.
 7                   Langston, you'll have an
 8         opportunity to read and review your
 9         testimony before you're asked to
10         sign off on it.
11              THE WITNESS:  Yeah.  That's
12         good.
13              MR. ASKEW:  Perfect.  Well, I
14         hope you have a wonderful weekend,
15         man.  Congratulations on an
16         outstanding career.
17                   If the preliminary
18         injunction is granted, I hope you
19         play great for Vanderbilt.  If it's
20         not, I wish you the best of luck in
21         your future football endeavors and
22         everything thereafter.
23              THE WITNESS:  I appreciate it.
24              THE VIDEOGRAPHER:  Counsel,
25         before we go off, I would like to
```

```
 1   take the video orders if there are
 2   any.
 3       MR. ASKEW:  I don't think we
 4   need a video order; but we would
 5   like a rush transcript, whatever our
 6   standard order is.
 7       MS. ADKISSON:  That is the same
 8   for us.  I don't think we need a
 9   video but would request rush.  I
10   assume -- we've been able to get
11   transcripts day of or pretty quickly
12   the morning after, but I don't know
13   if that's the standard for this one.
14   It certainly depends on Ms. Barre's
15   capacity.
16       THE REPORTER:  Yes.
17       MS. ADKISSON:  As soon as we
18   can get it.
19       THE VIDEOGRAPHER:  Okay.
20   Mr. Hernandez?
21       MR. HERNANDEZ:  I don't need to
22   order one.
23       THE VIDEOGRAPHER:  Okay.  Then
24   the time is 3:06 p.m., and we're
25   going off the record.  Thank you,
```

1  everyone.

2      (Proceedings concluded at 3:06 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

64

1                    CHANGES AND SIGNATURE

2  WITNESS NAME: LANGSTON PATTERSON

3  DATE OF DEPOSITION: December 12, 2025

4  PAGE LINE   CHANGE                    REASON

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

65

1    I, LANGSTON PATTERSON, have read the foregoing

2 deposition and hereby affix my signature that same is

3 true and correct, except as noted above.

4

5                                    _____

                                     LANGSTON PATTERSON

6

7 THE STATE OF _____)

8 COUNTY OF _____)

9    Before me, _____, on this day

10 personally appeared LANGSTON PATTERSON, known to me or

11 proved to me on the oath of _____ or through

12 _____ (description of identity card

13 or other document) to be the person whose name is

14 subscribed to the foregoing instrument and acknowledged

15 to me that he/she executed the same for the purpose and

16 consideration therein expressed.

17    Given under my hand and seal of office on this _____

18 day of _____, _____.

19

20                                    _____

                                     NOTARY PUBLIC IN AND FOR

21                                   THE STATE OF _____

22 My Commission Expires: _____

23

24 _____No Changes Made  _____ Amendment Sheet(s) Attached

25

66

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                 NASHVILLE DIVISION

 3 LANGSTON PATTERSON,          )
   NICHOLAS ("NICK") LEVY,      )
 4 NATHANIAL VAKOS, KEVIN       )
   GALLIC, LANCE MASON, CHAD    )
 5 MAURICE ("CJ") TAYLOR JR.,)
   QUINCY SKINNER JR.,          )
 6 BRAYDEN SCHAGER, BERNARD     )
   ("BJ") HARRIS JR., JOHN      )
 7 ("JOHNNY") LUETZOW, HENRY    )
   STEWART, JAKOB RUSSELL,      )
 8 JUSTINE PISSOTT,             )
   NDJAKALENGA ("JAK")          )
 9 MWENENTANDA, LAWSON          )
   LOVERING, ELLIE GEOFFROY,    )
10 XARLET ("X") PINEDA, REESE)
   RAGLAND, AND ALL OTHERS      )
11 SIMILARLY SITUATED,          )
                                )
12      PLAINTIFFS              )
                                )
13 vs.                          )  CASE NO. 3:25-cv-00994
                                )
14 NATIONAL COLLEGIATE          )
   ATHLETIC ASSOCIATION,        )
15                              )
        DEFENDANTS              )
16

17              REPORTER'S CERTIFICATE

18      ORAL DEPOSITION OF LANGSTON PATTERSON

19                 December 12, 2025

20

21     I, Melinda Barre, Certified Shorthand Reporter in

22 and for the State of Texas, hereby certify to the

23 following:

24     That the witness, LANGSTON PATTERSON, was duly sworn

25 by the officer and that the transcript of the oral
```

1 deposition is a true record of the testimony given by

2 the witness;

3      That the original deposition was delivered to

4 Taylor Askew.

5      That a copy of this certificate was served on all

6 parties and/or the witness shown herein

7 on _____.

8      I further certify that pursuant to FRCP Rule

9 30(f)(1), that the signature of the deponent:

10      ____ was requested by the deponent or a party before

11 the completion of the deposition and that the signature is

12 to be before any notary public and returned within 30 days

13 from date of receipt of the transcript.  If returned,

14 the attached Changes and Signature Page contains any

15 changes and the reasons therefor:

16      ____was not requested by the deponent or a

17 party before the completion of the deposition.

18      I further certify that I am neither counsel for,

19 related to, nor employed by any of the parties or

20 attorneys in the action in which this proceeding was

21 taken, and further that I am not financially or

22 otherwise interested in the outcome of the action.

23

24

25

```
 1        Certified to by me on this, the _____ day

 2  of _____, 2025.

 3

 4

 5

 6                           _____

 7                           Melinda Barre
                             Texas CSR 2192
 8                           Expiration:  12/31/27

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1  COUNTY OF HARRIS      )

 2  STATE OF TEXAS        )

 3      I hereby certify that the witness was notified on

 4  _____ that the witness has 30 days or (____

 5  days per agreement of counsel) after being notified by

 6  the officer that the transcript is available for review

 7  by the witness and if there are changes in the form or

 8  substance to be made, then the witness shall sign a

 9  statement reciting such changes and the reasons given by

10  the witness for making them;

11      That the witness' signature was/was not returned as

12  of _____.

13      Subscribed and sworn to on this, the _____ day of

14  _____, 2025.

15

16

17

18                      _____

19                      Melinda Barre
                        Texas CSR 2192
20                      Expiration:  12/31/27

21                      LEXITAS LEGAL
                        Firm No. 95
22                      lexitaslegal.com/premier
                        888.267.1200
23

24

25
```