# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| LANGSTON PATTERSON, et al., on behalf of themselves and all others similarly situated, | )<br>)<br>) |
| Plaintiffs, | )   NO. 3:25-cv-00994 |
| v. | )   JUDGE CAMPBELL<br>)   MAGISTRATE JUDGE NEWBERN |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | )<br>) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

Pending before the Court is a Motion for Preliminary Injunction filed by Plaintiffs Langston Patterson, Nicholas Levy, Nathanial Vakos, Kevin Gallic, and Lance Mason ("Plaintiffs").[1] (Doc. No. 39). Each of these Plaintiffs has played four seasons of National Collegiate Athletic Association ("NCAA") Division I football and wants to play one more season. Plaintiffs contend the NCAA rules limiting them to four seasons of competition constitute unreasonable restraints on trade in violation of Section 1 of the Sherman Antitrust Act. They seek a preliminary injunction to enjoin the NCAA from enforcing bylaws governing eligibility to preclude them from playing a fifth season of NCAA Division I college football during the 2026-27 season. (*Id.*).

For the reasons stated herein, the Motion for Preliminary Injunction is **DENIED**.

---

[1] The motion for preliminary injunction is brought by 5 of the 19 plaintiffs in this case. For purposes of this memorandum, reference to "Plaintiffs" refers to the five Plaintiffs seeking a preliminary injunction.

# I. BACKGROUND

Plaintiffs are football players on collegiate teams that are part of the Football Bowl Subdivision ("FBS") of NCAA Division I football. The NCAA has three divisions: Division I, Division II, and Division III, each of which promulgates its own rules and operating guidelines. Generally, Division I teams are the most popular and attract the most money and the most talented athletes. *See National Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 79 (2021). Within Division I football, the Football Bowl Subdivision ("FBS") encompasses the most prominent and successful collegiate football programs.

Division I collegiate football programs are bound by the Rules imposed by the NCAA's Division I Board of Directors. These Rules include comprehensive regulations governing eligibility that cover a variety of topics from minimum grade point average, minimum course enrollment, amateurism, and, at issue here, time limits, specifically the "Five-Year Rule" and the "Redshirt Rule."

The Five-Year Rule restricts the duration of a student-athlete's eligibility to compete to four seasons of competition within a five-year period. "Redshirt" is a term of art describing how a student-athlete can preserve a season of competition by not competing for various reasons. Generally, "any competition" during a season is counted as a season of competition. *See* NCAA Bylaw 12.6.3.1 (2025) (Minimum Amount of Competition).[2] For some sports, the Bylaws provide exceptions for what counts as competition during a season. An exception for FBS and Football Championship Series ("FCS") Football allows a student-athlete to compete in up to four contests

---

[2] NCAA Division I Bylaw 12.6.3.1 provides: "**Minimum Amount of Competition.** Any competition, regardless of time, during a season in an intercollegiate sport shall be counted as a season of competition in that sport, except as provided in [specified Bylaws]."

in a season without using a season of competition. NCAA Bylaw 12.6.3.1.6 (2025) (Exception – Football (FBS/FCS).[3]

Historically, the NCAA's amateurism rules severely restricted student-athletes' ability to earn compensation related to athletic competition. Relatively recently, however, the NCAA began allowing student-athletes to obtain compensation for name, image, and likeness ("NIL"); and in June 2025, pursuant to a settlement agreement in *In re College Athlete NIL Litigation*, Case No. 4:20-cv-03919, Doc. No. 979 (N.D. Cal. June 6, 2025) (the "*House* Settlement"), allowed collegiate institutions to pay student-athletes directly.[4] The *House* Settlement altered the market for Division I athletes in other ways too. These include caps on the number of players (*i.e.*, roster spots) and on the total amount of compensation that can be paid directly to student-athletes by each institution. (*See House* Settlement, Article 3, § 1; Article 4, § 1). In 2025, the amount of direct compensation per institution was capped at around $20.5 million, with increases each year;[5] this is in addition to third-party NIL compensation, the market for which is predicted to exceed $2 billion in 2025-26.[6]

Due to these developments, the ability to compete in Division I athletics brings with it not only educational and athletic opportunities, but the possibility of earning significant income. Given that only a very small percentage of college athletes ever compete professionally, it is

---

[3] NCAA Division I Bylaw 12.6.3.1.6 provides: **"Exception – Football. [FBS/FCS]** In football, a student-athlete representing a Division I institution may compete in up to four contests in a season without using a season of competition."

