IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | |
|---|---|
| LANGSTON PATTERSON, NICHOLAS ("NICK") LEVY, NATHANIAL VAKOS, KEVIN GALLIC, LANCE MASON, CHAD MAURICE ("CJ") TAYLOR JR., QUINCY SKINNER JR., BRAYDEN SCHAGER, BERNARD ("BJ") HARRIS JR., JOHN ("JOHNNY") LUETZOW, HENRY STEWART, JAKOB RUSSELL, JUSTINE PISSOTT, NDJAKALENGA ("JAK") MWENENTANDA, LAWSON LOVERING, ELLIE GEOFFROY, XCARET ("X") PINEDA, REESE RAGLAND, and TIMO LEGOUT, on behalf of themselves and all others similarly situated, <br><br>    Plaintiffs, <br><br>v. <br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, <br><br>    Defendant. | Case No. 3:25-cv-00994 <br><br> Chief Judge William L. Campbell, Jr. <br><br> Magistrate Judge Evans <br><br> JURY DEMAND |

### DEFENDANT NATIONAL COLLEGIATE ATHLETIC ASSOCIATION'S MOTION AND MEMORANDUM OF LAW TO DISMISS THE FIRST AMENDED COMPLAINT

Defendant National Collegiate Athletic Association ("NCAA"), by and through undersigned counsel, hereby moves to dismiss the First Amended Complaint filed by Plaintiffs Langston Patterson, Nicholas Levy, Nathanial Vakos, Kevin Gallic, Lance Mason, Chad Maurice Taylor Jr., Quincy Skinner Jr., Brayden Schager, Bernard Harris Jr., Johnny Luetzow, Henry Stewart, Jakob Russell, Justine Pissott, Ndjakalenga Mwenentanda, Lawson Lovering, Reese Ragland, Ellie Geoffroy, Xcaret Pineda, and Timo Legout (collectively, "Plaintiffs"). The NCAA

1

respectfully requests that the Court dismiss Plaintiffs' First Amended Complaint under Federal Rule of Civil Procedure 12(b)(6) for failing to state a plausible claim to relief.

Plaintiffs, a putative class of current and former Division I student-athletes spanning multiple sports, bring this action challenging the NCAA's Five-Year Rule (NCAA Bylaw 12.6) and the so-called "Redshirt Rule" insofar as these rules do not permit student-athletes to compete in five seasons of competition during their five years of eligibility (collectively, the "Challenged Rules"). Plaintiffs allege that the Challenged Rules constitute an unreasonable restraint on trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and seek both injunctive relief and damages on behalf of two putative classes.

The First Amended Complaint should be dismissed for three primary reasons. First, Plaintiffs' claims are barred by the final settlement agreement approved in *In re: College Athlete Litigation*, 4:20-CV-03919 (N.D. Cal.) ("*House*"). The release waives all claims challenging the period of eligibility in which student-athletes are eligible to receive the benefits of the settlement agreement, which is precisely what Plaintiffs attempt to do here. Second, Plaintiffs have failed to allege sufficient facts to state a plausible claim to relief because their market definitions are deficient. Third, even assuming Plaintiffs had adequately alleged relevant markets, they have not pleaded legally cognizable antitrust harm—that to quality, price, or output in the marketplace.

For the foregoing reasons, which are more fully discussed below, the Court should dismiss the First Amended Complaint with prejudice.

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b)(6) permits dismissal of a complaint for failure to state a claim upon which relief can be granted. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its

face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## ARGUMENT

**I. Plaintiffs Have Released Their Claims Under the *House* Settlement.**

The First Amended Complaint should be dismissed because Plaintiffs' claims have been released under the *House* Settlement.[1] The "Injunctive Relief Settlement Class" in *House* includes, as relevant here, "[a]ll student-athletes who compete on, competed on, or will compete on a Division I athletic team" after "June 15, 2020." (*See House* Settlement, Definition aa, attached as **Exhibit 1**). All named Plaintiffs are indisputably members of that class, as each competed after that date. They received notice and an opportunity to object (or opt out of the damages settlement), and none exercised that right. They are accordingly bound by the *House* Settlement.

