**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE NASHVILLE DIVISION**

**LANGSTON PATTERSON, NICHOLAS ("NICK") LEVY, NATHANIAL VAKOS, KEVIN GALLIC, LANCE MASON, CHAD MAURICE ("CJ") TAYLOR JR., QUINCY SKINNER JR., BRAYDEN SCHAGER, BERNARD ("BJ") HARRIS JR., JOHN ("JOHNNY") LUETZOW, JAKOB RUSSELL, JUSTINE PISSOTT, NDJAKALENGA ("JAK") MWENENTANDA, LAWSON LOVERING, REESE RAGLAND, ELLIE GEOFFROY XCARET ("X") PINEDA, TIMO LEGOUT, HENRY STEWART, ELIJAH JOE LOPEZ, IAN SCHIEFFELIN, JAYDEN PIERRE, AMAREE "MO" ABRAM, CAYDEN CHARLES, EMILY PAPE, AND VALENTINO PINEDO, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,**

**Plaintiffs,**

**v.**

**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION; ATLANTIC COAST CONFERENCE; THE BIG TEN CONFERENCE, INC.; THE BIG 12 CONFERENCE, INC.; PAC-12 CONFERENCE; AND SOUTHEASTERN CONFERENCE,**

**Defendants.**

**Case No. 3:25-cv-00994**

**Chief Judge William L. Campbell, Jr.**

**Magistrate Judge Luke A. Evans**

**JURY DEMAND**

# SECOND AMENDED COMPLAINT – CLASS ACTION

Plaintiffs Langston Patterson, Nicholas "Nick" Levy, Nathanial Vakos, Kevin Gallic, Lance Mason, Chad Maurice ("CJ") Taylor Jr., Quincy Skinner Jr., Brayden Schager, Bernard ("BJ") Harris Jr., John ("Johnny") Luetzow, Jakob Russell, Justine Pissott, Ndjakalenga ("Jak") Mwenentanda, Lawson Lovering, Reese Ragland, Ellie Geoffroy, Xcaret ("X") Pineda, Timo Legout, Henry Stewart, Elijah Joe Lopez, Ian Schieffelin, Amaree "Mo" Abram, Cayden Charles, Emily Pape, and Valentino

Pinedo (together, "Plaintiffs"), on behalf of themselves and all persons similarly situated, by and through undersigned counsel, and complaining of Defendant National Collegiate Athletic Association ("NCAA") and Defendants Atlantic Coast Conference, The Big Ten Conference, Inc., The Big 12 Conference, Inc., Pac-12 Conference, and Southeastern Conference ("Conference Defendants") (together, "Defendants"), allege as follows for their Second Amended Complaint:

## INTRODUCTION

1. Plaintiffs bring this lawsuit on behalf of a Transition Exclusion Class and a Lost Opportunities Damages Class of Division I college athletes[1] challenging the NCAA's unreasonable restrictions that arbitrarily cut short college athletes' ability to compete.

2. For almost fifty years, the NCAA has enforced a rule providing Division I college athletes with a five-year window to exhaust their competition eligibility (the "Five-Year Rule").[2] However, within those five years, the NCAA limits college athletes to *competing* in only four seasons of intercollegiate competition (the "Four Seasons Rule")[3] and otherwise dictates that a college athlete may use the fifth year only to compete in team activities without, or with limited,

[1] The putative classes are defined below under "Class Allegations." *See infra* ¶¶ 256 –263.

[2] NCAA Bylaw 12.6.1 Five-Year Rule. A student-athlete shall complete the student-athlete's seasons of competition within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution, with time spent on an official religious mission, in the armed services or with recognized foreign aid services of the U.S. government being excepted. For international students, service in the armed forces of the student's home country is considered equivalent to such service in the United States. *See NCAA*, 2025–26 NCAA Division I Manual, Bylaw 12.6.1, at 46 (2025) https://ncaapublications.com/products/2025-2026-ncaa-division-i-manual.

[3] NCAA Bylaw 12.6 Seasons of Competition: Five-Year Rule. A student-athlete shall not engage in more than four seasons of intercollegiate competition in any one sport (*see* Bylaws 12.02.3 and 14.3.3). An institution shall not permit a student-athlete to represent it in intercollegiate competition unless the student-athlete completes all seasons of competition in all sports within the time periods specified below. *NCAA*, 2025–26 NCAA Division I Manual, Bylaw 12.6, at 46 (2025) https://ncaapublications.com/products/2025-2026-ncaa-division-i-manual.

participation in intercollegiate competition (the "Redshirt Rule").[4] Collectively, these rules are referred to herein as the "Former Eligibility Rules." Until June 23, 2026, the NCAA enforced the Former Eligibility Rules on all Division I college athletes through mandatory NCAA legislation backed by significant penalties against member institutions—including forfeiture of wins, financial penalties, scholarship reductions, postseason restrictions, and, in the most serious cases, the so-called "death penalty," under which an institution may be prohibited from participating in NCAA competition in the affected sport.[5]

3. On June 23, 2026, while this litigation was pending, the NCAA adopted a fundamentally transformed eligibility framework that generally permits Division I college athletes who began their collegiate careers no later than the first academic year following their nineteenth birthdays to compete throughout all five years of their five-year eligibility window (the "Age-Based Eligibility Rule"). At the same time, however, thee-Based NCAA implemented a transition to the

[4] The "Redshirt Rule" is not a discrete NCAA Bylaw but rather a term of art describing how a college athlete may preserve a season of competition by not competing (or minimally competition) under several interrelated provisions of the *NCAA Division I Manual*. A redshirt year may occur in multiple ways including, *inter alia*:

- *Institutional Redshirt (Non-Participation)*: A student-athlete withheld from competition for a season does not use a season of competition unless competition thresholds are crossed. *See NCAA*, 2025–26 NCAA Division I Manual, Bylaw 12.6.1.7.1(a), at 48 (2025) https://ncaapublications.com/products/2025-2026-ncaa-division-i-manual.
- *Sport-Specific Exceptions*: Certain sports, such as football, permit limited competition without triggering use of a season (e.g., competition in up to four games). *NCAA*, 2025–26 NCAA Division I Manual, Bylaw 12.6.3.1.6, at 50 (2025) https://ncaapublications.com/products/2025-2026-ncaa-division-i-manual.
- *Academic Redshirts*: First-year students admitted as "academic redshirts" must serve a year of residence before competing, preserving their seasons of competition. *See NCAA*, 2025–26 NCAA Division I Manual, Bylaw 14.3.1.2, at 140 (2025) https://ncaapublications.com/products/2025-2026-ncaa-division-i-manual.

[5] *See generally*, 2025–26 NCAA Division I Manual, Bylaw 19. Infractions Program, at 307–31 (2025) https://ncaapublications.com/products/2025-2026-ncaa-division-i-manual.

Age-Based Eligibility Rule that denies the benefits of the new model of five seasons of competition to college athletes who completed—or are deemed to have completed—their fourth season of competition during the 2025–26 academic year, even if they remain within the five-year eligibility window as defined by the Age-Based Eligibility Rule (the "Transition Exclusion"). Unless otherwise indicated, references in this Complaint to the "Challenged Rules" include the Former Eligibility Rules, the Transition Exclusion, or both, depending on the context in which the term is used.

4. By operation of the Former Eligibility Rules, Division I college athletes were denied the opportunity to fully utilize the five-year eligibility period that the NCAA itself prescribed. The Former Eligibility Rules suppressed athletic careers, limited college athletes' institutional mobility, and unlawfully restrained competition in the market for Division I college athletes' athletic services. Rather than permitting college athletes to compete throughout the eligibility period established by the NCAA itself, the Former Eligibility Rules forced athletes to the sidelines—not because of injury, misconduct, or academic ineligibility—but because of an arbitrary, anticompetitive limitation imposed by the NCAA. Plaintiffs seek damages for the injuries caused by the Former Eligibility Rules and declaratory and prospective relief from Defendants' continuing enforcement of the Challenged Rules.

5. Plaintiffs do not challenge the concept of a defined eligibility period or the NCAA's Five-Year Rule. Likewise, Plaintiffs do not challenge the NCAA's adoption of an eligibility framework that grants future college athletes the benefit of the relief sought by the Transition Exclusion Class here—*i.e.*, the ability to compete in intercollegiate games throughout the full window of eligibility. Rather, Plaintiffs challenge Defendants' historical adoption, maintenance, and enforcement of the Former Eligibility Rules and Defendants' continuing enforcement of the Transition Exclusion, each of which arbitrarily restricts college athletes' competitive opportunities

without any legitimate procompetitive justification. Although the NCAA has now abandoned the Former Eligibility Rules for most Division I college athletes, it continues to impose substantially the same competitive restraints on Plaintiffs through the Transition Exclusion.

6. Plaintiffs challenge two related but distinct restraints. Those claims arise from the same nucleus of operative facts and are pleaded together to permit complete resolution of the parties' dispute in a single action. First, Plaintiffs seek damages and other relief arising from Defendants' historical adoption, maintenance, and enforcement of the Former Eligibility Rules throughout the Relevant Period. Second, Plaintiffs seek declaratory and injunctive relief from Defendants' continuing enforcement of the Transition Exclusion, which targets those Plaintiffs and those similarly situated who completed their fourth season of competition during the 2025–26 academic year, to deny them the myriad benefits of competition in the NCAA Division I sports.

7. The NCAA's own conduct further demonstrates that workable, significantly less restrictive alternatives to the Former Eligibility Rules existed throughout the Relevant Period. On or around June 23, 2026, the NCAA unanimously approved the new eligibility framework that expressly eliminates the Four-Year Rule, as well as athletic redshirts, sport-specific eligibility provisions, and many eligibility waivers. In doing so, the NCAA abandoned the very restraints it had long maintained were necessary to preserve the character of Division I athletics, replacing them with an eligibility framework that the NCAA once vociferously opposed but now acknowledges is both workable and preferable. This subsequent rule change constitutes compelling evidence that feasible, workable, and substantially less restrictive alternatives to the Former Eligibility Rules existed throughout the Relevant Period. But the NCAA's unjustifiable decision to continue withholding those same benefits from Plaintiffs and similarly situated college

athletes through the Transition Exclusion further reinforces the arbitrary and anticompetitive nature of the challenged restraints.

8. The weaknesses in the NCAA's justifications for these rules were evident well before June 23, 2026. For example, one historical justification for the Redshirt Rule was that it allowed athletes who transferred from one college to another to practice with their team while sitting out a year of competition as required by other NCAA Bylaws. But in 2023, the NCAA voluntarily removed the "one year sit out," making all athletes immediately eligible after transferring—thereby eliminating a major historical justification for the Redshirt Rule.

9. Additionally, when confronted with the extraordinary disruption of the COVID-19 pandemic, the NCAA voluntarily waived the Four Seasons Rule for college athletes who entered Division I programs between 2017 and 2020, thus allowing all college athletes to compete for five seasons in five (or six) years—a move that has, at best, a tangential connection to public health—thereby acknowledging that its rigid eligibility limits were neither indispensable nor tied to any genuine procompetitive justification. This waiver demonstrated that the enterprise of NCAA intercollegiate sports could thrive without the restraints imposed by the Former Eligibility Rules.[6] In other words, while the NCAA's adoption of the rule permitting competition throughout the window of eligibility confirmed that a substantially less restrictive alternative was and had been available at all times during the Relevant Period, it was hardly the first evidence to illustrate that fact. The NCAA's own actions undermine any claim that the overly restrictive Four Seasons and Redshirt Rules were necessary to achieve legitimate competitive objectives.

[6] The NCAA's operations were unaffected by extending college athletes' eligibility to five years under the COVID waiver, as its revenue of $1.5 billion in 2021 exceeded that of the pre-pandemic year. *See* Associated Press, *NCAA Earns $1.15 Billion in 2021 as Revenue Returns to Normal*, ESPN (Feb. 2, 2022), https://www.espn.com/college-sports/story/_/id/33201991/ncaa-earns-115-billion-2021-revenue-returns-normal.

10. But the NCAA has denied, and continues to deny without any legitimate procompetitive justification, Plaintiffs and similarly situated Division I college athletes the opportunity to maximize their athletic participation within the NCAA's prescribed Five-Year Rule. As a practical matter, the Transition Exclusion leaves the non-redshirt college athletes who began their collegiate careers in 2021 and 2022 as the only cohorts of Division I college athletes in the post-*Alston* era who were categorically barred from receiving the benefits of five full years of intercollegiate athletic participation. Their teammates who competed during the 2020-21 academic year received an additional season of competition through the NCAA's COVID-19 eligibility waivers, and all future Division I college athletes will generally receive the benefit of the NCAA's newly adopted five-year competition model. This inequity is compounded by the fact that the 2021 and 2022 classes experienced significant disruptions to recruiting, college selection, and athletic development during the COVID-19 pandemic, further limiting their opportunities. Among those who have participated in Division I sports since COVID, these Plaintiffs alone were left to navigate an artificially compressed window in which to develop athletically, compete, earn scholarships, build their brands, and realize the full economic value of their collegiate careers.

11. The consequences are particularly stark with respect to financial opportunities. College athletes who first enrolled in 2021 will receive none of the collectively hundreds of millions of dollars annually that Division I universities are now permitted to pay directly to college athletes pursuant to the *House* settlement approved in June 2025, and those who first enrolled at a Division I institution in 2022 will be artificially denied a year of those payments as a consequence of the continued enforcement of the Former Eligibility Rules. The latter denial is particularly egregious given that Plaintiffs remain within the five-year eligibility period now recognized by the

NCAA itself. This selective denial of benefits underscores the arbitrary and anticompetitive nature of the Former Eligibility Rules.

12. The harm to athletes who first enrolled in or before 2021 is already complete and irreversible: their five-year eligibility clocks have expired, foreclosing any opportunity of a fifth season of competition. Those athletes have suffered concrete economic and competitive injuries for which damages under the antitrust laws are appropriate. By contrast, college athletes who first enrolled in 2022 and remain within the five-year window as defined by the new eligibility framework could still benefit from an additional season. But as with the Lost Opportunities Plaintiffs, once the opportunity to compete is lost, it cannot be restored. Because collegiate careers are uniquely finite, the injury caused by the Former Eligibility Rules and the Transition Exclusion is not only ongoing but irreparable.

13. Through the Former Eligibility Rules and now the Transition Exclusion, Defendants have unreasonably restrained competition in the market for Division I college athletes' athletic services and the related markets for athletic scholarships, grant-in-aid, institutional revenue-sharing payments, roster positions, name, image, and likeness ("NIL") compensation, and other commercial opportunities. Although the NCAA has now permanently adopted an eligibility framework that generally permits Division I college athletes to compete throughout their five-year eligibility period, Defendants continue to withhold those same benefits from a narrow group of current college athletes—including non-redshirt seniors who completed their fourth season of competition in the 2025–26 academic year without taking a redshirt—through the Transition Exclusion. By artificially limiting athletic participation, Defendants have suppressed competition among member institutions for the services of Division I college athletes, diminished Plaintiffs' economic opportunities, and interfered with Plaintiffs' existing and prospective contractual and commercial relationships with

NCAA member institutions. Defendants' conduct further breaches contractual obligations and the implied covenant of good faith and fair dealing owed to Plaintiffs under the laws of the applicable states by arbitrarily denying them the benefits of the NCAA's newly adopted eligibility framework while continuing to prevent member institutions from competing to renew, extend, or offer athletic scholarships, grant-in-aid, institutional compensation, and related benefits for a fifth season of participation. Plaintiffs therefore seek damages, declaratory relief, injunctive relief, and all other relief available under federal and applicable state law to redress these anticompetitive and contractual violations.

## PROCEDURAL BACKGROUND

14. In *NCAA v. Alston*, 594 U.S. 69 (2021), the United States Supreme Court unanimously held that the lower court's enjoining of the NCAA's restraints on education related benefits was consistent with established antitrust principles. In reaching this conclusion, the Court rejected the NCAA's proposal for "a sort of judicially ordained immunity from the terms of the Sherman Act for its restraints of trade," in an attempt to resist a rule of reason analysis. *Id*. at 94–96. Under the rule of reason analysis, the Court endorsed the "demanding standard" applied by the lower court in reviewing the procompetitive rationale for the NCAA's restraints: whether it was "'patently and inexplicably stricter than necessary' to achieve the procompetitive benefits the league had demonstrated." *Id*. at 101 (internal citations omitted).

15. The *Alston* Court also recognized that "[w]hen it comes to college sports, there can be little doubt that the market realities have changed significantly since 1984." *Id*. at 93. Specifically, college athletics have transformed into a multibillion-dollar enterprise, paving the way for college athletes to receive compensation for the use of their names, images, and likenesses ("NIL Compensation"). For example, between 1982 and 1984, CBS paid approximately $16 million per

year for the broadcast rights to the NCAA's Division I Men's Basketball Tournament.[7] By 2016, those rights generated more than $1.1 billion annually.[8] The Supreme Court's decision in *Alston* paved the way for college athletes to begin earning NIL Compensation and affirmed that athletes are not mere chess-pieces in this system but essential contributors entitled to share in the immense economic value they help create.

16. The market realities for college athletics have further evolved since the Supreme Court's decision in *Alston*. Effective July 1, 2021, the NCAA lifted its blanket prohibition on NIL Compensation, giving rise to a robust commercial market for Division I college athletes. Since that time, NIL opportunities have expanded dramatically, generating billions of dollars in economic activity and fundamentally changing the market in which Division I college athletes compete for athletic services, scholarships, and significant compensation opportunities.[9]

17. The recent settlement in *House v. NCAA* further underscores this ongoing evolution of the labor market for NCAA Division I college athletes, reflecting a recognition that their participation carries substantial economic value.[10] Starting in July 2025, Division I schools are authorized to make direct cash payments to their college athletes from an annual revenue allocation

---

[7] *NCAA Awards CBS Rights for $48 Million*, UPI (Mar. 5, 1981), https://www.upi.com/Archives/1981/03/05/NCAA-Awards-CBS-Rights-for-48-Million/8996352616400/.

[8] Andrew Chapados, *March Madness Money: How the NCAA Makes a Billion Dollars Every Year*, Blaze Media (Mar. 17, 2025), https://www.theblaze.com/fearless/march-madness-ncaa-money-tournament.

[9] The resulting NIL market has grown into a billion-dollar industry, valued at roughly $1.1 billion for football alone since 2024. *See The Annual Opendorse Report*, Opendorse, 4 (2024), https://biz.opendorse.com/wp-content/uploads/2024/07/NIL-AT-3-The-Annual-Opendorse-Report-1.pdf#gf_56.

[10] *In re Collegiate Athlete NIL Litigation* (commonly known as *House v. NCAA*), No. 20-cv-03919, 2025 WL 1675820, slip op. (N.D. Cal. June 6, 2025) (final approval of class-action settlement).

established under the *House* settlement.[11] The NCAA's subsequent adoption of the new five-year competition model occurred against this backdrop of rapidly expanding economic opportunities, further increasing the commercial significance of an additional season of Division I competition.

18. Outside the NCAA Division I athletics framework, college athletes have no meaningful avenue to monetize their NIL.

19. In light of these developments—including the Supreme Court's decision in *Alston*, the emergence of a robust NIL marketplace, the implementation of institutional revenue sharing, and the NCAA's adoption of the Age-Based Eligibility Rule—the NCAA's eligibility rules are commercial restraints governing participation in an increasingly valuable labor market.

20. Plaintiffs challenge two related restraints arising from the NCAA's eligibility rules. First, Plaintiffs challenge the NCAA's historical adoption, maintenance, and enforcement of the Former Eligibility Rules, which artificially restricted Division I college athletes to four seasons of competition despite the NCAA's own five-year eligibility period. Second, Plaintiffs challenge Defendants' enforcement of the Transition Exclusion, which denies Plaintiffs and those similarly situated a fifth season of competition solely because they completed their fourth season of competition in the 2025–26 academic year. Together, these restraints arbitrarily deprive Plaintiffs of additional athletic participation, grant-in-aid, roster opportunities, institutional compensation, revenue-sharing payments, NIL opportunities, and other economic benefits.

21. These restraints distort competition among NCAA member institutions for the services of Division I college athletes, interfere with existing and prospective contractual

---

[11] Andrew Kean, *The Game-Changer: From 1 July Universities Can Now Pay Money Directly to Student-Athletes*, FirstPoint USA (June 2025), https://www.firstpointusa.com/blog/2025/06/gamechanger-from-july-universities-can-pay-money-directly-to-studentathletes/.

relationships between college athletes and member institutions, diminish the value of athletic scholarships and related economic opportunities, and inflict direct competitive and economic harm on Plaintiffs.

22. The actual and foreseeable injury to Plaintiffs is a direct consequence of the harms to competition caused by the Former Eligibility Rules and Transition Exclusion. The NCAA's COVID-19 waiver and, more recently, its adoption of the new eligibility framework permitting five seasons of competition each demonstrate that workable, significantly less restrictive alternatives to the Former Eligibility Rules existed. Having now abandoned those restraints for nearly every other Division I college athlete, Defendants cannot continue to deny Plaintiffs the same competitive opportunities without violating the federal antitrust laws and the contractual and other legal obligations alleged in this Complaint.

## JURISDICTION AND VENUE

23. This Court has subject matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1337, and 15 U.S.C. § 4, as this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C.§§ 15(a) and 26.

24. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over any state-law claims asserted herein, because those claims are so connected to Plaintiffs' federal antitrust claims that they form part of the same Article III case or controversy. Plaintiffs' state-law and federal claims arise from the same eligibility rules, the same rulemaking conduct by the NCAA and the Conference Defendants, the same adoption, maintenance, amendment, and enforcement of the Former Eligibility Rules and the Transition Exclusion, and the same resulting loss of athletic-competition and compensation opportunities, such that they derive from a common nucleus of operative fact and would ordinarily be tried in a single judicial proceeding.

25. The state-law claims asserted herein arise from the same conduct, transactions, and occurrences as Plaintiffs' federal antitrust claims and involve the same parties, witnesses, evidence, and commercial restraints. Resolution of all claims in a single proceeding therefore promotes judicial economy and avoids inconsistent judgments.

26. This Court also has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) et seq. ("CAFA"), because this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and in which at least one member of the proposed classes is a citizen of a state different from at least one Defendant.

27. Defendant National Collegiate Athletic Association is an unincorporated association headquartered in Indianapolis, Indiana.

28. Defendant Atlantic Coast Conference is an unincorporated association, with its principal place of business in Charlotte, North Carolina.

29. Defendant Southeastern Conference is an unincorporated association with its principal place of business in Birmingham, Alabama.

30. Defendant Pac-12 Conference is an unincorporated association with its principal place of business in San Ramon, California.

31. Defendant The Big Ten Conference, Inc. is incorporated in Delaware and maintains its principal place of business in Rosemont, Illinois.

32. Defendant The Big 12 Conference, Inc.is incorporated in Delaware and maintains its principal place of business in Irving, Texas.