[4] The *House* Settlement Agreement and Order approving it are filed in this case at Docket Entries 77-1 and 77-2.

[5] *See* https://www.collegesportscommission.org/revenue-sharing/.

[6] *See NIL at 3 / The Annual OpenDorse Report*, (2024-25) (available at *https://biz.opendorse.com/wp-content/uploads/2024/07/NIL-AT-3-The-Annual-Opendorse-Report-1.pdf)*.

unsurprising that some student-athletes seek to retain their eligibility to compete (and earn money) at the college level.[7]

Plaintiffs are five student-athletes who have competed during four consecutive seasons of NCAA Division I football at various colleges. Each of them expects to earn a bachelors' degree during that four-year period.[8] None of these Plaintiffs had a "Redshirt" year – *i.e.*, they did not play any portion of a fifth year. Now they want a fifth year of competition, not just the four games they could have had as a Redshirt athlete – they want an additional full year of eligibility. They argue that the "shutdown of their final season of eligibility" is an unreasonable restraint on trade in violation of the Sherman Antitrust Act. Plaintiffs seek a preliminary injunction enjoining the NCAA from enforcing the Five-Year Rule and the Redshirt Rule and granting them a fifth season of competition.

The Court held a hearing on December 15, 2025. The Court heard testimony from Plaintiffs Patterson, Gallic, Vakos, and Levy. Expert economists Dr. Daniel Rascher and Dr. Matthew Backus also testified. The parties also rely upon the exhibits filed in the record before and after the hearing.

---

[7] Only about 1.5% of NCAA football players eligible for the NFL are drafted. (Rascher Decl., Doc. No. 38-1, ¶ 30 (citing *https://www.ncaa.org/sports/2015/3/6/estimated-probability-of-competing-in-professional-athletics.aspx*)). The same website states that when considering only Division I student-athletes, the odds are slightly better – approximately 3.8% of draft-eligible Division I football players were chosen in the 2023 NFL draft. The odds are even better for draft-eligible Division I FBS players – 6.7%.

[8] Langston Patterson and Nathaniel Vakos graduated in December 2025. Nicholas Levy, Kevin Gallic, and Lance Mason expect to graduate in May 2026.

## II. STANDARD OF REVIEW

"To secure a preliminary injunction, a plaintiff must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *EOG Resources, Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 874 (6th Cir. 2025) (citing *Winter v Nat. Rs. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The purpose of a preliminary injunction is to "preserve the relative positions of the parties until a trial on the merits can be held." *Id*. at 883. (citing *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345-46 (2024)). The relief is *preliminary* – "it does not conclusively resolve anything – that's what final judgment is for." *Id*. "The preliminary injunction simply puts the case in a holding pattern and 'balance[s] the equities as the litigation moves forward.'" *Id*. (citing *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017)).

"Because a preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right,' the plaintiff must make a 'clear showing' that these factors favor him." *Id*. (quoting *Starbucks*, 602 U.S. at 345-46). The movant "faces a burden of proof 'more stringent than the proof required to survive a summary judgment motion.'" *Enchant Christmas Light Maze & Market Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020).

A failure to establish a likelihood of success on the merits "'is usually fatal' to a plaintiff's quest for a preliminary injunction." *Enchant*, 958 F.3d at 539 (quoting *Gonzalez v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000)). But even if the plaintiff shows a likelihood of success on the merits, "a preliminary injunction does not follow as a matter of course." *EOG Resources*, 134 F.4th at 883 (citing *Benisek v. Lamone*, 585 U.S. 155, 158 (2018)). "The plaintiff must also show that some irreparable harm will take place without the court's immediate intervention." *Id*. ("While the *extent* of an injury may be balanced against other factors, the

*existence* of an irreparable injury is mandatory."). In considering the balance of equities, the Court "balance[s] the competing claims of injury[,] … consider[ing] the effect on each party of the granting or withholding of the requested relief." *EOG Resources*, 134 F.4th at 886 (citing *Winter*, 555 U.S. at 24).