That forecloses Plaintiffs' claims, because they have released, as part of the *House* Settlement, the claims they now seek to relitigate. The Settlement defines the "Released Injunctive Class Claims" to include any and all challenges to "the subjects addressed by the Related Injunctive Relief NCAA & Conference Rules." (*Id.* at 12–13, Definition qq.) The Settlement then makes clear that the category of "Related Injunctive Relief NCAA & Conference Rules" includes:

> NCAA and conference rules governing *the number of seasons/length of time student-athletes are eligible to receive benefits*, including scholarships and payments pursuant to the Injunctive Relief Settlement, including without limitation

---

[1] This Court may take judicial notice of the *House* Settlement to ascertain whether the claims pleaded have been released without converting this Motion to Dismiss into one for summary judgment. *See Coleman-Ward v. Bowden*, No. 1:22-cv-01211-STA-jay, 2023 U.S. Dist. LEXIS 217127, at *6–7 (W.D. Tenn. Oct. 24, 2023) (collecting cases).

3

*any rule capping the number of years a student-athlete may receive payments at four years, and providing that all four of those years must be played within a consecutive five-year period.*" *Id.* at 13–14 (Definition rr(2)) (emphasis added).

That description encompasses the Challenged Rules, which limit a student-athlete to four seasons of competition within the five-year period of eligibility. Moreover, the NCAA adopted a rule in connection with the approval of the *House* Settlement making clear that any benefits agreements with student-athletes cannot run past their period of NCAA eligibility. (*See* 2025-26 DI Manual, Bylaw 16.13.1.1, attached as **Exhibit 2**; *see also House* Settlement, Injunctive Relief Settlement Art. 4, Section 3(a)). Plaintiffs are directly challenging those rules—they seek damages and injunctive relief to which they would be entitled only if the Court declares the current eligibility limitation of four seasons in five years an anticompetitive restraint on trade.

Simply put, Plaintiffs are members of the *House* Settlement's Injunctive Class, and certain Plaintiffs separately accepted damages payments under the Settlement. (*See House* Settlement at 6.) The very premise of Plaintiffs' lawsuit is that they seek to expand the period of eligibility in which they can obtain the benefits of participation in collegiate athletics (including direct payments authorized by the *House* Settlement) from four seasons to five. The *House* Settlement's release addressed both the availability of those benefits and the time period in which student-athletes could obtain them. Plaintiffs cannot now sue again raising claims they explicitly released.

## II. The Court Should Dismiss the First Amended Complaint Because Plaintiffs Have Failed to Plausibly Allege Relevant Markets.

The Court must evaluate whether the First Amended Complaint plausibly alleges that the Challenged Rules' restraint on trade is "unreasonable." *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) (internal quotation marks omitted) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)). In assessing whether a challenged restraint is unreasonable, the "rule of reason" presumptively applies. *Alston*, 594 U.S. at 81.

4

The rule of reason is a three-step, burden-shifting exercise. *Am. Express*, 585 U.S. at 541. "Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* Before a district court can assess whether a rule has an anticompetitive effect, it "must first define the relevant market." *Id.* at 542. "[T]he relevant market is defined as the area of effective competition" which is the "arena within which significant substitution in consumption or production occurs." *Id.* at 543 (cleaned up). Without defining the relevant market, "there is no way to measure the defendant's ability to lessen or destroy competition." *Id.* (cleaned up).

"The essential test for ascertaining the relevant product market involves the identification of those products or services that are either (1) identical to or (2) available substitutes for the defendant's product or service." *White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 500 (6th Cir. 1983). "The relevant market includes those products or services that are reasonably interchangeable with, as well as identical to, defendant's product." *Am. Council of Certified Podiatric Phys. & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 622 (6th Cir. 1999). "[R]easonable interchangeability may be gauged by (1) the product uses, *i.e.*, whether the substitute products or services can perform the same function, and/or (2) consumer response (cross-elasticity); that is, consumer sensitivity to price levels at which they elect substitutes for the defendant's product or service." *White & White, Inc.*, 723 F.2d at 500.