33. Because Plaintiffs and proposed class members are citizens of numerous states other than Indiana, North Carolina, Alabama, California, Delaware, Illinois, and Texas, minimal diversity

exists between at least one class member and at least one Defendant. No exception to jurisdiction under the Class Action Fairness Act, 28 U.S.C. §§ 1332(d) *et seq.*, including the local-controversy and home-state exceptions set forth in 28 U.S.C. § 1332(d)(4), applies to this action because neither the NCAA nor any Conference Defendant is a citizen of the forum state and greater than one-third of the members of the proposed classes are citizens of states other than the forum state.

34. This Court may exercise personal jurisdiction over Defendant National Collegiate Athletic Association because, *inter alia*, the NCAA: (a) currently transacts substantial business within the geographical boundaries of the Nashville Division of the Middle District of Tennessee; (b) conducts athletic competitions, ticket and merchandise sales, television agreements, and other revenue-generating activities in the District along with its member institutions; (c) has substantial contacts with the United States, including in this District; and (d) is engaged in an illegal anticompetitive scheme that is directed at and has the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. Moreover, several NCAA Division I institutions are found within this District, *i.e.* Vanderbilt University, Belmont University, Tennessee State University, Middle Tennessee State University, Austin Peay University, Tennessee Tech University, and Lipscomb University.

35. This Court may exercise personal jurisdiction over Defendant Atlantic Coast Conference ("ACC") because, *inter alia*: (a) although no ACC member institution is located in Tennessee or this District, ACC member institutions have competed and are scheduled to compete against member institutions located in this District; (b) through those competitions and related commercial activities, ACC member institutions have purposefully directed athletic competition involving ACC teams into this District; (c) the ACC derives substantial benefits from the commercial operation of ACC athletic competition through media-rights and broadcast

arrangements; (d) the ACC participates in the NCAA's Division I governance structure and, together with the NCAA and the other Conference Defendants, adopted, maintained, amended, implemented, enforced, benefited from, and/or ratified the Former Eligibility Rules and, more recently, implemented and enforced the Transition Exclusion accompanying the NCAA's adoption of the Age-Based Eligibility Rule; and (e) Plaintiffs' claims arise out of and relate directly to the ACC's participation in the adoption, maintenance, amendment, implementation, and enforcement of the Former Eligibility Rules and, more recently, the implementation and enforcement of the Transition Exclusion accompanying the NCAA's adoption of the Age-Based Eligibility Rule, all of which restricted Plaintiffs' athletic and economic opportunities in Tennessee and throughout the United States.

36. This Court may exercise personal jurisdiction over Defendant The Big Ten Conference, Inc. ("Big Ten") because, *inter alia*: (a) although no Big Ten member institution is located in Tennessee or this District, Big Ten member institutions have competed and are scheduled to compete against member institutions located in this District; (b) three named Plaintiffs—Nick Levy, Nathanial Vakos, and Lance Mason—have competed for the University of Wisconsin, a Big Ten member institution; (c) through those competitions and related commercial activities, Big Ten member institutions have purposefully directed athletic competition involving Big Ten teams into this District; (d) the Big Ten derives substantial commercial benefits from Big Ten athletic competition through national media-rights and broadcast agreements; (e) the Big Ten participates in the NCAA's Division I governance structure and, together with the NCAA and the other Conference Defendants, adopted, maintained, amended, implemented, enforced, benefited from, and/or ratified the Former Eligibility Rules and, more recently, implemented and enforced the Transition Exclusion accompanying the NCAA's adoption of the Age-Based Eligibility Rule; and

(f) Plaintiffs' claims arise out of and relate directly to the Big Ten's participation in the adoption, maintenance, amendment, implementation, and enforcement of the Former Eligibility Rules and, more recently, the implementation and enforcement of the Transition Exclusion accompanying the NCAA's adoption of the Age-Based Eligibility Rule, all of which restricted Plaintiffs' athletic and economic opportunities in Tennessee and throughout the United States; (g) the challenged eligibility rules have applied to Messrs. Levy, Vakos, and Mason, each of whom competed for a Big Ten member institution; and (h) the Big Ten's conduct has caused foreseeable injury in Tennessee, where this action is litigated and where Messrs. Levy, Vakos, and Mason have joined as named class representatives to redress the loss of competitive and economic opportunity caused by rules the Big Ten helped adopt and enforce.

37. This Court may exercise personal jurisdiction over Defendant The Big 12 Conference, Inc. ("Big 12") because, *inter alia*: (a) although no Big 12 member institution is located in Tennessee or this District, two named Plaintiffs—Ellie Geoffroy and X Pineda—have competed for Oklahoma State University, a Big 12 member institution, and were directly subject to the eligibility rules the Big 12 helped adopt and enforce; (b) Big 12 member institutions' athletic competitions, including those involving Oklahoma State, are broadcast into and generate commercial activity within this District; (c) the Big 12 transacts substantial business directed at this District through national and conference media-rights agreements, broadcasts, and sponsorship arrangements that reach this District; (d) the Big 12 participates in the NCAA's Division I governance structure and, together with the NCAA and the other Conference Defendants, adopted, maintained, amended, implemented, enforced, benefited from, and/or ratified the Former Eligibility Rules and, more recently, implemented and enforced the Transition Exclusion accompanying the NCAA's adoption of the Age-Based Eligibility Rule; (e) Plaintiffs'

claims arise out of and relate directly to the Big 12's participation in the adoption, maintenance, amendment, implementation, and enforcement of the Former Eligibility Rules and, more recently, the implementation and enforcement of the Transition Exclusion accompanying the NCAA's adoption of the Age-Based Eligibility Rule, all of which restricted Plaintiffs' athletic and economic opportunities in Tennessee and throughout the United States; (g) the challenged eligibility rules have applied to Mses. Geoffroy and Pineda, each of whom competed for a Big 12 member institution; and (h) the Big 12's conduct has caused foreseeable injury in Tennessee, where this action is litigated and where Mses. Geoffroy and Pineda have joined as named class representatives to redress the loss of competitive and economic opportunity caused by rules the Big 12 helped adopt and enforce.

38. This Court may exercise personal jurisdiction over Defendant Pac-12 Conference ("Pac-12") because, *inter alia*: (a) although no Pac-12 member institution is currently located in Tennessee or this District, Pac-12 member institutions have competed and are scheduled to compete against member institutions located in this District; (b) other institutions that joined the Pac-12 in July 2026—including Boise State, Colorado State, and Utah State—also competed in Tennessee during the three years preceding their admission to the conference; (c) the Pac-12 transacts business directed at this District both through the ticket sales, sponsorship, and broadcast activity associated with the Oregon State-Lipscomb match and through national broadcast and media arrangements associated with its member institutions' athletic competitions generally, which reach households and businesses in this District; (d) the Pac-12 participates in the NCAA's Division I governance structure and, together with the NCAA and the other Conference Defendants, adopted, maintained, amended, implemented, enforced, benefited from, and/or ratified the Former Eligibility Rules and, more recently, implemented and enforced the Transition

Exclusion accompanying the NCAA's adoption of the Age-Based Eligibility Rule; (e) Plaintiffs' claims arise out of and relate directly to the Pac-12's participation in the adoption, maintenance, amendment, implementation, and enforcement of the Former Eligibility Rules and, more recently, the implementation and enforcement of the Transition Exclusion accompanying the NCAA's adoption of the Age-Based Eligibility Rule, all of which restricted Plaintiffs' athletic and economic opportunities in Tennessee and throughout the United States; and (f) the Pac-12's conduct in adopting and enforcing the challenged rules has caused foreseeable injury to Division I athletes nationwide, including within Tennessee, by suppressing competitive opportunities and NIL compensation under rules the Pac-12 helped adopt and enforce.

39. This Court may exercise personal jurisdiction over Defendant Southeastern Conference ("SEC") because, *inter alia*: (a) the SEC's member institutions located in Tennessee and this District include Vanderbilt University, where Plaintiffs Langston Patterson, CJ Taylor, Quincy Skinner Jr., Justine Pissott, and Jak Mwenentanda have competed; (b) the SEC regularly conducts conference championships and related conference activities within this District, including the SEC Men's Basketball Tournament, which has been held annually at Bridgestone Arena in Nashville, Tennessee, since 2023; (c) the SEC transacts substantial business within this District by administering and promoting SEC athletic competitions held in Nashville, including competitions involving Vanderbilt, selling tickets to the SEC Men's Basketball Tournament, and granting media rights to SEC competitions held in Nashville under its agreements with ESPN; (d) the SEC participates in the NCAA's Division I governance structure and, together with the NCAA and the other Conference Defendants, adopted, maintained, amended, implemented, enforced, benefited from, and/or ratified the Former Eligibility Rules and, more recently, implemented and enforced the Transition Exclusion accompanying the NCAA's adoption of the Age-Based Eligibility Rule;

(e) Plaintiffs' claims arise out of and relate directly to the SEC's participation in the adoption, maintenance, amendment, implementation, and enforcement of the Former Eligibility Rules and, more recently, the implementation and enforcement of the Transition Exclusion accompanying the NCAA's adoption of the Age-Based Eligibility Rule, all of which restricted Plaintiffs' athletic and economic opportunities in Tennessee and throughout the United States; (f) the challenged eligibility rules have applied to Tennessee-based athletes and institutions, including Messrs. and Mses. Patterson, Taylor, Skinner, Pissott, and Mwenentanda, while they competed for Vanderbilt in this District; and (g) the SEC's conduct has caused foreseeable injury in Tennessee, where this action is litigated and where Messrs. and Mmes. Patterson, Taylor, Skinner, Pissott, and Mwenentanda have joined as named class representatives to redress the loss of competitive and economic opportunity caused by rules the SEC helped adopt and enforce.

40. Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391(b)(2) because the NCAA transacts business and is found within this District and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

41. Venue is likewise proper in this District as to Defendant Atlantic Coast Conference under Section 12 of the Clayton Act, 15 U.S.C. § 22, because, as alleged above, the ACC is found within and transacts business in this District through its member institutions' athletic competitions against Vanderbilt and the resulting broadcast, sponsorship, and ticket revenue directed at this District. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims, including the ACC's participation in adopting, maintaining, and enforcing the Former Eligibility Rules and the Transition Exclusion against athletes competing in this District, occurred in this District.

42. Venue is likewise proper in this District as to Defendant The Big Ten Conference, Inc. under Section 12 of the Clayton Act, 15 U.S.C. § 22, because, as alleged above, the Big Ten is found within and transacts business in this District through its member institutions' athletic competitions against Vanderbilt and related broadcast revenue directed at this District. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, including the Big Ten's enforcement of the Former Eligibility Rules and the Transition Exclusion against Plaintiffs Nick Levy, Nathanial Vakos, and Lance Mason, who competed for a Big Ten member institution and now litigate this action from this District.

43. Venue is likewise proper in this District as to Defendant The Big 12 Conference, Inc. under Section 12 of the Clayton Act, 15 U.S.C. § 22, because, as alleged above, the Big 12 transacts business in this District through the broadcast and commercial activity generated by its member institutions' athletic competitions, including those involving Oklahoma State. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, including the Big 12's enforcement of the Former Eligibility Rules and the Transition Exclusions against Plaintiffs Ellie Geoffroy and X Pineda, who competed for a Big 12 member institution and now litigate this action from this District.

44. Venue is likewise proper in this District as to Defendant Pac-12 Conference under Section 12 of the Clayton Act, 15 U.S.C. § 22, because, as alleged above, the Pac-12 transacts business in this District through Oregon State's scheduled competition in this District and through national broadcast arrangements covering its member institutions' athletic competitions generally. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, including the enforcement and effects of the

Former Eligibility Rules and the Transition Exclusion, the effects of which are felt in this District through Oregon State's scheduled athletic competition here.

45. Venue is likewise, and most directly, proper in this District as to Defendant Southeastern Conference under Section 12 of the Clayton Act, 15 U.S.C. § 22, because, as alleged above, the SEC is found within and transacts substantial business in this District through Vanderbilt University and the SEC Men's Basketball Tournament held annually in Nashville. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, including the SEC's enforcement of the Former Eligibility Rules and the Transition Exclusion against Plaintiffs Langston Patterson, CJ Taylor, Quincy Skinner Jr., Justine Pissott, and Jak Mwenentanda who competed for an SEC member institution and now litigate this action from this District.

## THE PARTIES

### I. Plaintiffs

46. Plaintiff Langston Patterson was a senior linebacker for Vanderbilt University (a Tennessee institution located in Nashville, Tennessee) football during the 2025 season who resides in Nashville, Tennessee. Mr. Patterson, a standout from Christ Presbyterian Academy in Nashville, began his NCAA Division I career in 2022. He was a steady contributor to Vanderbilt's defense, continuing his progression from local high school star to Southeastern Conference ("SEC") competitor.

47. Plaintiff Nick Levy was a senior Long Snapper for the University of Wisconsin football team during the 2025 season, who resides in Ashburn, Virginia. Mr. Levy began his NCAA Division I career in 2022 at the College of William & Mary. After an impressive freshman and sophomore season, Mr. Levy's performance earned him the opportunity to transfer to a Power Four school,

Purdue University in 2024. After demonstrating his ability to compete in one of the most competitive conferences in Division I, Mr. Levy transferred to the University of Wisconsin, where he was named to the Patrick Mannelly Award preseason watch list.

48. Plaintiff Nathanial Vakos was a senior Kicker for the University of Wisconsin football team during the 2025 season, who resides in Avon, Ohio. Mr. Vakos began his NCAA Division I career in 2022 at Ohio University. After a standout freshman season, Mr. Vakos was honored as an All-American by College Football News and he transferred to the University of Wisconsin in 2023. Mr. Vakos played in every game during his sophomore and junior season where he converted 27 of 38 field goal attempts and all 65 of his extra point attempts. In the 2025 season, Mr. Vakos was named to the Lou Groza Award preseason watch list and played in all twelve games, making seven of eleven field goal attempts and nineteen-of-nineteen extra points.

49. Plaintiff Kevin Gallic was a senior Long Snapper for the University of Nebraska football team during the 2025 season, who resides in Lincoln, Nebraska. Before Mr. Gallic transferred in 2025, he competed for three seasons at the University of New Hampshire. During his time at New Hampshire, Mr. Gallic played in 36 games as the Wildcats' Long Snapper and was honored in his junior season as a mid-season first-team FCS All-American by American sportswriter Phil Steele. Mr. Gallic was the University of Nebraska's primary Long Snapper for the 2025 season.

50. Plaintiff Lance Mason was a senior Tight End for the University of Wisconsin football team, who resides in Seattle, Washington. Mr. Mason began his NCAA Division I career in 2022 at Missouri State University, where he played three seasons. Mr. Mason quickly became a key player and has been recognized for his efforts, such as being honored as an All-American Third-Team selection by Stats Perform and FCS Football Central and as an honorable mention All-American by the Associated Press.

51. Plaintiff CJ Taylor played NCAA Division I football at Vanderbilt University from 2021 through 2024. A highly regarded safety, Mr. Taylor was recognized for his leadership and performance, culminating in his appointment as team captain during his senior year. ‘

52. Plaintiff Quincy Skinner Jr. played NCAA Division I football as a wide receiver at Vanderbilt University from 2021 through 2024. A productive four-year contributor, Mr. Skinner's collegiate success led to his signing with the Atlanta Falcons as a rookie for the 2025–26 NFL season.

53. Plaintiff Brayden Schager played NCAA Division I football as a quarterback at the University of Hawaii from 2021 through 2024. Mr. Schager appeared in six games during his freshman season, preventing a redshirt year, and through his impressive performance earned the starting quarterback role, which he held for three consecutive seasons from 2022 to 2024.

54. Plaintiff BJ Harris Jr. played NCAA Division I football for four seasons, attending the University of Missouri for two years before transferring to Central Michigan University, competing from 2021 through 2024. Known for his strong on-field contributions and value to his team, Mr. Harris built a reputation as a reliable performer. Mr. Harris applied for a medical hardship waiver for his third season following an injury, but the NCAA denied his request and his appeal of the decision.

55. Plaintiff Johnny Luetzow was a catcher on the Santa Clara University (a California institution located in Santa Clara, California) baseball team who began his NCAA Division I career in 2022. An accomplished and recognized player, Mr. Luetzow has been a consistent contributor over the last four seasons. In 2025, he finished third on the team in batting average (.281), fourth in on-base percentage (.387), and fifth in hits (41). In his 2026 season, he had a career-high batting average (.333).

56. Plaintiff Jakob Russell was a college baseball player from San Bernardino County, California who spent his senior year on the Long Beach State University (a California institution located in Long Beach, California) baseball team. Known for his skill and contributions on the field, Mr. Russell began his NCAA Division I career at Long Beach State University, competing in the 2025 season. Prior to that, he attended the University of Redlands for three years where he competed in NCAA Division III baseball for three seasons.

57. Plaintiff Justine Pissott played NCAA Division I women's basketball for three years, attending the University of Tennessee for one year before transferring to Vanderbilt University in 2025. Ms. Pissott finished her high school career as a McDonald's All-American and was one of the highest rated recruits in the class of 2022. Ms. Pissott is known for her shooting ability, particularly from three-point territory where she has consistently improved her three-point percentage during her Division I career. Ms. Pissott was drafted by the Indiana Fever in the 2026 WNBA draft and now plays professionally for the Los Vegas Aces.

58. Plaintiff Jak Mwenentanda played NCAA Division I women's basketball for three years, attending the University of Texas before transferring to Vanderbilt University in 2025. Ms. Mwenentanda was a highly ranked high school recruit, and she immediately carved out a substantial role during her three seasons at Texas, appearing in more than 100 games and earning 18 starts during that period. Ms. Mwenentanda now plays professionally in the WNBA for the Golden State Valkyries.

59. Plaintiff Lawson Lovering played NCAA Division I men's basketball for four seasons, attending the University of Colorado for two years from 2021 to 2023 before transferring to the University of Utah, where he competed from 2023 to 2025. At over seven feet tall, Mr. Lovering is known for his size and defensive prowess; he led the team in blocked shots during his sophomore

season. He played a small role off the bench during his freshman season, which prevented a redshirt year. He became a key piece during his years at Utah, starting 52 games during his two years in Salt Lake City.

60. Plaintiff Reese Ragland was a college athlete on full scholarship at Tulane University (a Louisiana institution located in New Orleans, Louisiana) and a member of its women's cross country and track and field programs. At Tulane, Ms. Ragland competed in numerous collegiate meets, representing the university in both cross country and middle-distance track events. Ms. Ragland recorded personal bests in the 800m, 1000m, 1500m, and mile, and consistently contributed to Tulane's team performances through her reliability and steady progression each season.

61. Plaintiff Ellie Geoffroy was a senior defender for the Oklahoma State University women's soccer team and resides in Stillwater, Oklahoma. She began her NCAA Division I career in 2022 at the University of Oklahoma, where she appeared in 19 games (seven starts), totaling over 1,000 minutes and scoring her first career goal. As a junior, Ms. Geoffroy started all 22 games and anchored a defense that set a program record with nine consecutive shutouts.

62. Plaintiff X Pineda was a senior Midfielder for the Oklahoma State University women's soccer team, who resides in Stillwater, Oklahoma. Ms. Pineda was a key player for the Cowgirls since her freshman season, starting in 17 of their 19 games and recording 2 goals and 2 assists. Ms. Pineda impressed during each season she played, earning various awards, such as All-Big 12 Second Team honors and United Soccer Coaches All-Midwest Region First Team honors.

63. Plaintiff Timo Legout was a student at the University of Texas and a member of its men's tennis program. Although he did not enroll until 2024, the NCAA imposed a three-season penalty based on the time between his high school graduation in Europe and his NCAA enrollment.

As a result, Mr. Legout's only season of NCAA Division I competition was 2024–2025. Despite the NCAA's penalty, he remains within his five-year eligibility window and would be eligible for an additional season of competition in the 2026-2027 season. Since leaving the University of Texas, Mr. Legout has competed professionally in the International Tennis Federation World Tennis Tour and the Association of Tennis Professionals Challenger Tour.

64. Plaintiff Henry Stewart is a citizen of Colorado and resides in Lakewood, Colorado. Mr. Stewart was a Division I baseball athlete at Santa Clara University, competing as a left-handed pitcher in the West Coast Conference. Santa Clara University is the only institution at which he competed. Mr. Stewart first enrolled full-time at Santa Clara University in the fall of 2022. He completed four seasons of NCAA Division I baseball, and during that time, he did not receive athletically related financial aid or receive NIL compensation. He did not take a redshirt year, remains within his five-year eligibility window, and would be eligible for an additional season of competition in the 2026-27 academic year. Absent the Four Seasons Rule, Mr. Stewart would have been eligible to receive a roster position, athletically related financial aid, institutional revenue-sharing compensation, and related NIL opportunities for the 2026–27 season.

65. Plaintiff Elijah Joe Lopez is a citizen of California and resides in Whittier, California. Mr. Lopez was a Division I baseball athlete and second baseman at California State University, Fullerton, which is the only institution at which he competed. Mr. Lopez first enrolled full-time at California State University, Fullerton, in the fall of 2022. He competed in four seasons of NCAA Division I baseball, from 2023 through 2026, and received athletically related financial aid equal to a full grant-in-aid in each of those years. Mr. Lopez was not permitted to compete for a fifth year under the NCAA's Four Seasons Rule. During his fourth season in 2026, Mr. Lopez broke his hand, which prevented him from finishing the season and competing in the postseason, and he

believes this harmed his prospects of playing professional baseball. Mr. Lopez remains within his five-year eligibility window and would be eligible for an additional season of competition in the 2026–27 academic year. Absent the Four Seasons Rule, Mr. Lopez would have been eligible to receive a roster position, athletically related financial aid, institutional revenue-sharing compensation, and related NIL opportunities for the 2026–27 season.

66. Plaintiff Ian Schieffelin is a citizen of Georgia and was a Division I basketball athlete at Clemson University (a South Carolina institution located in Clemson, South Carolina) from 2021–25, and a Division I football athlete at Clemson University during the 2025–26 season. Mr. Schieffelin first enrolled at Clemson University full-time in 2021. He received athletically related financial aid equal to at least 50% of a full grant-in-aid for all five years of college. He competed in four seasons on the Clemson University men's basketball team but was not allowed to compete for a fifth year under the NCAA's Four Seasons Rule. Although he preferred to play basketball and would have earned significant NIL earnings doing so, he opted to play one season on Clemson University's football team rather than forego his fifth year of eligibility altogether. Absent the Four Seasons Rule, Clemson University's men's basketball team would have retained Mr. Schieffelin for the 2025–26 basketball season, and Mr. Schieffelin would have been eligible to receive a roster position, institutional compensation, and related NIL opportunities. Mr. Schieffelin would have commanded significantly more NIL earnings if he had been allowed to compete for a fifth year on Clemson University's basketball team. Enforcement of the Four Seasons Rule prevented that relationship from continuing or being completed and caused Mr. Schieffelin to lose significant economic benefits.