"As a general rule, the law requires that 'losses should remain where they fall until an adequate legal or equitable justification for shifting them has been demonstrated.'" *Id.* at 884 (citing *Higuchi Int' Corp. v. Autoliv ASP, Inc.*, 103 F.4th 400, 404 (6th Cir. 2024)).

### III. ANALYSIS

#### A. The *House* Settlement Release

Before turning to the merits of Plaintiffs' antitrust claim, the Court will first address the NCAA's argument that the release of claims in the *House* Settlement forecloses relief here. (Doc. No. 50 at 5-7).

The *House* Settlement class includes "[a]ll student athletes who compete on, competed on, or will compete on a Division I athletic team" after "June 15, 2020." *House* Settlement at 9 (Definition aa). The Settlement Agreement includes a release of "Injunctive Class Claims" which are defined to include any and all challenges to "the subjects addressed by the Related Injunctive Relief NCAA & Conference Rules." *Id.* at 12-13 (Definition qq). The Settlement Agreement states that "Related Injunctive Relief NCAA & Conference Rules" includes:

> NCAA and conference rules governing the number of seasons/length of time student-athletes are eligible to receive benefits including scholarships and payments pursuant to the Injunctive Relief Settlement, including without limitation any rule capping the number of years a student-athlete may receive payments at four years, and providing that all four of those years must be played within a consecutive five-year period.

*Id.* at 13-14 (Definition rr (2)).

6

The NCAA argues Plaintiffs' claims for injunctive relief are barred by the terms of the settlement because they are directly challenging the eligibility rules for the purpose of obtaining benefits (scholarship and NIL payments) they are ineligible to receive. Plaintiffs do not dispute that they are members of the *House* Settlement class and that they did not opt out of the settlement. They argue, however, that the release of claims in the *House* Settlement does not apply to the claims in this case because the released claims do not share a factual predicate with the claims asserted in the complaint. (Doc. No. 52 at 1-2). Plaintiffs contend that because *House* challenged different NCAA rules (compensation restrictions, scholarship caps, and NIL revenue distribution) than those challenged in this case (eligibility duration), the claims are not based on a shared factual predicate and the claims asserted in this case fall outside the *House* release as a matter of law. In support of this argument, Plaintiffs rely upon Sixth Circuit cases that address class member objections to a court's approval of a class settlement as "fair, reasonable, and adequate." *See Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 349 (6th Cir. 2009); *Olden v. Gardner*, 294 F. App'x 210, 220 (6th Cir. 2008). Plaintiffs argue that courts in other circuits have applied a similar standard when deciding whether a release of claims applies to a subsequently filed action. (Doc. No. 52 at 2). *Moulton* and *Olden*, which addressed class member challenges to the breadth of release of claims in class settlement agreements in the context of a fairness determination and settlement approval, are not directly applicable here. The *House* Settlement has been approved. *See* Final Settlement Approval, Docket Entry 979, *In re College Athlete NIL Litigation* ("*House*"), 4:20-cv-03919-CW (N.D. Cal. Jul. 26, 2024) (filed in this case at Doc. No. 77-1).

The question here is different than that considered in *Moulton* and *Olden*. Does the release of claims in *House* entirely foreclose Plaintiffs' challenges in this case to Rules governing time limits on eligibility? The question merits careful consideration which will benefit from

7

Defendant's response and more fulsome briefing. In light of the ultimate disposition of the motion for preliminary injunction, the Court need not decide the applicability of the settlement release at this time.