"***Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand***, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, ***the relevant market is legally insufficient and a motion to dismiss may be granted.***" *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 436 (3d

Cir. 1997) (emphasis added) (cited with approval in *NHL Players' Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 473 (6th Cir. 2005) ("*NHLPA II*")); *see also Apani Southwest, Inc. v. Coca-Cola Enters.*, 300 F.3d 620, 628 (5th Cir. 2002) (same).

Plaintiffs here allege four relevant labor markets: (1) the market for DI FBS football players, (2) the market for DI men's basketball players, (3) the market for DI women's basketball players, and (4) the markets for athletes in the remaining DI sports. (First Am. Compl. ("FAC") ¶178.) The First Amended Complaint is devoid of factual allegations that could render these market definitions plausible.

Regarding the alleged labor markets, the First Amended Complaint contains no adequate factual allegations articulating how professional sports leagues (namely, the NFL, NBA, WBNA, or foreign basketball leagues) are not reasonably interchangeable substitute buyers of student-athletes' services. Plaintiffs assert that there are "zero practical alternatives" to the NCAA, citing a list of benefits that NCAA institutions provide. (*Id.* ¶¶ 48, 181.) But the First Amended Complaint describes the unique benefits available in college sports without explaining why the professional leagues—which also provide athletes the opportunity to be compensated for their services—are not potential substitute buyers within the same market. That one buyer offers different compensation than another, or even unique compensation, says nothing about whether the buyers are in competition for the services of the same sellers.

Furthermore, Plaintiffs' fourth alleged market—"athletes in the remaining Division I sports"—lumps together an undifferentiated mass of distinct sports with vastly different competitive structures, compensation opportunities, and labor dynamics. (*Id.* ¶ 178.) Plaintiffs provide no factual allegations plausibly describing how there exists cross-elasticity of demand among athletes in these disparate sports (*i.e.*, that a women's soccer player is a substitute for a

6

men's tennis player or a women's track and field runner) for the DI member institutions who are the alleged purchasers in the labor market. Without such allegations, this amalgamated "Tuition Revenue Sports" market is implausible.

For the foregoing reasons, the Court should dismiss the First Amended Complaint in its entirety. But if the Court finds that Plaintiffs have alleged facts to substantiate one or more of the alleged markets, but not all of them, the Plaintiffs encompassed within those markets not plausibly alleged should be dismissed from the case.

### III. The Court Should Dismiss the First Amended Complaint Because Plaintiffs Cannot Allege a Legally Cognizable Anticompetitive Effect of the Challenged Rules.

Even assuming the Challenged Rules fall within the purview of the Sherman Act and Plaintiffs had adequately alleged relevant markets, Plaintiffs have not pleaded legally cognizable antitrust harm—that to quality, price, or output in the marketplace.

#### A. The Alleged Harms to Plaintiffs Are Not Cognizable Antitrust Harms.

In order to sustain an antitrust claim, the anticompetitive harm alleged must be to output, price, or quality. *See Am. Express*, 585 U.S. at 542. The harm must affect the market as a whole, which cannot be shown merely through alleged harm to a subgroup of competitors within the marketplace. *See NHL Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 720 (6th Cir. 2003) ("*NHLPA I*") (the "antitrust laws were enacted for 'the protection of *competition*, not *competitors*,'" so a plaintiff must "present evidence of an injury to a definable market," not just that the rule "might result in significant personal injury to" himself (emphasis in original) (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990))). And, as the Sixth Circuit explained in *NHLPA I*, a rule that "merely substitutes one arguably less skilled player for another arguably more skilled player" does not cause "an injury to a definable market." 325 F.3d at 720.

7

Plaintiffs' allegations do not demonstrate reductions in price, quality, or output below the competitive level. Rather, they concern only the allocation of who receives the benefits of competition. But as the Sixth Circuit explained in *NHLPA I*, a lawsuit premised upon to whom the benefits of competition are allocated—rather than the effect of a restraint on the price, output, or quality of benefits available market-wide—cannot succeed as a matter of law.