67. Plaintiff Jayden Pierre is a citizen of New Jersey and was a Division I men's basketball athlete who competed at Providence College from 2022 through 2025 and a Texas

Christian University ("TCU") during the 2025–2026 season. Mr. Pierre first enrolled full-time at Providence College in the fall of 2022. He competed in four seasons on NCAA Division I men's basketball—as a freshman, sophomore, and junior at Providence College, and as a senior at TCU—and was not permitted to compete for a fifth year under the NCAA's Four Seasons Rule. He did not take a redshirt year and therefore, unlike athletes who preserved a season through a redshirt, he had no ability to access a fifth season of participation. Over the course of his career, Mr. Pierre developed into a productive and increasingly valuable player, and his compensation grew accordingly. Mr. Pierre remains within his five-year eligibility window and would be eligible for an additional season of competition in the 2026–27 academic year. Absent the Four Seasons Rule, Mr. Pierre would have been able to receive a roster position, athletically related financial aid, institutional revenue-sharing compensation, and related NIL opportunities for the 2026–27 season. Enforcement of the Four Seasons Rule prevented Mr. Pierre from continuing his collegiate basketball career and caused him to lose significant economic benefits.

68. Plaintiff Amaree "Mo" Abram is a citizen of Texas who played NCAA Division I men's basketball for four seasons, competing at the University of Mississippi in 2022–23, the Georgia Institute of Technology in 2023–24, and Louisiana Tech University in 2024–25 before transferring to the University of Tennessee, where he played in 2025–26. Mr. Abram first enrolled full-time at the University of Mississippi in the fall of 2022, where he was one of four players to appear in all 33 games. After performing in ten games during his sophomore year at Georgia Tech, he went on to start in all 32 games at Louisiana Tech in his junior year before joining for his senior year the University of Tennessee's team, which advanced to the Elite Eight of the 2026 NCAA Tournament. He did not take a redshirt year, and his compensation grew alongside his role,. But for the NCAA's Four Seasons Rule, Mr. Abram remains within his five-year eligibility window

and would be eligible to compete in the 2026-27 season. Enforcement of the Four Seasons Rule has prevented Mr. Abram from continuing his collegiate basketball career and caused him to lose significant economic benefits.

69. Plaintiff Cayden Charles is a citizen of and resides in Kennesaw, Georgia. Mr. Charles played NCAA men's basketball for four seasons, attending Division II University of North Georgia for three years from 2022 to 2025 before transferring to St. Bonaventure University, a Division I program in the Atlantic 10 Conference, where he competed during the 2025–26 season. Mr. Charles first enrolled full-time at the University of North Georgia in the fall of 2022. During three seasons with North Georgia, he appeared in 86 games at combo guard accruing 63 starts, scoring 972 points and grabbing 488 rebounds, and he was named Most Outstanding Player of the 2024 NCAA Division II Southeast Regional while leading the Nighthawks to the Elite Eight. In his lone Division I season at St. Bonaventure, he started in all 34 games, averaging 12.9 points, 6.6 rebounds, 2.0 assists, and a team-high 1.5 steals in 33.2 minutes per game. He also earned NIL compensation as a senior. He did not take a redshirt year, having competed in each of his four seasons. Mr. Charles remains within his five-year eligibility window and would be eligible for an additional season of competition in the 2026–2027 academic year.

70. Plaintiff Emily Pape is a citizen of and resides in Park Ridge, Illinois. Ms. Pape played Division I NCAA women's basketball for four seasons at Cornell University, attending from 2022–2026. Ms. Pape first enrolled full-time at Cornell University in the fall of 2022. During her four seasons at Cornell, she started in 81 of the 106 games she appeared in at forward and finished as the only player in school history with at least 1,100 points, 600 rebounds, and 110 made threes. Cornell University competes in the Ivy League, which has its own set of rules limiting athletic participation in that league to four seasons. Accordingly, Ms. Pape would have need to

transfer to a different collegiate conference to continue her Division I career because Ms. Pape did not take a redshirt year, having competed in each of her four seasons. Ms. Pape remains within her five-year eligibility window and would be eligible for an additional season of competition in the 2026-2027 academic year.

71. Plaintiff Valentino Pinedo is a citizen of Spain and currently resides in Greensboro, North Carolina. Mr. Pinedo played Division I NCAA men's basketball for four seasons, attending East Carolina University ("ECU") for two years from 2022–2024, before transferring to Saint Francis University from 2024–2025, and transferring again to the University of North Carolina at Greensboro ("UNCG") to compete in Southern Conference for the 2025–2026 season. Mr. Pinedo first enrolled full-time at East Carolina University in the fall of 2022. During his first two seasons at ECU, Mr. Pinedo contributed as a spark off the bench earning a couple of starts along the way, but he decided to pursue a new opportunity and transfer to Saint Francis University. Mr. Pinedo flourished at Saint Francis where he started in 26 of the 29 games he appeared in, scoring 298 points and grabbing 185 rebounds, which earned him Third Team All-Northeast Conference honors. Mr. Pinedo was a major contributor in his lone season at UNCG, starting in 28 of the 32 games he appeared in, tallying 232 points and 156 rebounds in 26.5 minutes per game. He earned NIL compensation from UNCG during his senior season. He did not take a redshirt year, having competed in each of his four seasons. Mr. Pinedo remains within his five-year eligibility window and would be eligible for an additional season of competition in the 2026–2027 academic year.

## II. Defendants

### A. The NCAA

72. The National Collegiate Athletic Association is a self-described unincorporated, not-for-profit, educational organization founded in 1906, and maintains its principal place of business in Indianapolis, Indiana.

73. The NCAA is the governing body of college sports. The NCAA includes more than 1,100 member colleges and universities throughout the United States, including institutions in the Middle District of Tennessee.

74. Through the NCAA's Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports, including specifically, NCAA Bylaw 12.6 (the Four Seasons Rule) and the Redshirt Rule. The NCAA Constitution and Bylaws were adopted pursuant to a vote of the member institutions and various NCAA councils, and these rules can only be amended by a vote of the member institutions or NCAA councils.

75. As a practical matter, an academic institution that wishes to compete in any meaningful way in the highest and most popular level of collegiate athletics must maintain membership in the NCAA and abide by the Division I rules and regulations promulgated by the NCAA and its members. Failure to abide by these rules and regulations risks subjecting sports programs at the academic institution to punitive measures from the NCAA that include reduced athletic-scholarships, suspensions, prohibition on post-season eligibility, vacating previously earned wins, monetary fines, and the so-called "death penalty."[12]

---

[12] The "death penalty" is the NCAA's most severe punishment and refers to the complete shutdown of a specific athletic program at a member institution for at least one year. This sanction is reserved for egregious and repeated rule violations, particularly where the institution has shown a pattern of noncompliance or a lack of institutional control. *See Enforcement Process: Penalties,*

76. The NCAA and its member institutions control the highest and most popular level of collegiate education and athletics. Therefore, any individual who wishes to provide athletic services in exchange for the payment of partial or full tuition for top tier education and wishes to derive the substantial benefits from competing at the highest level of collegiate athletics must attend an NCAA Division I member institution.

77. There are zero practical alternatives that can provide the unique combination of attributes offered by Division I NCAA athletic schools: (i) the ability to exchange athletic services for the payment of the partial or full cost of an education plus room and board, (ii) high quality academic educational services, (iii) top-of-the-line training facilities, (iv) high quality coaches that are best suited to launch players to professional careers, (v) national publicity through national championships and nationwide broadcasting contracts, (vi) opportunities to profit from NIL agreements, and (vii) competition at the highest level of collegiate athletics.

## A. The Conference Defendants

### *a. The Atlantic Coast Conference*

78. The Atlantic Coast Conference ("ACC") is an unincorporated association whose member institutions participate in NCAA Division I athletics. The ACC maintains its principal place of business in Charlotte, North Carolina.

79. Through its representatives on NCAA Division I governance bodies, the ACC participates in the adoption and administration of NCAA eligibility legislation, including the Four Seasons Rule and the Redshirt Rule. The ACC and its member institutions have applied those rules in determining the eligibility of college athletes at ACC member institutions.

---

NCAA, https://www.ncaa.org/sports/2013/11/27/enforcement-process-penalties.aspx (last visited Nov. 10, 2025).

80. The ACC's Commissioner joined the Commissioners of the Big Ten, the Big 12, the Pac-12, and the SEC in filing a declaration in this action urging the Court to uphold the NCAA's eligibility rules challenged in this action. Dkt. No. 69, Ex. A.

***b. The Big Ten Conference, Inc.***

81. Defendant The Big Ten Conference, Inc. (the "Big Ten") is a Delaware corporation whose member institutions participate in NCAA Division I athletics. The Big Ten maintains its principal place of business in Rosemont, Illinois.

82. Through its representatives on NCAA Division I governance bodies, the Big Ten participates in the adoption and administration of NCAA eligibility legislation, including the Four Seasons Rule and the Redshirt Rule. The Big Ten and its member institutions have applied those rules in determining the eligibility of college athletes at Big Ten member institutions.

83. The Big Ten's Commissioner joined the Commissioners of the AAC, the Big 12, the Pac-12, and the SEC in filing a declaration in this action urging the Court to uphold the NCAA's eligibility rules challenged in this action. Dkt. No. 69, Ex. A.

***c. The Big 12 Conference, Inc.***

84. Defendant The Big 12 Conference, Inc. (the "Big 12") is a Delaware corporation whose member institutions participate in NCAA Division I athletics. The Big 12 maintains its principal place of business in Irving, Texas.

85. Through its representatives on NCAA Division I governance bodies, the Big Ten participates in the adoption and administration of NCAA eligibility legislation, including the Four Seasons Rule and the Redshirt Rule. The Big 12 and its member institutions have applied those rules in determining the eligibility of college athletes at Big 12 member institutions.

86. The Big 12's Commissioner joined the Commissioners of the AAC, the Big Ten, the Pac-12, and the SEC in filing a declaration in this action urging the Court to uphold the NCAA's eligibility rules challenged in this action. Dkt. No. 69, Ex. A.

#### *d. Pac-12 Conference*

87. Defendant Pac-12 Conference (the "Pac-12") is an unincorporated association whose member institutions participate in NCAA Division I athletics. The Pac-12 maintains its principal place of business in San Ramon, California.

88. Through its representatives on NCAA Division I governance bodies, the Pac-12 participates in the adoption and administration of NCAA eligibility legislation, including the Four Seasons Rule and the Redshirt Rule. The Pac-12 and its member institutions have applied those rules in determining the eligibility of college athletes at Pac-12 member institutions.

89. The Pac-12's Commissioner joined the Commissioners of the AAC, the Big Ten, the Big 12, and the SEC in filing a declaration in this action urging the Court to uphold the NCAA's eligibility rules challenged in this action. Dkt. No. 69, Ex. A.

#### *e. Southeastern Conference*

90. Defendant Southeastern Conference (the "SEC") is an unincorporated association whose member institutions participate in NCAA Division I athletics. The SEC maintains its principal place of business in Birmingham, Alabama.

91. Through its representatives on NCAA Division I governance bodies, the SEC participates in the adoption and administration of NCAA eligibility legislation, including the Four Seasons Rule and the Redshirt Rule. The SEC and its member institutions have applied those rules in determining the eligibility of college athletes at SEC member institutions.

92. The SEC's Commissioner joined the Commissioners of the AAC, the Big Ten, the Big 12, and the Pac-12 in filing a declaration in this action urging the Court to uphold the NCAA's eligibility rules challenged in this action. Dkt. No. 69, Ex. A.

### III. Co-Conspirators

93. Various other persons, firms, corporations, organizations, and business entities, both known and unknown, have participated as co-conspirators in the unlawful conduct alleged herein. These include NCAA member institutions and other NCAA Division I athletic conferences. Representatives of member schools and conferences serve on NCAA committees that propose and adopt rule changes. By voting for and enforcing NCAA rules that unlawfully restrain trade, those institutions and conferences have knowingly agreed to impose and benefit from the anticompetitive restraints described herein.

## FACTUAL BACKGROUND

### I. An Overview of the NCAA

94. The NCAA is a member-led organization founded to "regulate the rules of college sport and protect young college athletes."[13] Article 1 of the NCAA Constitution states that the NCAA's basic purpose is to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body, and, by so doing, retain a clear line of demarcation between intercollegiate athletics and professional sports.

95. The NCAA claims it is "dedicated to the well-being and lifelong success of college athletes," and "united around one goal: creating opportunities for college athletes."[14] In practice,

[13] *History*, NCAA, https://www.ncaa.org/sports/2021/5/4/history (last visited Oct. 8, 2025).

[14] NCAA, Return of Organization Exempt from Income Tax (IRS Form 990) for Fiscal Year Ending Aug. 2018 (filed 2019).

however, the NCAA has evolved into the central gatekeeper of a multi-billion-dollar industry, where rules often serve to maximize institutional revenue rather than college athlete welfare.

**A. History and Purpose**

96. In 1905, President Theodore Roosevelt called together athletic leaders from some of the top football universities of the time, prompting them to curb the violence in the sport. Thirteen universities assembled to tackle the issue of football safety, and they were ultimately able to reach agreement on a set of new rules. Shortly after this meeting, 62 colleges and universities became charter members of the Intercollegiate Athletic Association of the United States ("IAAUS")—the precursor to the NCAA.[15]

97. The IAAUS became the official rules-making body as of March 31, 1906. By 1910, the IAAUS was renamed the National Collegiate Athletic Association ("NCAA"). The NCAA quickly expanded its reach, hosting its first national championship in track and field in 1921. Many others followed throughout the 1920s and 1930s, with the first NCAA basketball tournament being hosted in 1939.

98. The NCAA rapidly grew into the giant organization recognized today due, in part, to its growing popularity and federal legislation prohibiting sex discrimination in sports. As bigger schools began to see returns from their participation in the sports cartel, they continued to invest in their sports programs; however, smaller schools were unable to keep pace. The result was a widening gap between haves and have-nots—a gap that persists to this day.

99. In 1973, the Association's membership was divided into Divisions I, II, and III, with each division having legislative powers and separate championships. Five years later, Division I

[15] *History*, NCAA, https://www.ncaa.org/sports/2021/5/4/history (last visited Oct. 8, 2025).

members voted to create subdivision I-A and I-AA (renamed the Football Bowl Subdivision ("FBS") and the Football Championship Subdivision ("FCS") in 2007) in football.

100. Around the turn of the century, a "landmark restructuring of the NCAA governance,"[16] took place that "provided greater autonomy for the three divisions and placed institutional presidents in charge of each division and of the Association in general."[17]

101. Today, the NCAA generates billions in revenue, largely because of the business opportunities arising from Division I FBS football and basketball. FBS college football and Division I men's basketball are, combined, among the most lucrative sports products in the nation. During the 2022-2023 season alone, the NCAA reported roughly $1.3 billion in revenue, a number driven overwhelmingly by college athletes who are prohibited by application of the NCAA's rules and regulations from sharing equitably in that economic success.[18]

102. Meanwhile, college athletes devote extraordinary time and effort to their sports, often at the expense of academic opportunities, internships, and paid work, while the NCAA and member institutions reap billions of dollars in revenue from their efforts.

### B. NCAA Governance Structure

103. The NCAA "is a voluntary, self-governing organization of four-year colleges, universities and conferences committed to the well-being and development of college athletes, to

---

[16] *Id.*

[17] *Id.*

[18] Associated Press, *NCAA Generates Nearly $1.3 Billion in Revenue for 2022-23*, ESPN (Feb. 1, 2024), https://www.espn.com/college-sports/story/_/id/39439274/ncaa-generates-nearly-13-billion-revenue-2022-23.

sound academic standards and the academic success of college athletes, and to diversity, equity and inclusion."[19]

104. The NCAA asserts that member schools are ultimately responsible for determining which rules to adopt for their respective divisions, covering areas such as recruiting, compliance, academics, and championships. Nevertheless, employees at the NCAA national office play a significant role in "support[ing] the member committees that make rules and policies for college sports."[20]

105. Today, the NCAA and its members collaboratively establish rules governing numerous athletic competitions among member schools. Over 500,000 college athletes compete across NCAA's three divisions, representing approximately 1,100 member institutions. Roughly 350 schools compete at the Division I level, which is further divided into 32 conferences. While these conferences may adopt and enforce their own rules, such regulations must remain consistent with NCAA rules.

106. The NCAA Board of Governors, comprised of institution presidents, chancellors, ex-college athletes, and other chief executives, is the highest governing body and is responsible for enacting the rules governing participation in the NCAA.

107. The NCAA and its members abide by the NCAA manual, which is amended and promulgated annually and contains the NCAA's Constitution and Bylaws, which include nearly 500 pages of regulation governing all aspects of college sports. The NCAA's Constitution and Bylaws are

---

[19] *NCAA Constitution*, 1 (Dec. 14, 2021), https://ncaaorg.s3.amazonaws.com/governance/ncaa/constitution/NCAAGov_Constitution121421.pdf.

[20] *Overview*, NCAA, https://www.ncaa.org/sports/2021/2/16/overview (last visited Oct. 8, 2025).

adopted by a vote of the NCAA membership. These Bylaws are not merely technical guidance, but rather mechanisms by which the NCAA exerts control over college athletes' careers, compensation, and opportunities, and the labor markets for college athletics.

**C. The NCAA's History of Antitrust Violations**

108. The NCAA has a history of violating federal antitrust law with numerous parties successfully challenging its restrictive rules. Time and again, the NCAA has argued that loosening its anticompetitive restraints would destroy amateurism and reduce consumer demand for college sports. Time and again, courts have rejected these arguments, and, in every instance that a court has rejected these arguments, demand for college athletics has only continued to grow.

109. In 1984, the U.S. Supreme Court in *NCAA v. Board of Regents* affirmed the lower court's finding that the NCAA violated the Sherman Act by limiting the number of televised football games and threatening penalties for schools that pursued competing broadcast agreements. 468 U.S. 85, 119 (1984) (rejecting NCAA argument that restricting sale of broadcast rights was necessary "to preserve amateurism").

110. Antitrust challenges have arisen in other contexts: in *White v. NCAA*, a Central District of California court certified a class of individuals who received athletic-based grant-in-aid scholarships for claims that the NCAA and its member institutions entered into a horizontal agreement to adhere to a cap in their financial aid awards. No. CV 06-999-RGK, 2006 WL 8066803 (C.D. Cal. Oct. 19, 2006). And in *Law v. NCAA*, the Tenth Circuit affirmed summary judgment and a permanent injunction striking down an NCAA rule limiting entry-level coaches' salaries. 134 F.3d 1010, 1021 (10th Cir. 1998) (rejecting the NCAA's proposed procompetitive justifications for restricting assistant coach salaries). Each decision dismantled an artificial restraint and, contrary to NCAA predictions, demand for college sports increased.

111. The NCAA's restrictions on college athlete compensation have also been repeatedly struck down. In *O'Bannon v. NCAA*, the court held that NCAA rules preventing college athletes from sharing in revenue generated from their name, image, and likeness violated Section 1 of the Sherman Act. 802 F.3d 1049 (9th Cir. 2015). Subsequent rulings, including the Ninth Circuit's decision in the *In re National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litigation*, and affirmed by the Supreme Court in *Alston*, confirmed that certain of the NCAA's compensation rules imposed substantial anticompetitive effects without legitimate procompetitive justification. 958 F.3d 1239 (9th Cir. 2020), *aff'd sub nom.*, *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021).

112. The NCAA's historic entanglement with violating federal antitrust law further demonstrates that the NCAA operates as a cartel, artificially depressing the value of college athletes' services and violating antitrust law. Restrictions on compensation, eligibility, and benefits do not reflect market realities, but are instead deliberate attempts to control competition, suppress pay, and maximize profits for institutions at the expense of the college athletes themselves. Most recently, the NCAA's own decision to abandon the Former Eligibility Rules further confirms that its historic predictions regarding the necessity of restrictive eligibility restraints have repeatedly proven unfounded.

### D. Bylaws and Enforcement

#### *1. The Former Eligibility Rules*

113. Until June 23, 2026, the NCAA limited college athletes to four seasons of intercollegiate competition within five-year eligibility period via the Former Eligibility Rules.

114. Under NCAA Bylaw 12.6, an NCAA Division I college athlete had five years of eligibility to play four seasons of intercollegiate competition in his or her chosen sport. The college

athlete's window—known as an Eligibility Clock—ran from the date on which a college athlete registers as a full-time student at any collegiate institution.

115. Plaintiffs do not challenge the concept of a defined eligibility period or the Five-Year Rule itself. Nor do Plaintiffs challenge the NCAA's authority to adopt reasonable, procompetitive eligibility rules establishing the outer bounds of a collegiate athletic career. Indeed, the Supreme Court has recognized that certain eligibility rules may serve legitimate purposes within the NCAA's regulatory framework. *See NCAA v. Alston*, 594 U.S. 69 (2021). What Plaintiffs challenge are the NCAA's historical adoption and enforcement of the Former Eligibility Rules—and Defendants' continuing enforcement of the Challenged Rules via the Transition Exclusion—which arbitrarily deny certain college athletes the full opportunity to compete throughout five-year eligibility period. The Former Eligibility Rules functioned not as reasonable eligibility boundaries, but as anticompetitive restraints that arbitrarily denied some college athletes the full use of that five-year eligibility period while selectively extending comparable opportunities to others.

116. Historically, the NCAA claimed its eligibility restrictions existed to "move student-athletes toward graduation in a timely manner."[21] Those asserted justifications are substantially undermined by the NCAA's June 23, 2026 adoption of the new eligibility framework permitting five seasons of competition, which eliminated the Former Eligibility Rules while preserving the same five-year eligibility period. Even if Eligibility Bylaws like the Four Seasons and Redshirt Rules loosely tracked academic pacing, they have no legitimate role in protecting competitive integrity—especially in the wake of the NCAA's rule change allowing players to transfer an

[21] *Guide for Four-Year Transfers 2024–25*, 13, NCAA, http://fs.ncaa.org.s3.amazonaws.com/Docs/eligibility_center/Transfer/FourYearGuide.pdf (last visited Oct. 8, 2025).

unlimited number of times between schools without sitting out a season. Thus, while Plaintiffs do not challenge the NCAA's authority to define an overall eligibility window, the NCAA has gone further—artificially capping the number of seasons of competition within that window and applying the Redshirt Rule inconsistently across sports and without any procompetitive rationale. These restrictions suppress competition and limit college athletes' economic opportunities.

### 2. *The Redshirt Rule*

117. The Redshirt Rule historically allowed college athletes to extend their period of eligibility by sitting out competition for a season while remaining fully enrolled and practicing with their team. Under the Redshirt Rule, a college athlete may compete in a limited number of team activities without it counting as a full season of eligibility. The rule purportedly provided flexibility for athletes recovering from injury, adjusting academically, or developing athletically, while preserving the total number of seasons they may compete. In practice, redshirt athletes received many of the benefits of full participation—they trained with the team, took classes, and engaged in meetings, travel, and film study. Many also earned NIL compensation during a redshirt year, as their ongoing team involvement retains marketable value.