**B.     The Sherman Act Claim**

The Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. To succeed under Section 1 of the Sherman Act, Plaintiff must show that the NCAA "(1) participated in an agreement that (2) unreasonably restrain[s] trade in the relevant market." *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003). The parties agree that in assessing whether a challenged restraint is "unreasonable," the "rule of reason" presumptively applies. Under the rule of reason, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect in the relevant market. *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 97 (2021). If the plaintiff carries his burden to show a substantial anticompetitive effect, the burden then shifts to the defendant to show a procompetitive rationale for the restraint. *Alston*, 594 U.S. at 97. If the defendant can make that showing, the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through *substantially* less restrictive means. *Id*. at 100.

"Whether an antitrust violation exists necessarily depends on a careful analysis of market realities." *Alston*, 594 U.S. at 93 (noting that market realities have changes significantly since 1984). Those market realities have changed even more significantly since *Alston* (2021) and *House* (2025). Most antitrust claims fail at the first step. *Id*. at 97 (noting that "courts have disposed of nearly all rule of reason cases in the last 45 years on the ground that the plaintiff failed to show a

8

substantial anticompetitive effect"). A "voluminous record" is often "critical" to showing substantial anticompetitive effect. *Pavia*, 154 F.4th at 416. (Thapar, J. concurring) (citing *Alston*, 594 U.S. at 97 (noting that the burden to show significant anticompetitive effects in the relevant market is not "slight" and that the district court in *Alston* based its findings on a "voluminous" record)).

Even if the plaintiffs show a substantial anticompetitive effect, the *Alston* court urged restraint in fashioning an antitrust remedy: "[C]aution is key. Judges must resist the temptation to require that enterprises employ the least restrictive means of achieving their legitimate business objectives. Judges must be mindful, too, of their limitations – as generalists, as lawyers, and as outsiders trying to understand intricate business relationships." *Alston, 594 U.S.* at 106. "Courts reviewing complex business arrangements, should, in other words, be wary about invitations to 'set sail on a sea of doubt.'" *Id*. at 107. Judge Thapar echoed the *Alston* Court's warning in his concurrence, cautioning that the potential downstream implications of decisions about the eligibility rules should make judges "mindful" of their "limitations." *Pavia*, 154 F.4th at 418 (Thapar, J., concurring).

1. Commercial Nature of the Rules

Before engaging with the Rule of Reason framework, the Court will first address Defendant's argument that the Challenged Rules are not within the purview of the Sherman Act because they are not commercial in nature. (Doc. No. 50 at 7). Defendant argues the Court must distinguish between the NCAA's compensation rules, which it concedes are commercial in nature, and its eligibility rules, which are not. (*Id.*).

Defendant is correct that, in the context of challenges to NCAA Rules, the Sixth Circuit has held that the Sherman Act only applies to Rules that are "commercial in nature," *Worldwide*

9

*Basketball & Sports Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, 388 F.3d 955, 958 (6th Cir. 2004), and has instructed that the "appropriate inquiry is whether the rule itself is commercial, not whether the entity promulgating the rule is commercial." *Bassett v. NCAA*, 528 F.3d 426, 433 (6th Cir. 2008). However, as this Court explained in prior decisions, these cases and reasoning are from a pre-NIL era where rules about who could compete and for how long did not have the same commercial implications as they do today. *See e.g.*, *Pavia*, 760 F. Supp. 3d 527, 536-37 (M.D. Tenn. 2024). As this court previously stated concerning a challenge to different eligibility restrictions, "the challenged eligibility bylaws restrict who is eligible to play and therefore to negotiate NIL agreements" and now also to receive direct payments from schools. *Id.* at 537. Thus rendering the Challenged Rules inherently commercial.