Plaintiffs contend that the Challenged Rules are anticompetitive because they restrain student-athletes from receiving *House* revenue-sharing payments, third-party NIL opportunities, and education-related benefits. (FAC ¶¶ 193–201.) Even assuming the Challenged Rules cause the harms alleged to student-athletes who did not redshirt, they are not legally cognizable antitrust harms to a marketplace that can support a plausible cause of action.

Plaintiffs cannot sustain a claim as a matter of law based on the lost opportunity to receive *House* Settlement revenue sharing opportunities. Under the *House* Settlement, the amount that institutions can pay directly to student-athletes is capped each year. *See House* Settlement, Art. III, § 1(g).[2] Accordingly, restricting student-athletes' ability to participate in a fifth season of DI competition cannot demonstrate market-wide harm to compensation (*i.e.*, price) because extending the eligibility of those student-athletes who do not redshirt cannot have any effect on the available compensation in the market—*House* dictates that sum.[3] As criticized in *NHLPA I*, Plaintiffs' First Amended Complaint focuses on how the benefits of the *House* Settlement are allocated proportionally, not the sum of benefits available in the market. Only the latter can sustain an antitrust claim.

---

[2] Again, Plaintiffs have released all claims concerning the subject matter raised in *House*, including the cap on benefits agreed to as part of the settlement.

[3] Plaintiffs concede this issue by alleging that some schools would pay in excess of the cap if the cap were not in place. (*See* FAC ¶ 197.)

8

The Challenged Rules similarly do not depress the quantity of the educational or intangible benefits of participation in collegiate athletics because, after *House*, the number of opportunities available are capped. The *House* Settlement capped the number of student-athletes on each DI intercollegiate football roster at 105. *See* Bylaw 17.2.[4] Accordingly, the Challenged Rules have no impact on the quantity of opportunities to participate in the labor market. Like with the *House* payment allegations, Plaintiffs' claim only concerns who gets those benefits, not the quantity of benefits available. The former cannot support a claim.

In alleging that the Challenged Rules decrease output, Plaintiffs erroneously characterize eligible student-athletes as "output." Output is dictated by buyers' demand for labor, *i.e.*, the number of positions to fill in the labor market, not sellers' demand to offer labor. *See, e.g.*, *Deslandes v. McDonald's USA, LLC*, No. No. 17 C 4857, 2021 U.S. Dist. LEXIS 140735, at *25 (N.D. Ill. July 28, 2021) ("When new outlets open, the outlets must be staffed. Thus, new restaurants also increase output in the labor market (*i.e.*, demand for labor)."). Plaintiff confuses inputs in the labor market (*i.e.*, the number of eligible student-athletes), with output (*i.e.*, the number of roster spots through which student-athletes offer their athletic services). To illustrate, consider a hypothetical market in which 100 "sellers" are willing to offer their services to play professional croquet in the United States; if no "buyers" are willing to pay to field a team and hire any of those 100 sellers to play croquet professionally, then the output of the hypothetical professional croquet labor market would be zero because there would be no competitive croquet contests, irrespective of the available labor supply. Accordingly, Plaintiffs' allegations that the Challenged Rules decrease output by removing student-athletes from the alleged market are implausible. The *House* roster limits, not the Challenged Rules, dictate labor market output.

---

[4] Like the time-period of eligibility and capped direct-payment benefits, Plaintiffs also released challenges to new roster limits by participating in the *House* Settlement.

Additionally, Plaintiffs' claims of anticompetitive harm to third-party NIL compensation are distinct from the relevant market as pleaded: the allegations concern a situation where third parties, not NCAA member institutions, are the buyers of athletes' NIL rights (as opposed to institutions offering compensation for athletes' athletic services as alleged). Given this third-party NIL market is not identified as a relevant market in the First Amended Complaint, the allegations cannot demonstrate harm to a defined relevant market as pleaded.