118. Athletes who did not take a redshirt year at the start of their NCAA careers were typically those who were academically eligible, capable of and ready to compete immediately in their college athletics career, and who demonstrated that neither they nor their coaches believed a preparatory "primer" year was necessary. This distinction underscores the Redshirt Rule's uneven, anticompetitive impact: it advantages some college athletes while unnecessarily restricting those ready to (and perhaps best able to) compete, limiting their playing opportunities and economic potential on the backend of their collegiate careers.

119. Historically, the Redshirt Rule granted Division I college athletes the ability to preserve a year of eligibility, provided—depending on the sport—that they did not participate in intercollegiate competition during their redshirt season. At the same time, these athletes were permitted to practice with the team, participate in meetings and film sessions, and receive scholarships and other financial benefits tied to their athletic participation. In other words, the Redshirt Rule allowed (and universities often required) college athletes to engage fully in the day-to-day demands of Division I sports without consuming a season of eligibility.

120. By contrast, Plaintiffs and similarly situated college athletes who did not redshirt each lost a full season of athletic participation available to their redshirt counterparts. They are arbitrarily denied the opportunity to access the benefits of a fifth NCAA season—benefits their redshirt peers automatically received. This limitation is particularly significant because a college athlete's final season—whether redshirted or not—often coincides with peak athletic development, maximum professional exposure, and highest earning potential.

121. The resulting disparity is stark: two college athletes may spend four years on campus and fully participate in their athletic programs, yet one can preserve eligibility through redshirting and be automatically entitled to a fifth season while the other, generally by means of stepping on a court or field for a single moment,[22] is arbitrarily denied that opportunity and limited to four seasons, unable to fully capitalize on their competitive window. This arbitrary distinction withholds the most valuable portion of a college athlete's career from some while granting it to others, creating an unequal playing field with significant economic and professional consequences. "Such [changed market] realities now include . . . seemingly prevalent participation by older, non-JUCO players on Division I football teams through pathways like . . . redshirting." *Pavia v. NCAA*, 154 F.4th 407, 421 (6th

[22] Or, for football, playing a snap in more than four regular season games.

Cir. Oct. 1, 2025) (Hermandorfer, J., concurring) (citing *id.* at 417 (Thapar, J., concurring); *Fourqurean v. NCAA*, 143 F.4th 859, 864 (7th Cir. 2025)).

122. The Redshirt Rule was modified for football players, who could compete in up to four regular season games and, as of 2024, postseason contests without losing a year of eligibility.[23] No comparable flexibility exists under the Redshirt Rule for college athletes in other sports, such as basketball, where even a single moment of competitive play consumes an entire season of eligibility. This selective application underscores the Redshirt Rule's arbitrary nature and lack of any procompetitive justification.

123. The economic consequences of these restrictions are significant. An additional season of competition now carries substantial financial benefits, including NIL earnings and payments through the recently established revenue-sharing model under the *House v. NCAA* settlement. Successful college athletes who are forced to expend eligibility without access to a fifth season are denied their most valuable years for compensation, exposure, and professional development.

### E. The NCAA's June 23, 2026 Abandonment of the Former Eligibility Rules Confirms the Availability of a Substantially Less Restrictive Alternative

124. For years, Defendants vigorously defended the Former Eligibility Rules as necessary to preserve competitive balance, academic integration, roster management, and the defining characteristics of Division I athletics. Throughout this litigation and others challenging NCAA eligibility restrictions, the NCAA repeatedly argued that permitting Division I college athletes to compete throughout their five-year eligibility period would undermine the collegiate model, reduce

[23] *See NCAA*, 2025–26 NCAA Division I Manual, Bylaw 12.6.3.1.6, at 50 (2025) https://ncaapublications.com/products/2025-2026-ncaa-division-i-manual.

opportunities for incoming college athletes, and create significant administrative burdens. Those assertions formed the central justification for maintaining the Former Eligibility Rules.

125. On June 23, 2026—approximately nine months after this litigation was first filed—the NCAA unanimously approved a fundamentally different eligibility framework that abandoned the Former Eligibility Rules challenged in this litigation. Effective as of the 2026–27 academic year, the NCAA adopted a new age-based eligibility model under which Division I college athletes generally may compete throughout their five-year period of eligibility without restrictions on seasons of competition, athletic redshirts, or many of the sport-specific eligibility limitations that had governed Division I athletics for decades.

126. The Age-Based Eligibility Rule specifically eliminates the Former Four Seasons Rule and the Former Redshirt Rule, alongside numerous eligibility waivers that previously governed Division I athletics. Although the NCAA retained a finite period of eligibility, it eliminated the artificial cap on seasons of competition that forms the basis of this action. The new framework also includes limited exceptions permitting college athletes to pause their eligibility clock for military service, religious missions, pregnancy, and certain comparable circumstances.

127. By adopting the Age-Based Eligibility Rule, the NCAA necessarily determined that permitting Division I college athletes to compete throughout their five-year eligibility period is both administratively feasible and consistent with the NCAA's stated educational and competitive objectives. The NCAA thereby abandoned the very restraints they had long defended as necessary to preserve the character of collegiate athletics—a decision unanimously ratified by the Conference Defendants. While the NCAA's subsequent rule change does not itself determine liability for the historical enforcement of the Former Eligibility Rules, it constitutes powerful evidence that workable and substantially less restrictive alternatives existed throughout the Relevant Period.

128. But the NCAA's rule change does not apply uniformly. Instead, Defendants adopted the Transition Exclusion governing which college athletes would receive the benefit of the new eligibility framework. College athletes who first enroll beginning with the 2027–28 academic year are governed exclusively by the Age-Based Eligibility Rule. Current college athletes with remaining eligibility after the 2025–26 academic year, as well as many college athletes first enrolling during the 2026–27 academic year, can elect to have their eligibility enforced under either the Age-Based Eligibility Rule or the Former Eligibility Rules.

129. Plaintiffs, however, were excluded from those transition allowances. Defendants continue to deny them a fifth season of competition if they competed in their fourth season of competition during the 2025–26 academic year. As a result, Plaintiffs remain subject to the very restraint the NCAA has now eliminated for virtually every other Division I college athlete.

130. The practical effect of the Transition Exclusion is that, with limited exceptions for athletes who delayed initial collegiate enrollment or whose eligibility clocks began later for other recognized reasons, the non-redshirt Division I college athletes who began their college careers in 2021 and 2022 are the only post-*Alston* cohorts of Division I college athletes that will not receive the benefit of five full seasons of Division I competition eligibility. Earlier cohorts received additional seasons through the NCAA's COVID-19 blanket waivers, while later cohorts will compete under the NCAA's new eligibility framework permitting five seasons of competition. Plaintiffs alone are denied the benefit of a fifth season of competition despite remaining within the five-year eligibility window recognized and enforced by Defendants.

131. The consequences of that exclusion are substantial. Because the commercial value of Division I athletics has increased dramatically since *Alston*, Plaintiffs are denied not merely an additional season of competition, but also the opportunity to obtain renewed or extended athletic

grant-in-aid, maintain roster positions, participate in institutional revenue-sharing programs, enter into prospective NIL agreements, enhance their professional opportunities, and receive the full economic benefits associated with an additional season of Division I competition.

132. Defendants have never identified any legitimate reason why an eligibility framework that permits five seasons of competition within the five-year window of eligibility could not have been adopted years earlier. The commercial transformation of Division I athletics began no later than July 2021, when the NCAA authorized NIL compensation, and accelerated through the *House* settlement and the emergence of institutional revenue sharing. Yet throughout that period—and throughout this litigation—Defendants continued to defend and enforce the Former Eligibility Rules while simultaneously expanding the economic value of each year of Division I participation.

133. The NCAA's public announcements of the rule change did not identify any newly relevant competitive, educational, or administrative concern that suddenly made the new eligibility framework feasible in June 2026. Instead, the abrupt and complete discarding of the Former Eligibility Rules reinforces Plaintiffs' allegation that the challenged restraints were unnecessary and that substantially less restrictive alternatives existed throughout the Relevant Period.

134. Plaintiffs do not challenge Defendants' decision to adopt the new five-year competition model. To the contrary, Plaintiffs welcome Defendants' recognition that Division I college athletes should be permitted to compete throughout their five-year eligibility period. Plaintiffs instead challenge Defendants' decision to withhold that same opportunity from Division I college athletes who fully competed during four seasons of intercollegiate competition and who otherwise would be eligible to compete but for the Transition Exclusion. By continuing to enforce the Transition Exclusion against those athletes, Defendants perpetuate the same anticompetitive harms caused by

the Former Eligibility Rules while arbitrarily denying Plaintiffs the benefit of the less restrictive alternative Defendants themselves ultimately adopted.

### F. The Application of the Eligibility Restraints to Named Plaintiffs

135. The NCAA's application of the Former Eligibility Rules to all named Plaintiffs, and those similarly situated, unreasonably restrains trade in the various labor markets for NCAA Division I college athletes in violation of Section 1 of the Sherman Act.

#### 1. Application of the Challenged Rules and Resulting Injuries to Plaintiff Langston Patterson

136. Plaintiff Langston Patterson grew up in Nashville, Tennessee, and played high school football at Christ Presbyterian Academy, appearing in four consecutive state championship games. In his senior year, he was ranked the No. 12 inside linebacker nationally by ESPN and signed with Vanderbilt University in 2022.

137. The 2025 season marked Mr. Patterson's fourth year with the Commodores and only his second as a starting linebacker. He was known for his leadership both on and off the field, and 2025 was also his second year serving as team captain. Mr. Patterson consistently excelled academically, earning a spot on the SEC Academic Honor Roll each of his first three seasons.

138. Mr. Patterson graduated in Spring 2026 with a bachelor's degree in Human and Organizational Development and a Business minor and may pursue post-graduate coursework absent the challenged eligibility restrictions. Given his impressive tenure, he would be a valuable asset to his current team as a fifth-year player or a highly sought-after addition to the football program at another NCAA institution.

139. Because of the NCAA's Former Eligibility Rules, Mr. Patterson's ability to compete and fully capitalize on NIL opportunities has been and continues to be restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and

economic opportunities causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 2. Application of the Challenged Rules and Resulting Injuries to Plaintiff Nicholas ("Nick") Levy

140. Plaintiff Nick Levy grew up in Ashburn, Virginia, and played football at Broad Run High School, where he earned first-team all-state honors at Linebacker. During his senior season, Mr. Levy led his team with 127 tackles, which was the second-best single-season total in school history.

141. Mr. Levy began his Division I career at the College of William and Mary and he was incredibly successful. As a freshman, Mr. Levy started all 13 games at Long Snapper and was honored as an All-American by Stats Perform and Phil Steele Magazine. Mr. Levy flourished academically during his time at William & Mary, being named to CAA Commissioner's Academic Honor Roll and receiving the Provost Award for academic excellence.

142. His stellar athletic and academic performance earned him the opportunity to transfer to Purdue University for his junior season. At Purdue, Mr. Levy finally got the opportunity to demonstrate he was talented enough to succeed at the highest level of competition in Division I sports.

143. Mr. Levy appeared in all 12 games as the starting Long Snapper and he was credited with six tackles, including two against a highly ranked Notre Dame team. Mr. Levy transferred to Wisconsin for his senior season where he was named to the preseason watch list for the Patrick Mannelly Award.

144. Mr. Levy graduated with a bachelor's degree in Health Promotion and Health Equity in Spring of 2026 and hopes to pursue post-graduate coursework absent the challenged eligibility restrictions. Given his impressive athletic career, Mr. Levy would be a valuable asset to

his current team as a fifth-year player or a highly sought-after addition to the football program at another NCAA institution.

145. Because of the NCAA's Former Eligibility Rules, Mr. Levy's ability to compete and fully capitalize on NIL opportunities has been and continues to be restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 3. Application of the Challenged Rules and Resulting Injuries to Plaintiff Nathanial Vakos

146. Plaintiff Nathanial Vakos is from Avon, Ohio, where he was a standout Kicker who played four years of varsity football at Avon High School. During his career he only missed one extra point attempt, and this came on his first ever attempt; Mr. Vakos went on to set a national record by making his next 260 extra point attempts. During his senior year, Mr. Vakos earned second-team all-state honors and was named Avon High School Athlete of the year.

147. Mr. Vakos began his Division I career at Ohio University in 2022 where he quickly found success. Mr. Vakos started in all 13 games his freshman year, making 19 of 23 field goals attempts and 48 of 49 extra point attempts. He transferred to the University of Wisconsin the following year, where he continued to prove himself as a reliable Kicker. As a sophomore, Mr. Vakos started in all 13 games for the Badgers, converting 15 of 19 field goal attempts and all of his 34 extra point attempts. He was also named Big Ten Special Teams Player of the Week and honored as a Semifinalist for the Lou Groza Award. As a junior, Mr. Vakos became the Badgers' all-time leader in 50+ yard field goals. Mr. Vakos was named to the preseason watch list for the Lou Groza Award heading into his senior season.

148. Mr. Vakos graduated with a bachelor's degree in Consumer Behavior and Marketplace Studies in Spring of 2026 and hopes to pursue post-graduate coursework absent the challenged eligibility restrictions. Given his impressive athletic career, Mr. Vakos would be a valuable asset to his current team as a fifth-year player or a highly sought-after addition to the football program at another NCAA institution. Additionally, a fifth year would further support Mr. Vakos's development as he prepares for his goal of playing in the NFL.

149. Because of the NCAA's Former Eligibility Rules, Mr. Vakos's ability to compete and fully capitalize on NIL opportunities has been and continues to be restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

#### 4. Application of the Challenged Rules and Resulting Injuries to Plaintiff Kevin Gallic

150. Plaintiff Kevin Gallic is originally from Warren, New Jersey. Before beginning his NCAA Division I career, he played as a Long Snapper and Defensive Lineman at Lewistown High School in Maine where he established himself as a disciplined, hardworking, and dependable athlete.

151. Mr. Gallic began his NCAA Division I career at the University of New Hampshire, which competes in the FCS. His relentless work ethic and dedication quickly proved he was a valuable asset to the team, earning him playing time in all 13 games during his first season. He continued to build on that success throughout his remaining seasons at the University of New Hampshire consistently demonstrating reliability, leadership, and commitment to his craft both on and off the field.

152. Following his tenure at University of New Hampshire, Mr. Gallic transferred to the University of Nebraska where he has become an integral contributor to their football program. He served as Nebraska's primary Long Snapper for punts and field goals/PATs and has appeared in every game this season showcasing his consistency and precision in a critical role. His performance and steady play have earned him recognition for his effort and dependability. Academically, his success has been acknowledged with his inclusion on the Nebraska Scholar-Athlete Honor Roll in Spring 2025, reflecting his commitment to excellence both athletically and academically.

153. Mr. Gallic graduated with a bachelor's degree in Child, Youth, and Family Studies in Spring 2026 and hopes to pursue post-graduate coursework absent the challenged eligibility restrictions. Given his impressive athletic career and proven leadership, Mr. Gallic would be a valuable asset to his current team as a fifth-year player or a highly sought-after addition to another NCAA football program. Additionally, a fifth year would further support Mr. Gallic's development as he prepares for his pursuit of being drafted into the NFL.

154. Because of the NCAA's Former Eligibility Rules, Mr. Gallic's ability to compete and fully capitalize on NIL opportunities has been and continues to be restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

#### 5. Application of the Challenged Rules and Resulting Injuries to Plaintiff Lance Mason

155. Plaintiff Lance Mason is from Rockwall, Texas, where he was a standout player on the Rockwall Heath High School football team. Mr. Mason was a three-year starter for Coach Mike Spradlin. After playing inside linebacker his sophomore year, Mr. Mason was given the opportunity to move to the offensive side of the ball to play Tight End. As a junior, Mr. Mason

caught 27 passes for 450 yards and 3 touchdowns, which earned him all-district honors and an academic all-state selection. As a senior co-captain, Mr. Mason caught 39 passes for 603 yards and 7 touchdowns, which propelled his team to 11 wins, a district championship, and earned him first-team all-district honors.

156. Mr. Mason began his NCAA Division I career in 2022 at Missouri State University, where he played three seasons. Mr. Mason quickly became a key player for the Bears, starting in ten games as a freshman, and seven games as a sophomore. During his first two seasons, Mr. Mason was named to the Athletic Director's Honor Roll every semester. Mr. Mason had a breakout season as a junior where he started in eight games and led the Missouri Valley Conference in yards per reception at 17.35, which ranked 28th nationally among all pass catchers and first among Tight Ends. He finished that season with 34 catches for 590 yards and six touchdowns. In his junior season, Mr. Mason was honored as an All-America Third-Team selection by Stats Perform and FCS Football Central, and he was named an honorable mention All-American by the Associated Press. Mr. Mason's stellar play earned him the opportunity to transfer to the University of Wisconsin, a Power Four school, where he could finally compete against the very best players in the country.

157. Mr. Mason made consistent academic progress towards a bachelor's degree in Finance and to graduate in 2026. He hopes to pursue further graduate coursework absent the challenged eligibility restrictions. Given his impressive athletic career, Mr. Mason would be a valuable asset to his current team as a fifth-year player or a highly sought-after addition to the football program at another NCAA institution.

158. Because of the NCAA's Former Eligibility Rules, Mr. Mason's ability to compete and fully capitalize on NIL opportunities has been and continues to be restricted. These rules have

directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

#### 6. Application of the Challenged Rules and Resulting Injuries to Plaintiff Chad Maurice ("CJ") Taylor Jr.

159. Plaintiff CJ Taylor Jr. hails from McMinnville, Tennessee and played NCAA Division I football at Vanderbilt University from 2021 through 2024. Throughout his collegiate career, Mr. Taylor demonstrated exceptional athleticism and football IQ, culminating in his appointment as team captain during his senior year. Mr. Taylor's dedication to the program was evident as he remained loyal to Vanderbilt, choosing to build something special at one unique program rather than transferring to another institution.

160. Mr. Taylor's success in NCAA Division I football was not immediate. His freshman season was limited by injuries, including hand surgery, and the depth of Vanderbilt's roster. Nonetheless, he displayed natural instincts for the game. Instead of redshirting his first season, he found a way to contribute, excelling on special teams and developing under the guidance of coaches. His breakout came in his sophomore year including a pivotal play against Missouri in 2022 that highlighted his athleticism. Over the course of his 2021 through 2024 collegiate career, Mr. Taylor established himself as a highly regarded safety and a leader on the team culminating in his appointment as team captain during his senior season.

161. During those four years, Mr. Taylor played in 42 games, starting 29, and accumulated 181 total tackles, 17 tackles for loss, five interceptions, and four forced fumbles. In his senior season (2024-25), he played in all 13 games, starting 12, and finished fourth on the team with 64 tackles. His performance earned him recognition as the Thorpe Award Player of the Week following a standout game against Auburn.

162. Academically, Mr. Taylor pursued a degree in Medicine, Health, and Society maintaining strong academic performance while balancing the demands of Division I football. He has consistently demonstrated leadership, resilience, and dedication both on and off the field embodying the values of Vanderbilt University and serving as a role model to his teammates.

163. Because of the NCAA's Former Eligibility Rules, Mr. Taylor's ability to compete and fully capitalize on NIL opportunities has been restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

#### 7. Application of the Challenged Rules and Resulting Injuries to Plaintiff Quincy Skinner Jr.

164. Plaintiff Quincy Skinner Jr. played NCAA Division I football at Vanderbilt University from 2021 through 2024. Throughout his collegiate career, Mr. Skinner demonstrated exceptional skill, athleticism, and consistency as a wide receiver culminating in a standout senior season and a reputation as a reliable team leader. Mr. Skinner's dedication to Vanderbilt reflected his commitment to developing within a single program rather than transferring elsewhere.

165. Mr. Skinner's collegiate career progressed steadily. As a freshman in 2021, he appeared in eight games, gaining valuable experience. His sophomore season (2022) saw him appear in nine games, recording 17 receptions for 238 yards and two touchdowns, including a pair of touchdown catches against South Carolina and four catches in consecutive games against Missouri and South Carolina. In 2023, Mr. Skinner continued to improve, finishing the season with 20 receptions for 204 yards and three touchdowns highlighted by touchdown receptions at Tennessee, South Carolina, and UNLV. He was named to the SEC Fall Academic Honor Roll.

166. Mr. Skinner capped his Vanderbilt career as a senior in 2024, playing in all 13 games and starting 12. He totaled 66 receptions for 809 yards and eight touchdowns, including a

seven-yard touchdown in the Birmingham Bowl win over Georgia Tech, three catches for 72 yards and a score at LSU, and four catches for 72 yards with the season's first touchdown in the win over Virginia Tech. He finished the season with four consecutive games with multiple catches and established himself as a key offensive contributor. Following his collegiate career, Mr. Skinner signed to play in the NFL for the Atlanta Falcons during the upcoming 2025–26 season, but he was cut before the first game.

167. Academically, Mr. Skinner pursued a degree in Communication Studies while balancing the rigorous demands of Division I football. He consistently demonstrated dedication, discipline, and leadership both on and off the field serving as a role model to teammates and embodying Vanderbilt's core values.

168. Because of the NCAA's Former Eligibility Rules, Mr. Skinner's ability to compete and fully capitalize on NIL opportunities has been restricted. These rules have directly limited his athletic participation, ability to compete, and leadership potential, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

**8. Application of the Challenged Rules and Resulting Injuries to Plaintiff Brayden Schager**

169. Plaintiff Brayden Schager played NCAA Division I football as a quarterback at the University of Hawaii from 2021 through 2024. Mr. Schager appeared in six games during his freshman season which precluded him from obtaining a redshirt year, and subsequently earned the starting quarterback role which he held for three consecutive seasons. Over the course of his career, Mr. Schager demonstrated exceptional skill, leadership, and consistency, throwing for over 9,000 yards and 60 touchdowns and establishing himself as one of Hawaii's top quarterbacks.

170. A three-time Academic All-Mountain West honoree, Mr. Schager graduated in the Spring of 2025 and was honored with the Jack Bonham Award (the University of Hawaii's highest

honor), rewarding "leadership on the court, in the pool and on the field, along with excellence in the classroom and service in the community." Mr. Schager would have been highly sought after as a graduate transfer if he had an additional year of eligibility. Following his collegiate career, Mr. Schager tried out for the Baltimore Ravens but was cut from the regular season roster.

171. Academically, Mr. Schager pursued an interdisciplinary degree in sports, business, and leadership while balancing the rigorous demands of Division I football. Had he been eligible for a fifth season, Mr. Schager planned to pursue his master's of Business Administration. Mr. Schager consistently demonstrated dedication, discipline, and leadership both on and off the field serving as a role model to teammates and embodying Vanderbilt's core values.