This Court is not alone in this conclusion. In appeal of the preliminary injunction in *Pavia*, Judge Hermandorfer observed in her concurring opinion that "*National Collegiate Ass'n v. Alston* makes clear that the NCAA may no longer sidestep antitrust scrutiny with an amateurism justification ill-suited for today's age of compensated college players" and that the NCAA cannot "immunize any trade restraint from review by deeming it 'eligibility' related." *Pavia v. NCAA*, 154 F.4th 407, 421 (6th Cir. 2025) (Hermandorfer, J., concurring). *See also, Elad v. Nat'l Collegiate Athletic Ass'n*, 160 F.4th 407, 415 (3d Cir. 2025) ("The District Court did not err in holding that the JUCO Rule is commercial because it interferes with Elad's desire to compete in NCAA Division I athletics and profit from that participation"); *Zeigler v. Nat'l Collegiate Athletic Ass'n*, 25-cv-226, 2025 WL 1671952, at *3 (E.D. Ky. May 16, 2025) (citation modified) ("The Four-Seasons Rule is commercial because it implicates commercial activity and has some commercial impact."); *Tennessee v. Nat'l Collegiate Athletic Ass'n*, 718 F. Supp. 3d 756, 762

10

(E.D. Tenn. 2024) ("Agreements between NIL collectives and student-athletes are undoubtedly commercial transactions.").

The Court concludes that the Challenged Rules are subject to the Sherman Act and will proceed to consider the Rule of Reason framework.

2. <u>Substantial Anticompetitive Effect on the Relevant Market</u>

To determine whether Plaintiffs can show substantial anticompetitive effects on the relevant market, the Court must first determine what that market is. *Ohio v. Am. Exp.*, 585 U.S. 529, 542 (2018). The relevant market is defined as "the area of effective competition." "Typically this is the 'arena within which significant substitution in consumption or production occurs.'" *Ohio v. Am. Exp.*, 585 U.S. 529, 543 (2018). Different products or services should be combined into a single market when that combination "reflects commercial realities." *Id*. (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966)).

Plaintiffs assert the relevant market is the submarket for NCAA Division I FBS football, which is comprised of the 136 most competitive collegiate football programs. (Rascher Decl., Doc. No. 38-1 at ¶ 16, n.9). In support of its argument that this is a distinct submarket, Plaintiffs state that the NCAA itself has designated Division I FBS Football as an exclusive competitive tier, and the public, media, and commercial partners treat it as an enterprise distinct from the NFL and lower collegiate divisions. Dr. Rascher devotes a significant portion of his analysis to defining the submarket. (*Id*. at ¶¶ 9-47).

Defendant argues Plaintiffs have not adequately defined the relevant market, in part because they jump to defining a submarket – Division I FBS football – without first defining the larger market – presumably Division I football. Defendant also argues Plaintiffs' expert relied on flawed data when considering whether there is reasonable interchangeability between Division I

11

FBS and the NFL. The NCAA posits that Dr. Rascher failed to adequately assess whether the market should be broader and include the NFL or more narrow and be further subdivided to account for "high-end" FBS athletes and schools. (Backus Decl., Doc. No. 49, ¶¶ 37-49).

For purposes of the Court's consideration of Plaintiffs' motion for preliminary injunction, the Court will accept Plaintiffs' proposed market as the submarket for Division I FBS football. Plaintiffs have provided evidence through the declaration and testimony of Dr. Rascher that this is a valid submarket.

The next step in the rule of reason framework is to determine whether Plaintiffs have established that the Challenged Rules have a substantial anticompetitive effect on the market for Division I FBS football labor. Plaintiffs argue that the Challenged Rules "reduce output, diminish quality, and restrict competition" and are a "concerted boycott that excludes athletes from offering their services for a fifth season, restraining competition and suppressing wages in the Division I football labor market." (Doc. No. 38 at 20-21). Plaintiffs contend that "removing eligibility caps would expand competition for athlete talent, improving both opportunity and compensation" and that if universities competed for fifth-year players it would "increase compensation across the market." (*Id*. at 22).