Moreover, even if Plaintiffs had alleged a corresponding market, Sixth Circuit precedent forecloses their third-party NIL theory. In *NHLPA II*, 419 F.3d at 474, the Sixth Circuit explained that "we have been unable to uncover any cases addressing the issue of whether a defendant is subject to antitrust liability for secondary anti-competitive effects of the defendant's actions." It further held, "[w]e decline, in this case, to establish definitive rules regarding whether or when an anti-competitive injury that is only secondarily or indirectly caused by a defendant's alleged restraint on trade may ever support a viable claim under the Sherman Act." *Id*. It then affirmed dismissal of the plaintiffs' complaint, premised on secondary anticompetitive harm, for failure to state a claim. *Id.* at 476. The United States District Court for the Eastern District of Tennessee relied on the foregoing in declining to find a likelihood of success on the merits in *Zeigler v. NCAA*, 3:25-cv-226-KAC-JEM, 2025 U.S. Dist. LEXIS 111927, at *11–12 (E.D. Tenn. June 12, 2025) ("to the extent that there are secondary anticompetitive effects of the Four-Seasons Rule brought on by independent actors in the market, Plaintiff has presented no basis for holding Defendant liable.").

Plaintiffs' third-party NIL theory improperly depends on second-order effects of the Challenged Rules on independent third parties. Plaintiffs contend: there exists third-party demand to pay DI student-athletes for their NIL rights; the Challenged Rules limit Plaintiffs' ability to

remain eligible to participate in DI collegiate athletics (the first-order effect); therefore, the Challenged Rules restrain Plaintiffs' ability to obtain third-party NIL compensation because their resulting ineligibility depresses third-party demand for their NIL rights (the second-order effect). (*See* FAC ¶ 200) (describing third-party NIL compensation as tied to "third-party collectives, sponsors, and brands . . . motivate[ion] to pay college athletes *so long as they can compete on the field or court*." (emphasis added)). But under *NHLPA II*, the effect of the Challenged Rules on the third-party NIL marketplace is a second-order effect and, as a matter of law, Plaintiffs cannot maintain an antitrust claim thereon.

### B. Plaintiffs' Allegations of Harm to Consumers Cannot Support a Claim.

Plaintiffs' contention that the Challenged Rules harm consumers by "reduc[ing] the quality, variety, and continuity of the on-field and on-court product" fares no better. (FAC ¶ 181.) As the Sixth Circuit has explained, harm to competition on the field does not equate to harm to competition in the antitrust sense, so the former does not support a claim. See *NHLPA I*, 325 F.3d at 720 ("the effect on the market as defined by appellees is on athletic competition, which is not protected by the antitrust laws."). And, to the extent Plaintiffs allege the Challenged Rules harm consumers by rendering skilled athletes ineligible, Sixth Circuit precedent indicates harm to the quality of on-field competition is not anticompetitive harm in the antitrust sense.

Accordingly, for the foregoing reasons, Plaintiffs have failed to plausibly allege that the Challenged Rules cause anticompetitive effects in any relevant market. Plaintiffs' claim concerns who gets to benefit proportionally from a fixed pool of benefits. But Plaintiffs cannot sustain an antitrust claim upon the allocation of benefits in a market where the price, output, and quality of benefits remain constant irrespective of the Challenged Rules. Their voluminous conclusory assertions to the contrary do not obviate their need to plead facts that demonstrate a plausible cause of action.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' First Amended Complaint with prejudice.

Dated: March 2, 2026

*/s/ Taylor J. Askew*
Taylor J. Askew (BPR 033193)
David J. Zeitlin (BPR 037664)
**HOLLAND & KNIGHT LLP**
511 Union Street, Suite 2700
Nashville, Tennessee 37219
Telephone: (615) 244-6380
Facsimile: (615) 244-6804
taylor.askew@hklaw.com
david.zeitlin@hklaw.com

Rakesh Kilaru (*pro hac vice*)
Max Warren (*pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
rkilaru@wilkinsonstekloff.com
mwarren@wilkinsonstekloff.com
*Counsel for National Collegiate Athletic Association*

## Certificate of Service

I hereby certify that on March 2, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties and counsel of record.

Dated: March 2, 2026

*/s/ Taylor J. Askew*
Taylor J. Askew
**HOLLAND & KNIGHT LLP**
511 Union Street, Suite 2700
Nashville, Tennessee 37219
taylor.askew@hklaw.com

*Counsel for National Collegiate Athletic Association*