172. Despite his performance and potential, the NCAA's Former Eligibility Rules restricted Mr. Schager's ability to extend his collegiate career. Having lost a year of eligibility due in part to having to fill in for an injured teammate and the coaching staffs' ignorance, he was denied the opportunity to compete for an additional season which would have allowed him to further refine his skills, gain additional game experience, and increase his visibility to professional scouts at his peak. These limitations curtailed both his athletic development and his opportunities to earn compensation through NIL arrangements.

173. Because of the NCAA's Former Eligibility Rules, Mr. Schager's ability to compete and fully capitalize on NIL opportunities has been restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

**9. Application of the Challenged Rules and Resulting Injuries to Plaintiff Bernard ("BJ") Harris Jr.**

174. Plaintiff BJ Harris Jr. played NCAA Division I football for four seasons, beginning his collegiate career at the University of Missouri before transferring to Central Michigan

University. Over his four-year career, Mr. Harris appeared in 43 games and established himself as a consistent and productive contributor at running back. Across his career, he rushed for 562 yards and four touchdowns on 43 carries (averaging 4.0 yards per carry) and caught 13 passes for 102 yards. At Central Michigan, he rushed 110 times for 457 yards and three touchdowns, with a long of 71 yards, while catching 12 passes for 102 yards.

175. During his senior season in 2024, Mr. Harris played in all 12 games, earning one start, and was recognized with College Football Network All-MAC honorable mention honors. Mr. Harris was named MAC Offensive Player of the Week following a 151-yard rushing performance against Ball State. That season, he ranked second on the team in rushing yards (418), carries (91), rushing yards per game (34.8), and rushing touchdowns (three), while adding 11 receptions for 93 yards. Mr. Harris had several standout performances, including a 156 all-purpose yard game against Ball State, which included a career-long 71-yard run.

176. Academically and personally, Mr. Harris excelled while balancing the demands of Division I athletics, majoring in Information Systems and demonstrating leadership on and off the field. An additional year of eligibility at the NCAA Division I level would have allowed Mr. Harris to continue his academic pursuits, develop his athletic skills, expand professional prospects, and increase his NIL opportunities to at least a five-figure package.

177. Because of the NCAA's Former Eligibility Rules, Mr. Harris's ability to compete and fully capitalize on NIL opportunities has been restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 10. Application of the Challenged Rules and Resulting Injuries to Plaintiff John ("Johnny") Luetzow

178. Plaintiff Johnny Luetzow was a catcher on the Santa Clara University baseball team who began his NCAA Division I career in 2023. Over four seasons, he emerged as a consistent performer both athletically and academically earning recognition as one of the program's most dependable players.

179. Mr. Luetzow appeared in 126 games with 108 starts, including 60 behind the plate, and has maintained a career batting average of .298 with a .395 on-base percentage. He has recorded 113 hits, 19 doubles, six home runs, 68 RBIs, and 57 runs scored while posting a career fielding percentage of .986 and throwing out 18 base runners. In 2025, he was named to the Buster Posey Award Midseason Watch List recognizing the nation's top collegiate catchers and finished third on the team in batting average and fourth in on-base percentage. In 2026, he posted the strongest offensive season of his career, recording career highs in batting average (.333), hits (44), doubles (10), home runs (4), RBIs (25), runs scored (23), slugging percentage (.500), and on-base percentage (.420).

180. Academically, Mr. Luetzow earned a bachelor's degree in Finance, while balancing the rigorous demands of Division I baseball. Mr. Luetzow consistently excelled in the classroom, earning "Gold" honors on the West Coast Conference Commissioner's Honor Roll in each of his three seasons. He was named to the WCC All-Academic first team in 2025 after receiving honorable mention honors in 2024 and was also recognized as Academic All-District by the College Sports Communicators.

181. An additional year of eligibility would allow Mr. Luetzow to continue developing his skills, pursue post-graduate coursework, enhance his professional baseball prospects, and expand his NIL opportunities while providing veteran leadership to his team.

182. Because of the NCAA's Former Eligibility Rules, Mr. Luetzow's ability to compete and fully capitalize on NIL opportunities has been restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 11. Application of the Challenged Rules and Resulting Injuries to Plaintiff Jakob Russell

183. Plaintiff Jakob Russell was a left-handed pitcher for the Long Beach State University baseball team who began his NCAA Division I career in 2025 after transferring from the University of Redlands. Over his four collegiate seasons, including three at the NCAA Division III level, Mr. Russell has demonstrated both athletic versatility and academic dedication.

184. During his three seasons at Redlands (2022-2024), Mr. Russell appeared in 49 games, including two starts, compiling a 9-3 record with six saves. Mr. Russell struck out 143 batters over 114.2 innings—showcasing impressive strikeout rates—while walking 44. Mr. Russell complemented his on-field contributions by making the Dean's List on two occasions. In the summer of 2024, he competed in elite summer leagues where he combined for three saves, a 2.45 ERA in the CCL, and strong strikeout numbers that further elevated his profile.

185. In the 2025 season at Long Beach State, Mr. Russell pitched 12.1 innings across 16 relief appearances, striking out 17 and walking only four, ending with a 6.57 ERA. Notably, Mr. Russell earned the win in a key victory against LMU, delivering 1.1 innings and striking out two in his sole appearance as the pitcher of record. These contributions underscore his ability to step into high-pressure situations and perform effectively at the Division I level.

186. Academically, Mr. Russell maintained solid standing as a Consumer Affairs major. His consistent academic performance, combined with his athletic persistence, reflects a well-rounded college athlete poised for further opportunities.

187. Additional eligibility would offer Mr. Russell meaningful benefits: the chance to continue refining his pitching arsenal at the NCAA Division I level, enhance his prospects for both professional baseball and significant NIL opportunities, and possibly secure graduate funding such as tuition, room, and board scholarships to pursue postgraduate studies. This extra year would also have allowed him to build deeper rapport with teammates and coaching staff, strengthening his leadership contributions.

188. Because of the NCAA's Former Eligibility Rules, Mr. Russell's ability to compete and fully capitalize on NIL opportunities is restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 12. Application of the Challenged Rules and Resulting Injuries to Plaintiff Justine Pissott

189. Plaintiff Justine Pissott was a senior guard for the Vanderbilt University women's basketball team. Ms. Pissott joined Vanderbilt after a successful true freshman season at Tennessee. Over her time in NCAA Division I women's basketball, Ms. Pissott demonstrated skill, resilience, and a commitment to elevating her team's performance. She was drafted in the WNBA draft by the Indiana Fever and now plays professionally for the Las Vegas Aces.

190. Ms. Pissott stands 6'4" and was highly regarded coming out of high school as a McDonald's All-American. In her Vanderbilt tenure, she has played in 23 games (2024-25 season) averaging 3.6 points per game and making 19 three-pointers, including a 38.8% rate from beyond the arc. Earlier, in her first season at Vanderbilt (2023-24), she appeared in 33 games and made 28 starts, contributing 6.8 points per game and ranking second on the team with 52 made 3-pointers.

191. Academically, Ms. Pissott majored in Human and Organizational Development, demonstrating dedication to both her studies and her athletic career. She transferred to Vanderbilt

after initially committing elsewhere, ultimately choosing Vanderbilt to make her mark and help restore its women's basketball program.

192. Ms. Pissott graduated in Spring of 2026. An additional year of eligibility would have allowed Ms. Pissott to continue refining her game, expand her role, increase her NIL opportunities, and build greater continuity and leadership for her team.

193. Because of the NCAA's Former Eligibility Rules, Ms. Pissott's ability to compete fully and capitalize on NIL opportunities has been restricted. These rules have directly limited her athletic participation, ability to compete, leadership potential, and economic opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 13. Application of the Challenged Rules and Resulting Injuries to Plaintiff Ndjakalenga ("Jak") Mwenentanda

194. Plaintiff Ndjakalenga ("Jak") Mwenentanda was a guard on the Vanderbilt University women's basketball team who began her NCAA Division I career at the University of Texas in 2022. Over her collegiate career, Ms. Mwenentanda emerged as a versatile and impactful player consistently demonstrating skill, adaptability, and leadership on the court.

195. Ms. Mwenentanda appeared in over 100 collegiate games with significant contributions on both ends of the court throughout her career. After three seasons at Texas, where she appeared in 103 games with 18 starts and helped the Longhorns capture three Big 12 titles while making multiple NCAA tournament runs, she transferred to Vanderbilt for the 2025–2026 season. As a graduate student, she started all 34 games for the Commodores and recorded career-best marks in several statistical categories, averaging 6.9 points per game while shooting 47.2 percent. She also delivered a standout NCAA tournament performance. Her collegiate accomplishments also include participation in the 2022 Jordan Brand Classic and being a 2022 McDonald's All-American Nominee, highlighting her status as a top high school recruit and a

significant contributor at the collegiate level. Notably, she recorded a career-high 19 points against Illinois in the NCAA Tournament showcasing her scoring ability under postseason pressure.

196. Academically, Ms. Mwenentanda maintained strong performance throughout her collegiate career. She entered Vanderbilt as a graduate student after completing her undergraduate career at Texas and continued to excel both academically and athletically. She has earned recognition on the SEC Winter Academic Honor Roll, demonstrating her ability to maintain success in the classroom while competing at the highest level of collegiate basketball.

197. An additional year of eligibility would have allowed Ms. Mwenentanda to continue developing her game, expand her NIL opportunities, and provide veteran leadership to her team. With another season, Ms. Mwenentanda could further refine her skills, increase her visibility to professional scouts, and continue serving as a role model within the Vanderbilt program and the broader women's college basketball community.

198. Because of the NCAA's Former Eligibility Rules, Ms. Mwenentanda's ability to compete fully and capitalize on NIL opportunities has been restricted. These rules have directly limited her athletic participation, ability to compete, leadership potential, and economic opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 14. Application of the Challenged Rules and Resulting Injuries to Plaintiff Lawson Lovering

199. Plaintiff Lawson Lovering played NCAA Division I basketball for four seasons, beginning his collegiate career at the University of Colorado before transferring to the University of Utah. Throughout his career Mr. Lovering worked tirelessly and demonstrated consistent development in his skill, athleticism, and leadership abilities, earning him the job of starting Center and the NIL opportunities to match. Mr. Lovering is known as a kind, hardworking, and humble

teammate, who has mentored younger players to help them acclimate to the struggles of being a Division I basketball player.

200. Over his four-year career, Mr. Lovering appeared in 113 games and started in 86 of them, establishing himself as a strong rebounder and defensive anchor. Across his career, Mr. Lovering contributed more than 600 points (averaging 5.7 per game), 486 rebounds, 176 assists, 81 blocks, and 53 steals. Mr. Lovering played NCAA Division I basketball for four seasons, beginning his collegiate career at the University of Colorado before transferring to the University of Utah.

201. Mr. Lovering graduated from the University of Utah with his Bachelor of Arts in Communications, demonstrating that his skills extend far beyond the court. Academically, Mr. Lovering thrived while balancing the demands of Division I athletics, being recognized as Student Athlete of the Month and named to the Honor Roll. An additional year of eligibility would have allowed Mr. Lovering to continue his academic pursuits, further develop his athletic abilities, expand his professional prospects, and capitalize from an NIL valuation in excess of seven figures.

202. Because of the NCAA's Former Eligibility Rules, Mr. Lovering's ability to compete and fully capitalize on NIL opportunities has been restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 15. Application of the Challenged Rules and Resulting Injuries to Plaintiff Reese Ragland

203. Plaintiff Reese Ragland was a member of the Tulane University women's cross country and track and field teams. After joining the Green Wave in 2022, Ms. Ragland competed in a range of middle-distance and long-distance events, establishing herself as a consistent and

dependable performer in both indoor and outdoor competition. Ms. Ragland's steady progression made her a key contributor to Tulane's success and a respected leader within the program.

204. Before arriving at Tulane, Ms. Ragland was an accomplished runner at the high school level where she was recognized among the top distance athletes in her region. Ms. Ragland earned multiple all-state honors, set school records in both cross-country and track events, and consistently qualified for state championship meets. Ms. Ragland's early achievements reflected the same determination, endurance, and leadership that have characterized her collegiate career.

205. At Tulane, Ms. Ragland balanced her athletic commitments with academic excellence. As a double Political Science and Gender Studies major, she demonstrated a strong commitment to her studies and plans to attend law school. Ms. Ragland's academic and athletic discipline have made her a role model for her teammates and an asset to the university community.

206. Ms. Ragland seeks to continue her studies in a field related to her undergraduate degree to advance her professional development and prepare for her eventual pursuit of law school. An additional year of eligibility would allow Ms. Ragland to continue competing at a high level, further develop her athletic potential, and expand her NIL and leadership opportunities as she prepares for her future professional endeavors.

207. Because of the NCAA's Former Eligibility Rules, Ms. Ragland's ability to compete and fully capitalize on NIL opportunities has been and continues to be restricted. These rules have directly limited her athletic participation, leadership potential, and economic opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 16. Application of the Challenged Rules and Resulting Injuries to Plaintiff Ellie Geoffroy

208. Plaintiff Ellie Geoffroy is from Andover, Kansas, where she was a standout three sport athlete at Andover Central High School, who lettered in Soccer, Tennis, and Track and Field. Ms. Geoffroy also served as team captain for her club soccer team, Oklahoma Energy FC.

209. Ms. Geoffroy began her NCAA Division I career in 2022 at the University of Oklahoma. Before transferring, Ms. Geoffroy played in 19 games—starting in seven of them—for the Sooners, totaling over 1000 minutes of playing time and scoring her first career goal. Ms. Geoffroy received a bigger opportunity during her sophomore year at Oklahoma State, where she started in 16 of her 17 games played. Ms. Geoffroy started in all 22 games for the Cowgirls as a junior, anchoring a defense that set a program record with nine consecutive shutouts and that led the Big 12 and ranked fourth nationally with 15 shutouts. For her efforts, she was named a Big 12 Defensive Player of the Week and earned Academic All-Big 12 honors.

210. Ms. Geoffroy will graduate at the end of Summer 2026 and hopes to pursue post-graduate coursework absent the challenged eligibility restrictions. Given her impressive athletic career, Ms. Geoffroy would be a valuable asset to her current team as a fifth-year player or a highly sought-after addition to the women's soccer program at another NCAA institution.

211. Because of the NCAA's Former Eligibility Rules, Ms. Geoffroy's ability to compete and fully capitalize on NIL opportunities has been and continues to be restricted. These rules have directly limited her athletic participation, ability to compete, leadership potential, and economic opportunities causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 17. Application of the Challenged Rules and Resulting Injuries to Plaintiff Xcaret ("X") Pineda

212. Plaintiff Xcaret Pineda is from Bolingbrook, Illinois, where she was a standout Midfielder for Plainfield East High School and Eclipse Select Soccer Club. As a senior, Ms. Pineda earned all-conference and all-sectional honors representing her high school and helped lead her club team to a national championship in the Elite Club National League.

213. Ms. Pineda began her Division I career at Oklahoma State University, and she immediately carved out a significant role in the team's midfield, starting in 17 of their 19 games and recording 2 goals and 2 assists. Ms. Pineda showed significant improvement in her second season. As a sophomore, Ms. Pineda started in all 20 games and was third on the team among field players in minutes played with 1,518. She also contributed six goals and five assists for 17 points, which ranked among the top three on the team, and earned her Second Team All-Big 12 honors. Her stellar performance carried over throughout her junior season. Ms. Pineda started in all 22 games and accounting for 16 points (6 goals and 4 assists) and a team-high 24 shots, earning her All-Big 12 First Team and United Soccer Coaches All-Midwest Region First Team honors.

214. Ms. Pineda graduated in Spring of 2026. Given her impressive athletic career, Ms. Pineda would have been a valuable asset to her current team as a fifth-year player or a highly sought-after addition to the women's soccer program at another NCAA institution.

215. Because of the NCAA's Former Eligibility Rules, Ms. Pineda's ability to compete and fully capitalize on NIL opportunities has been and continues to be restricted. These rules have directly limited her athletic participation, ability to compete, leadership potential, and economic opportunities causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 18. Application of the Challenged Rules and Resulting Injuries to Plaintiff Timo Legout

216. Plaintiff Timo Legout was a student at the University of Texas and a member of its men's tennis program. Although he did not enroll until 2024, the NCAA imposed a three-season penalty on him based on the time between his high school graduation in Europe and his enrollment at Texas. As a result, Mr. Legout's only season of NCAA Division I competition was the 2024-25 season.

217. Despite this limitation, Mr. Legout made an immediate impact on the Texas program. He contributed consistently in both singles and doubles play, demonstrating strong competitive instincts, technical skill, and leadership on the court. Coaches and teammates alike recognized his value as a versatile and reliable competitor, and he played a key role in the team's success throughout the season.

218. Mr. Legout remains within his Five-Year Eligibility Window and would be eligible for an additional season of competition. Restoring this opportunity would allow him to continue developing as a college athlete, further his athletic goals, and fully realize the benefits of his commitment to the Texas men's tennis program. An additional season would also provide him with valuable competitive experience as he continues pursuing opportunities within the professional tennis pathway, including ITF World Tennis Tour and ATP-level competition.

219. Because of the NCAA's Former Eligibility Rules, Mr. Legout's ability to compete and fully capitalize on NIL opportunities is restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 19. Application of the Challenged Rules and Resulting Injuries to Plaintiff Henry Stewart

220. Plaintiff Henry Stewart grew up in Lakewood, Colorado, and played baseball at J.K. Mullen High School, where he was a standout two-way player. As a hitter, he maintained a .410 batting average and drove in 20 runs, and as a pitcher he posted a 3-1 record with a 3.50 earned run average ("ERA"). Recruited to play college baseball, Mr. Stewart enrolled at Santa Clara University in the fall of 2022, where he competed as a left-handed pitcher for the Santa Clara Broncos in NCAA Division I baseball in the West Coast Conference.

221. Mr. Stewart developed steadily over his four seasons with the Broncos, contributing out of the bullpen as a freshman and sophomore before emerging as a reliable left-handed reliever in his junior season in 2025. That year, he appeared in 17 games, went 3-0 with a 2.28 ERA, held opponents to a .214 batting average, and struck out 23 batters. He continued to contribute in his fourth season in 2026, throwing five innings with seven strikeouts.

222. Mr. Stewart excelled academically throughout his time at Santa Clara, earning West Coast Conference All-Academic Honorable Mention, recognition as an Academic All-District selection by College Sports Communicators, and repeated placement on the WCC Commissioner's Honor Roll with "Silver" honors. He graduated in the winter of 2026 with a degree in communication and hopes to pursue post-graduate coursework towards a master's degree in sports management, absent the challenged eligibility restrictions. Mr. Stewart received neither an athletic scholarship nor any NIL compensation during his time at Santa Clara.

223. Having pitched for four seasons at the Division I level and developed into a dependable left-handed pitcher, Mr. Stewart would be a valuable asset to his current team as a fifth-year player or a highly sought-after addition to the baseball program at another NCAA institution. He remains within his five-year eligibility window and would be eligible for an additional season of competition in the 2026–27 academic year, for which he has a well-founded

basis to believe a roster spot would be available to him. He did not, however, take a redshirt year, and therefore—unlike players who preserved a season of eligibility to participate or compete through a redshirt—he has no ability to access a fifth season of participation or competition.

224. Because of the NCAA's Former Eligibility Rules, Mr. Stewart's ability to compete and full capitalize on NIL opportunities for the upcoming year has been and continues to be restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 20. Application of the Challenged Rules and Resulting Injuries to Plaintiff Elijah Joe Lopez

225. Plaintiff Elijah Joe Lopez grew up in Whittier, California, and played baseball at Los Altos High School, where he was a standout performer. He was named a First Team All-League selection as both a junior and senior, earned his team's Defensive MVP honors as a junior and Team MVP honors as a senior, was a Second Team All-California Interscholastic Federation ("All-CIF") selection as a senior, and helped his team reach a league championship. Recruited to play college baseball, Mr. Lopez enrolled at California State University, Fullerton in the fall of 2022, where he competed as a second baseman for the Cal State Fullerton Titans in NCAA Division I baseball in the Big West Conference.

226. Mr. Lopez earned his place in the lineup and became one of the Titans' most productive everyday players over his four seasons. After joining the program as a walk-on and starting 11 games as a freshman in 2023, he became an everyday starter, appearing in 53 of 54 games as a sophomore in 2024 and batting .300 with 19 RBIs and a team-high 32 runs. He followed that with his strongest campaign in 2025, starting 52 of 56 games, batting .314 to rank fourth on

the team, and recording 23 RBIs and 38 runs—a performance that earned him Big West Honorable Mention recognition and included a diving catch featured among SportsCenter's Top 10 plays.

227. Mr. Lopez's fourth season, in 2026, was cut short. After playing in 36 games and starting in 32 of them, he broke his hand in April when he was hit by a pitch, which prevented him from finishing the year and from competing in the playoffs. Mr. Lopez believes that being unable to complete the season caused him to be overlooked for opportunities, including harming his prospects of pursuing a career in professional baseball, and he views an additional season of competition as an opportunity to finish what he started.

228. Mr. Lopez remained continuously enrolled as a full-time student and made consistent academic progress throughout his time at Cal State Fullerton, graduating in the spring of 2026 with a degree in kinesiology. He hopes to pursue post-graduate studies and a career in professional baseball absent the challenged eligibility restrictions. Having competed for four seasons at the Division I level and having established himself as a productive player, Mr. Lopez would be a valuable asset to his current team as a fifth-year player or a highly sought-after addition to the baseball program at another NCAA institution. He remains within his five-year eligibility window and would be eligible for an additional season of competition in the 2026–27 academic year, for which he has a well-founded basis to believe a roster spot would be available to him. He did not, however, take a redshirt year, and therefore—unlike players who preserved a season of eligibility through a redshirt—he has no ability to access a fifth season of participation.

229. Because of the NCAA's Former Eligibility Rules, Mr. Lopez's ability to compete and fully capitalize on NIL opportunities has been and continues to be restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic

opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 21. Application of the Challenged Rules and Resulting Injuries to Plaintiff Ian Schieffelin

230. Plaintiff Ian Schieffelin enrolled at Clemson University in 2021 and competed on Clemson's NCAA Division I men's basketball team during the 2021–2025 seasons. He was a key player and helped the Clemson Tigers to NCAA Tournament appearances in each of his final two seasons, including a program-record-tying Elite Eight appearance as a junior in 2023–2024 and a program-record 27 wins as a senior in 2024–2025. In 2024, he earned the ACC's Most Improved Player award and was named to the NCAA All-West Region Team, helping lead Clemson to its first Elite Eight appearance since 1980. His upward trajectory continued into his senior season, when he posted career highs across every major statistical category—averaging 12.4 points, 9.4 rebounds, and 2.7 assists per game in 33.4 minutes per contest. He earned Second-Team All-ACC honors, was selected to the Karl Malone Power Forward of the Year Top 20 Watch List, received the USBWA Oscar Robertson National Player of the Week award, and earned ACC Player of the Week recognition.