Dr. Rascher opines that these restrictions directly depress competition in the athlete labor market and deprives athletes of a full year of play and its attendant benefits – scholarships, athletic development, and NIL income. (*See* Rascher Decl., Doc. No. 38-1). Dr. Rascher is undoubtedly correct in this conclusion. But what is the effect *on the Division I FBS football labor market* of limiting eligibility to four years as opposed to five? Dr. Rascher does not address this topic in his initial declaration. (*See* Rascher Decl., Doc. No. 38-1). He observes that Plaintiffs and others in their position will lose out on potentially lucrative time playing FBS football, but he does not

explain how the harm to these players results in *harm to the market*. His reply declaration provides additional analysis on this point. (Racher Reply Decl., Doc. No. 52). There he asserts that the Challenged Rules artificially restrict the demand for labor, and but for the restriction schools would hire more experienced fifth-year student athletes at levels of compensation higher than that of new freshmen thereby reducing both overall compensation and quality of play. (*Id*. at ¶¶ 96-102).

A few aspects of Plaintiffs' analysis merit further development. First and foremost is the *House* Settlement, which caps direct player payment and by doing so creates an artificial economic environment in which the overall market compensation stays the same and is reallocated amongst the market participants. The same is largely true for Plaintiffs' argument that extended eligibility would increase "opportunity" and/or "expand output." Again, the roster limits imposed in the *House* Settlement cast doubt on this theory because the overall number of FBS athletes would remain unchanged. Plaintiffs' expert claims FBS teams, particularly those at the low end of the FBS, have room to absorb additional players. But this contention is not supported by any data or analysis. Nor is there evidence that any such teams would absorb additional players into their rosters if the market included additional eligible fifth year players. In fact, it may be the case that the supply of eligible players already outpaces demand – not every aspiring FBS football player is offered a position on an FBS team – and that roster spots on certain teams remain unfilled due to budget constraints or other reasons. If so, then adding more highly compensated players is not likely to expand overall market compensation.[9]

---

[9] Defendant's expert, Dr. Backus provides evidence to suggest that the exiting class of ineligible seniors will not have substantial effect on the NIL market. In fact, some of the highest NIL earners are those with remaining eligibility. (*See* Bachus Rept., Doc. No. 49, ¶ 33 (listing the top 10 College Foot valuations, six of whom have remaining eligibility)). Dr. Bachus also reports data indicating that in 2025 only about 196 senior athletes, about 1% of the total number of FBS football student-athletes, have estimated NIL earnings over $100,000. (*Id*. at ¶ 56).

13

Plaintiffs' argument that allowing more experienced players to compete will affect the overall quality of the football product may ultimately prove to be correct, but at this juncture, Plaintiffs have not shown a substantial effect on quality. At most it can be said that some of non-Redshirt fifth-year players are "higher quality" than the players who replace them, but does this affect the overall quality of the Division I FBS football product?[10] There are 136 FBS teams and each of these teams is comprised of approximately 105 players who work together to create a football "product" the quality of which is dependent on the inner workings of the team as much as the contributions of any individual athlete. Perceptions may be skewed by the success of certain star players, but the market impact cannot be judged based on a few isolated examples, it requires careful analysis.

Plaintiffs compare the market harm to that recognized in *Ohio v. NCAA*. In *Ohio*, the court found that the NCAA's transfer rule, which penalized players "with an entire academic year of ineligibility" was an unreasonable restraint on trade because it resulted in a disincentive to member institutions to recruit transfers. But here there is no such penalty – student athletes become ineligible due to the passage of time. Unlike the players in *Ohio* who were only ineligible because of their decision to transfer, the time limits on eligibility and the passage of time apply equally to all student-athletes.

---

[10] Anecdotal evidence presented during the hearing suggests that more experienced players are not always the most valuable in terms of playing time. Several Plaintiffs testified that starting positions were filled with junior players even when more senior players were available. Those familiar with college sports can undoubtedly come up with endless examples of new players earning starting positions over more senior athletes. Assuming a correlation between playing time and NIL compensation, it is far from clear that more experienced players are more valuable in either respect than less experienced players. Instead, a players' "value" is determined by talent, which does not necessarily correlate directly with experience, or the needs of the team.

14

On a developed record, Plaintiffs may be able to show substantial economic harm from the Challenged Rules. However, at this juncture they have not done so.