231. Despite this clear upward trajectory—which demonstrated that Mr. Schieffelin's best basketball was still ahead of him—the NCAA's Four Seasons Rule prohibited him from competing in a fifth season of men's basketball. As a direct result of the Four Seasons Rule, Mr. Schieffelin was denied the opportunity to capitalize on his growing basketball prominence through NIL earnings during what would have been a fifth basketball season.

232. Instead of competing as one of the top returning players in college basketball and commanding significant NIL compensation commensurate with his status, Mr. Schieffelin was forced to either forgo his remaining year of eligibility or pivot to a different sport. He chose the

latter, joining Clemson's football team as a tight end. The enforcement of the Four Seasons Rule thus deprived Mr. Schieffelin of substantial economic benefits, including NIL earnings that would have been significantly greater had he been permitted to continue playing the sport in which he had demonstrated elite, nationally recognized ability.

233. Because of the NCAA's Four Seasons Rule Mr. Schieffelin's ability to compete and fully capitalize on NIL opportunities was restricted. The rule directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities, causing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 22. Application of the Challenged Rules and Resulting Injuries to Plaintiff Jayden Pierre

234. Plaintiff Jayden Pierre attended Long Island Lutheran High School, where he was recruited to play college basketball. Mr. Pierre enrolled at Providence College in the fall of 2022, where he competed as a guard in NCAA Division I men's basketball in the Big East Conference for three seasons. He then transferred to TCU, where he competed in the Big 12 Conference in the 2025–26 season.

235. Mr. Pierre developed into an increasingly productive player over his four seasons. After playing a limited role at Providence in 2022–2023, he averaged 9.5 points per game in 2023–2024 and 12.3 points per game in 2024–2025. Following his transfer to TCU, he started in all 35 games of the season, averaging 10.1 points per game.

236. Having competed for four seasons at the Division I level and developed into a productive and highly valued player, Mr. Pierre would be a valuable asset to his current team as a fifth-year player or a highly sought-after addition to the basketball program at another NCAA institution. He remains within his five-year eligibility window and would be eligible for an

additional season of competition in the 2026–2027 academic year, for which he has a well-founded basis to believe a roster spot would be available to him.

237. Because of the NCAA's Former Eligibility Rules, Mr. Pierre's ability to compete and fully capitalize on NIL opportunities has been and continues to be restricted. These rules directly limit his athletic participation, ability to compete, leadership potential, and economic opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 23. Application of Challenged Rules and Resulting Injuries to Plaintiff Amaree ("Mo") Abram

238. Plaintiff Amaree "Mo" Abram grew up in Port Arthur, Texas, and graduated high school from Southern California Academy after also attending Port Arthur Memorial High School and Summer Creek High School in Texas. He graduated as a top 100 recruit, also with a 4.0 GPA and in the top 15 in his class. Recruited to play college basketball, Mr. Abram enrolled at the University of Mississippi in the fall of 2022, where he competed as a guard in NCAA Division I men's basketball in the SEC. He later transferred to the Georgia Institute of Technology, competing in the ACC in 2023–2024, to Louisiana Tech University, competing in Conference USA in 2024–2025, and to the University of Tennessee, competing again in the SEC in 2025–2026.

239. Mr. Abram was a productive contributor across his four seasons and multiple programs. As a freshman at the University of Mississippi, he was one of four players to appear in all 33 games, and he started in 22 games. He reached his statistical peak as a junior at Louisiana Tech in 2024–2025, where he started in all 32 games, averaged 12.3 points, 4.4 rebounds, 1.7 assists, led the team in made three-pointers, and earned All-Conference USA Honorable Mention recognition. In his senior season in 2025–2026, he joined a Tennessee team that advanced to the

Elite Eight of the NCAA tournament, appeared in 25 games, and ranked among the team leaders in three-point percentage and steals.

240. Having competed for four seasons at the Division I level and established himself as a productive player at multiple programs, Mr. Abram would be a valuable asset to his current team as a fifth-year player or a highly sought-after addition to the basketball program at another institution. He remains within his five-year eligibility window and would be eligible for an additional season of competition in the 2026–2027 academic year, for which he has a well-founded basis to believe a roster spot would be available to him. He did not take a redshirt year.

241. Because of the NCAA's Former Eligibility Rules, Mr. Abram's ability to compete and fully capitalize on NIL opportunities has been and continues to be restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities, causing ongoing competitive harm in violation of Section 1 of the Sherman Act.

### 24. Application of Challenged Rules and Resulting Injuries to Plaintiff Cayden Charles

242. Plaintiff Cayden Charles played NCAA men's basketball for four seasons, beginning his collegiate career at Division II University of North Georgia before transferring to St. Bonaventure University, a Division I program in the Atlantic 10 Conference. Throughout his career, Mr. Charles worked tirelessly and demonstrated consistent development in his skill, athleticism, and leadership abilities, earning him a role as a starting combo guard and the NIL opportunities to match. Mr. Charles is known as a hard worker and outstanding teammate who has consistently played against much older competition beginning his collegiate career at just 17 years old.

243. Over his three seasons at North Georgia, Mr. Charles appeared in 86 games and started 63 of them, establishing himself as a productive scorer and strong rebounder. During that

time he contributed 972 points, 488 rebounds, and 132 assists, was named Most Outstanding Player of the 2024 NCAA Division II Southeast Regional, and led the Nighthawks to the Elite Eight. In his lone Division I season at St. Bonaventure in 2025–2026, Mr. Charles started in 35 games, averaging 12.9 points, 6.6 rebounds, 2.0 assists, and a team-high 1.5 steals in 33.2 minutes per game.

244. Mr. Charles graduated from St. Bonaventure with a degree in business administration, demonstrating that his skills extend far beyond the court. Academically, Mr. Charles thrived while balancing the demands of collegiate athletics, being recognized by the NCAA Division II Men's Player of the Week and named to the Peach Belt Conference Presidential Honor Roll Scholar. An additional year of eligibility would have allowed Mr. Charles to continue his academic pursuits, further develop his athletic abilities, and expand his professional prospects, and capitalize on an NIL valuation.

245. Because of the NCAA's Former Eligibility Rules, Mr. Charles's ability to compete and fully capitalize on NIL opportunities has been restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 25. Application of Challenged Rules and Resulting Injuries to Plaintiff Emily Pape

246. Plaintiff Emily Pape is a citizen of and resides in Park Ridge, Illinois. Ms. Pape played NCAA Division I women's basketball for four seasons, spending her entire collegiate career at Cornell University. Throughout her career, Ms. Pape worked tirelessly and demonstrated consistent development in her skill, athleticism, and leadership abilities, earning her a starting role at forward. Ms. Pape is known as a kind, hardworking, and humble teammate who has mentored younger players to help them acclimate to the demands of being a Division I basketball player.

247. Over her four-year career, Ms. Pape appeared in 106 games and started in 81 of them, establishing herself as a productive scorer, strong rebounder, and reliable outside shooter. Across her career, Ms. Pape contributed 1,111 points (averaging 10.6 per game), ranking 14th all-time at Cornell, along with more than 600 rebounds and 112 made three-pointers, ranking 12th all-time. She is the only player in program history with at least 1,100 points, 600 rebounds, and 110 made threes, and she also received Academic All-Ivy honors in her senior season.

248. Ms. Pape graduated with her degree from Cornell University as an Environment & Sustainability major, demonstrating that her skills extend far beyond the court. Academically, Ms. Pape thrived while balancing the demands of Division I athletics, being honored as an Academic All-Ivy athlete. An additional year of eligibility would have allowed Ms. Pape to continue her academic pursuits, further develop her athletic abilities, expand her professional prospects, and capitalize on lucrative NIL opportunities.

249. Because of the NCAA's Former Eligibility Rules, Ms. Pape's ability to compete and fully capitalize on NIL opportunities has been restricted. These rules have directly limited her athletic participation, ability to compete, leadership potential, and economic opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

### 26. Application of Challenged Rules and Resulting Injuries to Plaintiff Valentino Pinedo

250. Plaintiff Valentino Pinedo is a citizen of Spain and currently resides in Greensboro, North Carolina. Mr. Pinedo played NCAA Division I men's basketball for four seasons, beginning his collegiate career at East Carolina University before transferring to Saint Francis University and, thereafter, the University of North Carolina Greensboro. Throughout his career, Mr. Pinedo worked tirelessly and demonstrated consistent development in his skill, athleticism, and leadership

abilities, earning him a starting role at forward and the NIL opportunities to match. Mr. Pinedo is resilient and known as a kind, hardworking, and humble teammate.

251. Over his entire career, Mr. Pinedo appeared in 106 games, establishing himself as a productive scorer and strong rebounder. During his two seasons at East Carolina, he appeared in 45 games, and in 2024–2025 at Saint Francis he appeared in 29 games, was named to the All-NEC Third Team, and helped the program win its first Northeast Conference Championship since 1991, including a 17-point performance in an NCAA Tournament First Four game against Alabama State. Across his East Carolina and Saint Francis seasons, Mr. Pinedo contributed 330 points and 217 rebounds. In his single season at UNCG, he added 232 more points and 156 rebounds.

252. Mr. Pinedo is set to graduate from the University of North Carolina, Greensboro this summer with his degree in Biology, demonstrating that his skills extend far beyond the court. Academically, Mr. Pinedo thrived while balancing the demands of Division I athletics, and he served as a Student-Athlete Advisory Committee (SAAC) representative for the 2023-24 academic year. An additional year of eligibility would have allowed Mr. Pinedo to continue his academic pursuits, further develop his athletic abilities, expand his professional prospects, and capitalize on at least a five-figure NIL valuation.

253. Because of the NCAA's Former Eligibility Rules, Mr. Pinedo's ability to compete and fully capitalize on NIL opportunities has been restricted. These rules have directly limited his athletic participation, ability to compete, leadership potential, and economic opportunities, causing ongoing competitive and economic harm in violation of Section 1 of the Sherman Act.

## CLASS ALLEGATIONS

254. Plaintiffs Nathanial Vakos, Nick Levy, Kevin Gallic, Henry Stewart, Ellie Geoffroy, Reese Ragland, Timo Legout, Cayden Charles, Emily Pape, Valentino Pinedo, Elijah

Joe Lopez, Amaree "Mo" Abram, and Jayden Pierre bring this action under Federal Rule of Civil Procedure 23(b)(2), on their own behalf and on behalf of the following Class:

> The "Transition Exclusion Class"—
>
> All NCAA Division I college athletes who first enrolled in college no later than the fall of 2022 who (i) did not take a redshirt year; (ii) received at least 50% of "full grant-in-aid," as defined by NCAA Bylaw 15.02.5; (iii) completed their fourth season of competition during the 2025–2026 academic year; and (iv) were excluded from participation in a fifth season of competition during the 2026–2027 academic year.
>
> This Class excludes NCAA officers, directors, and employees. This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

255. Plaintiffs Langston Patterson, Lance Mason, Johnny Luetzow, Justine Pissott, Jak Mwenentanda, Xcaret "X" Pineda, CJ Taylor Jr., Quincy Skinner Jr., Brayden Schager, BJ Harris Jr., Lawson Lovering, Jakob Russell, and Ian Schieffelin bring this action under Federal Rule of Civil Procedure 23(b)(3), on their own behalf and on behalf of the following Class:

> The "Lost Opportunities Damages Class"—
>
> All NCAA Division I college athletes who first enrolled in college no earlier than the fall of 2020 and no later than the spring of 2022, who (i) did not take a redshirt year; (ii) received at least a 50% of "full grant-in aid," which is defined by NCAA Bylaw 15.02.5; and (iii) whose eligibility was extinguished by application of the Four Seasons Rule (NCAA Bylaw 12.6) at the conclusion of the 2023–2024 season (for spring sports) or 2024–2025 season (for all sports).
>
> This Class excludes NCAA officers, directors, and employees. This Class also excludes all judicial officers presiding over this action and their immediate family members and staff, and any juror assigned to this action.

256. The Transition Exclusion Class and the Lost Opportunities Damages Class are hereafter referred to collectively as the "Classes."[24]

---

[24] To the extent necessary, Plaintiffs seek certification of appropriate state-specific subclasses under Rule 23(c)(5) for their state-law claims and reserve the right to propose such subclasses following discovery and in connection with class certification proceedings.

257. **Numerosity.** The Classes are so numerous that joinder of all members is impracticable. While the exact number of members in each of the classes is unknown to Plaintiffs at this time and can only be discerned through discovery, Plaintiffs are informed and believe that there are thousands of members in each of the Classes.

258. **Commonality.** Numerous common questions of law and fact exist as to all members of the Classes. Furthermore, these common questions predominate over any questions affecting solely individual members of the Classes. The questions of law and fact common to the Classes include but are not limited to:

a) Whether the Defendants engaged in a contract, combination, or conspiracy to unreasonably restrain trade by limiting the compensation available to members of the Classes for lost athletic scholarships, lost revenue sharing, loss of use of their names, images, and/or likenesses;

b) Whether such conduct caused members of the Classes to receive less compensation than they would have received for lost athletic scholarships, lost revenue sharing, loss of use of their names, images, and/or likenesses in a truly competitive market;

c) The duration of the contract, combination, or conspiracy alleged herein;

d) Whether Defendants violated Section 1 of the Sherman Act;

e) Whether the conduct of the NCAA and its co-conspirators caused injury to Plaintiffs and Class members;

f) Whether the Transition Exclusion Class is entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief;

g) Whether the Members of the Lost Opportunities Damages Class are entitled to monetary relief, and if so, the manner in which damages (including treble damages authorized by the Sherman Act) should be determined.

259. **Typicality.** Plaintiffs' claims are typical of the claims of other members of the Classes. Plaintiffs and other members of the Classes sustained damages arising out of the NCAA's common course of anticompetitive conduct in violation of law as described herein. Additionally, Plaintiffs'

claims are typical of the Class because the challenged eligibility restraints directly and proximately caused injuries to both named Plaintiffs and the members of the Classes.

260. **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class action litigation, including antitrust class action litigation. Additionally, Plaintiffs are adequate representatives of the Classes and will protect the claims and interests of the Classes. Plaintiffs do not have interests that conflict with those of the Classes and Plaintiffs will vigorously prosecute the claims set forth herein.

261. **Superiority.** A class action is superior to other methods for the fair and efficient resolution of this controversy. The class action device presents fewer management difficulties, and provides the benefit of a single adjudication, economy of scale, and comprehensive supervision by a single court. The damages suffered by named Plaintiffs and each member of the Classes are relatively small as compared to the expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent class certification, it would not be feasible for named Plaintiffs and members of the Classes to redress the wrongs done to them. It would be grossly inefficient for the judicial system to preside over large numbers of individual cases. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the judicial system. Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

## RELEVANT MARKETS

262. The Former Eligibility Rules and, for Plaintiffs and those similarly situated who would remain eligible but for the Transition Exclusion, the Transition Exclusion operate in multiple distinguishable nationwide labor markets for the respective services of NCAA Division I college

athletes. Specifically, the challenged restraints operate in (1) the market for Division I FBS football players, (2) the market for Division I men's basketball players, (3) the market for Division I women's basketball players, and (4) the markets for athletes in the remaining Division I sports for both men and women (the fourth collectively, the "Tuition Revenue Sports").

263. These markets share many similarities: in each, NCAA Division I institutions compete—through athletic scholarships, room-and-board benefits, and, beginning in July 2025, direct payments authorized by the *House* settlement—to secure the athletic services of current and prospective college athletes. The named Plaintiffs, and all putative class members, are or were the sellers of those athletic services, while NCAA member institutions compete to acquire those services through athletic scholarships and grant-in-aid, roster opportunities, institutional revenue-sharing payments, NIL opportunities, and related forms of compensation. The challenged Former Eligibility Rules and, as applicable, the Transition Exclusion directly suppress competition in these markets by preventing otherwise eligible college athletes from offering their athletic services during an additional season of Division I competition.

264. For each sport and gender market, the relevant geographic market is the United States. The NCAA and its member institutions are located across the country, and they engage in on-field competition and competition in nationwide labor markets for collegiate college athletes. The restraints at issue affect national markets as member institutions recruit and compete for talent across state lines. Accordingly, the relevant labor market extends throughout the United States.

265. There are no meaningful substitutes for the athletic scholarships, grant-in-aid, roster opportunities, institutional revenue-sharing payments, NIL opportunities, and other commercial benefits available through NCAA Division I athletics.[25] The opportunity to showcase athletic skills

[25] The NIL market is booming—projected to reach $1.67 billion in 2024–25 (a 43.1 percent year-over-year increase), with women's-sports earnings expected to rise 15 percent and collectives

at the highest level of amateur athletic competition while pursuing a degree from a Division I institution makes competition in these markets unique. Within these markets, the NCAA and its member institutions maintain exclusive market power, with the sole ability to dictate the rules and regulations for competition in Division I athletics. The transactions in which the NCAA and its member institutions engage in these markets with college athletes are commercial in nature, as they significantly affect the future earning potential of college athletes and yield significant financial revenue for the member institutions from the sizable consumer interest in college athletics. By prematurely sidelining qualified college athletes through the Former Eligibility Rules and, for Plaintiffs, continuing to do so through the Transition Exclusion, Defendants reduce the quality, variety, and continuity of Division I athletic competition while suppressing competition in the market for college athletes' services.

266. As a practical matter, NIL opportunities are only available to college athletes competing at NCAA Division I institutions as more than 99% of NIL dollars are paid to those college athletes.[26] And even if Division II or Division III programs provide some marginal substitute opportunities, those levels are also governed by the NCAA's cartel and subject to the same eligibility rules that restrain Division I athletes.

267. Although the NCAA is a non-profit organization, the transactions that member institutions make with college athletes yield significant financial revenue for the member institutions

outspending commercial deals at roughly a four to one ratio—demonstrating the uniqueness and magnitude of these opportunities. *See The Annual Opendorse Report*, Opendorse, 4 (2024), https://biz.opendorse.com/wp-content/uploads/2024/07/NIL-AT-3-The-Annual-Opendorse-Report-1.pdf#gf _56.

[26] *See id.*

and have significant effects on the future earning potential of those college athletes. These transactions include, among other benefits, partial or full scholarships in exchange for the college athlete's services. Those commercial relationships frequently include renewable athletic grant-in-aid agreements, roster positions, institutional compensation, and related benefits that are directly affected by the challenged restraints. The college athletes, in return, receive the means to develop, refine, and showcase their skills—essential inputs to their future earning potential. NCAA athletic events in which these college athletes compete are marketed to consumers who view both in-person and via broadcasts of these sporting events, yielding significant revenue to the NCAA's member institutions and conferences. Accordingly, and as numerous courts have recognized, the exchange between member institutions and college athletes is commercial in nature and squarely within the scope of the Sherman Act.

## ANTITRUST ALLEGATIONS

### I. The Commercial Nature of the Former Eligibility Rules and Transition Exclusion

268. This Court's finding in *Pavia* is fully applicable here: "[R]estrictions on who is eligible to play and therefore to negotiate NIL agreements [are] commercial in nature." *Pavia v. Nat'l Collegiate Athletic Ass'n*, 760 F. Supp. 3d 527, 537 (M.D. Tenn. 2024). The Former Eligibility Rules—and Defendants' continued enforcement of the Transition Exclusion against Plaintiffs and similarly situated college athletes—operate as artificial restraints on competition and therefore constitute commercial restraints subject to scrutiny under the Sherman Act in the post-*Alston* era.

269. When the NCAA lifted its compensation restrictions and allowed college athletes to profit from their names, images, and likenesses, eligibility rules circumscribing the population of college athletes permitted to compete in Division I athletics necessarily became commercial in nature. *See id.*

The Former Eligibility Rules, and now the Transition Exclusion, restrict "who is eligible to play and therefore to negotiate NIL agreements[.]" *Id.* Because eligibility to compete in NCAA Division I athletics is an essential condition of access not only to NIL opportunities, but also to roster positions, grant-in-aid, institutional revenue-sharing payments, and other forms of compensation, Defendants' restrictions on college athletes' ability to compete throughout their eligibility windows operate as market restraints. Accordingly, the Former Eligibility Rules and Transition Exclusion fall within the ambit of the Sherman Act.[27]

270. Defendants may continue to contend, notwithstanding their recent adoption of the new eligibility framework, that the challenged restraints are justified by concerns regarding academics, competitive balance, or amateurism. In practice, however, the Former Eligibility Rules functioned—and, through the Transition Exclusion, continue to function—as restraints in the relevant markets. They arbitrarily restrict the ability of college athletes to obtain the full competitive and commercial benefits available during the NCAA's prescribed five-year eligibility period, including grant-in-aid, roster positions, institutional compensation, NIL opportunities, and professional development. They also deprive college athletes of meaningful educational benefits, including additional scholarship support, academic progress, and access to training, coaching, and medical resources.

271. The NCAA itself generates billions of dollars from the competitions these college athletes make possible, and its exceptions—such as transfer waivers and medical redshirts—demonstrate that the restrictions are not essential to educational goals. Moreover, under the Former Redshirt Rule, some college athletes received most of the benefits associated with participation—

[27] The NCAA conceded that this Court's interpretation of *Bassett v. NCAA*, 528 F.3d 426 (6th Cir. 2008), in the *Pavia* order—concluding that the NCAA's eligibility rules are commercial in nature—remains controlling precedent at this time. *See Bellamy v. Nat'l Collegiate Athletic Ass'n*, No. 3:25-cv-00750, Oral Arg. Tr. at 7-8, ECF No. 32 (M.D. Tenn. July 16, 2025).

including practice, financial aid, academic progress, NIL opportunities, and institutional compensation—without consuming a season of eligibility. Most significantly, the NCAA has now abandoned the Former Eligibility Rules for most Division I athletes through adoption of the new five-year competition model, while Defendants continue to withhold those benefits from Plaintiffs through the Transition Exclusion.

272. Plaintiffs, by contrast, remain denied the opportunity to compete during an additional season at or near the point of their greatest collegiate earning potential. The Former Eligibility Rules and Transition Exclusion therefore operate as commercial restraints subject to antitrust review.

## II. Anticompetitive Effects of the Challenged Restraints

### A. Effects on Labor Markets for Division I College Athletics

273. The Former Eligibility Rules and Transition Exclusion operate as coordinated restrictions among Defendants and NCAA member institutions, functioning as horizontal agreements that reduce quality, suppress the availability of college-athlete services, and limit competition for the labor of Division I college athletes in numerous markets.

274. By capping competition at four seasons within a five-year window, the Former Eligibility Rules and Transition Exclusion limit the number and/or quality of college athletes who could otherwise contribute to and benefit from an additional season of play. The effect is to suppress economic opportunities, reduce bargaining power, and arbitrarily limit college athletes' personal and professional development. Absent Defendants' agreements to adopt and enforce the Former Eligibility Rules and, now, the Transition Exclusion, universities would compete for this talent, as they already do for redshirting fifth-year college athletes, increasing competition in the relevant labor market and compensation opportunities for college athletes, while also allowing them to pursue graduate education. The growing markets for transfer and graduate-transfer college

athletes since *Alston* illustrates the natural demand for retaining skilled players when eligibility is not artificially capped.