3. Procompetitive Rationale

Even if the Court were to conclude otherwise, Plaintiffs have not shown that the procompetitive benefits can be reasonably achieved through *substantially* less restrictive means. The Court does not devote time to discussion of the NCAA's asserted procompetitive effects of the Challenged Rules. Although Plaintiffs contend the NCAA has not shown a procompetitive rationale for the challenged restraint – *i.e.*, it has not provided justification for allowing only four years of competition for non-Redshirt athletes while allowing Redshirt athletes to play up to four games in a fifth season, as opposed to allowing five years of competition for all athletes with no partial Redshirt seasons. Plaintiffs concede that a five-year time limit on eligibility to compete is appropriate, so their dispute is not with the time limit itself, but with the duration of the time limit. In assessing whether Defendant has provided a pro-competitive rationale for the Challenged Rules, the Court does not consider whether the asserted procompetitive rationale could be achieved through less restrictive means (four years instead of five) – that analysis come in the next step. The Court finds a rationale that supports a five-year limit (which Plaintiffs concede is valid) also applies to a four-year limit.

4. Less Restrictive Alternative

Defendant argues Plaintiffs fail to establish that the Challenged Rules are "patently and inexplicably stricter than necessary to achieve procompetitive benefits." (Doc. No. 50 at 26 (citing Alston, 594 U.S. at 101)). "[A]ntitrust law does not require businesses to use anything like the least restrictive means of achieving legitimate business purposes." *Alston*, 594 U.S. at 98. "[A]ntitrust courts must give wide berth to business judgments before finding liability." *Id*. at 102.

15

"[C]ourts should not second-guess 'degrees of reasonable necessity' so that 'the lawfulness of conduct turn[s] upon judgments of degrees of efficiency.'" *Id.* at 98 (quoting *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 227 (D.C. Cir. 1986)). "[T]he Supreme Court has admonished that we must generally afford the NCAA 'ample latitude' to superintend college athletics." *O'Bannon*, 802 F.3d at 1074. Plaintiffs' requested judicial "second guess[ing] [of] degrees of reasonable necessity so that the lawfulness of conduct turn[s] upon judgments of degrees of efficiency … would be a recipe for disaster, for a skilled lawyer will have little difficulty imagining possible less restrictive alternatives to most joint arrangements." *Alston*, 594 U.S. at 98 (citation modified).

Defendant argues Plaintiffs' proposed alternative has the same anticompetitive effects as the current rule, it just changes where the eligibility line is drawn so that these Plaintiffs fall on the right side at least for one more year. In addition, the proposed alternative would not maintain the same opportunities for graduating high school seniors, would not incentivize student athletes to graduate from four-year institutions within four years, and would harm student-athletes who redshirted because they would have the opportunity to participate in fewer seasons of competition (four +) than those who did not (five). Defendant argues Plaintiffs have no idea if the proposed alternative is substantially less restrictive because they have not analyzed the world of collegiate athletics without the Challenged Rules.

In addition, Defendant asserts that the proposed Rules change would result in significantly increased costs to the NCAA because the Redshirt rule and built-in fifth year provides flexibility to student-athletes experiencing extenuating circumstances. Under a five-in-five rule, any extenuating circumstances that result in loss of competition would be cause for a waiver request and the NCAA would need more staff to process. (Vaughn Decl. ¶¶ 22-23).

16

Plaintiffs are correct that their proposed alternative that allows non-Redshirt student-athletes an additional year of eligibility is less restrictive, but so too is any increased time on eligibility. When considering such deviations, the Court must be especially mindful of its own limitations and not second guess degrees of efficiency. Does four years of competition strike a perfect competitive balance? Maybe it does. Maybe it does not. Based on the current record, the Court cannot accurately compare and contrast the market effects of a four-year versus a five- or six- or seven-year time limit with and without Redshirt exceptions. And even if that analysis could be performed accurately, unless it showed that the restrictions are patently stricter than necessary, *i.e.*, that the same benefits can be achieved through substantially less restrictive means, a finding that a four-year limit on eligibility to compete violates antitrust laws would not be warranted. Therefore, mindful that the Court should not "second guess 'degrees of reasonable necessity' so that 'the lawfulness of conduct turn[s] upon judgments of degrees of efficiency,'" Plaintiffs have not shown the procompetitive benefits can be achieved through substantially less restrictive means.