275. The Former Eligibility Rules also undermined the quality of competition in the NCAA labor markets. College athletes who did not redshirt are denied a full year of benefits— including team access, scholarships, training, academic support, and, in some cases, NIL income—that redshirt athletes were able to leverage to enhance their academic options, athletic performance, and market value. The cumulative advantages of five seasons, previously available only through redshirting, allow athletes to reach peak performance in their final year, maximizing both competitive impact and economic potential. Those who did not redshirt lack the opportunity to earn additional degrees, refine their skills and elevate their quality in a fifth season. Plaintiffs are forced to expend eligibility at the front end of their careers, effectively removing what could be their highest-quality season from the labor market. Further, the NCAA applies these restrictions unevenly across sports. Division I football players could compete in up to nine games, including postseason competition, and still claim a redshirt season. No comparable flexibility exists in other Division I sports. A basketball player, for example, would forfeit their fifth year of eligibility by playing a single second of an intercollegiate game in the recognized competitive season. This inconsistent application highlights that the Former Eligibility Rules were not tethered to educational goals or competitive balance but instead operated as restraints on labor supply across Division I sports.

276. Plaintiffs' experiences illustrate these harms. For example, Henry Stewart, who had limited participation in his first two NCAA Division I seasons, is deprived of the opportunity to fully develop and showcase his skills, diminishing the overall quality of his play. Quincy Skinner, a wide receiver who played in his first four years, is denied the opportunity to extend his career into a fifth season, ultimately limiting his contribution to competition in the market at his peak.

Johnny Luetzow, a top catcher at Santa Clara, cannot continue building on his record of performance reducing both his competitive quality and professional prospects. Each example reflects the economic and developmental opportunities historically foreclosed by the Former Eligibility Rules and, for Plaintiffs who remain within their eligibility windows, presently foreclosed by the Transition Exclusion.

### B. The Challenged Restraints Exclude Plaintiffs from the Full Benefits of Compensation Unique to Division I Sports

277. In June 2025, the NCAA reached a settlement with a putative class of current and former NCAA college athletes, through which the NCAA would begin compensating players for the NCAA's use of their NIL between 2016 and 2024. Under the settlement, the NCAA and its "Power Four" member conferences (ACC, Big Ten, Big 12, and SEC) have agreed to share up to 22%, with incremental annual adjustments, of the average athletic department revenue among Power Four conference schools with their college athletes.[28] The shared revenue formula provided for up to $20.5 million per school for direct compensation to college athletes during the 2025–26 academic year.

278. Although the *House* Settlement creates a significant new stream of institutional compensation for college athletes, the Former Eligibility Rules deprived members of the Lost Opportunities Damages Class of the ability to receive such compensation during an additional season, and the Transition Exclusion continues to deny Plaintiffs and members of the Transition Exclusion Class the full benefit of that compensation during their remaining eligibility windows.

279. Moreover, while the *House* Settlement establishes a potential framework for future college athlete compensation, the model has not been uniformly adopted across the NCAA's

---

[28] *See* Stipulation and Settlement Agreement (ECF 450-3), *In re College Athlete NIL Litigation*, 4:20-cv-03919-CW (N.D. Cal. July 26, 2024).

member institutions.[29] For example, the settlement does not mandate that schools pay out the full shared revenue pool in any given year, and many institutions may opt out entirely.[30] Additionally, all Ivy League schools have declined participation in the *House* Settlement.[31]

280. While Plaintiffs commend the named *House* plaintiffs for their efforts, they neither represented—nor represent—the class members in this case for compensation for being denied the benefit of a fifth season of competition.

281. Absent the shared-revenue cap, many schools would likely pay substantially more for NIL rights. For example, in 2024, the University of Texas generated $331.9 million in athletic revenue; Ohio State, $292.3 million; and Alabama, $234.8 million.[32] The $20.5 million shared revenue pool applicable to the 2025–26 academic year represented only 6%, 7%, and 8.7% of these schools' 2024 revenues, respectively. Even lower-revenue programs in the new Autonomous Five such as Mississippi State ($127 million), Kansas State ($104 million), and North Carolina State ($133 million), could allocate more but for the settlement-imposed ceiling.[33] Therefore, without the NCAA's eligibility restraints and the shared revenue cap, many NCAA Division I programs

---

[29] Weston Blasi, *WNBA Players Only Get 9.3% of League Revenue. Here's How Much NBA, NFL, and NHL Players Get*, MarketWatch (Oct. 22, 2024), https://www.marketwatch.com/story/wnbaplayers-only-get-9-3-of-league-revenue-heres-how-much-nba-nfl-and-nhl-players-get-0abef80c.

[30] Gerard T. Leone, Jr., Austin Maloney & Brigid Harrington, *Important Considerations for Universities Awaiting House Settlement Approval*, Nat'l L. Rev. (May 21, 2025), https://natlawreview.com/article/important-considerations-universities-awaiting-house-settlement-approval.

[31] Associated Press, *Ivy League Won't Join NCAA Antitrust Settlement*, ESPN (Jan. 24, 2025) https://www.espn.com/college-sports/story/_/id/43550303/ivy-league-join-28-billion-ncaa-antitrust-settlement.

[32] *Football Bowl Subdivision (FBS*), Knight Commission on Intercollegiate Athletics, https://knightnewhousedata.org/fbs (last visited Nov. 7, 2025).

[33] *Id*.

would spend significantly more to attract and compensate college athletes, including for college athletes' fifth year of competition.

### C. The Challenged Restraints Arbitrarily Prevent College Athletes from Obtaining Additional Grant-in-Aid and Other Education-Related Benefits

282. The Former Eligibility Rules arbitrarily prevented college athletes who did not take a redshirt season from receiving an additional year of athletic grant-in-aid and related education benefits despite remaining within the NCAA's prescribed five-year eligibility period. The Transition Exclusion now continues that restraint against Plaintiffs and similarly situated college athletes by preventing NCAA member institutions from competing to renew, extend, or offer grant-in-aid, roster positions, institutional compensation, and related benefits for their fifth season. Those foreclosed benefits include tuition, room and board, academic support, access to training facilities and coaching, medical care, performance-development programs, and other benefits that would be available to qualified athletes in a competitive market.

### D. The Challenged Restraints Arbitrarily Limit College Athletes' Access to Third-Party NIL Compensation

283. Separate and apart from the direct payments that universities may now provide under the *House* settlement, college athletes continue to have the ability to secure additional compensation for their individual NIL rights from third parties. While the university payments are designed to compensate college athletes for the institutions' collective use of NIL, college athletes are also free to enter into private market arrangements with school-affiliated collectives, national corporations, and local merchants for the commercial use of their personal NIL.

284. The Former Eligibility Rules and Transition Exclusion exploit Defendants' market power to restrict Plaintiffs' access to third-party NIL opportunities. By historically capping some college athletes at four seasons, and now continuing that limitation against Plaintiffs through the

Transition Exclusion, the NCAA forecloses their ability to generate NIL income tied to competition in a fifth year while at the same time permitting other college athletes to compete and profit from NIL for five seasons. This arbitrary distinction is not driven by market forces or competitive necessity. On the contrary, third-party collectives, sponsors, and brands remain motivated to pay college athletes so long as they can compete on the field or court. The NCAA's restriction therefore functions as a horizontal restraint that artificially suppresses overall athlete compensation for their services (such as through NIL opportunities) for one subset of college athletes while allowing others similarly situated to benefit.

285. By excluding certain college athletes from an additional competitive season, the Former Eligibility Rules and Transition Exclusion suppress compensation, reduce bargaining power, and distort market incentives. Combined with Defendants' market power, those restraints constitute unlawful restraints of trade under Section 1 of the Sherman Act.

## III. No Procompetitive Justification for the Challenged Restraints

286. Defendants historically maintained that the Former Eligibility Rules were essential to preserving college athletics, typically invoking: (1) alignment of academics and athletics; (2) preservation of amateurism; and (3) competitive balance. Defendants' subsequent adoption of the Age-Based Eligibility Rule substantially undermines each of those asserted justifications, particularly because Defendants continue to impose substantially the same limitation on Plaintiffs through the Transition Exclusion.

### A. Alignment of Academics and Athletics

287. The NCAA historically claimed that its eligibility standards fostered academic development because they were "designed to move student-athletes toward graduation in a timely

manner."[34] The NCAA contends that limiting eligibility to four years encouraged students to prioritize their studies and avoid unnecessary delays in completing their degrees. However, this rationale oversimplifies the realities faced by college athletes and ignores the diverse academic ambitions and personal circumstances that can affect a student's educational journey. Yet the NCAA has now determined that college athletes generally may compete throughout the same five-year eligibility period, and has wholly eliminated the Former Eligibility Rules for college athletes who will begin their Division I careers in or following the 2027–2028 academic year.

288. Many college athletes do, in fact, complete their degrees in a timely manner, with a significant number graduating in good academic standing within four years. However, the Former Eligibility Rules disincentivized more ambitious academic pursuits, such as dual degrees, combined undergraduate and graduate programs, or graduate-level study in general—academic paths that often require more than the four seasons of eligibility NCAA rules allow. As a result, those rules force college athletes to choose between maximizing their educational opportunities and continuing their athletic careers, undermining the very academic development the NCAA claims to promote. The Transition Exclusion continues that harm for Plaintiffs despite Defendants' abandonment of those restrictions for nearly every other Division I athlete.

289. Additionally, the NCAA's own reporting underscores the inconsistency. It measures graduation success over a six-year period, while its eligibility rules impose a five-year window while limiting participation in competition to four years.[35] Further, the NCAA's recent rule allowing players

---

[34] *See Guide for Four-Year Transfers 2024-25*, NCAA, 13, http://fs.ncaa.org.s3.amazonaws.com/Docs/eligibility_center/Transfer/FourYearGuide.pdf (last visited Oct. 8, 2025).

[35] *Division I Graduation Rates Database,* NCAA (Nov. 2024), https://www.ncaa.org/sports/2017/12/12/division-i-graduation-rates-database.

to transfer to a new school each and every year shows a dramatic disconnect between the NCAA's purported goal of encouraging graduation within four years and the reality of current competitive market for college athletes.[36] For example, prior to the NCAA's rule change allowing unlimited transfers without having to sit out, less than 1% of highly recruited football players transferred more than once. In contrast, more than 20% of the top 600 recruits in the 2021 high school graduating class transferred multiple times. Finally, the NCAA allows athletes to compete in four seasons in one sport and then a fifth season in a different sport (and even trumpets that opportunity), again showing a disconnect application of NCAA rules and any supposed desire to force students to graduate in four years.[37] This inconsistency demonstrates that the historical four-season cap was not grounded in genuine academic necessity and that continued enforcement of substantially the same limitation through the Transition Exclusion serves no legitimate procompetitive purpose.

**B. Promoting Amateurism**

290. Additionally, the Former Eligibility Rules did not advance the NCAA's claimed interest in preserving consumer demand through its "amateurism model," which purports to distinguish college athletic events from professional sporting events. The NCAA has never articulated a clear,

---

[36] *See* David Ubben, *How Often Do College Football Players Actually Transfer? Heres' What the Data Tells Us, The Athletic* (Aug. 1, 2025), https://www.nytimes.com/athletic/6527935/2025/08/01/college-football-transfer-portal-numbers/.

[37] *See Former Lacrosse Standout Sammy White Joins Northwestern Womens' Basketball*, NU Sports (June 20, 2025), https://nusports.com/news/2025/6/20/womens-basketball-former-lacrosse-standout-sammy-white-joins-northwestern-womens-basketball (four-year women's lacrosse player plays basketball in fifth year); *How Pat Spencer, College Lacrosse Record Holder, Made the GoldenState Warriors*, NCAA.com (May 1, 2025) https://www.ncaa.com/news/lacrosse-men/article/2025-05-01/how-pat-spencer-college-lacrosse-record-holder-made-golden-state-warriors (four-year men's lacrosse player plays basketball in fifth year, followed by NBA).

consistent, or enforceable definition of amateurism, and its application of the concept has shifted over time to suit its own interests. The Former Eligibility Rules were not tied to any substantive aspect of amateurism: they do not address whether college athletes are compensated, whether they maintain academic standing, or whether they compete for the love of the game rather than financial gain. Instead, they simply impose an arbitrary time limit on competition, regardless of a college athlete's actual status or conduct. In fact, the NCAA's own rules and enforcement history show that eligibility limits like the Former Eligibility Rules were not essential to maintaining the distinction between college and professional sports, nor do they have any real impact on the public's perception of amateurism. Recent NCAA eligibility decisions further confirm that "amateurism" is not coherently or consistently defined. For example, the NCAA recently allowed former professional players to be ruled eligible to compete in Division I men's basketball.[38] And in 2024, the NCAA ended its categorical ban on Canadian Hockey League players, opening Division I hockey to athletes long labeled "professional."[39] These shifts—embracing athletes with prior professional experience—underscore that the NCAA's amateurism rationale never justified capping competition at four seasons within a five-year window. The NCAA's adoption of the new eligibility framework further confirms that a four-season cap was not necessary to distinguish college athletics from professional sports.

291. The NCAA's position that college athletes should lose a year of amateur status solely by competing in games against another school—while they are attending school, practicing with

---

[38] *See, e.g.*, Lindsay Schnell, *Former G League Player Thierry Darlan Ruled Eligible by the NCAA to Play at Santa Clara*, N.Y. Times (The Athletic) (Sept. 23, 2025), https://www.nytimes.com/athletic/6655724/2025/09/23/g-league-player-eligible-santa-clara-thierry-darlan/.

[39] Greg Wyshynski, *NCAA Makes Canadian Hockey League Players Eligible for Div. I*, ESPN (Nov. 7, 2024), https://www.espn.com/college-sports/story/_/id/42254200/ncaa-makes-canadian-hockey-league-players-eligible-div-i.

their team, and within their five-year eligibility window—is unfounded. Under the Former Eligibility Rules, the NCAA permitted numerous exceptions under which college athletes could compete beyond the restriction of the Four Seasons Rule without undermining its asserted amateurism model. For example, students were (and are) allowed to attend a preparatory school prior to their undergraduate university without triggering the eligibility clock, and professional college athletes could attend NCAA member institutions to compete in other sports without penalty. These exceptions make clear that the Former Eligibility Rules were not necessary to protect amateurism, and the Transition Exclusion cannot be justified on that basis. Any argument by the NCAA to the contrary is not only inconsistent with its own policies and the lived experience of college athletes, but also fails to justify the exclusionary and restrictive nature of the rule.

### C. Maintaining Competitive Balance

292. Finally, the NCAA's claimed procompetitive justification for the Former Eligibility Rules of preserving competitive balance among college athletes, the NCAA, and its member institutions is undermined by the organization's own precedents. The COVID-era eligibility exception, which allowed certain college athletes to compete for five seasons, provides a clear example that competitive integrity was not only preserved, but enhanced when eligibility was extended. College athletes continued to perform at a high level while benefiting from NIL opportunities; the NCAA sustained its popularity and commercial appeal; and member institutions actively recruited and showcased top-tier talent generating significant financial returns.

293. The NCAA has argued that allowing athletes to compete throughout their five-year eligibility periods would reduce opportunities for incoming high school athletes. But the NCAA's COVID-era extensions created the same asserted concern without undermining college athletics, and the NCAA has now permanently adopted, with Conference Defendants' unanimous support, an Age-Based Eligibility Rule permitting five seasons of competition for nearly all Division I

athletes. Defendants have identified no competitive-balance rationale for withholding that same opportunity from Plaintiffs through the Transition Exclusion.

294. Moreover, starting in 2018 Division I football players were permitted to compete in up to four regular season games, as well as postseason games, in a season without losing a year of eligibility under the Former Eligibility Rules, effectively allowing them to gain meaningful game experience while preserving a redshirt year.[40]

178. This approach did not diminish competitive equity; to the contrary, college football's popularity, commercial appeal, and overall level of play only increased. These outcomes underscore that allowing college athletes additional opportunities to compete can enhance, rather than undermine, the health and integrity of collegiate athletics. The NCAA cannot demonstrate that categorically stricter limitations of the Former Eligibility Rules were necessary, nor has it shown that relaxing these restrictions would harm competitive balance, reduce consumer demand, or adversely affect the labor markets in which college athletes participate.

## IV. Any Potential Procompetitive Justifications for the Challenged Rules Are Demonstrably Accomplished by Less Restrictive Alternatives

295. Even if the NCAA's asserted goals of promoting the alignment of academics and athletics, preserving amateurism, and maintaining competitive balance were valid procompetitive justifications—which they are not—Defendants' approval and implementation of an eligibility framework that provides for five seasons of competition within the five-year window of eligibility further confirms each could be achieved through significantly less restrictive means.

[40] Michelle Brutlag Hosick, *DI Football to Offer More Participation Opportunities*, NCAA (June 13, 2018), https://www.ncaa.org/news/2018/6/13/di-football-to-offer-more-participation-opportunities.

296. Even under the Former Eligibility Rules the NCAA employed less restrictive measures to advance these objectives. For example, NCAA Bylaw 14.4.1 requires college athletes to maintain satisfactory progress toward their degrees to remain eligible for competition. Other Bylaws establish minimum credit hour and grade point average requirements for athletic eligibility. These provisions addressing academic progress, GPA, and in-season transfers effectively further the NCAA's stated academic and amateurism objectives without imposing the unnecessary and harmful restraints embodied in the Former Eligibility Rules or continuing substantially the same restriction against Plaintiffs through the Transition Exclusion

297. The NCAA has now adopted a less restrictive alternative which substantively realizes the relief sought by Plaintiffs: permitting Division I college athletes to compete for up to five seasons within a five-year eligibility period. The Age-Based Eligibility Rule demonstrates that Defendants can advance any legitimate academic, competitive-balance, or other objectives without imposing the Former Eligibility Rules. Defendants' decision to continue withholding that less restrictive framework from Plaintiffs through the Transition Exclusion confirms that the ongoing restraint is not necessary to achieve any legitimate procompetitive objective.

## V. Enforcement of the Challenged Rules Represents a Group Boycott

298. The Former Eligibility Rules, and now the Transition Exclusion, effectuate a horizontal agreement among Defendants and NCAA member institutions to boycott college athletes who have completed four seasons of intercollegiate competition but remain within the NCAA's prescribed five-year eligibility period. The boycott is enforced through the threat of penalties against any member institution that fields an athlete whom Defendants deem ineligible under those restraints.

299. Historically, a member institution found to have violated the Former Eligibility Rules could face forfeiture of wins, fines, scholarship reductions, among other potential punishments– up

to and including the "death penalty" for repeat offenders, through which colleges are barred from participation in NCAA intercollegiate participation in the sport in which the violation occurred. Those same enforcement mechanisms support Defendants' continued enforcement of the Transition Exclusion.

300. Moreover, any member school that knowingly competes against a school that is in violation of the Former Eligibility Rules or Transition Exclusion can similarly be subject to severe penalties. Such enforcement mechanisms illustrate the nature of the boycott against college athletes such as Plaintiffs, as adopted and enforced by Defendants and carried out through NCAA member institutions.

301. Absent Defendants' agreements to adopt and enforce the Former Eligibility Rules and continue enforcing them through the Transition Exclusion, NCAA Division I institutions would compete to retain or recruit Plaintiffs and similarly situated athletes for an additional season through roster positions, athletic grant-in-aid, institutional revenue-sharing payments, NIL opportunities, and related compensation.

## COUNT I: VIOLATION OF SECTION 1 OF THE SHERMAN ACT ILLEGAL AGREEMENT TO RESTRAIN TRADE

302. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as if fully restated herein.

303. Defendant NCAA, acting through its officers, directors, employees, agents, and representatives, together with its member institutions, entered into and enforced an unlawful agreement to restrain and suppress competition in the relevant markets by adopting and maintaining the Four Seasons Rule and the Redshirt Rules. These rules operate as an illegal agreement to restrain trade, unreasonably restricting the ability of Division I college athletes who did not take or receive a redshirt year to compete in the market for an additional fifth year. By denying college athletes this

opportunity, the rules restrict exposure necessary to earn NIL compensation, impair professional advancement, and unlawfully restrain trade.

304. The relevant labor markets for purposes of antitrust analysis are the markets for the services of NCAA Division I college athletes nationwide, in each sport and gender combination, as discussed above. Transactions between NCAA member institutions and college athletes in these markets that are impacted by the Former Eligibility Rules are commercial in nature and fall squarely within the scope of the Sherman Act.

305. The unlawful horizontal agreement unreasonably restrains competition for college athlete services. By preventing college athletes from competing in every season during their five-year eligibility window, the rules deny college athletes NIL compensation opportunities, reduce their visibility to professional scouts, and diminish their present and future earning potential.

306. Absent these restrictions, schools would compete more vigorously for college athletes, including for graduate transfers. The artificial cap imposed by the Former Eligibility Rules directly suppressed that competition, inflicting antitrust injury on named Plaintiffs and similarly situated college athletes.

307. The Former Eligibility Rules, which limit college athletes to only four seasons of competition within a five-year window (while arbitrarily permitting exceptions), provide little, if any, procompetitive benefit. Any such benefits are far outweighed by the harm to college athletes and to competition. Moreover, a plainly less restrictive alternative exists that would advance the NCAA's stated objectives without suppressing trade: allowing all college athletes five full seasons of competition within their five-year eligibility window.

308. Defendant's conduct is ongoing and continues to inflict direct harm on named Plaintiffs and other college athletes by restricting their ability to secure NIL compensation,

preventing them from receiving direct payments available under the *House* Settlement, and limiting their ability to showcase their skills for professional opportunities. Unless enjoined, this unlawful restraint will continue to injure named Plaintiffs, other college athletes, and consumers of NCAA Division I sports.

309. Defendant NCAA and its member institutions' anticompetitive conduct is intentionally directed at the United States market and has had, and continues to have, a substantial and foreseeable effect on interstate commerce.

310. Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, named Plaintiffs seek a permanent injunction prohibiting Defendant from continuing to violate Section 1 of the Sherman Act by enforcing the competition restrictions contained in NCAA Bylaw 12.6.

311. Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, named Plaintiffs further request that the Court declare that members of the Injunctive Class are entitled to compete in every season of competition occurring within their five-year eligibility window.

312. Plaintiffs belonging to the Damages Class seek monetary damages to compensate them for the loss of their final year of eligibility and related economic opportunities.

313. Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, named Plaintiffs are entitled to recover their reasonable attorneys' fees and costs.

## COUNT II: VIOLATION OF SECTION 1 OF THE SHERMAN ACT CONCERTED BOYCOTT THROUGH TRANSITION EXCLUSION

**(On behalf of the Transition Exclusion Class)**

314. Plaintiffs repeat and reallege each preceding allegation as though fully set forth herein.

315. Following adoption of the Age-Based Eligibility Rule, Defendants agreed to continue excluding the Transition Exclusion Class members from Division I competition through

the Transition Exclusion. Acting in concert, Defendants and their member institutions agreed that the Transition Exclusion Class members would be denied roster positions, athletic grant-in-aid, institutional revenue-sharing opportunities, NIL opportunities, and other commercial benefits solely because they competed during four seasons under the Former Eligibility Rules.

316. The Transition Exclusion operates as a concerted refusal by Defendants and NCAA member institutions to deal with the members of the Transition Exclusion Class. Through mandatory NCAA legislation backed by substantial penalties, Defendants prohibit member institutions from competing to recruit, retain, or compensate the Transition Exclusion Class members for an additional season of Division I competition, notwithstanding Defendants' determination that virtually every other Division I college-athlete may now compete throughout the five-year window of eligibility.

317. Absent Defendants' agreement to enforce the Transition Exclusion, NCAA member institutions would compete for the athletic services of the Transition Exclusion Class members by offering roster positions, renewed or extended grant-in-aid, institutional revenue-sharing payments, NIL opportunities, and related compensation.

318. The Transition Exclusion substantially restrains competition in the relevant labor markets and constitutes an unlawful group boycott in violation of Section 1 of the Sherman Act.

319. The members of the Transition Exclusion Class have suffered and will continue to suffer irreparable injury as a direct result of Defendants' concerted refusal to permit them to compete during an additional season of Division I athletics. Once a season of eligibility expires, it cannot be restored.

320. Pursuant to Section 16 of the Clayton Act, Plaintiffs on behalf of the Transition Exclusion Class seek declaratory and permanent injunctive relief prohibiting Defendants from

enforcing the Transition Exclusion against the Transition Exclusion Class and declaring that those athletes are entitled to compete for a fifth season of competition. Absent injunctive relief the Transition Exclusion Class members are entitled to monetary damages to compensate them for the loss of their final year of eligibility and related economic opportunities.

## COUNT III: BREACH OF CONTRACT UNDER INDIANA LAW WITH RESPECT TO THE NCAA BYLAWS

**(On behalf of All Class Members Nationwide)**

321. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as if fully restated herein.

322. Plaintiffs are intended third-party beneficiaries of the membership agreement between the NCAA and its member institutions, which incorporates the NCAA's Bylaws as set forth in the NCAA Division I Manual (the "Manual"). Under Indiana law, contracts carry an implied covenant of good faith and fair dealing that prohibits a party from acting in a manner that destroys or injures the right of the other party to receive the benefit of the contract.

### B. Breach One: The NCAA Violated Its Own Express Textual Commitments to Fairness.

323. The NCAA's own Constitution—incorporated by reference into the membership agreement—contains express, operative commitments to fairness that are not aspirational preamble but binding obligations on the Association. Article 1-C of the Constitution states that all individuals associated with intercollegiate athletics programs "should adhere to such fundamental values as respect, fairness, civility, honesty, responsibility, academic integrity, [and] ethical conduct." Article 1-D further requires that intercollegiate athletics programs be conducted "in a manner designed to protect, support and enhance the physical and mental health and safety of student-athletes," and expressly mandates that "coaches and administrators exhibit fairness, openness and honesty in their relationship with student-athletes." The NCAA breached these

textual commitments. Plaintiffs spent four years competing against athletes who received an extra year of competition through COVID-era waivers. The NCAA then made the fifth season of competition permanent—one year after the expiration of carved out the class of 2022, a class bearing the full burden of those COVID-era waivers throughout their careers. That outcome is neither fair, nor open, nor honest. It is the precise antithesis of the fairness the NCAA's own governing document promises.

### D. Breach Two: The NCAA Refused in Bad Faith to Exercise Discretionary Waiver Authority Expressly Granted in the Bylaws.

324. The Manual does not merely permit the NCAA to remedy inequities like those faced by Plaintiffs: it expressly authorizes the Committee on Student-Athlete Reinstatement to do so. Bylaw 12.6.6 provides that a college athlete "may be granted an additional season of competition by the Committee on Student-Athlete Reinstatement" due to "other extenuating circumstances," and states explicitly that "[i]n cases in which a student-athlete does not meet the criteria of this waiver, the Committee on Student-Athlete Reinstatement shall have authority to review and grant a waiver based on additional documented extenuating circumstances." Bylaw 12.6.1.7.1.3 likewise reserves to the Committee the right to review requests for "circumstances of extraordinary or extreme hardship." These provisions vest the Committee with broad, affirmative discretionary authority—which is grounded in the contract itself. The covenant of good faith and fair dealing requires that such discretion be exercised honestly and consistently. Instead, the NCAA exercised that discretion in an arbitrary and bad-faith manner: it granted substantive relief to former professional players—men who played 36, 54, and even 84 paid professional games—while denying identical relief to all athletes who played minimal minutes as freshmen and/or exceeded the number of games allowed for a medical redshirt. The refusal to exercise available waiver authority to remedy a documented, class-wide inequity, while simultaneously exercising that same

authority generously in favor of former professionals, is not a good-faith application of the Bylaws. It is a selective and pretextual denial of the very discretion the contract grants.

### E. Breach Three: The NCAA Applied Its Own Bylaw Framework Inconsistently, Denying Plaintiffs the Benefit They Were Owed.

325. The Manual establishes a specific, proportional framework for handling pre-enrollment competition. Under Bylaw 12.6.3.2.1, a college athlete who participates in organized competition before enrolling in college is charged with seasons of competition on a proportional basis—calculated as the number of contests participated in as a percentage of the maximum permissible contests in the sport. That framework reflects a deliberate policy judgment: the degree to which pre-enrollment competition counts should be proportional to its extent. Yet the NCAA abandoned that framework entirely when it came to former professional players. Players who competed in dozens—and in some cases over one hundred—paid professional games before enrolling were charged with zero seasons of competition. Meanwhile, the NCAA applied the most punishing possible interpretation to Plaintiffs: a single minute of play, in a single game, at an uncompensated level, consumed a full season of eligibility. This internal inconsistency—zero seasons charged for 84 professional games; one full season charged for six unpaid minutes—is not a principled application of the Manual's framework. It is a departure from the NCAA's own operative rules, applied selectively to deny Plaintiffs the competitive opportunity the contract promised them. The covenant of good faith and fair dealing prohibits exactly this: using the contract's machinery against the very beneficiaries it was designed to protect.

326. The NCAA has also allowed more than a dozen former professional basketball players to compete in NCAA Division I basketball without counting any of their professional seasons against the four seasons of competition limit, effectively granting them a waiver allowing a fifth season of competitive basketball at an NCAA school while denying Plaintiffs the same

opportunity. Incredibly, while the NCAA does not count a fifty-game season of professional basketball as a year of competition, it does count: (1) an uncompensated season at a junior college not governed by NCAA rules; and (2) an inconsequential number of minutes played as a freshman at an NCAA school, such as AK Okereke, a former Vanderbilt basketball player who started his career as a walk-on at Cornell University, where he played six minutes over the course of an entire season.

327. The NCAA is also in the process of a rule change which has the same effect as granting a waiver to every athlete from the high school graduating classes of 2023, 2024, and 2025 to allow each of them a fifth year of competition. Of athletes enrolled in college over the last four years, only the high school graduating class of 2022 is excluded.

328. The NCAA also breached the covenant of good faith and fair dealing by denying Plaintiffs the financial benefits to which their eligibility status entitles them under the Manual. Bylaw 16.13.1.1, adopted effective July 1, 2025, expressly ties the right to receive direct institutional payments and benefits to a college athlete's "period of eligibility to participate in intercollegiate athletics (see Bylaw 12.6)." Under the House v. NCAA settlement, Division I schools are now authorized to make direct cash payments to their college athletes. By arbitrarily truncating Plaintiffs' eligibility, the NCAA has not merely denied them playing time: it has denied them a concrete financial entitlement that the Manual itself conditions on active eligibility status. This is not a prospective rule change that Plaintiffs cannot challenge. It is the NCAA using the eligibility rules as a mechanism to deprive Plaintiffs of a benefit the contract already promises to those with remaining eligibility.

329. As intended third-party beneficiaries of the NCAA's Bylaws and Constitution, Plaintiffs have standing to pursue a claim for violation of the covenant of good faith and fair

dealing. The NCAA's own governing document—not merely general equitable principles—promised Plaintiffs fair treatment, authorized relief for their circumstances, and established a proportional framework for evaluating their eligibility. The NCAA breached each of those commitments.

## COUNT IV: BREACH OF CONTRACT UNDER TENNESSEE LAW WITH RESPECT TO THE NCAA BYLAWS

**(Langston Patterson, CJ Taylor, Quincy Skinner Jr., Jak Mwenentanda, Justine Pissott, and Amaree Abram on behalf of themselves and those similarly situated)**

330. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as if fully restated herein.

331. Plaintiffs are intended third-party beneficiaries of the membership agreement between the NCAA and its member institutions, which incorporates the NCAA's Bylaws as set forth in the NCAA Division I Manual (the "Manual"). Under Tennessee law, every contract carries an implied covenant of good faith and fair dealing that prohibits a party from acting in a manner that destroys or injures the right of the other party to receive the benefit of the contract. The NCAA has breached that covenant (and the Bylaws as a whole) through three independent, but related, courses of conduct rooted in specific provisions of the Manual itself, described in ¶¶ 323–329, *supra*.

## COUNT V: BREACH OF CONTRACT UNDER WISCONSIN LAW WITH RESPECT TO THE NCAA BYLAWS

**(Nick Levy, Nathanial Vakos, and Lance Mason on behalf of themselves and those similarly situated)**

332. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as if fully restated herein.

333. Plaintiffs are intended third-party beneficiaries of the membership agreement between the NCAA and its member institutions, which incorporates the NCAA's Bylaws as set forth in the

NCAA Division I Manual (the "Manual"). Under Wisconsin law, every contract carries an implied covenant of good faith and fair dealing that prohibits a party from acting in a manner that destroys or injures the right of the other party to receive the benefit of the contract. The NCAA has breached that covenant (and the Bylaws as a whole) through three independent, but related, courses of conduct rooted in specific provisions of the Manual itself, described in ¶¶ 323–329, *supra*.

## COUNT VI: BREACH OF CONTRACT UNDER NEBRASKA LAW WITH RESPECT TO THE NCAA BYLAWS

**(Kevin Gallic on behalf of himself and those similarly situated)**

334. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as if fully restated herein.

335. Plaintiffs are intended third-party beneficiaries of the membership agreement between the NCAA and its member institutions, which incorporates the NCAA's Bylaws as set forth in the NCAA Division I Manual (the "Manual"). Under Nebraska law, every contract carries an implied covenant of good faith and fair dealing that prohibits a party from acting in a manner that destroys or injures the right of the other party to receive the benefit of the contract. The NCAA has breached that covenant (and the Bylaws as a whole) through three independent, but related, courses of conduct rooted in specific provisions of the Manual itself, described in ¶¶ 323–329, *supra*.

## COUNT VII: BREACH OF CONTRACT UNDER CALIFORNIA LAW WITH RESPECT TO THE NCAA BYLAWS

**(Johnny Luetzow, Henry Stewart, Jakob Russell, and Elijah Joe Lopez on behalf of themselves and those similarly situated)**

336. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as if fully restated herein.

337. Plaintiffs are intended third-party beneficiaries of the membership agreement between the NCAA and its member institutions, which incorporates the NCAA's Bylaws as set forth in the

NCAA Division I Manual (the "Manual"). Under California law, every contract carries an implied covenant of good faith and fair dealing that prohibits a party from acting in a manner that destroys or injures the right of the other party to receive the benefit of the contract. The NCAA has breached that covenant (and the Bylaws as a whole) through three independent, but related, courses of conduct rooted in specific provisions of the Manual itself, described in ¶¶ 323–329, *supra*.

## **COUNT VIII: BREACH OF CONTRACT UNDER HAWAII LAW WITH RESPECT TO THE NCAA BYLAWS**

**(Brayden Schager on behalf of himself and those similarly situated)**

338. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as if fully restated herein.

339. Plaintiffs are intended third-party beneficiaries of the membership agreement between the NCAA and its member institutions, which incorporates the NCAA's Bylaws as set forth in the NCAA Division I Manual (the "Manual"). Under Hawaii law, every contract carries an implied covenant of good faith and fair dealing that prohibits a party from acting in a manner that destroys or injures the right of the other party to receive the benefit of the contract. The NCAA has breached that covenant (and the Bylaws as a whole) through three independent, but related, courses of conduct rooted in specific provisions of the Manual itself, described in ¶¶ 323–329, *supra*.

## **COUNT IX: BREACH OF CONTRACT UNDER UTAH LAW WITH RESPECT TO THE NCAA BYLAWS**

**(Lawson Lovering on behalf of himself and those similarly situated)**

340. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as if fully restated herein.

341. Plaintiffs are intended third-party beneficiaries of the membership agreement between the NCAA and its member institutions, which incorporates the NCAA's Bylaws as set forth in the

NCAA Division I Manual (the "Manual"). Under Utah law, every contract carries an implied covenant of good faith and fair dealing that prohibits a party from acting in a manner that destroys or injures the right of the other party to receive the benefit of the contract. The NCAA has breached that covenant (and the Bylaws as a whole) through three independent, but related, courses of conduct rooted in specific provisions of the Manual itself, described in ¶¶ 323–329, *supra*.

**COUNT X: BREACH OF CONTRACT UNDER OKLAHOMA LAW WITH RESPECT TO THE NCAA BYLAWS**

**(Ellie Geoffroy and X Pineda on behalf of themselves and those similarly situated)**

342. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as if fully restated herein.

343. Plaintiffs are intended third-party beneficiaries of the membership agreement between the NCAA and its member institutions, which incorporates the NCAA's Bylaws as set forth in the NCAA Division I Manual (the "Manual"). Under Oklahoma law, every contract carries an implied covenant of good faith and fair dealing that prohibits a party from acting in a manner that destroys or injures the right of the other party to receive the benefit of the contract. The NCAA has breached that covenant (and the Bylaws as a whole) through three independent, but related, courses of conduct rooted in specific provisions of the Manual itself, described in ¶¶ 323–329, *supra*.

**COUNT XI: BREACH OF CONTRACT UNDER LOUISIANA LAW WITH RESPECT TO THE NCAA BYLAWS**

**(Reese Ragland on behalf of herself and those similarly situated)**

344. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as if fully restated herein.

345. Plaintiffs are intended third-party beneficiaries of the membership agreement between the NCAA and its member institutions, which incorporates the NCAA's Bylaws as set forth in the NCAA Division I Manual (the "Manual"). Under Louisiana law, every contract carries an implied covenant of good faith and fair dealing that prohibits a party from acting in a manner that destroys or injures the right of the other party to receive the benefit of the contract. The NCAA has breached that covenant (and the Bylaws as a whole) through three independent, but related, courses of conduct rooted in specific provisions of the Manual itself, described in ¶¶ 323–329, *supra*.

## **COUNT XII: BREACH OF CONTRACT UNDER TEXAS LAW WITH RESPECT TO THE NCAA BYLAWS**

**(Timo Legout and Jayden Pierre on behalf of themselves and those similarly situated)**

346. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as if fully restated herein.

347. Plaintiffs are intended third-party beneficiaries of the membership agreement between the NCAA and its member institutions, which incorporates the NCAA's Bylaws as set forth in the NCAA Division I Manual (the "Manual"). Under Texas law, every contract carries an implied covenant of good faith and fair dealing that prohibits a party from acting in a manner that destroys or injures the right of the other party to receive the benefit of the contract. The NCAA has breached that covenant (and the Bylaws as a whole) through three independent, but related, courses of conduct rooted in specific provisions of the Manual itself, described in ¶¶ 323–329, *supra*.

## **COUNT XIII: BREACH OF CONTRACT UNDER MISSOURI LAW WITH RESPECT TO THE NCAA BYLAWS**

**(BJ Harris Jr. on behalf of himself and those similarly situated)**

348. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as if fully restated herein.

349. Plaintiffs are intended third-party beneficiaries of the membership agreement between the NCAA and its member institutions, which incorporates the NCAA's Bylaws as set forth in the NCAA Division I Manual (the "Manual"). Under Missouri law, every contract carries an implied covenant of good faith and fair dealing that prohibits a party from acting in a manner that destroys or injures the right of the other party to receive the benefit of the contract. The NCAA has breached that covenant (and the Bylaws as a whole) through three independent, but related, courses of conduct rooted in specific provisions of the Manual itself, described in ¶¶ 323–329, *supra*.

**COUNT XIV: BREACH OF CONTRACT UNDER NEW YORK LAW WITH RESPECT TO THE NCAA BYLAWS**

**(Cayden Charles and Emily Pape on behalf of themselves and those similarly situated)**

350. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as if fully restated herein.

351. Plaintiffs are intended third-party beneficiaries of the membership agreement between the NCAA and its member institutions, which incorporates the NCAA's Bylaws as set forth in the NCAA Division I Manual (the "Manual"). Under New York law, every contract carries an implied covenant of good faith and fair dealing that prohibits a party from acting in a manner that destroys or injures the right of the other party to receive the benefit of the contract. The NCAA has breached that covenant (and the Bylaws as a whole) through three independent, but related, courses of conduct rooted in specific provisions of the Manual itself, described in ¶¶ 323–329, *supra*.

**COUNT XV: BREACH OF CONTRACT UNDER NORTH CAROLINA LAW WITH RESPECT TO THE NCAA BYLAWS**

**(Valentino Pinedo on behalf of himself and those similarly situated)**

352. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as if fully restated herein.

353. Plaintiffs are intended third-party beneficiaries of the membership agreement between the NCAA and its member institutions, which incorporates the NCAA's Bylaws as set forth in the NCAA Division I Manual (the "Manual"). Under North Carolina law, every contract carries an implied covenant of good faith and fair dealing that prohibits a party from acting in a manner that destroys or injures the right of the other party to receive the benefit of the contract. The NCAA has breached that covenant (and the Bylaws as a whole) through three independent, but related, courses of conduct rooted in specific provisions of the Manual itself, described in ¶¶ 323–329, *supra*.

## COUNT XVI: BREACH OF CONTRACT UNDER SOUTH CAROLINA LAW WITH RESPECT TO THE NCAA BYLAWS

**(Ian Schieffelin on behalf of himself and those similarly situated)**

354. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as if fully restated herein.

355. Plaintiffs are intended third-party beneficiaries of the membership agreement between the NCAA and its member institutions, which incorporates the NCAA's Bylaws as set forth in the NCAA Division I Manual (the "Manual"). Under South Carolina law, every contract carries an implied covenant of good faith and fair dealing that prohibits a party from acting in a manner that destroys or injures the right of the other party to receive the benefit of the contract. The NCAA has breached that covenant (and the Bylaws as a whole) through three independent, but related, courses of conduct rooted in specific provisions of the Manual itself, described in ¶¶ 323–329, *supra*.

## PRAYER FOR RELIEF

WHEREFORE, named Plaintiffs, individually and on behalf the Classes, respectfully request that the Court enter judgment in their favor and grant them relief as follows:

1. Order a trial by jury on all claims and issues so triable;

2. Certify the proposed Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives, and appoint undersigned counsel as Class Counsel;

3. Declare that Defendants' adoption, maintenance, and enforcement of the Former Eligibility Rules, and Defendants' continued enforcement of the Transition Exclusion, constitute unreasonable restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and grant such declaratory relief as is appropriate with respect to Plaintiffs' state-law claims;

4. Permanently enjoin Defendants, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, from continuing to enforce the Former Eligibility Rules Transition Exclusion against Plaintiffs and members of the Transition Exclusion Class, and grant such additional declaratory and injunctive relief as the Court deems just and proper;

5. Award the members of the Lost Opportunities Damages Class all damages recoverable under the Sherman Act according to proof at trial, and award any additional damages recoverable under the Sherman Act to Plaintiffs or members of the Transition Exclusion Class to the extent Defendants' continued enforcement of the Transition Exclusion causes the loss of an otherwise available season of Division I competition during the pendency of this action.

6. Treble all antitrust damages as provided by Section 4 of the Clayton Act, 15 U.S.C. § 15(a);

7. Award Plaintiffs all damages, declaratory relief, equitable relief, and all other relief available under the applicable state-law claims asserted herein, including relief for breach of contract, breach of the implied covenant of good faith and fair dealing, and any other state-law claims pleaded in this Complaint, according to proof at trial;

8. Award Plaintiffs their costs of suit, reasonable attorneys' fees, and all other recoverable litigation expenses as authorized by law;

9. Award pre-judgment and post-judgment interest where permitted by law; and

10. Award such other and further relief as the Court deems just and proper.

DATED: July 15, 2026

*/s/ Ryan Downton*
Ryan Downton (*Admitted to M.D. Tenn.*)
Texas Bar No. 24036500
**THE TEXAS TRIAL GROUP**
875 Carr 693, Ste. 103
Dorado, PR 00646*
(512) 680-7947
Ryan@TheTexasTrialGroup.com
*Ryan Downton is licensed in Texas, not Puerto Rico

*/s/ Salvador M. Hernandez*
Salvador M. Hernandez (# 020121)
Milton S. McGee III (# 024150)
**RILEY & JACOBSON, PLC**
1906 West End Ave.
Nashville, TN 37205
P: (615) 320-3700
F: (615) 320-3737
shernandez@rjfirm.com
tmcgee@rjfirm.com

Respectfully submitted,

*/s/ Christopher P. Wilson*
JoAnna B. Adkisson (#041016)
Christopher P. Wilson (*pro hac vice*)
Erik T. Koons (*pro hac vice*)
Bridget Moore (*pro hac vice*)
Michael A. Munoz (*pro hac vice*)
Alexander Kraszewski (*proc hac vice*)
**BAKER BOTTS L.L.P.**
700 K Street NW
Washington, DC 20001
(202) 639-7700
joanna.adkisson@bakerbotts.com
christopher.wilson@bakerbotts.com
erik.koons@bakerbotts.com
bridget.moore@bakerbotts.com
michael.munoz@bakerbotts.com
alexander.kraszewski@bakerbotts.com

*Counsel for Plaintiffs and the Proposed Classes*

**CERTIFICATION OF SERVICE**

I hereby certify that I caused to be served a true and correct copy of the foregoing upon the following persons via the ECF system on the 15th day of July 2026:

Taylor J. Askew
**Holland & Knight**
511 Union Street, Suite 2700
Nashville, TN 37219
Tel: (615) 850-8113
Fax: (615) 244-6804
taylor.askew@hklaw.com

Rakesh Kilaru
Max Warren
**Wilkinson Stekloff LLP**
2001 M Street NW
10th Floor
Washington, DC 20036
Tel: (202) 847-4046
Fax: (202) 847-4005
rkilaru@wilkinsonstekloff.com

*JoAnna B. Adkisson*
JoAnna B. Adkisson