In summary, at this juncture and on a limited record, the Court finds Plaintiffs have not shown a likelihood of success on the merits of their antitrust claim. A failure to establish a likelihood of success on the merits "'is usually fatal' to a plaintiff's quest for a preliminary injunction." *See Enchant*, 958 F.3d at 539 (quoting *Gonzalez v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000)).

## C.  Irreparable Harm

A preliminary injunction requires a showing of irreparable harm. *See EOG Resources*, 134 F.4th at 883 (citing *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) ("While the *extent* of an injury may be balanced against other factors, the *existence* of an irreparable injury is mandatory.")).

17

Case 3:25-cv-00994   Document 85   Filed 01/15/26   Page 17 of 20 PageID #: 3554

Plaintiffs argue the inability to compete will result in myriad consequences, some of which are not compensable. They point to the impact on their professional trajectories and reputations, the ability to produce game film, participate in all-star events, and receive evaluation from professional scouts. Defendant argues that Plaintiffs have not shown irreparable harm because they delayed seeking relief, lost NIL earnings are compensable harm, and they have not established that they will be offered a position on a team next year if the requested relief is granted. Defendant also argues that there are no cases finding that the lost opportunity to compete in more than four seasons of college sports constitutes irreparable harm.

Defendant correctly points out that Plaintiffs have been aware of the Challenged Rules for years and waited until virtually the eve of the opening of the transfer portal to seek injunctive relief. Plaintiffs respond that they did not seek relief until now because the NCAA was considering extending eligibility to five years and did not announce a decision not to do so until August 2025. (Doc. No 52 at 14). But Plaintiffs could have sought relief while the NCAA was considering a rule change. Had they done so, they and the Court would have likely benefitted from a more developed record.

Defendants correctly raise the speculative nature of the asserted irreparable harm. But the Court views the speculation as a matter of degree. Of course, Plaintiffs cannot know with any certainty what opportunities another season of play would bring, but the opportunity itself, once lost, cannot be recovered. On this basis, the Court finds Plaintiffs have made a showing of *some* irreparable harm.

**D.     Balance of Equities and the Public Interest**

Plaintiffs argue the equities and the public interest favor an injunction. They content that allowing these players an additional season of eligibility imposes virtually no burden on the NCAA, the requested injunction is narrowly tailored in that it would apply only to five Plaintiffs in this case, and that ensuring fair and equitable competition in in the public interest.

As discussed above, based on the current record, Plaintiffs' success on the antitrust claim is far from clear. Maybe they will succeed on a more developed record, but for now the public interest in granting a preliminary injunction is neutral at best.

With regard to the effects on others, Defendant argues that Plaintiffs ignore the ripple effects of the Court enjoining the Challenged Rules only as to them. First, this is a class action and the next step would be to seek class certification and class-wide relief. Class relief aside, experience has shown that granting relief to one set of Plaintiffs will result in uncertainty for student-athletes who are not included in the injunction and a flood of litigation from other similarly situated student-athletes who seek another year of eligibility. Additionally, given the roster limits and direct payment caps, these Plaintiffs would almost certainly take a position or compensation that otherwise would have been allocated to someone else.

More importantly, small changes in the eligibility rules have consequences that likely cannot be fully appreciated without further development of the record. The Court is mindful of its limitations in assessing the consequences of invalidating long-standing eligibility rules and Judge Thapar's admonition that judges "should tread carefully in this area and insist on a thorough record from which to rule." *Pavia*, 154 F.4th at 418 (Thapar, J., concurring). Here, the public interest and balance of the equities do not favor a preliminary injunction.

## IV. CONCLUSION

For the reasons stated, Plaintiffs have not shown that immediate relief is warranted. Accordingly, the motion for Preliminary Injunction (Doc. No. 39) is **DENIED**.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE